**IN THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF ILLINOIS
URBANA DIVISION**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA and the STATE OF ILLINOIS, *ex rel.* VANESSA ABSHER and LYNDA MITCHELL, | ) ) ) ) | Judge Harold A. Baker Case No. 2 04 C 2289 |
| Plaintiffs/Relators, | ) ) | |
| v. | ) ) | |
| MOMENCE MEADOWS NURSING CENTER, INC., and JACOB GRAFF, individually, | ) ) ) ) | |
| Defendants. | ) | |

**PLAINTIFFS/RELATORS' MEMORANDUM IN OPPOSITION TO DEFENDANTS
COMBINED MOTION AND MEMORANDUM FOR SUMMARY JUDGMENT**

Defendants' Motion for Summary Judgment should be denied insofar as disputed issues of material facts exist and require trial on each claim for which defendants seek judgment.

Defendants contend that they are not liable for submitting false claims for payment for providing worthless or substandard services to the residents of Momence Meadows Nursing Center ("Momence"); the failure of government inspectors to discover fraudulent payments, exonerates them from False Claims Act ("FCA") liability; they have not expressly or impliedly submitted false claims; that a "public disclosure bar" exists; Relators have failed to state a claim for retaliation and finally, that Defendant Graff has no exposure or individual liability for the sub-standard care to the residents or resulting from the false claims submitted to the government. As set forth below, defendants' motion should be denied in full insofar as substandard care and monthly claims for payment give rise to liability under the FCA; administrative surveys do not

bar FCA litigation, no public disclosure bar exists and triable issues are presented on retaliation.

Momence is a long-term care ("LTC")[1] facility. As a condition of receiving government funds, and pursuant to their Provider Agreements and certifications, Defendants were mandated required under Federal and State law to prevent harm to the residents. Absent compliance with mandated harm prevention outcomes for its residents, defendants' claims for payment were ineligible for coverage. Further, defendants' substandard care and failure to deliver the outcomes mandated and paid for by the government warrants summary judgment in favor of Plaintiffs on the FCA claims. *See,* Fed. R. Civ. Pro. 56(f).

Plaintiffs/Relators Vanessa Absher's and Lynda Mitchell's ("Relators") Complaint is brought on behalf of the government. Relators allege that defendants failed to deliver required LTC services, thus depriving the government of the benefit of its bargain, and the residents of required services essential to their well-being *and* required by law. Instead of failing to *prevent harm* to Momence residents, Defendants bred a profligacy of pressure sores, infection, scabies, injuries and death, all in violation of the FCA.

As set forth below, the substandard care/worthless services at Momence included uncontrolled incidents of scabies and patient left in bed to lie in their own bodily waste, or to rot from infected necrotic bedsores, eventually leading to sepsis and death. (Ex. 24, Ex. 27) re: MG (non-communicative resident with Down's Syndrome and early-onset Alzheimers). And as the above occurred, Momence's owner, Defendant Graff, would call daily from his Beverly Hills

---

1. Under Medicare, a "skilled nursing facility" ("SNF") is reimbursed for skilled nursing and rehabilitative services ordered by a physician. 42 C.F.R. § 409.31(a). Care not meeting the SNF coverage requirements are referred to as "custodial care." 42 C.F.R. § 411.15(g). Since Medicaid pays for custodial care, it uses the general term "nursing facility" ("NF"). *See,* 42 C.F.R. § 483.1(b). To make general references to both, the regulations use the term "long-term care facility" ("LTC facility").

home or office to yell at the staff to fill beds for billing. (Ex. 8, Deddo Dep. 70:12-21, 129:25, 130:1-5; Ex. 1, Absher Dep. 136:11-138:22, inclusive.).

In about 2000 and 2001, the incidence of pressure sores at Momence was so high that Medicare and Medicaid prospectively denied payment for new residents from 2001 through 2003 there were significant outbreaks of communicable disease, namely scabies; and infection control protocols generally were not followed, putting all residents at constant risk. In addition, there were individualized incidents such as injury from scalding, near-strangulation in bed rails and death from asphyxiation on feces from an improperly maintained colostomy bag. Egregiously, as these events unfolded, defendants concealed the failed outcomes from government inspectors.[2]

## FACTS[3]

Momence operated a 140-bed LTC facility in Momence, Illinois whose services were certified as eligible for coverage by Medicare and Medicaid. As part of becoming such a certified facility, Momence submitted an application form wherein it certified that it would comply with all statutes, regulations and rules governing the operation of that type of facility. (Ex. Pls. 6th Am. Compl., Doc. # 145-2 Ex. B.). After passing inspection, Momence executed a Provider Agreement in which it certified compliance. (Ex. 28). During the relevant period from

---

2. Defendants ordered mass destruction of documents after they were served with a subpoena from the Department of Health and Human Services ("HHS") that was prompted by this case, which remained under seal. The shredding also occurred after defense counsel met with Momence employees about the HHS investigation. Regardless of testimony that in a normal course of business pt records are only kept for seven years, Momence employees destroyed documents after being notified by counsel of a federal investigation and responding to a document subpoena, which in fact was driven by this law suit which remained under seal. Exhibit 17, Schell Dep, 34:18-24, 35 21-25, 36:18-25, 37:14-22, 38:1-20 Exhibit 12, Henschel Dep. 67:3-73:8 *inclusive* 101:251110:14.

3       There are hundreds of pages of greater-detailed additional material facts which are presented, in their entirety, attached hereto as the Appendix, and incorporated by reference as though fully set forth. The body of this memorandum contains a summary of the relevant undisputed material facts, along with relevant citations. Cites to the Appendix are either designated "ASMF," or by the exhibit number.

late 1998 through June 2006, Momence was also enrolled in the prospective payment system, ("PPS") in which it again and on a periodic systematic basis submitted false statements that it would comply with Medicare and Medicaid regulations and law.  As part of it "PPS" submissions,  These were false claims. In this case, regulations expressly mandated that Momence "must . . .prevent" certain harms to its residents.  These "never" events  included the development of pressure sores, worsening and infection of pressure sores, spread of infectious and communicable diseases, and accidents.  Momence failed, yet accepted and retained the funds it received from the government.  Set forth below is a small sampling of evidence submitted in Plaintiffs' Statement of Additional Material Facts ("PSAMS") corroborating defendants' failures of standard of care and the concomitant submission of false claims.

### a.  Pressure Sores

As a condition of payment, Momence was required to ensure that a new resident did not develop pressure sores unless proven to be clinically unavoidable.  Afflicted residents are require to receive all necessary treatment and services to promote healing, prevent infections an prevent new sores from developing. 42 C.F.R. § 483.25(c).  The regulations require Momence to go beyond what seemed reasonable and furnish **whatever was necessary** to achieve mandated outcomes. *Clermont Nursing and Convalescent Center v. Leavitt,* 142 Fed.Appx. 900, 904 (6th Cir. 2005) (affirming liability under Civil Monetary Penalty Law which parallels FCA).  Momence has failed to assert any facts that it fulfilled the regulatory mandates or that pressure sores were clinically unavoidable.  Relators' evidence of substandard care/worthless service in violation of the FCA includes:

De**cubitus** Ulcer Reports.  As examples, attached are reports dated 1/3/2002, 3/15/2002 and 5/8/2002.  (Ex. 46 MM222563-64, MM222547- 49, MM222529-31)

- Summary of **decubitus**:  Summary dated 1/3/02-1/24/02 illustrates that Momence was treating between 7 and 15 in house acquired **decubitus** ulcers.  (Ex. 47 MM222555)

- Medical records of MG:  the hospital records for MG identify deceits ulcers to both her hips, coccyx and glutei area and describe at least 3 of the ulcers are stage 3 out of 4.  The medical records go onto state that "The patient is very well-known to me from multiple previous admissions.  Her wounds are tending to follow a rather predictable process in that they routinely improve while she is here at RMC.  She usually returns to the hospital about 2 weeks at the NH and her wounds are routinely worse when she is readmitted to RMC."  (Ex. 27 RMC-000050-51, RMC-000578.)

  A March 30, 2001 survey indicated that Momence was found to have violated this regulation because "14 residents had developed at least 31 pressure ulcers since the last survey, February 28, 2001.  (Ex. 33)

- Robin Archer was employed at Momence between October 2002 and February 2004 as a Licensed Practical Nurse (LPN).  When she made her rounds at Momence she observed many bedsores and ulcers on the residents throughout Momence, but especially on the Medicare wing (A-wing).  Ms. Archer believed the large number of pressure sores was due to the fact that there was not enough staff at Momence, and many of the staff didn't care.  The CNAs would not clean and change the residents' undergarments, and they would not turn the residents as required (Pls. 6th Am. Compl. Doc.  # 145-7, Ex. D. Decl. of Robin Archer, ¶ 2,16,17).)

- Resident of Momence, AD, developed pressure sores on several areas of her body, including her coccyx, while in Momence care.  In approximately 2000, AD developed a pressure sore on her coccyx that became as wide and as deep as a large, hollowed-out cantaloupe.  AD was then transferred to Riverside Hospital and then to a wound care center in Hinsdale, IL.  After several months the wound care center was able to get the sore under control.  AD was transferred back to Momence and the sore flared up after a month or two.  She was again transferred to Hinsdale, Il wound care center for treatment.  (Ex.38 , Decl. of Brenda Bubo, ¶ 6, 11, 12)

- According to Nancy Zellmer, who was a registered nurse employed at Momence between November 2001 and July 2003, most of the pressure sores at Momence were acquired while residing at Momence and arose because the residents were not turned as often as they should have been and the staff failed to change the residents' Depends often enough Pls. 6th Am. Compl. Doc. # 145-7, Ex. D. Decl. of Nancy Zellmer, ¶ 2, 16).).

- According to Lydia Isaacs, who was employed at Momence as a nurse from June through September 2002, and then as Assistant Director of Nursing until her departure in March 2003, there was a high number of pressure sores because the facility was understaffed

and thus residents could not be turned every two hours as set forth in Momence's policy or protocol for pressure sore prevention. (Ex. 13, Isaacs Dep. 62:10-24, 63:1-8).

## b. Infection Control

### i. Generally

Nursing facilities are required by federal law to "establish and maintain an infection control program designed to provide a safe, sanitary, and comfortable environment in which residents reside and to help prevent the development and transmission of disease and infection." 42 U.S.C. § 1396r(d)(3). This statutory requirement is repeated and expanded upon in the regulations which detail steps that *must* be taken in order to *help prevent* the spread of disease and infection. 42 C.F.R. § 483.65.[4] In addition to Momence's failure to help prevent the spread and outbreak of scabies, Momence failed to properly perform infection control functions, thereby putting residents at constant risk of infection, as evidenced by the following examples.

Momence employees, including Judy DeMeullenarer (hereinafter referred to as "Judy D.") (Ex. 9, DeMeullenarer Dep. 3-4) failed to use proper protocols and precautions when treating patients' wounds. Judy D was a "wound nurse" for part of the time she worked at Momence. (*Id.* at 36-37). As a wound nurse, Judy D.'s responsibilities included "assessing the

---

4. That provision provides (emphasis added):
   The facility must establish and maintain an infection control program designed to provide a safe, sanitary, and comfortable environment and to help prevent the development and transmission of disease and infection.
   (a) Infection control program. The facility must establish an infection control program under which it –
       (1) Investigates, controls and **prevents infections** in the facility;
       (2) Decides what procedures, such as isolation, should be applied to an individual resident; and
       (3) Maintains a record of incidents and corrective actions related to infections.
   (b) **Preventing spread** of infection.
       (1) When the infection control program determines that a resident needs isolation to prevent the spread of infection, the facility **must isolate** the resident.
       (2) The facility **must prohibit employees with a communicable disease or infected skin lesions from direct contact with residents** or their food, if direct contact will transmit the disease.
       (3) The facility must require staff to wash their hands after each direct resident contact for which handwashing is indicated by accepted professional practice.
   (c) Linens. Personnel must handle, store, process, and transport linens so as to prevent the spread of infection.

wound, starting the treatment, starting the prevention, monitoring their labs, making sure they had correct medication to enhance healing, educating the families, educating the nurses, CNAs. Monitoring the prevention being done. Calling families, calling doctors." (*Id.* at 37). Yet with all these responsibilities she often failed to use gloves while treating patients. According to Carol Burt-Lafi, a certified nursing assistant (CNA) at Momence, Judy D. performed a lot of treatments without gloves. (Ex. 6 Burt-Lafi Dep. 27.) In her deposition, Ms. Burt-Lafi stated as follows:

> Q. Do you know whether other CNAs or nurses at the facility performed procedures or -- without gloves that otherwise they would've worn gloves for?
> MR. SILBERMAN: Objection. Compound nature. Objection. Calls for speculation. Objection. Foundation.
> Q. You can answer.
> A. I remember Judy D. doing a lot of treatments without gloves.
> Q. Just during the time -- that short time when they didn't have gloves or --
> A. No, this was --
> Q. -- at -- at all times?
> A. -- all the time.

(*Id* at 26:23-27:11).Ms. Burt-Lafi also indicated that housekeeping would bag residents' clothing because of an "outbreak." (*Id*. at 76.) She also noted that the "housekeeper supervisor" would bag up the affected clothing without wearing a protective gown. (*Id*. at 78).

- According to her medical records, resident MG was affected by multiple stage III and stage IV pressure ulcers and the ulcer in the coccyx area was "affected by what appears to be a fungal infection." (Ex. 27, RMC-000083).

- The conditions at Momence were often unsanitary. According to the declaration of James Wasser, he saw the walls and hallway streaked in urine and feces (Pls. 6th Am. Compl.

Doc. # 145-2, Ex. D. Decl. of James Wasser, ¶ 7).The infection control protocols apparently were not properly formulated and/or implemented because in addition to rampant scabies among the residence, the employees were also infected with scabies. According to Jess-Yanni Barrett (f/k/a Vesta Fulton), a CNA-shower girl- (Ex. 4, Barret (Fulton) Dep. 12:25) at Momence, she was given cream to apply to herself for scabies on two occasions. (*Id*. at 92). Ms. Barrett also testified that "Gwen" her other "shower partner" was also given the cream. (*Id.* at 93). Apparently, the Momence nur*se*s handed out the medication to Gwen and Ms. Barrett. (*Id*. at 93-94).

- An investigation report prepared *by* the Department of Health and Human Services Centers for Medicare & Medicaid Services confirmed in *a*n interview with an employee (designated as E4) that Momence "had not done any tracking of the development of these rashes, had not monitored the spread of the rashes and had not investigated why the residents are developing these skin rashes. E4 did state that the residents who had received Elimite treatment had the protocol for scabies followed." The report also noted interviews with employees designated as E10 and E11 on 3/7/03. According to the employees, in contravention of the Momence protocol, "no clothes were washed for residents per scabies protocol and no room cleaning was done per scabies protocol for any of the identified residents with rashes." (Ex. 33).

### ii. Scabies

The evidence presented with this motion comprises only some of the extensive evidence concerning scabies at Momence. The presented evidence shows that in 2001 there was a modest outbreak involving at least 6 residents. In 2002, however, at least 8 residents were diagnosed with scabies, and another 49 had symptoms and were treated despite lack of a diagnosis of

scabies. (Ex. 34). The fact everyone who was treated showed symptoms belies any testimony by the Medical Director or others concerning prophylactic treatment of residents. The foregoing is also consistent with Bednarowicz' testimony that she would just get doctor approval to treat based on her assessment. (Ex. 5, Bednarowicz Dep. 186:9-187:2). Dozens more residents showed symptoms but were not treated. But relators only show a few of the worst examples.

Importantly, and contrary to the Administrator's assertion, when resident MG was admitted in January 2002 she did not have scabies, but the facility still had a problem with it. (*Id*. at 177:24-25, 178:1-18). Hence, a jury could conclude that MG was exposed to scabies, which developed into Norwegian Scabies, all while at Momence.

Evidence obtained from the 200 boxes of medical records indicate that the outbreak waned during the winter of 2002-03, but by March 2003 it had blossomed again leading to an investigation by IDPH of a scabies outbreak. (Ex. 33). The investigation includes an admission by a top-level employee at Momence that they failed to track the situation or to figure out what was causing the problem. (*Id*.). The investigation also verifies that the top-level employee's assurance to the inspector that appropriate protocols were being followed was utterly false, as shown by the inspector's observation of employee practices. (*Id*.). Persons with typical scabies generally have fewer than 50 live mites on their skin at any given time. Therefore, typical scabies is difficult to transmit from patient to healthcare worker unless there is *prolonged (emp. added)* unprotected skin-to-skin contact between the infested patient and the non-infested healthcare worker. *Management of Scabies Outbreak, California Department of Public Health, 2008.* Those employee practices, such as not wearing protective gear when handling infected linens, explains why so many employees also had scabies (Ex. 6, Burt-Lafi Dep. 26:2-28:9; Ex.

4, Fulton (Barrett) Dep. 92:9-93:17; Ex. 12, Henschel Dep. 34:17-35:2; Ex. 58), and suggest a clear route of transmission throughout the facility as the employees assisted other residents, and an indifference to the risk of harm and infestation to the residents.

Also of significance is that at least one resident, MG, developed a more serious form known as Norwegian Crusted Scabies in which, rather than just a dozen mites on the body, there can be hundreds to millions of living mites under the skin which greatly increases the risk of spreading the disease. (Ex. 55) In fact, when this resident was sent to a local hospital without informing them of her condition, her presence caused an outbreak of scabies at the hospital. (Ex. 27, RMC-001442-44). MG was initially diagnosed and treated for scabies at Riverside hospital. (Ex. 27, RMC 001312) She eventually returned to Momence, her records reflecting the infestation was gone. (Ex. 27, RMC 001162-001164) A few months later, she was readmitted to the hospital and was found again to be infested with scabies, the source of the re-infestation was according to her records, Momence. (*Id*. at RMC-000578). A jury could easily find that Momence continued in its failure to deliver the mandated outcome of preventing the spread of infectious and communicable diseases.

Various other anomalies were described by the pharmacist, who testified that he had never seen a facility need so much scabicide, and that a facility is generally not permitted to have "house stock" of a drug such as scabicide that requires a personalized prescription. (Ex. 14, Jaffe Dep. 71:15-18, 74:17-25, 79:4-5, 101:16-102:2, 103:14-25, 129:6-21). He also testified that the facility insisted on paying for the medication itself, rather than allowing him to bill Medicaid directly as he normally did. (*Id.* at 79:21-24). He concluded, "in that situation, the home is trying "I assume, hide … that they had a scabies outbreak and took it upon themselves to pay for it."

10

(*Id.* at 80:4-13).   As it turned out, the prescriptions he received were all in the names of employees. (Ex. 58).  This explains the testimony that, indeed, Momence created a "house stock" of scabicide. (Ex. 10, Glenn (Cavender) Dep. 262:25-263:20; Ex. 19, Willey Dep. 140:3-141:-2). It may also explain why, just when Momence needed more staff to deal with the problem, it made significant staff cuts in order to achieve a predetermined dollar amount in savings. (Ex. 8, Deddo Dep. 132:5-11, 14-25, and Ex. 36)

### c.  Accidents

The LTC regulations state: The "facility must ensure that – (1) The resident environment remains as free of accident hazards as possible; and (2) Each resident receives adequate supervision and assistance devices to prevent accidents."42 C.F.R. § 483.25(h).  This provision has been broadly interpreted as even requiring prevention of assaults from other residents and elopement, and the harm need not occur to find facility permitted an unacceptable **risk of harm.** *Clermont Nursing and Convalescent Center v. Leavitt,* 142 Fed.Appx. 900, 904 (6th Cir. 2005) (affirming judgment under Civil Monetary Penalties Law).  A few of the myriad of examples at Momence Meadows of accidents includes:

- **Choking to Death on Feces.**  Resident AB choked to death on feces.  This event was used as a pretext for Momence to terminate Relators and then file false and malicious charges against them with the Illinois Department of Financial and Professional Regulation that licenses nurses.  Those charges indeed found to be meritless.   Specifically, Upon arriving to work the 7:00 am shift at Momence, Ms. Mitchell was alerted by a CNA and a housekeeper that AB was choking.  (Ex. 2, Mitchell depo p. 121).  Ms. Mitchell and Ms. Absher arrived in AB's room to find him choking on his dried feces because his G tube came out during the

11

night. (*Id.* at 123-26).    It was apparent that AB had not been checked on by the night nurse and had been neglected throughout the night because the feces had dried on his face.  (*Id.*).  Ms Mitchell was unable to save AB and he died.  *Id.* at 128-29.  Ultimately, Ms. Mitchell and Ms. Absher were not found responsible for the death of AB.

- **Bedrail Near-Strangulation**:  D.O. was a mentally disabled young female resident at Momence who was confined to her bed.  On one occasion, Lynda Mitchell testified that she discovered D.O. with her head stuck between the bed rails and was basically suffocating to death.  Mitchell immediately moved to hold the bed rail up but needed immediate assistance.  Mitchell testified that "she screamed out a window for CNA's to help and was told *that's not their floor.*"  (Ex. 2, Mitchell Dep. at 34) (emphasis added).  Other CNA' s were in the Courtyard at the time smoking pot and apparently did not want to be bothered.  (*Id.*).  Mitchell further testified that the bar of the bed was over the little girl's throat and that it was an old bed.  (*Id.* at 34-35).  **Most significantly however is the subsequent cover-up of this incident.**  Mitchell went on to testify that she was instructed by Sue Cavender to not tell the father about the incident for a fear of a lawsuit.  She was also told to only report the bare minimum of symptoms to the Doctor and not the incident details.  Finally, Mitchell was instructed by Cavender on exactly what would be acceptable to chart regarding the incident and Mitchell's detailed account of the choking incident was removed from the chart by Cavender and replaced with a Cavender white-washed version.  (Id at 35-39). In fact, Mitchell was told by Cavender that if she did not follow her instructions on charting, she would be fired. (Id at 37).  The D.O. incident never was reported to the public health authorities.  (Id at 39).

**Whirlpool Burn:**  An Illinois Department of Public Health Survey dated 07/16/2003 revealed an incident on 06/30/2003 in which a Resident (R1) sustained 1st degree burns after being left in scalding hot water in a whirlpool.  The investigation revealed that: "The resident just removed from the Whirlpool, her eyes rolling up, lethargic, skin redden, vital signs: temperature 105.2F., Respiration 28." (Ex. 59). This Resident was sent to the hospital where a Dr. commented that "when R1 arrived at the hospital her skin looked like she had horrible sun burn, had some scald spots on the skin and her skin was red." *Id*.

A follow-up to this incident revealed that a hot water mixing valve malfunctioned, that staff had failed to properly monitor the temperature of the water, and that the Whirlpool Tub did not have a required safety device to alert the staff if the water in the tub is too hot.   If Momence had implemented only one of these three practices this incident would have been avoided.  The failure of not one, but three critical safety practices, is a *reckless* failure to do what was necessary to prevent harm.

**Pattern of Falls:**  Momence  had a pattern of Resident falls and at least one deposition witness in the case has indicated that the Fall rate at Momence was very high and that Staff in fact tried to cover up the high number of falls.  (Ex. 1, Absher Dep.  239:21-24, 240:17,241:5) A synopsis of three falls at Momence within only a one week period reveal are illustrative:

- 03/13/2000 Fall:  This was a fall of a Resident in either the bathroom or next to her bed.  X-rays of Resident's lumbar revealed "mild compression of uncertain age". (Ex. 61, MM223411).

- 03/14/2000 Fall:  This Resident, AS, was found on the floor by a CNA.  It is not apparent from the report how the time of the fall (listed as 8:30 A.M.) was determined or how long the Resident may have been lying on the floor prior to the CNA finding her. (*Id.* at MM223412).

- 03/17/2000 Fall: This Resident, GW, fell to the floor causing a very serious lac*era*tion to the left side of her forehead requiring 13 sutures. The internal investigation blamed the resident for trying to help her roommate pick up a "call light." (*Id*. at MM223415).

This pattern of accident and falls, taken in its entirety, demonstrates that Momence utterly and completely failed to uphold the standard of care required of it. This pattern of accidents and death, taken in its entirety, demonstrates that Momence utterly and completely failed to do what was necessary to prevent harm.

### d. Administration

Importantly, Momence failed to provide the legally required leadership through effective policies, management and independent medical oversight. As part of those administrative requirements, it also failed to provide adequate and competent staffing, and failed to keep accurate and complete care records.

<u>Medical Records</u>. There is abundant evidence of falsification of medical records and incomplete records in violation of the LTC mandate to maintain complete, accurate, accessible and organized clinical records as required by. 42 C.F.R. § 483.75(l). These records are, as Defendants concede, required to be made available to the government to prove compliance with the care mandates. Hence, these records were made, in part, to support Momence's claims for payment. Some examples include the following (underline added):

- It is clear that the Director of Nursing ("DON") Sue Cavender asked Lydia Isaacs (staff nurse/Assistant Director of Nursing ("ADON"), at Momence June 2002-March 2003) to forge other nurses' initial in the Medication Administration Records ("MAR"). (Docket # 135-11, Exh. D. Decl. of Lydia Isaacs, ¶ 16)). Compelling details emerged during her deposition (underline added):

      [Ms. Quimby]     Q. Were you ever asked -- strike that. Did
      anybody ever <u>ask you to forge</u> the medi -- medication
      administration <u>records</u>?                    0:46:00
      A. <u>Yes</u>.

14

Q.   Who asked you to do that?
A.   Sue <u>Cavender</u>.
Q.   And what did she ask you to do?
A.   She <u>asked me to</u> look in the old books, look
at the nurses' signature, find the nurse -- first of
all, look into who was working that shift and that day.
Go through and find their signature.  Their initials.
And <u>practice writing their initials the way they wrote
it.  And then put in that -- their -- their spaces</u>.        0:46:27
Q.   Do you know why she asked you to do that?
MR. SILBERMAN:  Objection, calls for
speculation.
A.   Yes.  She wanted it to appear as though the
nurse had signed the MAR.
MR. SILBERMAN:  Objection, move to strike.
Q.   Did she tell you that was the reason why --
MR. SILBERMAN:  Objection, calls --
Q.   -- she asked you –
MR. SILBERMAN:  -- for hearsay.
Q.   -- to complete the MARs?
A.   She told me she had to have them filled out.        0:46:47
Q.   Did -- did Sue Cavender ask you on more than
one occasion to forge the MARs?
A.   She did it monthly.
MR. SILBERMAN:  Objection, not responsive.
Objection, move to strike.
Q.   And did she ask you to do that every month
that you worked at Momence Meadows?                        0:47:14
A.   No.  Just for <u>the months I was ADON</u>.
Q.   Okay.  And what months were you ADON?
A.   From October through March.
Q.   Okay.  And just for the record, was that Octo
-- what years?
A.   <u>October 2002 to March 2003</u>.
Q.   Thank you.  And did you do -- did you in fact
forge any of the MARs?                                     0:47:45
A.   No.
Ex. 13 Isaacs Dep. at  50:4 – 51:19

- When Ms. Isaacs refused, Ms. Cavender said there was nothing wrong with forging initials on the MAR, that she had been doing it a long time, and that she could continue to do it.  Pls. 6th Am. Compl. Doc. # 145-7, Ex. D. Decl. of Lydia Isaacs, ¶ 16))

- Barbra Clark, a medical records clerk at Momence between approx 1991/92-1999, observed Kim Bacon (Administrator at Momence) and Paula Deddo (Assistant

Administrator at Momence) order Peggy Weybright, the Director of Nursing (DON) to have the nursing staff alter residents' medical records. The medical records were always re-written in preparation for state inspections. Ms. Clark observed nurses change entire sets of residents' chart notes in cases where a resident experienced health complications because the charts notes showed the resident had received either sub-standard care or nor care at all leading to the residents; new symptoms and/or complications. Pls. 6th Am. Compl. Doc. # 145-7, Ex. D. Decl. of Barb Clark, ¶ 2, 4, 14, 15)

- While Nancy Zillmer (a registered nurse at Momence between November 2001-July 2003) worked at Momence, Sue Cavendar (DON) asked her to change and/or re-copy residents' medical records. Specifically, Ms. Cavender told Ms. Zillmer that "We need to have this [record] recharted because someone charted something they shouldn't have." Pls. 6th Am. Compl. Doc. # 145-7, Ex. D. Decl, of Nancy Zillmer, ¶ 2, 18)

- While Robin Archer (a LPN at Momence between October 2002-February 2004) worked at Momence she noticed that at the end of the month there were many blank spaces in the Medication Administration Records ("MAR") and if there was a blank space in a MAR, It was assumed that the medication was not administered. At the end of each month Cavender or sometimes Judy DeMulenaere, the treatment nurse, would ask the nurses to fill in the blanks. Ms. Archer personally observed DeMuelenaere filling in a lot of blanks in the MARs. Pls. 6th Am. Compl. Doc. # 145-7, Ex. D. Decl. of Robin Archer, ¶ 2, 9)

- Testimony also exists regarding the destruction of documents. According to Henschel, who worked at Momence as a Social Services Assistant in approximately the summer of 2005, Mr. Hoffmann met with the staff of Momence to discuss a "federal" investigation. Ex. 12, Henschel Dep. 63:5-25, 64:1-25, 65:1-7.)Sometime after the meeting with Hoffmann, a shredding truck came to Momence and shredded boxes of documents that were taken from a storage garage containing deceased or discharge resident files, charts and billing records. (*Id*. at 63:5-73:8 *inclusive*) Further, Ms. Henschel recalls a discussion with a fellow employee of Momence, Kathy Schnell. In that conversation, Ms. Schnell told her that she was instructed to get rid of patient records and medical bills, and that she feared going to jail for destroying the documents. (*Id*. at 101:25-110:14 *inclusive*).

Governing Body. It is here, with respect to oversight, policies and administration that Defendant Graff, the majority owner who was the *de facto* Governing Body "legally responsible" for implementing effective policies and management. Since these facts are integral to the theories of liability against Defendant Graff, they are detailed *infra.*

Staffing: Directly relevant to the prevention of harm are the policies concerning staffing. They include the effective training and competency of nursing aides who must actually perform

many of the tasks relevant to harm prevention such as turning, assisting, feeding, toileting and other routine custodial care tasks. 42 C.F.R. § 483.75(e) & (f). They also mandate that the "facility must employ … those professionals *necessary* to carry out the provisions of these requirements. 42 C.F.R. § 483.75(e) (emphasis added). This means that the number and competency of the staff must be sufficient to deliver the mandated outcomes, and at least to deliver the baseline mandates for harm prevention, which takes into consideration the actual needs of each resident. In the industry this is known as the resident's "acuity level," and the aggregate needs of all the residents is referred to as the facility's "acuity mix."

Notwithstanding this requirement, the Assistant Administrator who oversaw staff scheduling admitted that Momence only ensured compliance with the State of Illinois regulation requiring a simple ratio for life safety purposes. (Ex. 8, Deddo Dep. 86:25-87:18, 157:1-158:14)Thus, while she admitted to occasionally adding one person to a wing, she admitted that Momence did not closely assess its acuity mix and schedule accordingly. (Ex. 8, Deddo Dep. 47:22-48:10).. Furthermore, there is material evidence of staffing and other cuts driven by financial considerations rather than the needs of the residents. (*Supra,* n. 4).

Medical Director: Also deserving special mention is the requirement for an independent Medical Director responsible for the "implementation of resident care policies and the coordination of medical care in the facility." 42 C.F.R. § 483.75(i). Thus, the Medical Director shares some of the policy implementation responsibilities that ultimately reside with the Governing Body. The Long Term Care Survey, which Momence witnesses repeatedly acknowledged as a familiar authority (Ex. 8, Deddo Dep. 81:10-82:4), clearly indicates, at F-TAG F501, that the scope of this provision includes "coordination of facility-wide medical care,"

"clinical guidance and oversight" and helping "identify, evaluate, and address/resolve medical and clinical concerns." It continues by stating the "medical director has an important leadership role" including input into the development, review, and approval of resident care policies. (Id.)

Dr. Patel was hired as the medical director at Momence in approximately 1991, and served throughout Graff's ownership of the facility for a $500/mo fee. (Ex. 16, Patel Dep. 30:11-15, 56:16-18).He had no experience in that position, took no courses relevant to the duties of a medical director, and did not do any research about the responsibilities of a medical director. Ex. 16. Patel Dep. 41:13-21).Between 1998 and 2006, Dr. Patel would fulfill his Medical Director duties only by attending monthly quality assurance meetings at Momence. (Id. at 41). Dr. Patel has never looked at 42 C.F.R. Chapter 483 regulating LTC facilities, did not know the regulations set forth duties for the medical director, and never saw the Long Term Care Survey book (used by the inspectors) describing the medical director role in more detail. (*Id*. at 45:9-12, 53:16-19, 80:25-82:1).

Between 1998 and 2006 Dr. Patel did not assist Momence in the development and implementation of written resident care policies and procedures, and never developed or participated in any in-service training programs. (*Id*. at  75:11-76:6,  243:20-244:4).Although surveys were discussed at the QA meetings, Dr. Patel did not recall seeing an actual survey or inspection report of the facility.  (Id. at 77: 6-17).  It is also noteworthy that Dr. Patel does not know what an OSCAR report is, which compares the facilities demographics and deficiencies with surrounding facilities on a local and national level as a measure of the quality of the care provided.  (Id at 78:11-14).  Momence did not provide them to Dr. Patel, even though he testified he would have liked to have seen them.  (*Id.* at 232:25-233:8).

He also never saw a written complaint by either a resident or resident's family although they were discussed at the QA meetings. (Id at 87:2-12). Dr. Patel also testified that he was never aware that Momence was threatened with denial of payment by Medicare and that Momence was cited for failure to take care of pressure sores appropriately. (*Id*. at 92:14-16, 125:10-126:23).Dr. Patel has never heard of a plan of correction used in the regulatory context wherein a plan is submitted to a regulatory agency to correct a deficiency. (*Id*. at 86:18-23). With regard to scabies outbreaks at Momence, Dr. Patel diagnosed and treated large number of patients for scabies. (*Id*. at 144:3-166:11; and Ex. 16, Patel Dep. 98:2-5)He never reported an outbreak of scabies at Momence to any State or federal authority and in fact Dr. Patel does not know if scabies is a reportable communicable disease or not. (Id at 112:12-113:13).

## LEGAL ARGUMENT

Defendants fail to negate the staggering body of evidence against them or any element of Relators' claims asserting that Defendants failed to prevent harm to residents. For these reasons, Defendants' motion must be dismissed.

In part, Defendants reargue their already rejected motion to dismiss. They also confuse their analysis of liability theories with various other affirmative defenses. Relators here first separately address each those affirmative defenses in order to keep the analysis of those issues, as well as the theories of liability, clean and straightforward. As to the theories of liability, Defendants' recast Plaintiffs' Sixth Amended Complaint ("SAC") as presenting claims against Momence for express and implied certification liability under the FCA. This approach, however, overlooks other grounds for liability encompassed by the SAC. For this reason too, Defendants' motion fails to meet its burden of production and must be denied. In order to address all

applicable theories of liability supported by the SAC, Plaintiffs herein systematically address liability under each of the Counts pled and in the process identify which theories were and were not addressed by Defendants.

## I.   LEGAL STANDARD FOR SUMMARY JUDGMENT MOTION BROUGHT BY DEFENDANTS

Federal Rule of Civil Procedure 56 instructs that "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute[5] as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a) (2010). "The burden of establishing the non-existence of a 'genuine issue' is on the party moving for summary judgment." *Celotex Corp. v. Catrett*, 477 U.S. 317, 330 (1986) (citations omitted) (Brennan, J., dissenting on other grounds). Defendants' motion must be denied if they fail to discharge their initial burden of production or, if they meet it, then if they fail to meet their ultimate burden of persuasion by either: negating an element of plaintiff's claim; or failing to address *all* the record evidence and demonstrating that plaintiff lacks support for its claim. *Id.* at 331-32 (Brennan, J. dissenting on other grounds).

Defendants here cannot meet their burdens, and thus their motion must be denied. Furthermore, the evidence is sufficient for the court to grant summary judgment *against* Defendants' on their liability to the government, as well as on Relators' ancillary claim for statutory attorneys' fees, expenses and costs up through this juncture of the proceedings, *Fed. R. Civ. P.* 56(f)(1). This would leave for trial only the amount of damages to the government and Plaintiffs' personal claims for retaliation and/or wrongful discharge.

---

1. In 2010 Rule 56's wording was changed from "genuine issue" to "genuine dispute."

## II. FCA LIABILITY

### A. FCA General Principles

Relators' two federal counts (and its two mirror state counts) are grounded in the FCA's[6] initial liability provisions, which impose liability on anyone who:

> (1) knowingly presents, or causes to be presented, to an officer or employee of the United States Government or a member of the Armed Forces of the United States a false or fraudulent claim for payment or approval[7]; [or]

> (2) knowingly makes, uses or causes to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the government.[8]

31 U.S.C. § 3729(a)(1)&(2) (as enacted prior to May 2009).[9] Actual damages are not required, since even the mere attempt to improperly obtain funds from the government is actionable. 31 U.S.C. § 3729(a).

The FCA defines "knowingly" to "mean that a person, with respect to information: (1) has actual knowledge of the information; (2) acts in deliberate ignorance of the truth or falsity of the information; or (3) acts in reckless disregard of the truth or falsity of the information, and no proof of specific intent to defraud is required." 31 U.S.C. § 3729(b). Hence, while Rule 9(b)'s

---

6. Because this matter was filed in 2004, Relators will refer to the statute as it existed then.

7. In 2009 Congress amended this subpart to read: "knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval." The deleted phrase "to an officer or employee of the United States Government or a member of the Armed Forces of the United States" has no bearing upon this case, since it was long ago settled that submitting documentation to Medicare and Medicaid agents is reachable by the FCA. *U.S. v. Ortho-McNeil Pharmaceutical, Inc.,* 2007 WL 2091185 (N.D. Ill. 2007).

8. In 2009 Congress renumbered this subpart as § 3729(a)(1)(B), and amended it to read "knowingly makes, uses or causes to be made or used, a false record or statement material to a false or fraudulent claim." At the time Congress expressly sought to overrule *Allison Engine Co, Inc, v. U.S. ex rel. Sanders,* 128 S.Ct. 2123 (2008), by making this particular amendment expressly retroactive to all cases pending on or after June 7, 2008 (two days prior to the *Allison Engine* decision. *Fraud Enforcement and Recovery Act of 2009 ("FERA")*. Enforcement of that retroactivity provision, however, has seen mixed results in the courts but is not pertinent here. *Allison Engine* involved records or statements by a subcontractor to a prime contractor, and the Supreme Court judicially imposed an element of intent to deceive the government, which Congress' overruled. Since the instant case does not involve records or statements by a subcontractor, but rather by the contractor itself that necessarily knew it was material to the government's obligation to pay and was being used "to get" the government to pay money, liability attaches here under any version and interpretation of this subpart.

9. Relators also filed claims under the Illinois Whistleblower Reward and Protection Act, 740 ILCS 175 *et seq.*, which mirror these provisions. These claims enable this action to reach the state portion of Medicaid funds.

particularity pleading requirements have been held to apply to FCA cases, it is not truly a 'fraud' statute, as Congress intended to codify the principle that "men must turn square corners when they deal with the government." *U.S. ex rel. Compton v. Midwest Specialties, Inc.,* 142 F.3d 296, 302 (6th Cir. 1998) (quotations and citations omitted). Thus, this Court should ignore as inapposite all of Defendants' assertions that Relators cannot prove "fraud" and/or cannot show that either of the Defendants, and especially majority owner Graff, did not have actual knowledge that Momence failed to deliver the required outcomes or did not have actual knowledge about how they obtained government funds.

The term "claim" is statutorily defined to include "any request or demand, whether under a contract or otherwise, for money or property which is made to a contractor, grantee, or other recipient if the United States Government provides any portion of the money or property requested or demanded, or will reimburse such contractor, grantee, or other recipient for any portion of the money or property which is requested or demanded." 31 U.S.C. § 3729(c). The terms "false" and "fraudulent" are not statutorily defined. This language, however, has always been accorded a very broad reach in order to protect the federal fisc. *U.S. ex rel. Hendow v. Univ. of Phoenix,* 461 F.3d 1166, 1173 (9th Cir. 2006) (for FCA purposes, a 'claim' is "a call on the government fisc"); *U.S. v. Neifert-White Co.,* 390 U.S. 228, 230-33 (1968) (the term "claims" in the FCA reaches defendant's application for loans, confirming the FCA's objective "was broadly to protect the funds and property of the Government from fraudulent claims, regardless of the particular form, or function, of the government instrumentality upon which such claims were made").

Directly relevant here is that failure to provide goods and/or services of the quality

contracted for by the government was the driving force behind enactment of the FCA during the Civil War and has always been a basis for FCA liability. As was colorfully explained at the time: "[f]or sugar [the government] often got sand; for coffee, rye; for leather, something no better than brown paper; for sound horses and mules, spavined beasts and dying donkeys; and for serviceable muskets and pistols, the experimental failures of sanguine inventors, or the refuse of shops and foreign armories."[10]

Indeed, even the mere receipt of government funds a Defendant knew he was not entitled to has long given rise to FCA liability. *Scolnick v. United States,* 331 F.2d 598 (1st Cir. 1964) (cashing check the endorser knew to be issued in error was a fraudulent claim giving rise to FCA liability against endorser and his father to whom he transferred funds). This is precisely why courts have held that the term "claim" encompasses any and all documents or information submitted to the government that is material to the government's obligation to pay and/or material to the defendant's asserted right to receive and retain the funds. *U.S. ex rel. Tyson v. Amerigroup Illinois, Inc.,* 488 F.Supp.2d 719, 727 (N.D. Ill. 2007) (Medicare/Medicaid "enrollment forms are claims because they were 'submitted in order to receive payment,' even if payment was not immediate."). Defendants assertions that the FCA as requires a specific request for payment after services are performed are unfounded and simply mock the sophistication of the government prospective payment systems they availed themselves of all these years.

In the present case, Relators' SAC repeatedly alleges "worthless or substantially diminished services" as the general predicate for FCA liability. (*See, e.g.* Dkt# 145 at ¶ 4).

---

10. 1 F. Shannon, *The Organization and Administration of the Union Army, 1861-1865,* at 58 (1965) (quoting Tomes, *Fortunes of War,* 29 Harper's Monthly Mag. 228 (1864), *quoted in U.S. ex rel. Newsham v. Lockheed Missiles and Space Co., Inc.,* 722 F.Supp. 607, 609 (N.D.Cal. 1989) (upholding constitutionality of FCA after 1986 amendments thereto).

Before turning to the particular theories of liability, Plaintiffs first address certain affirmative defenses interspersed throughout Defendants' brief.

### B.  Defendants' Affirmative Defenses Lack Merit

#### 1.  Claims Are Not Barred By Prior Civil Money Penalties

Buried at the end of Defendants' 'implied false certification' argument (Dkt# 314 at 31) is a stand-alone partial defense under 31 U.S.C. § 3730(e)(3).   In particular, Defendants assert that because the government already conducted certification compliance surveys and imposed nominal civil money penalties in connection therewith, Relators' are barred from bringing any claims concerning the particular harms cited in the related surveys or even the entire periods of time covered by those penalties. (Dkt # 314 at 31).  Defendants cite no support and misread the law.

31 U.S.C. § 3730(e)(3) ostensibly bars *qui tam* claims "based upon allegations or transactions which are the subject of a civil suit or an administrative civil money penalty proceeding ("ACMP") in which the Government is already a party."  There is sparse case law interpreting that provision, but it clearly indicates that the ACMP must concern the same allegations of false or fraudulent claims upon the government fisc, and the proceeding must be capable of reaching all the same defendants. *U.S. ex rel. Prawer & Co. v. Fleet Bank of Maine,* 24 F.3d 320 (1st Cir. 1994), *discussed in U.S. ex rel. McDermott v. Genentech, Inc.,* No. 05-147-P-C, at *6 (D.Maine Dec. 14, 2006).  Thus, in this case the issue turns on the purpose of the prior surveys and nominal penalties.

Government surveys of LTC facilities are routine, conducted for annual recertification purposes and to investigate complaints from hotlines or other sources.  The surveys also aim to determine if there are enough eligible facilities in any given geographic area to meet the

Medicare/Medicaid resident demand. Thus civil monetary penalties imposed by the regulators are designed to nudge facilities toward maintaining eligibility. Defendants offer no authority that they are a penalty for false or fraudulent claims upon the government. To the contrary, the Secretary of HHS lacks authority in such a proceeding to recoup payments already made, leaving those powers vested with the Department of Justice. 42 U.S.C. 1396r(h)(3)(C)(i) (only authorizing prospective denial of payments to facility) and in a FCA case such as the instant case.[11]

The Medicare/Medicaid Civil Monetary Penalties Law, 42 U.S.C. § 1320a-7a, imposes liability for improperly filed claims and is similar in many respects to the FCA. The ACMP includes treble damages and substantial penalties per claim. Only under that law, and upon authorization from DOJ, may the Secretary pursue a true ACMP action for false or fraudulent claims. *Id.* at 1320a-7a(c)(1). Relators submit that only an action pursuant to the latter statute would invoke the bar under 31 U.S.C. § 3729(e)(3). As the Department of Human Services Office of the Inspector General ("HHS-OIG")[12] noted:

> In cases that involve failure of care on a systemic and widespread basis, the nursing facility may be liable for submitting false claims for reimbursement to the Government under the Federal **False Claims Act**, the **Civil Monetary Penalties Law (CMPL)**, or other authorities that address **false and fraudulent claims or statements** made to the Government. Thus, compliance with applicable quality of care standards and regulations is essential for the lawful behavior and success of nursing facilities.

---

11. Thus, the authority to recover funds already paid to the facility is reserved to the federal government's other executive branches with enforcement powers, such as the OIG and the Department of Justice ("DOJ"). *See* SOM § 4146.7C(7) & (9) (contemplating disclosure of information to DOJ or other Federal agency "with authority to investigate potential fraud or abuse").

12. "The Office of Inspector General (OIG) was established at the Department of Health and Human Services by Congress in 1976 to identify and eliminate fraud, waste and abuse in Health and Human Services programs and to promote efficiency and economy in departmental operations. The OIG carries out this mission through a nationwide program of audits, investigations and inspections." *Special Fraud Alert: Fraud and Abuse in the Provision of Services in Nursing Facilities,* 1996 WL 34454005 (HHS-OIG May 1996).

OIG Supplemental Compliance Program Guidance for Nursing Facilities, 73 Fed. Reg. 56832-02, 56836 (Sept. 30, 2008) (citations omitted) (bold added).

In short, there is no impediment to subsequent civil and criminal actions arising from the conduct addressed by a mere certification compliance survey that was not a true ACMP proceeding, and one could even expect that facts giving rise to recoupment actions would have previously been the subject of minor certification compliance penalties. *See, U.S. ex rel. Shutt v. Community Home and Health Care Services, Inc.,* 305 Fed.Appx. 358, 2008 WL 5233478 (9th Cir. 2008) (affirming partial summary judgment for government and award of civil penalty and treble damages, and rejecting convicted LTC facility owner's double jeopardy and excessive fines arguments).  Therefore, Defendants motion to for partial dismissal pursuant to 31 U.S.C. § 3730(e)(3) must be denied as a matter of law.

### 2. Plaintiffs' Claims Do Not Otherwise Usurp Regulatory Discretion

At the end of their express certification argument ( (Defs. Combined Mem. Doc. # 314 at 26-27), Defendants again assert a stand-alone issue, asserting that Relators' FCA action usurps regulatory agency discretion.  Defendants cite cases opining that "the FCA is not an appropriate vehicle for policing technical compliance with administrative regulations," unless the "violator knowingly lies to the government about them." *U.S. ex rel. Lamers v. City of Green Bay,* 168 F.3d 1013, 1020 (7th Cir. 1999) (summary judgment against spurned bus company owner who alleged city knowingly lied about its compliance with bus route technicalities which were eventually brought into compliance); *following Hopper v. Anton,* 91 F.3d 1261, (9th Cir. 1996) (not all minor regulatory violations give rise to FCA liability, and here special education funding to district was not conditioned on compliance with regulation governing timely placement of

students for services).  In *Hopper,* the court went beyond the facts and express certification theory before it and made the sweeping statement that: "[v]iolations of laws, rules or regulations do not create a cause of action under the FCA. It is the false certification of compliance which creates liability when certification is a prerequisite to obtaining a government benefit." *Id.* at 1266-67.  Thus, *Hopper* has been criticized for failing to also examine contract and implied certification theories of liability. *Holder v. Special Devices, Inc.,* 296 F.Supp.2d 1167, 1176 (C.D. Cal. 2003).

As detailed in the previous section, the regulatory actions taken in connection with the certification compliance surveys was limited in scope and enforcement, and could not address false or fraudulent claims which are reserved to the DOJ or its agents, such as Relators here. Therefore, Defendants argument must be rejected as a matter of law.

### 3.   Relator's Claims Are Not Otherwise Barred as Violating Public Policy

Defendants argue,  (Defs. Combined Mem. Doc. # 314 at 27-29), that Relators' action violates various public policy rationales.  First, they argue that it would promote federalization of medical malpractice, citing *Mikes,* and effectively preempt the regulatory enforcement mechanisms already in place.  As to *Mikes,* the difference in public policy considerations is addressed below under implied certification and is part of the very reason *Mikes* is wholly inapposite to LTC where Congress *did* choose to impose a standard of care higher than the common law "reasonableness" standard.  *Villaspring Health Care Center, Inc.,* ___ F.Supp.2d ___, 2011 WL 6337455 *5-7(E.D. Ky Dec. 19, 2011) (denying motion to dismiss FCA action against LTC facility)  Thus, Defendants' argument that this case "preempts" the existing regulatory structures is a re-molding of its prior argument about usurping regulatory discretion

and must also be denied.

### 4. Plaintiffs Are Original Sources

Once again, Defendants assert they have the right to raise, *ad infinitum,* the notion that the court 'lacks jurisdiction' because Relators' claims are "based upon" publicly disclosed documents and the Relators cannot qualify as "original sources" of the information. The relevant FCA provision provides:

(A) No court shall have jurisdiction over an action under this section based upon the public disclosure of allegations or transactions in a criminal, civil, or administrative hearing, in a congressional, administrative, or Government [General] Accounting Office report, hearing, audit, or investigation, or from the news media, unless the action is brought by the Attorney General or the person bringing the action is an original source of the information.

(B) For purposes of this paragraph, "original source" means an individual who has direct and independent knowledge of the information on which the allegations are based and has voluntarily provided the information to the Government before filing an action under this section which is based on the information.

31 U.S.C. § 3730(e)(4)(A) & (B).13

Procedurally, Defendants wrongly assert that it is a true jurisdictional issue that may be raised at any time, whereas this Circuit interprets it as a substantive matter to determine who may properly speak for the government. *U.S. ex rel. Yannacopolous v. Gen'l Dynamics,* 315 F.Supp.2d 939, 946-47 (N.D. Ill. 2004), *citing, U.S. ex rel. Feingold v. AdminaStar Fed., Inc.,* 324 F.3d 492, 494-95 (7th Cir. 2003). Moreover, since this court has ruled on the issue numerous times in this case, and Defendants have made no argument as to why the court should reverse itself, the "law of the case" doctrine bars this repeat argument. *Carnegie v. Household Int'l,* 220 F.R.D. 542, 545 (N.D. Ill. 2004), *citing, Parts & Elec. Motors, Inc. v. Sterling Elec., Inc.,* 866 F.2d 228 (7th Cir. 1988).

---

13. As enacted prior to May 2009.

Defendants' assert that the state Inspection Reports Relators obtained from the State of Illinois pursuant to a public records request are public disclosures, relying on *Schindler Elevator Corp. v U.S. ex rel. Kirk,* 131 S.Ct. 1885 (U.S. 2011) (reports and other documents obtained under the Freedom of Information Act ("FOIA")*.* Defendants do not, however, explain how documents Relators obtained *after* they filed the SAC could invoke the public disclosure issue. Such a post-filing public disclosure is not contemplated by *Schindler,* which involved a relator obtaining documents *prior* to filing the FCA action. Nonetheless, they concede that Relators are original sources as to the periods of their employment, and thus limit their argument to the periods before and after their employment.

As to whether the documents constitute public disclosures under the law, Defendants assert that the survey reports disclose the general nature of the problems and any additional details possessed by Relators are insufficient. They cite, however, to *Swan* which has been discredited for ignoring the unique nature of the LTC regulations. *Villaspring Health Care Center, Inc.,* ___ F.Supp.2d ___, 2011 WL 6337455 *5-7(E.D. Ky Dec. 19, 2011) (denying motion to dismiss FCA action against LTC facility). The Seventh Circuit recently clarified this very issue, finding that prior reports were insufficient to bar the relator where the reports did not reveal the fraud, as evidenced by the government's failure to act on the information, and thus allegations in relators complaint went beyond the reported information and were 'based upon' her own knowledge. *U.S. ex rel. Baltazar v. Warden,* 635 F.3d 866, 868-69 (7th Cir. 2011).

Similarly here, the survey reports do not reveal the full basis for Relators' action, which is the widespread nature of the practices and harm to residents at Momence. This conclusion is further bolstered by the limited nature and scope of the surveys, as discussed *supra.* As noted,

the surveyors were not charged with ferreting out the full scope of the problem, merely to conduct "sampling" and institute any certification compliance remedies. Furthermore, the surveyor's lacked authority to investigate or prosecute false claims upon the government fisc, which further garners for the conclusion that their reports are not the full story and do not allege the false claims upon the fisc that are the subject of this case. *See, Springfield Terminal Ry Co. v. Quinn,* 14 F.3d 645, 649 (D.C. Cir. 1994) (public disclosure must reveal the conclusion of fraud, or sufficient facts from which the fraud is apparent). These facts and circumstances are thus distinguishable from *U.S. ex rel. Mathews v. Bank of Farmington,* cited by Defendants, because here the government officials did not have knowledge of the full scope the problems necessary to support false or fraudulent claims against the government and, even if they did, were not empowered to do anything about it. 166 F.3d 853 (7th Cir. 1999), *overruled on other grounds, U.S. ex rel. Glaser v. Wound Care Consultants, Inc.,* 570 F.3d 907, 920 (7th Cir. 2009).

As to the original source issue, Defendants rely on *Wang v. FMC Corp.,* 975 F.2d 1412, 1416 (9th Cir. 1992), to assert that to be an original source the Relators must have been the source of the public disclosure. The Seventh Circuit, however, squarely rejected that approach. *U.S. ex rel. Mathews v. Bank of Farmington,* 166 F.3d 853, 859 (7th Cir. 1999), *overruled on other grounds by U.S. ex rel. Glaser v. Wound Care Consultants, Inc.,* 570 F.3d 907, 920 (7th Cir. 2009).

Defendants also inaccurately cite *Rockwell Int'l Corp. v. U.S. ex rel. Stone,* 549 U.S. 457 (2007), for the proposition that Relator's can only be original sources as to that which they have personal knowledge from their term of employment at Momence. In that case the relator alleged that pondcrete used to contain radioactive waste was defective. *Id.* at 460-63. The government's

investigation, however, determined that relator's hypothesis was not supported by the facts. *Id.* By pure chance, during the investigation the government determined that changes to the pondcrete process made after relator's employment resulted in a different defect. *Id.* at 465-66. Without any knowledge or evidence whatsoever to later violations predicated on a different theory, the Supreme Court held that the relator was not an original source and should not obtain a windfall from a fortuitous investigation. *Id.* at 473 ("trivial theory of fraud for which he had some direct and independent knowledge" does not allow relator to add "[new] theories of fraud from the public domain"). Hence, the focus is on the theory of recovery, not the term of relator's employment. *U.S. ex rel. Howard v. Lockheed,* No1:99-cv-285, 2012 WL 1391198 (W.D.Ohio Jan. 18, 2012) (granting relator's motion to amend adding evidence previously disclosed during hearing in same case, since it did not disclose a new theory of recovery).

Thus, Relators here may properly speak for the government for the entire period of time covered by the statute of limitations, from November 1998 through June 2006. *See, Walker v. R & F Properties, Inc.,* 433 F.3d 1349, 1359 (11th Cir. 2005) (discovery not limited to term of nurse relator's employment). Indeed, this court previously ruled that discovery in this matter may proceed to examine the entire period of time covered by the statute of limitations. (*See*, Dkt# 195 Case Mgmt. Order #2 not restricting scope of discovery; Dkt# 208 (ordering production of all employees files from September 29, 1998 through May 2006). Furthermore, a relator does not need to be an employee at all, but may simply be someone who conducted an investigation and pieced together defendant's deceit upon the government. *U.S. ex rel. Lamers v. City of Green Bay,* 168 F.3d 1013, 1017-18 (7th Cir. 1999) (relator qualified as original source despite receiving some information under FOIA.

Disjointedly, in the immediately preceding public policy section of their implied false certification arguments (Dkt# 314 at 28-29), Defendants smuggle in yet another argument that Relators cannot be "original sources." In particular, they argue that Relators' disclosures to the government were not voluntary because, as nurses, they had a duty to report resident abuse or neglect and allegedly admitted that they failed to do so. First, Relators dispute Defendants' characterization of the evidence, since Relators clearly testified that they made numerous complaints to the hotline. (Ex. 1 Absher Dep. 19:22-20:16, 329:8-330:6, 331:14-19, Ex. 2 Mitchell Dep. 306:8-1). As to the law, Defendants cite only one case that is factually distinguishable as one in which the relator was an auditor employed by the Inspector General's office who's employment contract required him to report any fraud to his government employer charged with uncovering fraud. *U.S. ex. Rel. Fine v. Chevron, U.S.A.,* 72 F.3d 740, 743 (9th Cir. 1995). Other courts, however, permit even such government employee auditors to bring FCA actions. *U.S. ex rel. Maxwell v. Kerr-McGee Oil & Gas Corp.,* 540 F.3d 1180, 1184 (10th Cir. 2008). Moreover, Relators' legal obligation to report abuse and neglect to the authorities is designed to protect the health and safety of the residents. Relators had no obligation to report false or fraudulent claims to HHS-OIG or DOJ which, as detailed above, are the federal entities with primary enforcement authority. Hence, this argument must be rejected.

Not confident in their legal arguments, Defendants close with a legally unsupported factual argument that a widespread scabies outbreak should not be sufficient for FCA liability. First, they assert that it is only a minor condition. Scabies is not a mere inconvenience, as Defendants assert. Scabies a parasitic infestation caused by a tiny burrowing mite called *Sarcoptes scabiei*. The female mite burrows under human skin and lays its eggs. The larvae

hatch and work their way to the surface of the skin, leaving excrement and other waste products underneath the skin which causes an allergic reaction in humans resulting in intense itching. (www.cdc.gov/parasites/scabies).  It is a debilitating condition that, especially among persons who have weak immune systems, can lead to secondary infections and other complications.  The seriousness of the condition is reflected in Illinois laws governing LTC facilities, which require that a "facility shall inform the Department of all incidents of scabies and other skin infestations." 77 Ill. Adm. Code § 300.1020(c) (Ex. 57 ).  The Centers for Disease Control Guidelines, which Momence acknowledged as something it must follow, also require that all incidents of scabies be reported to local health care facilities that may send patients to, or receive patients from the facility. As such, failing to guard institutionalized residents against its transmission has stated a claim for liability in other contexts. *See, Hagan v Rogers,* 570 F.3d 146, 158 (3rd Cir. 2009) (approving prisoners' class action for 8th and 14th Amendment violations arising from prison being "deliberately indifferent to the exposure of inmates to a serious, communicable disease [scabies]").

Defendants also cite the self-interested testimony of the Medical Director for the proposition that the spread of scabies does not necessarily mean the facility did anything wrong. (Dkt# 314 at 39-41).  Such hypothetical testimony was not based on Relators' evidence that in 2002 alone 8 residents were diagnosed with scabies, and another 49 resident's symptoms and were treated by nurses without a diagnosis of scabies.  It also ignores Relators' evidence that Momence failed to follow infection control policies and procedures necessary to help prevent the spread of such a communicable disease.

Finally, Relators note that the expansive reach of their standing to speak for the

government is procedurally necessary because the outcome of this action has *res judicata* effect

on the government. *Stauffer v. Brooks Bros., Inc.,* 619 F.3d 1321, 1329 (Fed. Cir. 2010).  To rule

otherwise would eviscerate the FCA's *qui tam* provision by effectively requiring the government

to intervene in every FCA case in order to ensure that all of its relevant claims against the

defendant were adjudicated.  For all of the foregoing reasons, Defendants' oft-repeated motion to

dismiss under 31 U.S.C. § 3730(e)(4) must once again be denied.

### C.  Momence is Liable Under the FCA

#### 1.  Momence is Liable Under 3729(a)(1)

31 U.S.C. § 3729(a)(1) imposes liability on anyone who "knowingly presents, or causes

to presented … a false or fraudulent claim for payment or approval."  In the current case, the

underlying transactions were virtually all made in connection with the Medicaid assistance

program where the claim and payment system for LTC facilities is a simple automated payment

of a fixed *per diem* rate per resident per day based on a rolling census of Medicaid recipients at

the facility Ex. 3. Appel Dep. 14:18-15:14,  48:8-20).  The nature of the deceit here is not that

Momence submitted inflated census data, but rather that it did not deliver certain clearly

mandated outcomes under its contract with Medicare and Medicaid.  On the facts of this case,

liability under 3729(a)(1) is supported regardless which theory or analytical approach is applied.

#### a.  Momence is Liable Under a 'Worthless Services' Theory

The simplest theory of liability Relators alleged[14] is that allowing residents to suffer harm

necessarily renders at least the relevant portion of the services "worthless."  This theory rests on

---

14.  Defendants incorrectly assert that Relators did not allege or properly allege services were worthless.  To the
contrary, the SAC repeatedly alleges that services were "worthless or substantially diminished." (*e.g.* Dkt# 314 at 4)
Defendants assertion is thus that the allegation is not consistent with their legal theory that *all* the services must be
worthless, which Plaintiffs dispute.

the unexceptional proposition that the government should not pay for that which has no value. *See, e.g., U.S. v. Cathedral Rock Corp.,* No. 03-1090, 2007 WL 4270784 (E.D. Mo. Nov. 30, 2007) (LTC facility case noting "[i]n a worthless services claim, the performance of the service is so deficient that for all practical purposes it is the equivalent of no performance at all"). Contrary to Defendants arguments, this doctrine does not require *all* services, including room and board, to be alleged and found worthless. *U.S. v. Villaspring Health Care Center, Inc.,* ___ F.Supp.2d ___, 2011 WL 6337455 *5-7 (E.D.Ky 2011) (FCA action against LTC facility). In that case, the court rejected the same argument Defendants make here, that because the facility billed and was paid on a *per diem* basis, the worthless services theory could not apply unless it was shown that residents received none of the bundled services – including room and board. *Id.* at *5. The argument expands to concept to its absurd conclusion that a LTC facility may be paid in full if it places a resident in a bed with a roof overhead and then completely ignores them.

Quoting a LTC facility FCA opinion issued before *Mikes, the Villaspring* expounded that "[i]t is not necessary to show that the services were completely lacking; rather, it is also sufficient to show that 'patients were not provided the quality of care' which meets the statutory standard." *Id.* at *5, *quoting U.S. v. NHC Health Care Corp.,* 115 F.Supp.2d 1149 (W.D.Mo. 2000) ("*NHC I*"), *and* 163 F.Supp.2d 1051 (W.D. Mo. 2001) ("*NHC II*"); *accord, Aranda,* 945 F.Supp. at 1488 ("a problem of measurement should not pose a bar to pursuing an FCA claim against a provider of substandard health care services under appropriate circumstances," such as patient harm). In other words, such instances of unconscionable conduct obviate the need to examine contractual and regulatory obligations and to determine liability. Simply stated, where no value was provided, the defendant is entitled to no money. *Scolnick v. United States,* 331 F.2d

598 (1st Cir. 1964) (cashing check the endorser knew to be issued in error was a fraudulent claim giving rise to FCA liability against endorser and his father to whom he transferred funds).

In the present case, a reasonable jury could find that Momence's complete and utter failure to prevent harm rendered the relevant portion of its services (or lack thereof) worthless.

Moreover, the "worthless services" theory is consistent with the payment eligibility requirements for all goods and services under Medicare or Medicaid. (*See,* SAC at ¶ 98, Dkt# 145). Those laws require that services be "provided economically and only when, and to the extent, medically necessary" and "of a quality which meets professionally recognized standards of health care." 42 U.S.C. § 1320c-5(a)(1)&(2). Persons who fail to do so may be excluded from the programs. 42 U.S.C. § 1320a-7(b)(6)(B).

In addition, Medicare Part A's focus on hospital and related services further sharpens that program's general exclusion of coverage to goods or services that are not "reasonable and necessary for the diagnosis and treatment of illness or injury or to improve the functioning of a malformed body member." 42 U.S.C. § 1395y(1)(A). It also animates Medicare's limitation on LTC facility coverage to only qualified post-hospital services requiring "skilled nursing." 42 U.S.C. § 1395y(18) and § 1395yy. Medicaid, on the other hand, covers long-term custodial care services for those who remain unable to return home and care for themselves – as was the case with 90% of Momence's residents.

Even under these general Medicare and Medicaid coverage definitions and limitations, and without considering the harm prevention mandates in the LTC regulation, the failure to prevent harm to in-patient residents compels FCA liability. *U.S. ex rel. Aranda v. Comm. Psychiatric Center of Oklahoma, Inc.,* 945 F.Supp. 1485, 1488 (W.D. Okla. 1996). In that case

the court held FCA claims were properly stated based on physical and mental harm, including sexual perpetration, to children and adolescents at an in-patient psychiatric facility. The court's reasoning is instructive:

> Statutes and regulations governing the Medicaid program clearly require health care providers to meet quality of care standards, and a provider's failure to meet such standards is a ground for exclusion from the program. *See* 42 U.S.C. § 1320a-7(b)(6)(B) (the Secretary may exclude anyone who furnishes patient services "of a quality which fails to meet professionally recognized standards of health care"); *Id.* § 1320c-5 (providers must assure that patient services "will be of a quality which meets professionally recognized standards of health care"). Also, because federal funds are disbursed through state Medicaid programs, statutes and regulations governing state programs are pertinent. To obtain funding, a state must have a plan for medical assistance. *Id.* § 1396. The plan must contain procedures relating to payment for services sufficient "to assure that payments are consistent with ... quality of care." *Id.* § 1396a(a)(30)(A). Each state must have a fraud detection program, and the state plan must provide for exclusion of persons who have committed fraud or abuse. "*Abuse* means provider practices that are inconsistent with sound ... medical practices, and result in an unnecessary cost to the Medicaid program, or in reimbursement for services ... that fail to meet professionally recognized standards for health care." 42 C.F.R. § 455.2 (emphasis in original).

> The Court finds no merit in CPC's arguments that it could not knowingly violate such vague standards. FCA cases cited by the government involving contractors who furnished inferior goods are inapposite, but they provide a useful analogy. It may be easier for a maker of widgets to determine whether its product meets contract specifications than for a hospital to determine whether its services meet "professionally recognized standards for health care." In the Court's view, however, <u>a problem of measurement should not pose a bar</u> to pursuing an FCA claim against a provider of substandard health care services under appropriate circumstances.

*Id.* (underline added). In short, regardless of any contract, implied certification or other analytical framework, the failure to prevent harm is so unconscionably below any reasonable contemplation of the coverage standards that it renders the claims ineligible for payment.

This principle was partially codified in a 2008 Medicare regulation precluding payment to hospitals for treatment of preventable harms. 42 U.S.C. 1395ww(d)(4)(D) and Fed Reg. 2008,

73:48433 (CMS' final Rule of eight initial "never events", including Stage III and IV pressure ulcers, falls or trauma resulting in serious injury, and catheter associated infections). While enacted after the events in question here, these provisions are instructive since they clarify that Congress and CMS will not cover the costs of diagnosis and restorative care arising from preventable harm.

For all of the foregoing reasons, Defendants' motion for summary judgment as to a "worthless services" theory of liability under 31 U.S.C. § 3729(a)(1) must be denied.

### b. Failure to Prevent Harm as Mandated by the LTC Regulations

#### i. Generally

Any doubt that the "worthless services" theory provides a sufficient basis for FCA liability due a failure to prevent harm is resolved by the LTC regulations. *U.S. v. NHC Healthcare Corp.,* 163 F.Supp.2d 1051 (W.D. Mo. 2001) (FCA claims against LTC facility arising from harm to residents). The LTC regulations are so strong that FCA actions predicated on the occurrence of harm initially prompted some matters to settle the day the complaints were filed. Symposium Article, *When Neglect Becomes Fraud: Quality of Care and False Claims*, John R. Munich and Elizabeth W. Lane, 43 St. Louis, L.J. 27, 41-42, *citing U.S. v. GMS Management-Tucker, Inc.*, No. 96-1271 (E.D. Pa. 1996), and *U.S. v. Chester Care Center,* No. 98-cv-139 (E.D. Pa. 1998). Courts readily recognized the nexus between compliance with the regulatory prohibitions against allowing harm and the government's obligation to pay. *U.S. v. NHC Healthcare Corp.*, 163 F.Supp.2d 1051, 1055 (W.D. Mo. 2001) (FCA action against LTC concluding "the standard of care is indeed at the heart of the agreement between the parties").

LTC facilities are the only care setting where Congress stepped in and mandated the

38

delivery of certain outcomes, defined both as affirmative outcomes to be achieved[15] and negative outcomes that the facility "must prevent." 42 C.F.R. § 483.1 *et seq.* The latter were essentially the first "never" events promulgated by Congress, and are the focus of Relators' case here. *Woodstock Care Center v. Thompson,* 363 F.3d 583, 590 (6th Cir. 2003) (regulations requiring prevention of harm, to which LTC facility consented upon participation in Medicare and Medicaid, **set higher standard** than "reasonable care" at common law); *see, McCain v. Beverly Health and Rehabilitation Serv. Inc.,* 2002 WL 1565526 (E.D. Pa. 2002) (residents are intended beneficiary of federal LTC facility regulations' harm prevention requirements which thus supported *per se* **negligence** claim); *Clermont Nursing and Convalescent Center v. Leavitt,* 142 Fed.Appx. 900, 904 (6th Cir. 2005) (affirming civil monetary penalties and holding that regulatory obligation to promote healing and prevent infection of pre-existing pressure sores, and prevent new pressure sores required facility to go beyond what seemed reasonable and furnish **whatever was necessary** to achieve mandated outcomes)(prevention of "accidents" includes assaults from other residents and elopement, and harm need not occur to find facility permitted **risk of harm**). Those regulations include prevention of pressure sores, prevention of the worsening of pre-existing pressure sores, prevention of infection developing in any pressure sores, prevention of infectious disease (establishment and spread), prevention of falls, and prevention of accidents.

In addition to mandating these outcomes, Congress/CMS also promulgated requirements concerning oversight and management, and various staffing and training requirements, which were all intended to ensure that the outcomes being paid for would in fact be delivered. The

---

15. Medicare and Medicaid statutes state that nursing facilities "must provide services to attain or maintain the highest practicable physical, mental, and psychosocial well-being of each resident." 42 U.S.C. § 1395i-3(b)(2) and § 1396r(b)(2), and 42 C.F.R. Ch. 483.

oversight mandates are comprised of a Governing Body that is ultimately "legally responsible",

an Administrator, and a Medical Director. As detailed in the facts above and in the section

below concerning Defendant Graff, none of the three properly discharged their duties, resulting

in harm to residents, and resulting in the government not receiving the benefit of its bargain.

Similarly, the facility did not adhere to requirements governing staffing levels and competency

necessary to fulfill the harm prevention and other mandates, further setting-up systemic problems

that led inevitably to resident harm.

Importantly, in this case Relators' claims do not assert that the lapses in oversight and

staffing would be sufficient for FCA liability in the absence of harm to the residents.[16]  Where

such harm did occur, however, such lapses in oversight and staffing demonstrate that the harm

resulted from systemic problems at the facility and that Defendants acted "knowingly" -- i.e.

reckless disregard for whether they were complying with the requirements for receiving

payment.  Such systemic lapses are also relevant to the majority owner, Jacob Graff, who

admitted to functioning as the Governing Body which is ultimately "legally responsible" for the

management and policies that permitted such widespread harm to Momence's residents.

In sum, the mandatory and protective nature of the regulations, and their furtherance of

the regulatory scheme's central purpose to ensure the health, safety and welfare of LTC facility

residents, evince that they are essential elements of the bargain.

### ii.  Breach of Contract

Since there is a simple contractual basis for establishing that compliance is material to the

government's obligation to pay and thus failure to comply is an actionable breach, there is no

---

16.  Such a case would present a closer call as to whether violation of those provisions were material to the government's obligation to pay.  Furthermore, such a case would more likely require the court to conduct a materiality analysis, either directly or under the rubric of express or implied certification.

need to engage in an implied certification analysis that attempts to indirectly or artificially determine materiality and whether failure to comply rendered the claim for payment legally false. *Villaspring Health Care Center, Inc.,* ___ F.Supp.2d ___, 2011 WL 6337455 *5-7(E.D.Ky Dec. 19, 2011) (FCA action against LTC facility)*; U.S. ex rel. Holder v. Special Devices, Inc.,* 296 F.Supp.2d 1167, 1176 (C.D. Cal. 2003) ("the contracts specifically state that SDI must comply with a series of laws and regulations"); *U.S. v. Science Applications Int'l Corp. ("SAIC"),* 626 F.3d 1257, 1269 (D.C.Cir. 2010) (stripped of its intricacies, the services did not conform to the government contract and thus the claims were false, which renders superfluous any implied certification analysis). Those cases have criticized other decisions, including many cited by Defendants, which focused solely on an express and/or implied certification theory without examining the contractual relationship with the government. Defendants brief failed to address this theory of liability which, as a failure to discharge their burden of production, is sufficient grounds for denying their summary judgment motion. Nonetheless, Relators outline the merits of this theory to support their claim.

In *Holder*, an explosive and pyrotechnic manufacturer failed to comply with environmental, health or safety laws was found to be clearly material to the government's obligation to pay. In denying defendant's motion for summary judgment, the court noted that FCA liability could attach because "it is clear that its noncompliance with federal regulations was the *sine qua non* of payment because the contract specifically requires compliance." *Id.* at 1175, *quoted in Contreras,* 182 Cal.App.4[th] at 452. Holder also distinguished *Hopper,* upon which Momence variously relies, as a situation in which there was "little or no relationship between regulatory compliance and the receipt of funding from the government," and

analytically of little value because it did not address potential application of an implied certification analysis and did not examine a breach of contract theory. *Holder,* 296 F.Supp.2d at 1174 (C.D. Cal. 2003); *San Francisco Unified School District ex rel. Contreras v. Laidlaw Transit, Inc.,*182 Cal.App.4[th] 438 (2010) (FCA action against school bus contractor, criticizing *Hopper* and several other cases for failing to examine whether contract required regulatory compliance).

Here the Provider Agreement between Momence and HHS/CMS (Ex. 28, signed 1991 Form, and blank 2001 CMS Form) opens with "[i]n order to receive payment …" Momence will comply with all Medicare and Medicaid regulations applicable to LTC facilities. Courts hold that these Provider Agreements constitute a contract with the government in which each side's obligations are set forth in the regulations. *See, In re University Medical Center,* 973 F.2d 1065 (3rd Cir. 1992); *applied in U.S. v. Consumer Health Services of America, Inc.,* 108 F.3d 390, 392-93 (D.C. Cir. 1997) (affirming that Congress wanted "provider's stream of services to be one transaction for purposes of any claim the government would have against the provider"). Hence, the provider agreement creates a nexus to both the general Medicare/Medicaid payment requirements*,* and the LTC harm prevention regulations at 42 U.S.C. § 483.1 *et seq.* Moreover, the mandatory and protective nature of the regulations, and their furtherance of the regulatory scheme's central purpose to ensure the health, safety and welfare of LTC facility residents, evince that they are essential elements of the bargain. *See, NHC II,* 163 F.Supp.2d at 1055 (in LTC setting, "the standard of care is indeed at the heart of the bargain").

Thus, Momence's failure to comply with those mandates and prevent harm constitutes a material breach of its contract with the government. In turn, that breach rendered its claims for

services false or fraudulent under the FCA.

### iii. Implied Certification

Defendants do address implied certification as a theory of liability under 3729(a)(1). Implied certification is an indirect method of determining whether a claim was materially 'false or fraudulent' by finding that submission of the claim implied that the provider had complied with the requirements at issue. *U.S. ex rel. Lemmon v. Envirocare of Utah, Inc.,* 614 F.3d 1163, (10th Cir. 2010). Those requirements can be in statutes, regulations, or up-front promises and understandings that compliance was a condition of payment. *Id.* at 1168. The analysis also implicates whether compliance was material to the government's obligation to pay. *Id.* at 1169. On this point, there is a mix of approaches, with some courts applying a traditional materiality analysis either in place of implied certification or in addition to it. *E.g., Id.* at 1170-71; *U.S. ex rel. Hutcheson v. Blackstone Medical, Inc.,* 647 F.3d 377 (2011) (applying straight materiality test and rejecting implied certification).

The most restrictive approach is the one urged by Defendants here, which is to find materiality only when the statute or regulation setting forth the diagnostic or restorative care standard also expressly states that compliance is a condition of payment. *Mikes v. Straus,* 214 F.3d 687 (2nd Cir. 2001). Overall, it is becoming clear that the Second Circuit's approach often "obscures and distorts" the statutory requirements rather than help to enforce them. *U.S. ex rel. Hutcheson v. Blackstone Med., Inc,* 647 F.3d 377 (2011). Many courts have distinguished *Mikes,* even in the health care setting court decline to apply it where the materiality of compliance to payment was evidenced by other means, such as a nexus to licensing. *Illinois ex rel. Raymer v. The Univ. of Chicago Hospitals,* 2006 WL 2987118 (Ill. Cir. Ct. Oct. 6, 2006). Furthermore,

because its facts were at the far end of potential Medicare/Medicaid scenarios and was driven by particular public policy concerns, it is factually and legally inapposite to a more regulated setting such LTCs. *U.S. v. Villaspring Health Care Center, Inc.,* ___ F.Supp.2d ___, 2011 WL 6337455 *5-7(E.D. Ky Dec. 19, 2011) (FCA action against LTC facility).

The LTC regulations at issue here are framed as bright-line mandates that LTC facilities *must prevent harm* in furtherance of the legislation's central purpose to protect residents, dispel any doubt that they are material. *Id. In Villaspring*, the court rejected the seminal case relied upon by Defendants as inapposite. In particular, the court rejected *Mikes'* rigid implied certification construct requiring the underlying regulation to expressly state compliance is a condition of payment, discussing at length the anomalous results it had created. *Id.* at *6-7; *accord, Hutcheson, supra.* A similar result was reached a decade earlier in *NHC II,* which also did not apply *Mikes'* restrictive version of implied certification to an FCA action against a LTC facility. There the court reasoned that "the standard of care is indeed at the heart of the agreement between the parties [since] when caring for the infirmed it is not the end product result that is crucial [since most are slowly dying], it is the dignity and quality of life provided through the care process." 163 F.Supp.2d at 1055 (quotations and citations omitted); *accord, NHC I,* 115 F.Supp.2d at 1155 (for LTC facilities the "heart of the bargain" is the "complete care" of the residents in the manner required by specific regulations). *NHC I* also noted as "sufficiently analogous" the patient harm case of *Aranda,* discussed *supra.*

Thus, *Villaspring, NHC I & II,* and *Aranda* stand in stark contrast to a few district court opinions, relied upon by Defendants here, where the court rotely applied *Mikes'* to a LTC facility, which had the effect of improperly overriding the different public policy choices

44

Congress enacted to protect LTC residents and the government fisc. Unlike virtually any other Medicare/Medicaid context, for LTCs Congress' pushed right to, and perhaps slightly over, the edge of regulating the practice of medicine by mandating outcomes that compel a higher standard of care than the common law's "reasonableness" standard.[17] This fact undermines the very underpinnings of *Mikes'* concern that "permitting *qui tam* plaintiffs to assert that defendants' quality of care failed to meet medical standards would promote federalization of medical malpractice." *Id.* at 700. It was that concern that drove it hold that "a medical provider should be found to have implicitly certified compliance with a particular rule as a condition of payment" only where "the underlying statute or regulation *expressly* states the provider must comply in order to be paid." *Id.* at 701-02 (italic in original).

The centrality of *Mikes* and its progeny to Defendants' arguments compels a closer examination of that case. There the relator alleged a clinic's mere failure to properly calibrate an instrument according to a third-party manual, despite calibration and maintenance according to manufacturer instructions. *Mikes,* 274 F3rd. at 692. On this basis alone, the relator alleged defendants made false express certifications that their services complied with the general Medicare/Medicaid coverage limitations as "medically necessary," and made false implied certifications that their services met 'professionally recognized standards of health care,' both as required by Medicare/Medicaid's general regulations. *Id* at 701-02. Hence, *Mikes* was a case

---

17. *Woodstock Care Center v. Thompson,* 363 F.3d 583, 590 (6th Cir. 2003) (LTC regulations requiring prevention of harm, to which LTC facility consented upon participation in Medicare and Medicaid, set **higher standard** than "reasonable care" at common law); *see, McCain v. Beverly Health and Rehabilitation Serv. Inc.,* 2002 WL 1565526 (E.D. Pa. 2002) (residents are intended beneficiary of federal LTC facility regulations' harm prevention requirements which thus supported *per se* **negligence** claim); *Clermont Nursing and Convalescent Center v. Leavitt,* 142 Fed.Appx. 900, 904 (6th Cir. 2005) (affirming civil monetary penalties and holding that regulatory obligation to promote healing and prevent infection of pre-existing pressure sores, and prevent new pressure sores required facility to go beyond what seemed reasonable and furnish **whatever was necessary** to achieve mandated outcomes)(prevention of "accidents" includes assaults from other residents and elopement, and harm need not occur to find facility permitted **risk of harm**).

that did not involve a prospective payment system, and did not involve any *specific* regulatory requirements governing the type of services delivered -- let alone mandate easily measurable outcomes to be delivered. Hence, it is wholly inapposite to a LTC case. *Villaspring,* Slip. Op. at *6-7.

Defendants also argue at length from dicta in *Mikes'* in which the court reasoned that any statute or regulation not expressly stating that compliance was a condition of payment was necessarily a mere "condition of participation" that could not give rise to FCA liability. *Id.* This "condition of participation" distinction has been rightfully criticized as nonsensical, since compliance with the conditions of participation is the threshold of competency necessary to qualify (not entitle) a facility as a whole to begin and continue receiving funds from those programs. *U.S. ex rel. Hendow v. University of Phoenix,* 461 F.3d 1166, 1176 (9th Cir. 2006). As even a case cited by Defendants noted, "some regulations or statutes may be so integral to the government's payment decision as to make any divide between conditions of participation a 'distinction without a difference.'" *U.S. ex rel. Connor v. Salina Reg'l Health Ctr., Inc.,* 543 F.3d 1211 (10th Cir. 2008), *applied in U.S. ex rel. Lisitza v. Johnson & Jonson*, 765 F.Supp.2d 112, 128 (D.Mass. 2011) (collecting cases, and finding Medicare/Medicaid anti-kickback statute was both a condition of participation and a condition of payment). CMS itself responded by collapsing the distinction through the addition of language in its Provider Applications and other forms stating "payment … is conditioned upon … compliance with all applicable conditions of participation." Form 855-A Provider Application. (Ex. Pls. 6th Am. Compl. Doc # 145-2, Ex. B at 37 par. 3).

In connection with this argument, Defendants also misleadingly assert that nothing in the

LTC regulations are denoted 'conditions of participation' or 'conditions of payment.' What Defendants fail to admit, is that CMS uses different synonyms for different care settings. For LTCs, all of the mandates are labeled as "requirements," rather than "conditions," that must be met for both participation and payment. 42 C.F.R § 483, Subpart B "Requirements for Long Term Care Facilities"; *See also, CMS State Operations Manual ("SOM"),* § 1014 (2004) (noting language). The meaning, however, is the same. 42 C.F.R. § 483.1(b) ("the requirements that an institution must meet in order to qualify to participate as a SNF in the Medicare program, and as a nursing facility in the Medicaid program"); SOM § 1014 ("A provider … cannot *begin* to have its services covered and reimbursed by Medicare until it is found, via the certification process, to be in compliance with all federal requirements, including … in substantial compliance with the requirements for SNFs and NFs") (italics added). Thus, Defendants' assertion that the LTC facility regulations do not contain conditions of participation or conditions of payment is semantically correct while substantively false and misleading.

Finally, it is important to note in *Mikes* neither the express or implied certification analyses yielded a conclusion that the alleged noncompliance was material to the government's obligation to pay, and hence the court did not address what the measure of damages would be if materiality had been found. Thus, in *Mikes* the court also examined the relator's independent theory of whether the services were so deficient as to be worthless, thereby rendering the claims factually false regardless of any express or implied certification. 274 F.3d at 702-03. That final analysis, however, has sometimes been misconstrued as defining damages under an implied certification analysis. While a finding of 'worthless services' would simplify the measure of

damages (and even support a simpler theory of liability, *supra*), it is not necessary to calculate damages.

Damages in any FCA action are the difference in value between what the government paid and what was delivered. *U.S. v. Woodbury,* 359 F.2d 370, 379 (9th Cir. 1966). To the extent the services are totally worthless, then calculating damages will be relatively easy. To the extent, however, the services are only "substantially diminished," as Relators also alleged, then the calculation will be more complex. As *Aranda* noted, however, "<u>a problem of measurement should not pose a bar</u> to pursuing an FCA claim against a provider of substandard health care services under appropriate circumstances," such as the patient harm presented in that case. 945 F.Supp. at 1488 (underline added).

For all of the foregoing reasons, Defendants' motion to dismiss Relators claims under 3729(a)(1) must be denied.

### 2. Momence is Liable Under 3729(a)(2)

This FCA provision imposes liability upon anyone who "knowingly makes, uses, or causes to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the Government." 31 .U.S.C. § 3729(a)(2). As such, it "has three essential elements: (1) the defendant made a statement in order to receive money from the government, (2) the statement was false, and (3) the defendant knew it was false." *U.S. ex rel. Gross v. AIDS Research Alliance-Chicago,* 415 F.3d 601, 604 (7th Cir. 2005). The government often employs certifications of compliance with statutory, regulatory and contractual requirement in order to facilitate prosecution under this section pursuant to what is commonly referred to as "express certification." Defendants' motion only addresses that possibility. That context, however, is not

the only fact pattern giving rise to liability under this section.  In the second section below Relators address other false records that give rise to liability in this action.

### a.   False Express Certification

Express certification is simply where someone expressly certifies that the goods or services complied with certain statutes, regulations, or other requirements, and the falsity of that statement is actionable under 3729(a)(2).  The first element of such a claim, that the statement was made in order to receive money from the government, "requires that the fraudulent statement's purpose must be to coax a payment of money from the government." *Id.*  How that is done is not limited and may encompass any document made in order to coax payment from the government. *See, U.S. ex rel. Tyson v. Amerigroup Illinois, Inc.,* 488 F.Supp.2d 719, 727 (N.D. Ill. 2007) ("enrollment forms are claims because they were 'submitted in order to receive payment,' even if payment was not immediate") (citation omitted); *U.S. ex rel. Lemmon v. Envirocare of Utah, Inc.,* 614 F.3d 1163, 1168 (10th Cir. 2010) ("[t]he payee's 'certification' need not be a literal certification, but can be any false statement that relates to a claim").

As Relators alleged and argued in their SAC at Paragraphs 97-99:

97.  Cost report certifications are a condition of payment under Medicare. *See, United States ex. Rel. Thompson v. Columbia/HCA Healthcare Corp.,* 20 F. Supp. 1017, 1046 (S.D. Texas 1998). Thus, because Medicare payment is conditioned upon a cost report certification, a fraudulent certification of the cost report's express certification language supports an action under the FCA. Additionally, the Health Care Finance Administration ("HCFA" now "CMS") "interprets the phrase applicable instructions," to encompass Medicare program requirements." *Id.* at 1041-1042. "Applicable instructions" are found in the Provider Reimbursement Manual, Intermediary Letters, and C.F.R. provisions. *See, United States ex. rel. Augustine v. Century Health Services, Inc.,* 136 F.Supp.2d 876, 886 (M.D. Tenn. 2000), affirmed, 289 F.3d 409 (6th Cir. 2002). Where a provider does not

comply with the Medicare program guidelines, but nonetheless executes cost report certifications, it violates the FCA. Furthermore, when a provider executes the explicit cost report certifications, it also implicitly certifies it will continue to comply with the applicable regulations or file an amended cost report reflecting its non-compliance. *Id.* at 891-892.

98. It is well settled that Medicare/Medicaid providers may not submit claims for services that are "of a quality which fails to meet professionally recognized standards of health care." 42 U.S.C. ' 1320c-5(a)(2) (providers may not submit Medicare claims for inadequate care); 42 U.S.C. ' 1320a-7b(a)(1) and (3) (criminal penalties for submitting false claims when provider knows it has no continued right to receive payment); 42 U.S.C. ' 1320a-7(b)(6)(B) (provider can be excluded from participation in Medicare for submitting claims for inadequate care).

99. Defendants executed a Health Insurance Benefit Agreement (see Form CMS-1561, a copy of the current version attached hereto as Ex. "A," [Dkt# 145] and incorporated as if fully set forth herein), which states therein: "In order to receive payment under title XVIII of the Social Security Act ... [Momence Meadows] as the provider of services, agrees to conform to the provisions of Section 1866 of the Social Security Act and applicable provisions in 42 C.F.R." Additionally, Defendants signed the Medicare Healthcare Provider/Supplier Enrollment Application (See '15 Form CMS-855A, a copy of which is attached as Ex. "B," [Dkt# 145] and incorporated as if fully set forth herein), wherein they certified to the following provisions:

> *I agree to abide by the Medicare laws, regulations, and program instructions* that apply to this provider. The Medicare laws, regulations, and instructions are available through the Medicare contractor. I understand that **payment** of a claim by Medicare is **conditioned upon** the claim and the underlying transaction **complying with such laws, regulations and program instructions** (including, but not limited to, the Federal anti-kickback statute and Stark law), and on the provider's compliance with all applicable conditions of participation in Medicare... I will not knowingly present or cause to be presented a false or fraudulent claim for payment by Medicare, and will not submit claims with deliberate ignorance or reckless disregard of their truth or falsity." (Emphasis added.)

As to the Cost Reports, Defendants argue that Relators' reliance on *Thompson* is misplaced in light of *U.S. ex rel. Connor v. Salina Reg'l Health Ctr., Inc.,* 543 F.3d 1211, 1217 (10th Cir. 2008) which chose not to apply *Thomson* beyond the facts presented alleging violation of the anti-kickback statute, but not to quality of care standards. Defendants' reasoning is strained, and *Connor* itself is factually inapposite because it was not presented with the unique quality of care standards at issue here which mandated the prevention of harm. Furthermore, *Connor* is not binding precedent in this jurisdiction, where courts have preferred a much broader interpretation of what documents constitute part of the claim. *See, Tyson, supra.* Defendants also cite to *U.S. ex rel. Lacy v. New Horizons, Inc.,* 348 Fed.Appx. 421, 428 (W.D. Okl. Oct. 9, 2009), for the proposition that cost reports do not have the relationship to payment necessary for an FCA claim. That case, however, was interpreting the state of Oklahoma's usage of a cost report, which is inapposite to this action and the interpretation of law here. Moreover, it simply presents a non-binding approach, and this court is free to apply the logic of *Thompson,* which Relators submit is correct.

As to the Provider Agreements, Defendants cite to *U.S. ex rel. Blundell v. Dialysis Clinic, Inc.,* 2011 W 167246 (N.D. N.Y. Jan. 19, 2011), for the proposition that because it was signed prior to any regulatory violations it cannot be a false statement as to later regulatory violations. Defendants also cite it for the related assertion that it could only be an actionable false certification if they signed it knowing they later commit regulatory violations, yet Relators made no such allegations. Relators here assert, once again, that such an interpretation from another District is not binding precedent here. Moreover, courts in this District do interpret enrollment forms as part of the claim for payment. *Tyson,* 488 F.Supp.2d at 727, *citing U.S. v. Neifert-White*

51

*Co.,* 390 U.S. 228, 232 (1968). Thus, Relators assert that the Provider Application constitutes an ongoing certification of compliance with applicable regulations.

For all of the foregoing reasons, Relators submit that Defendants motion for summary judgment concerning false express certification as a basis for liability under 3729(a)(2) must be denied.

### b. Other False Records or Statements

Defendants completely fail to address this basis of liability under 3729(a)(2). Their failure to meet their burden of production on this issue requires denial of Defendants' motion for summary judgment.

Relators assert that Defendants are also liable under 3729(a)(2) for falsifying resident records that were required by law to be maintained and available to the government to demonstrate that the care was provided as required, including the prevention of harm. 42 C.F.R. § 483.75(l); *See, e.g., U.S. ex rel. Grubbs v. Kanneganti,* 565 F.3d 180, 193 (5th Cir. 2009) (claim stated under 3729(a)(2) alleging physician and staff falsified progress notes and other medical records supporting claims submitted to the government). As outlined in the fact section, *supra,* and presented in greater detail in Relators' appendixes filed herewith, there is substantial evidence of knowing and intentional falsification of medical records on a regular basis, routinely incomplete medical records, false statements to surveyors, and destruction of records after receiving an HHS-OIG subpoena in connection with its investigation of this action while it was under seal. These facts strongly support liability against Momence under 3729(a)(2) and therefore Defendants are not entitled to summary judgment dismissing Relators' claims under 31 U.S.C. § 3729(a)(2).

### D. Graff is Personally Liable for "Knowingly" "Causing" False Claims

As defenses to personal FCA liability, Graff asserts that he: did not personally provide care to any Momence residents; did not personally instruct staff how to care for residents; did not have actual knowledge of specific services or events concerning individual residents; and did not personally submit any claims for payment. Those defenses, however, are all grounded in tort principles and fail to address that FCA liability is grounded in contract, but with additional teeth to protect the government fisc. *Shutt.,* 305 Fed.Appx. 358 (affirming partial summary judgment for government and rejecting convicted LTC facility owner's double jeopardy and excessive fines arguments).

First, the FCA reaches not only the direct actors, but also anyone who "caused" the government to improperly part with its money. *In re AWP Litigation,* 491 F.Supp.2d 12, 17 (D.Mass. 2007) (causing providers to unknowingly submit claims rendered false or fraudulent by manufacturer's price manipulation "was not only a foreseeable and substantial factor in the government's loss, but also it was an intended consequence" supporting FCA liability). In the present case, as demonstrated below, Graff's actions and/or failure to fulfill certain regulatory duties he undertook were a foreseeable and substantial factor in Momence's failure to prevent harm to its residents which rendered the related claims false or fraudulent.

Second, although actual knowledge is sufficient, it is not necessary because the FCA defines "knowingly" to include anyone who acts in "deliberate ignorance" or "reckless disregard" of the truth or falsity of the information. 31 U.S.C. § 3729(b). As Congress noted, this was intended to reach businessmen who attempted to dodge liability by putting their head in the sand and claiming ignorance about their own business affairs. S. Rep. 99-345, at 20, 1986

U.S.C.C.A.N. 5266, 5285, *quoted in U.S. ex rel. Ervin & Assoc., Inc. v. Hamilton Securities Group, Inc.,* 370 F.Supp.2d 18, 41 (D.D.C. 2005) (noting that since FCA expressly does not require specific intent, the FCA's 'reckless disregard' is an extension of gross negligence short of intentional harm) (citations omitted).   In the present case, as demonstrated below, Graff's actual or feigned ignorance despite assuming the pinnacle of oversight mandated by the LTC regulations, constitutes an admission that he failed to fulfill his duties which were designed to ensure that the harm prevention mandates would be delivered.   Furthermore, and as Relators address first, Graff also directly participated in, controlled and/or influenced the management and operation of Momence, which supports an independent basis for personal FCA liability grounded in "causing" false claims to be presented and "causing" false records or statements to be made to get such claims paid.   In this section, Relators focus on the evidence supporting the fact Defendant "caused" such harm to the government, and did so "knowingly."

### 1.   Graff Was Actively Engaged in the Operation of MM

Graff portrays himself as a passive investor who did nothing more than review the monthly financials sent to him and, to the extent he was ever consulted, simply told Momence management to spend whatever money was necessary to care for the residents.   The full body of relevant evidence, however, portrays a majority owner whose significant financial stake animated his daily involvement in, and influence upon, the day-to-day operations of the facility. Graff admitted he called the facility to inquire about the census (i.e. revenue stream). (Ex. 11, Graff Dep. 69:17-21:70).   Other witnesses clarified that Graff called several times daily to check on the census, and one recounted Graff yelling that he did not care whether the residents were fed breakfast, all he was concerned about was whether even one bed was empty and not

generating revenue. (Ex. 1, Absher Dep. 136:11-138:22). Although Graff (and everyone else) denied setting budgets (Ex. 11 Graff Dep. 69:22-70:8) other evidence supports a finding that Graff indeed controlled the finances to the point that he approved all major purchases. (Ex. 19, Willey Dep. 263:15-24) . Importantly, there is abundant evidence that financial decisions were not driven by resident needs, contrary to Graff's self-serving testimony.[18] A jury could conclude that such conduct and statements served to control or influence the priorities and day-to-day operations at Momence, "elevat[ing] profit over patient care." *Estate of Canavan v. Nat'l Healthcare Corp.,* 889 So.2d 825, 826 (Fla. Dist. Ct. App. 2004) (LTC facility owner who also served as Governing Body was directly liable in negligence).

In addition, in about 2001, after Momence received a particularly bad survey in which they were prospectively denied payment for new Medicare and Medicaid patients, Larry Hovey arrived at Momence and described himself as "Graff's second hand man." (Ex. 8, Deddo Dep. 63:24-64:2). Hovey worked on-site at Momence as Graff's agent for several months before having an apparent dispute with Graff over the phone and walking out. (Ex. 8, Deddo Dep. 67:24-68:13). [PLEASE REFER TO CONFIDENTIAL ADDITIONAL STATMENT OF MATERIAL FACT AND ADDITIONAL CONFIDENTIAL ARGUMENT]

---

18. Testimony shows that cuts were made in the already meager food budget (a mere $3.50 or $4.50 a day to provide all breakfast, lunch, dinner and snack per resident), in order to bring it in line with the average of other long term care facilities in the region. (Ex. 3, Appel Dep. 179:14-22). Moreover, it was done despite the clinical fact proper nutrition is essential for the prevention and healing of pressure sores. (Ex. 5, Bednarowicz Dep. 78:4-21) Similarly, in the summer of 2002 when the scabies outbreak was spreading rapidly, a situation that requires additional help to properly control, significant staffing cuts were made driven by a predetermined dollar amount to be saved. (Ex. 36, Deddo Dep. Ex. 11) Staff were also informed that it was too expensive to have diagnostic scraping tests properly done by a professional laboratory, resulting in only a few scrapings being done by poorly trained Momence personnel. (Ex. 13, Isaacs Dep. 55:23-56:21).

Based on the foregoing, a reasonable jury could find that Defendant Graff actively participated in the management and operations of Momence and thereby knowingly caused Momence to present false or fraudulent claims, and/or to make or use false records or statements to get false or fraudulent claims paid.

### 2. Graff Acted as the Governing Body "Legally Responsible" for Ultimate Oversight of the Facility

#### a. Generally

The government's efforts to protect LTC residents from harm is also embodied in certain oversight mandates capped by a Governing Body that is "legally responsible for establishing and implementing policies regarding the management and operation of the facility; and … appoints the administrator who is … [r]esponsible for management of the facility." 42 C.F.R. § 483.75(d). *See, EPI Corp. v. Chater,* 91 F.3d 143, Unpublished, No. 95-5969 (6th Cir. 1996) (governing body liability against LTC owner for systemic failure to guide and monitor operations under prior version of regulation).19  Evidence shows that Graff assumed those responsibilities when it suited him to control revenue and enhance profits, but abdicated those responsibilities with respect to ensuring the required resident outcomes.

Graff's motion ignores his own testimony and that of other witnesses establishing that he acted as the Governing Body by: appointing and overseeing the administrator, either personally or through his agent, Larry Hovey, (Ex. 11, Graff Dep. 193:11-17, 195:21-23), (Ex. 19, Willey

---

19.  The Governing Body formerly had direct legal responsibility for the "operation" of the facility, but that provision has now been replaced with the duty to appoint the administrator who is responsible for "management." Hence, given that the Governing Body still retains responsibility for establishing and implementing policies regarding operation of the facility, Relators' submit that the regulations still place the bulk of the responsibility on the Governing Body to provide quality assurance oversight and coordination, with the administrator playing a subordinate role at the direction of the Governing Body.  Regardless of that nuance, the structure makes clear that the Governing Body occupies the pinnacle of legal responsibility for ensuring the facility delivers the required outcomes, including harm prevention.

Dep. 19:9-19) and (Ex. 8, Deddo Dep. 28:18-30:24) and approved and oversaw policies, either directly or through his agent, Larry Hovey who fired one administrator for writing policies without approval. (Ex. 19, Willey Dep. 46:21-47:9) Graff denied having involvement with policy, stating there may have been other members of the Governing Body but couldn't identify them (Ex.11, Graff Dep. 270:1-17), and asserted sometimes other employees were involved in evaluating potential administrators. (Ex. 11, Graff Dep. 201:14-202:24). Graff's efforts, if worthy of belief, merely create material issue of fact and suggest that his motion for summary judgment was not brought in good faith.

Notwithstanding the fact Graff clearly assumed the responsibilities of the Governing Body, Graff testified that he did nothing to monitor whether the policies were effective to properly manage and operate the facility. (Ex.11, Graff Dep. 200:7-12). He also testified that he did nothing to monitor the effectiveness of the administrator in discharging their duties, despite having been an administrator himself for many years. (Ex. 11, Graff Dep. 26:11-21). Instead, he testified that he sat back and waited to see whether the state inspectors caught them doing anything wrong, and then simply reviewed the reports and told the administrator to fix what his attorneys didn't negotiate down. (Ex. 11, Graff Dep. 28:6-11). In short, Graff admits that he abdicated his legal duties to provide effective oversight of Momence necessary to ensure harm was prevented.

The shortcoming of this alleged approach is demonstrated by examining four documents relevant to survey reports, The shortcoming of this approach is demonstrated by examining four documents relevant to survey reports. (Ex. 41, Patel Dep. April 19, 2001 letter from Duane Morris to IDPH; Ex. 42, May 30, 2001 letter from IDPH to Momence Meadows; Ex. 43, January

2, 2002 letter from IDPH to Momence Meadows; Ex. 44, August 29, 2003 letter from IDPH to Momence Meadows. Each of these documents reflect that Momence was repeatedly failing to achieve substantial compliance with the regulations, resulting in mandatory imposition of prospective denial of payment for new Medicare and Medicaid residents after a short opportunity to cure. In 2001 Momence failed to cure the serious pressure sore problems and prospective denial of payment was imposed along with a *per diem* penalty. None of the documents would have provided information to Graff concerning the incidence of scabies that persisted at the facility during those years. Momence's tenuous compliance history, however, may explain why Momence personnel went to great lengths to conceal the 2002 scabies outbreak that affected dozens of residents and placed the remaining residents at risk.

Placing the foregoing evidence alongside the evidence that Graff approved all major purchases and proclaimed to care only about revenue rather than whether residents were being fed, a reasonable jury could conclude that Graff was keenly aware of the profits and interjected himself in the day-to-day operations to enhance revenue, but was deliberately ignorant of the problems (i.e. "intentional disregard of the truth" under the FCA). A reasonable jury could also conclude that Graff failed to fulfill his oversight duties as the Governing Body which caused the situation that inevitably led to the patient harm rendering claims false or fraudulent. In short, a jury could find that Graff "knowingly caused the train wreck" by setting the facility on a course that was doomed to fail.

### b. Graff's Duties as Governing Body Connect to Other Oversight and Administration Requirements

Because the Governing Body is legally responsible for establishing and implementing policies regarding the management and operation of the facility, and overseeing the

58

administrator's management of the facility, Graff's duties in that role necessarily required that he actively evaluate the policies' effectiveness to prevent harm. Those policies covered not only direct resident care and harm prevention, they also covered the maintenance of accurate, organized and readily accessible clinical records, the shortcomings of which were discussed *supra*. 42 C.F.R. § 483.75(l).

Notwithstanding the mandate to staff with the "professionals necessary to carry out the [LTC] requirements," 42 C.F.R. § 483.75(l), the Assistant Administrator who oversaw staff scheduling admitted that Momence only ensured compliance with the State of Illinois regulation requiring a simple ratio for life safety purposes. (Ex. 8, Deddo Dep. 86:13-87:12). Although she said they occasionally added one person to a wing, she admitted that Momence did not closely assess its acuity mix and schedule accordingly. (Ex. 8, Deddo Dep. 161:3-14). Furthermore, given this regulatory requirement, as the Governing Body, Graff had an obligation to ensure there were effective policies in place ensuring compliance with this fundamental underpinning of Momence's ability to prevent harm and also deliver the other mandated outcomes.

Also deserving special mention is the requirement for an independent Medical Director responsible for the "implementation of resident care policies and the coordination of medical care in the facility." 42 C.F.R. § 483.75(i). Thus, the Medical Director shares some of the policy implementation responsibilities that ultimately reside with the Governing Body. The Long Term Care Survey, which Momence witnesses repeatedly acknowledged as a familiar authority (Ex. 8, Deddo Dep. 81:10-83:4), clearly indicates, at F-TAG F501, that the intent of this provision includes "coordination of facility-wide medical care," "clinical guidance and oversight" and help "identify, evaluate, and address/resolve medical and clinical concerns." It continues by stating

the "medical director has an important leadership role" including input into the development, review, and approval of resident care policies.

In this case, however, the Medical Director, Dr. Patel, testified that he did not know there were LTC facility regulations or other publications governing his duties, and never looked at any. (Ex. 16, Patel Dep. F, 45-46:10-18, 53 and 81), and never did anything to review, update or implement a single policy. (Ex. 16, Patel Dep. 75, 243-244). Likewise, Graff testified that he never knew who the medical director was, let alone work with him to develop and implement policies. (Ex. 11, Graff Dep. 74, 11-22). Dr. Patel also testified that he only attended quarterly quality assurance meetings and relied on the information provided by staff at those meetings. (Ex. 16, Patel Dep. 75). Incredibly, he never saw a written complaint and never saw an actual survey or inspection reports, and never saw OSCAR reports comparing the facility's statistics and survey results with the region, state and country – although he testified he would have liked to have seen them. (Ex. 16, Patel Dep. 77-78). He also testified that he never saw a written complaint and was never aware that Momence had ever been denied payment for new Medicare/Medicaid residents, or ever at risk of such a denial. (Ex. 16, Patel Dep. 87, 92, 126).

Taken at face value, their combined testimony paints a dramatic picture of complete dereliction of duty concerning oversight by Graff, coupled with an outside Medical Director in title only whose knowledge was carefully controlled to prevent damage to the facility's reputation. This left the staff free to do as they darn well felt like, so long as the surveyors didn't catch too much of it. This lax environment gave rise to the Assistant Administrator smoking marijuana with residents and staff (Ex. 2, Mitchell Dep. 83:13-84:11-19), which led to injury in when a nursing aide was unable or unwilling to assist Relator Mitchell extract resident DO from

beneath a faulty siderail choking her. Ex. 2, Mitchell Dep. 75:20 – 82:5) . Based on the foregoing, any reasonable jury could find that Momence and Graff were willing to do whatever was necessary to protect their reputations, but not what was necessary to prevent harm to residents. A deplorable elevation of profits over people at the government's expense.

On the whole, a reasonable jury could conclude that Graff assumed the role of Governing Body when it suited him, but either intentionally or with reckless disregard failed to fulfill the oversight duties designed to ensure the prevention of harm and other mandated resident outcomes were achieved. As a result, residents were harmed which in turn rendered the relevant claims false or fraudulent. Based on the foregoing, a reasonable jury could find that Defendant Graff's knowing failure to fully discharge the duties of the Governing Body caused Momence to present false or fraudulent claims, and/or to make or use false records or statements to get false or fraudulent claims paid.

### III.  Plaintiffs Can Satisfy the Elements of Both a State and Federal Retaliatory Discharge Claim (Counts III and IV)[20]

According to Defendants, Absher and Mitchell were mere "malcontents," not whistleblowers exposing fraud. Defts' Mem., at 49. Defendants have turned the facts on their head. Defendants were entrusted with millions of dollars in state and federal funds to care for these residents, funds which were squandered. The taxpayers were not the only victims – it was the residents who lived in conditions that threatened their safety who also suffered from Defendants' scheme. Absher and Mitchell were responsible for administering bedside care in these conditions, and were sickened by what they saw. They were not "malcontents" – they were

---

[20] Because Defendants presented a single argument for both of Plaintiffs' claims under the Illinois Whistleblower Reward and Protection Act and FCA ' 3730(h), Plaintiffs also present a single argument to demonstrate that Plaintiffs can establish the elements of both federal and state retaliatory discharge claims.

the **only** ones who tried to do something. Defendants knew they were "whistleblowers" and that

they were threatening to expose this abomination. They terminated Mitchell amid bogus charges

relating to a patient who died from the very conditions that Mitchell and Absher were opposing.

Then they tightened the screws on Absher until she was forced to leave. This is exactly the sort

of conduct which Section 3730(h) was intended to prohibit.

> Section 3730(h) provides that:
>
> Any employee who is discharged, demoted, suspended, threatened, harassed, or in any other manner discriminated against in the terms and conditions of employment by his or her employer because of lawful acts done by the employee … in furtherance of an action under this section, including investigation for, initiation of, testimony for, or assistance in an action filed or to be filed under this section, shall be entitled to all relief necessary to make the employee whole …

31 U.S.C. ' 3730(h). In the Seventh Circuit, there are three elements for establishing a ' 3730(h)

claim: "(1) the employee must be engaged in conduct protected by the statute, (2) the employer

must know the employee was engaging in such protected conduct, and (3) the employer must

have discriminated against the employee because of this protected conduct." *Luckey v. Baxter*

*Healthcare Corp.*, 2 F. Supp. 2d 1034, 1050 (7th Cir. 1998). Plaintiffs can establish the elements

of both federal and state retaliatory discharge claims.

### A. Plaintiffs Engaged in Protected Activity.

Protected activity under Section 3730(h) is interpreted broadly. *Luckey*, 2 F. Supp. 2d at

1051; *Fanslow v. Chicago Manufacturing Center, Inc.*, 384 F.3d 469, 479 (7th Cir. 2004). In

order to demonstrate that a plaintiff's activities were "in furtherance of" a qui tam, Plaintiffs

must show that a qui tam was a "distinct possibility," and that Plaintiffs in good faith believed

(and another reasonable employee might also have believed) that the employer was committing

fraud against the government. *Fanslow*, 384 F.3d at 479-80; *Neal v. Honeywell Inc.*, 33 F.3d 860, 864 (7th Cir. 1994).

There is no requirement that the plaintiffs know their investigation will lead to a *qui tam* or that the plaintiffs even know what a *qui tam* is at the time of their protected activity. *Fanslow*, 384 F.3d at 479-80, 481 ("An employee need not have actual knowledge of the FCA for her actions to be considered "protected activity" under § 3730(h). If so, only those with sophisticated legal knowledge would be protected by the statute"), *citing, Yesudian*, 153 F.3d 739-41 (". . . only [lawyers] would know from the outset that what they were investigating could lead to a False Claims Act prosecution."). It is well established that internal complaints about fraud to an employer are protected. *Fanslow*, 384 F.3d at 481; *Neal*, 33 F.3d at 865; *Yesudian*, 153 F.3d at 741.

Contrary to Defendants' assertions, Plaintiffs have presented ample evidence of protected conduct under Section 3730(h). For years, Absher and Mitchell complained internally about the horrific conditions at Momence Meadows, including resident neglect, chronic staff shortages, and severe scabies outbreaks. (ASMF && 4, 9).   Contrary to Defendants' Memorandum, these were complaints about **fraudulent** activity, and everyone at Momence Meadows knew it. Deft's Mem., at 49.   Quality Assurance Nurse Stacy Bednarowicz testified that neglect is fraud, and that if a nursing home neglects patients and submits Medicare/Medicaid claims, then it is fraud. (ASMF &10).   Sue Cavender, who ultimately terminated Mitchell's employment, repeatedly instructed Mitchell that she was not to record patient rashes as scabies in their charts, despite the chronic scabies outbreaks – the epitome of intentional fraudulent conduct.   ASMF, ¶¶1-4. Cavender told Mitchell that unless she wanted to lose her job, she was not to mention scabies

again. ASMF, ¶ 4. Plaintiffs testified that they understood that charting was part of each Momence Meadows Nursing Center resident's billing and that they reported to Momence Meadows administrative staff missing or false chart information they discovered. (ASMF &&1-2, 9).

Thus, it is beyond dispute that Plaintiffs reasonably believed they were complaining to their employer about false or fraudulent claims being submitted to the government and Defendants' claims to the contrary should be rejected. The fact that Plaintiffs (who worked in resident care, not billing) did not see the actual bills Momence Meadows submitted is completely irrelevant. *United States ex rel. Lusby v. Rolls-Royce Corp.*, 570 F.3d 849 (7th Cir. 2009) (A relator need not have seen the claims submitted to the federal government, but must know enough to make fraud a likely explanation for any overbilling). Plaintiffs were aware that Defendants were being paid to provide a standard of care for residents which the facility was nowhere close to providing, and that they were being instructed by their supervisors to cover it up.

With their internal complaints going nowhere, Plaintiffs went outside the organization. In 2001, Mitchell called the IDPH Nursing Home Hotline to report the scabies outbreak at Momence Meadows. (ASMF &&4-8). Between 2000 and 2002, Absher also called IDPH on multiple occasions to report the scabies outbreak as well as the chronic staff shortages at the facility, which were compromising patient care and safety. *Id.* This conduct was clearly protected. *Fanslow*, 384 F.3d at 481 (conversation with government official can "comfortably be characterized as investigatory conduct.")

Defendants' reliance on *Hopper v. Anton*, 91 F.3d 1261 (9th Cir. 1996), for the proposition that Plaintiffs' complaints are not protected because they were merely allegations of regulatory non-compliance should be rejected. *Hopper* drew a distinction between complaining about regulatory non-compliance and exposing fraud, the latter being protected. Unlike in *Hopper,* Absher's and Mitchell's complaints were complaints about fraud. The violations which Absher and Mitchell were complaining about eventually formed the basis of this FCA lawsuit, and as set forth above, the evidence of fraud is overwhelming. Absher and Mitchell were the original whistleblowers who brought these truths to light – their investigatory and opposition conduct, while they were employed, furthered this suit, and is by definition, protected under Section 3730(h). Contrary to Defendants' assertions, Plaintiffs were not questioning the adequacy of effort being put forth by their colleagues – they were complaining and reporting fraudulent conduct which placed the residents in harm's way.

Absher is an LPN, and Mitchell an RN. Each had a lay person's understanding of the State and Federal civil and criminal code. They knew something was wrong and they were being pressured to cover it up. They do not lose protection under the statute simply because they did not have the understanding of a seasoned FCA-attorney from the first moment they discovered something was wrong. *Fanslow,* 384 F.3d at 481 ("Congress intended to protect employees from retaliation while they are collecting information about a possible fraud, before they have put all the pieces of the puzzle together.").

Finally, even if this Court found that some of Plaintiffs' complaints did not fall within Section 3730(h)'s protection, though Plaintiffs argue that they do, it would still not entitle Defendants to summary judgment on this element. In *U.S. ex rel. Abner v. Jewish Hospital*

*Health Care Services, Inc.*, the plaintiffs complained to their supervisors as well as the HIPAA and Medicare hotlines about quality issues in the lab department and billing improprieties for blood tests. 2010 U.S. Dist. LEXIS 32352, *6-18 (S.D. Ind. 3/31/2010). The district court agreed with the defendant that some of the plaintiffs' conduct, such as complaints about quality of the lab department's work, did not fall within ' 3730(h) protection. *Id.* at *26. However, it determined that because a portion of the plaintiffs' investigation concerned billing improprieties and could have amounted to fraud, this was sufficient evidence for a jury to find the plaintiffs engaged in protected activity under ' 3730(h). *Id.* The court reasoned that plaintiffs' activity was protected since "' 3730(h) is intended to protect employees while they are 'put[ting] all the pieces of the puzzle together."

> **B.** **Momence Meadows Nursing Center Knew Plaintiffs Engaged in Protected Activity.**

To prove this second element, a plaintiff must show that the defendant knew the plaintiff was engaged in protected activity. *U.S. ex rel. Yesudian v. Howard Univ.*, 153 F.3d 731, 742 (D.C. Cir. 1998). Furthermore, a plaintiff must demonstrate that his protected activity put the defendant on notice of the distinct possibility of a qui tam action. *Fanslow*, 384 F.3d at 483.

Defendants incorrectly conclude that because Plaintiffs did not entertain the idea of bringing a qui tam action, then no one at Momence Meadows Nursing Center could be put on notice of a potential qui tam action. There is "no requirement that [the plaintiff] 'suggest to defendant' that he is contemplating [a FCA] action." *Yesudian*, 153 F.3d at 742. There is also no requirement that the plaintiff inform or threaten her employer that she will report the allegations to the government or anyone outside the employing institution. *Id*. at 743.

The record demonstrates that Plaintiffs' complaints put Momence Meadows on notice of the possibility of a qui tam action. Plaintiffs repeatedly complained to Momence Meadows administrative staff about missing or false information in resident charts, staff shortages, and resident neglect, including their suspicions about scabies. (ASMF &&2, 9). Both the Plaintiffs and also Defendants clearly understood that these were complaints about fraud, and that Plaintiffs were "whistleblowers" who were trying to expose their scheme. Indeed, Director of Nursing Sue Cavender told Absher in February 2003, "So you're a whistleblower now?" This statement is an admission, from a decision maker in Mitchell's termination, that the Defendants believed Plaintiffs were complaining about fraud. (ASMF &11). Defendants repeatedly threatened Plaintiffs with their jobs if they reported their complaints to anyone outside of Momence Meadows, especially government agencies. ASMF, ¶4,12. Clearly, they were aware that a whistleblower action was a "distinct possibility," and that Plaintiffs intended to report their scheme to the authorities. *Neal*, 33 F.3d at 865. This is certainly true on summary judgment, where inferences must be drawn in Plaintiffs' favor.

### C. Momence Meadows Nursing Center Terminated Plaintiffs Because They Engaged in Protected Activity

Contrary to Defendants' Memorandum, Mitchell was terminated because Defendants believed she was a whistleblower, and Absher was harassed and constructively discharged for her complaints. Defendants' claims that Mitchell was terminated for her an alleged role in the death of Patient AB, and for falsifying patient records are complete pretext. The bogus nature of these allegations against Mitchell, by itself, is telling evidence that illegal motive was the real reason for the decision. *Gordon v. United Airlines, Inc.*, 246 F.3d 878, 893 (7th Cir. 2001)("When the sincerity of an employer's asserted reasons for discharging an employee is cast into doubt, a

fact finder may reasonably infer that unlawful discrimination was the true motivation") (quoting *Adreani v. First Colonial Bankshares Corp.*, 154 F.3d 389, 395 (7th Cir. 1998)).

Mitchell had nothing to do with the death of resident AB – the resident died as a result of neglect, aspirating on his own bile and feces, because the night nurse failed to check on him during the night. (ASMF ¶16). Mitchell, who was the day nurse, was not responsible for his death, which was the result of the very staffing practices which she had repeatedly complained of.  Simply put, Mitchell was set up.  Her termination reeks with suspicion.  After the death of resident AB, Cavender instructed Mitchell not to speak with the state or the Office of the State Guardian or anyone else until Cavender spoke with them first. (ASMF &12). Furthermore, Cavender instructed Mitchell to falsely chart that she had spoken with Dr. Patel. (ASMF &12). Mitchell strenuously objected to this instruction, and refused to do it. (ASMF &13). It was only when Cavender threatened her with her job that Mitchell charted she had spoken with Dr. Patel when she had not. (ASMF &13).  Mitchell was terminated six days later. (ASMF &14). Defendants' claim that the falsification of this record was the reason for Mitchell's termination is complete pretext – Mitchell was just doing what she was told.  Cavender set her up because she believed she was a "whistleblower," and ensured that Mitchell's story about Patient AB would not come out by instructing her to be silent.

Defendants' claim that the decision-makers who terminated her "had no knowledge she was engaged any protected conduct" should be rejected on summary judgment, where the inferences must be drawn in Plaintiffs' favor.  It is reasonable to assume that Plaintiffs' multiple complaints over a period of years were communicated throughout upper management, and that Cavender's belief that they were "whistleblowers" was the belief of the company.  *U.S. ex rel.*

68

*Holeman v. City of Commerce City*, 112 F.Supp.2d 1079, 1086 (D.CO. 2000) ("Although it does not appear Plaintiff believes Ms. Baker, Ms. James, or Ms. Malloy were part of the alleged conspiracy to constructively discharge him, it is reasonable to assume those individuals communicated Plaintiff's complaints, either directly or indirectly, to either Mr. House or Mr. Gagen"); *see also, Staub v. Proctor Hospital*, 131 S.Ct. 1186, 1192, 179 L. Ed. 2d 144 (2011) (under "cat's paw" theory of liability, employer will be liable for discrimination where an adverse action taken by a decision-maker is "the intended consequence" of a non-decision-maker's "discriminatory conduct").

Mitchell was told to sign her termination document by Cavender and Bednarowicz in order to receive her final paycheck from Momence Meadows Nursing Center. (ASMF &15). After refusing to sign the termination document for approximately six weeks, she ultimately signed the document because she needed her check and was falsely told that Absher signed a similar document. (ASMF &15). Mitchell's signature on this document under these coercive circumstances is hardly a judicial admission of wrongdoing – to the contrary, it is further evidence that Defendants were doing everything they could to set her up and create a false record for Mitchell's forthcoming whistleblower lawsuit.

Absher resigned from Momence Meadows Nursing Center under extreme duress due to resident AB's death, Mitchell's termination, and PA announcements instructing Momence Meadows employees not to speak to her or else they would be fired. (ASMF &17). The PA announcement is a clear example of egregious harassment and ostracization specifically proscribed by Section 3730(h). All of these events occurred after Absher told Cavender and Assistant Administrator Paula Deddo that she would call OSG, CMS, IDPH, ombudsman, or any

other agency, and tell them about how sick Momence Meadows' residents are and how short staffed the facility was. (ASMF &19). Having seen Mitchell scapegoated and blamed for the death of patient AB and having been made to seem a traitor at her own workplace, Absher's departure was hardly voluntary and amounts to a constructive discharge. (ASMF &18); *Neal v. Honeywell*, 191 F.3d 827 (7th Cir. 1999)(affirming verdict finding constructive discharge under Section 3730(h) where employee suffered reduction of responsibilities, felt unsafe at work, and was made to feel like a traitor by her immediate supervisor). The fact that Absher's resignation letter did not mention any regulatory violations (Defts' Mem., at 51) is immaterial given her <u>numerous</u> complaints about the issues underlying this FCA action.

Finally, the egregious threats, harassment and intimidation which occurred following Plaintiffs' terminations is telling evidence of the extreme animosity which Defendants harbored toward them for their whistle blowing. RSF, ¶88, 94, 95, 97. There is no other explanation for why these menacing and bizarre actions would have occurred, and a jury could certainly infer that they are further evidence of Defendants' intent to further silence and intimidate Absher and Mitchell from whistle blowing.

Therefore, there is sufficient evidence in the record for a jury to find Defendants terminated Plaintiffs due to their protected activity.

## CONCLUSION

Based upon the argument set forth in this brief and the evidence submitted in this case, Defendants' Motions for Summary Judgment must be denied.

Respectfully submitted,

By: ___S/ Gerald C. Robinson_____
One of Plaintiffs' Attorneys

Robin B. Potter, Esq.
Denise M. Quimby, Esq.
ROBIN POTTER & ASSOCIATES, P.C.
111 E. Wacker Drive
Suite 2600
Chicago, Illinois 60601
(312) 861-1800 Phone
(312) 861-3009 Fax
robin@potterlaw.org
denise@potterlaw.org

Gerald C. Robinson, Esq.
   *Of Counsel*
Gale Pearson, Esq.
Stephen J. Randall, Esq.
PEARSON, RANDALL & SCHUMACHER, P.A.
100 South Fifth Street
Suite 1025
Minneapolis, Minnesota 55402
(612) 767-7500 Phone
(612) 767-7501 Fax
gerald.robinson@live.com
gpearson@prslegal.com
srandall@prslegal.com

**CERTIFICATE OF SERVICE**

   I, Gerald C. Robinson, certify that on January 23, 2012, I electronically filed the foregoing document with the Clerk of Court, using the Court's CM/ECF system, which will send electronic notification of the filing to the below CM/ECF participants. Parties may access this filing through the Court's system.

Howard M. Hoffman, Esq.
Mark J. Silberman, Esq.
Duane Morris LLP
190 S. LaSalle Street
Suite 3700
Chicago, IL 60603-3433
hmhoffmann@duanemorris.com
mjsilberman@duanemorris.com

Richard Scharlat, Esq.
Locke, Lord, Bissell & Liddell, LLP
3 World Financial Center
New York, New York 10281
rscharlat@lockelord.com

Keith E. Emmons, Esq.
MEYER CAPEL PC
P.O. BOX 6750

kemmons@meyercapel.com

Eric I. Long, Esq.
United States Attorney's Office
Civil Division-Illinois
318 South Sixth Street
Springfield, IL 62701
eric.long@usdoj.gov

Bradley Hart, Esq.
Patricia P. Tinch, Esq.
Assistant Attorney General
Office of the Illinois Attorney General
500 S. Second Street
Springfield, IL 62706
bhart@atg.state.il.us
ptinch@atg.state.il.us

Julia Callahan, Esq.
U.S. Department of Justice
Civil Division, Commercial Litigation Branch
P.O. Box 261
Ben Franklin Station
Washington, DC 20044
VIA U.S. MAIL ONLY

     By:   S/ Gerald C. Robinson