**IN THE UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS
URBANA DIVISION**

| | |
|---|---|
| UNITED STATES OF AMERICA )<br>and the STATE OF ILLINOIS, *ex rel.* )<br>VANESSA ABSHER and LYNDA MITCHELL, )<br> )<br> Plaintiffs, )<br> )<br>v. )<br> )<br>MOMENCE MEADOWS NURSING )<br>CENTER, INC. and JACOB GRAFF, )<br>Individually, )<br> )<br> Defendants. ) | Judge Harold A. Baker<br><br>Case No. 04-C-2289 |

## II. <u>RESPONSE TO ALLEGED UNDISPUTED MATERIAL FACTS</u>

### General Objections

The Defendants' Statement of Undisputed Material Facts fails to comply with Local Rule 7.1(D)(1)(b) in two respects.  First, the Local Rule requires a party moving for summary judgment to list and number each undisputed material fact which is the basis for the motion.  In their Motion, Defendants have listed what they ostensibly contend are ninety-eight (98) undisputed material facts.  However, the vast majority of the purportedly undisputed material facts are compound, i.e., comprised of many subparts.  For example, Defendants' Undisputed Material Fact No. 45 is eight pages long and encompasses ninety-nine (99) additional "facts."  Similarly, No. 38 is two pages long and comprised of twenty-three (23) additional "facts."

Local Rule 7.1(D)(1)(b) also states: "A WORD OF CAUTION: Material facts are only those facts which bear directly on the legal issue raised by the motion."  The Court has discretion to determine whether the local rules governing summary judgment motions should be strictly applied.

*Altman v. Benigno*, 2005 U.S. Dist. LEXIS 35540, *3 (C.D. Ill Dec. 9, 2005), citing *Waldridge v. American Hoechst Corp*., 24 F.3d 918, 923 (7th Cir. 1994). In *Altman*, the Court granted the defendant's motion to strike the plaintiff's statement of facts because it contained many facts that did not relate to the legal arguments raised by plaintiff, and because some of the facts raised by the plaintiff could have been stated more succinctly. *Id*. at *4. As is the case here, Defendants have included many purported facts that are that are wholly immaterial to the issues raised in their Motion. Moreover, many of the purported facts are duplicative. Plaintiffs object and move to strike those immaterial matters - both disputed and undisputed - and duplicative averments.

Second, many of the Defendants' purported statements of fact are not supported by their record citations or by admissible evidence and may also properly be disregarded. *Id.* Finally, Plaintiffs object to the "headings" included by Defendants, to the extent they are argumentative, speculative, or unsupported by the record, e.g., "The Government Routinely Surveyed Momence to Assess the Quality of Care Provided and Never Identified a Deficiency Related to any Subject About Which Plaintiffs' Complain, Factually or Legally Capable of Constituting Worthless Services" and "Plaintiffs Retaliatory Discharge Claim is Impossible as Mitchell was Terminated for Improper Nursing Care and Falsification of Documents and Absher Resigned."

Finally, any admissions made by Plaintiffs in these Responses are made solely for purposes of response to Defendants' Motion for Summary Judgment.

## A. UNDISPUTED MATERIAL FACTS

The Plaintiffs concede that the following are undisputed material facts:

1a.    At all relevant times Mitchell was a Licensed Registered Nurse. (Dkt. 145, Complaint 8).

1b.   Mitchell worked at Momence Meadows Nursing Center, Inc. ("Momence") from August 2001 through May 2002 as an employee of Pro Care. (Exh. 1, Mitchell p. 7).

1c.   Mitchell became an employee of Momence on June 1, 2002. (Exh. 1, Mitchell p. 7).

1d.   Mitchell was terminated on February 14, 2003. (Exh. 20).

1f.   Mitchell was reported by Momence to the Illinois Department of Professional Regulation ("IDPR"). (Exh. 21, IDPR 74).

2a.   At all relevant times Absher was a Licensed Practical Nurse. (Dkt. 145, Complaint 8; Exh. 2, Absher p. 15).

2b.   Absher was employed by Momence from December 8, 1998 through December 29, 1999 and January 9, 2000 through February 13, 2003. (Exh. 24).

2d.   Absher tendered another resignation letter to Momence on or about February 13, 2003 stating she was "taking an emergency mental health leave of absence." (Exh. 23).

2e.   Absher's last day of work at Momence was February 9, 2003. (Exh. 23).

2i.   On 3/7/03 Absher wrote a letter to Whom It May Concern setting out some employee complaints. (Exh. 25).

2j.   On 3/21/03 Absher was reported to the IDPR for withholding information regarding a resident's death. (IDPR 65).

3b.   Graff was one of the owners of Momence. (Dkt. 207, Answer 12).

4a.   Dr. Patel has been the medical director at Momence for approximately the last 20 years. (Exh. 4, Patel p. 21).

5a.   Willey was an employee of Premier Management and worked as the administrator of Momence from November 4, 2001 through May 3, 2005.
      (Exh. 5, Willey pp. 20-21, 32).

5d.   Willey was also executive director of Momence. (Exh. 5, Willey pp. 240).

6a.   Deddo worked at Momence from 1992 to 2006. (Exh. 6, Deddo p. 12).

7a.   DeMeullenarer has been employed by Momence as an LPN since September, 1988. (Exh. 7, DeMeullenarer p. 17).

8a.   Glenn worked at Momence from April 1999 through June 2004. (Exh. 8, Glenn pp. 23, 381).

8b.   Glenn is a licensed registered nurse in Illinois and Tennessee. (Exh. 8, Glenn pp. 13-14).

8c.   Glenn began working at Momence as a floor nurse on D Hall, then in or around the beginning of 2000 she became the Assistant Director of Nursing ("ADON"). (Exh. 8, Glenn p. 28).

8d.   At the end of 2001 Glenn became the Director of Nursing ("DON"). (Exh. 8, Glenn p. 41).

8e.   Glenn moved into the position of quality assurance nurse in or around the end of 2003. (Exh. 8, Glenn pp. 381-382).

10a.  Isaacs, a registered nurse, worked at Momence during the period 2002 – 2003. (Exh. 10, Isaacs p. 15, 51).

10b.    Isaacs was promoted to Assistant Director of Nursing in October 2002. (Exh. 10, Isaacs pp. 15, 51).

14a.    Schnell has worked at Momence since 1991 and is still employed at Momence. (Exh. 14, Schnell p. 10).

15a.    Burt-Lafi was employed as a CNA at Momence from Sept. 1997 through at least June 2006. (Exh. 15, Burt-Lafi pp. 8-10, 17).

16a.    Fulton worked as a CNA at Momence three different times (Exh. 16, Fulton pp. 9-10).

17a.    Jaffe, one of the owners of Jaffe Drug Store, was the consultant pharmacist to Momence for approximately 25 to 30 years. (Exh. 17, Jaffe p. 15, 21).

20.     Defendant Momence was a 140-bed skilled nursing facility that housed up to 140 elderly and disabled residents at any given time located in Momence, Illinois. (Dkt. 207, Answer ¶ 10).

21b.    Graff was not involved in the designation or choosing of the Medical Director at Momence. The administrator and director of nursing would have handled that. (Exh. 3, Graff pp. 203-204).

21c.    Graff did not monitor the Medical Directors performance. (Exh. 3, Graff p. 205).

21d.    Graff did not request reports or analyses from the medical director. (Exh. 3, Graff p. 205).

21e.    Jacob Graff did not attend quality assurance meetings.. (Exh. 4, Patel p. 44).

21f.    Jacob Graff had no involvement in adopting policies for Momence. (Exh. 14, Schnell p. 67).

21g.    Graff was not involved in establishing and implementing policies and procedures at Momence. It was the responsibility of the administrator and director of nursing. (Exh. 3, Graff pp. 197-198).

21h.    Graff did not review policies and procedures, nor was he informed of their Content. (Exh. 5, Willey p. 186).

21i.    Policies and procedures were implemented by Willey, consultants and staff. (Exh. 5, Willey p. 265).

22.     Graff did not provide guidance, instruction or insight on how to care for residents. (Exh. 1, Mitchell pp. 403-404; Exh. 3, Graff pp, 88, 184, 198-199; Exh. 4, Patel p. 316; Exh. 7, DeMeullenarer pp. 146-147; Exh. 8, Glenn p. 133; Exh. 9, Bednarowicz p. 9).

22a.    Dr. Patel, occasionally talked to Jacob Graff. Graff did not have any involvement on day-to-day patient decisions. (Exh. 4, Patel p. 316).

22b.    Graff never wrote, approved or reviewed any policies for Momence concerning resident care from 1998 to June 2006. (Exh. 3, Graff pp. 198-199).

22c.    Jacob Graff was not involved in the day to day decisions regarding patient care. He did not provide guidance or insight regarding how to care for a patient and did not give any limitations. (Exh. 7, DeMeullenarer pp. 146-147).

22e.    Jacob Graff had no role in reporting to Public Health. He was not informed in the day to day quality assurance discussion or patient care discussions. (Exh. 9, Bednarowicz p. 234).

22f. Graff did not act as the administrator and was not involved in direct patient care or the day-to-day care of residents. (Exh. 8, Glenn p. 133).

22g. Graff was not Momence's administrator. (Exh. 3, Graff p. 184).

22h. Graff never reviewed patient medical records. (Exh. 3, Graff p. 88).

24. Graff was in regular contact with administrators to monitor census. Graff was also apprised of survey results. (Exh. 3, Graff pp. 89-90, 201; Exh. 5, Willey pp. 62, 100, 186-188, 256; Exh. 6, Deddo pp. 69-71; Exh. 9, Bednarowicz pp. 96-97).

24a. Willey communicated with Graff on a daily basis. (Exh. 5, Willey p. 100, 256).

24b. Graff called everyday to find out what the census was. (Exh. 9, Bednarowicz pp. 96-97).

24c. Graff called daily to see what the census was. (Exh. 6, Deddo p. 69).

24d. Deddo spoke with Graff when Willey was not available. She provided him with the census and Medicare data. (Exh. 6, Deddo pp. 69-71).

24e. Graff reviewed surveys conducted by the IDPH with Momence's administrator. (Exh. 3, Graff pp. 89-90, 201).

24f. Graff had a copy of every survey. (Exh. 5, Willey pp. 62; 187-188).

24g. Graff was notified whenever there was a survey. (Exh. 5, Willey p. 186)

24h. At the conclusion of the survey, Graff was informed if there were any deficiencies and how they were going to be corrected. (Exh. 5, Willey pp. 186-187).

25d. Willey testified that anything the patients needed, she would call Graff, tell him what was needed and he would say, "If the patient needs it, get it." (Exh. 5, Willey p. 26).

25e. Graff would say, If it's something for the patients, patients can benefit, do it. (Exh. 5, Willey p. 50)

25j. No requests for special equipment were ever denied by Graff. (Exh. 8, Glenn pp. 133-135).

26a. Dr. Patel was the medical director of Momence. (Exh. 8, Glenn p. 63).

26b. Dr. Patel was the medical director at Momence during the relevant period. (Exh. 9, Bednarowicz p. 28).

33a. Administrator, nursing staff, physical therapist, pharmacist, dietician and social services attended the quality assurance meetings. (Exh. 4, Patel p. 44).

33d. There were quality assurance meetings and care plan meetings. (Exh. 13, Henschel pp. 19-20).

33g. When there were cases of scabies or other infectious disease in the facility it was discussed during the quality assurance meetings. (Exh. 4, Patel p. 74).

33h. Quality assurance meetings covered the entire gamut of issues a facility might encounter. (Exh. 8, Glenn p. 58).

34. Premier Management provided consulting services to Momence on financial matters. (Exh. 3, Graff pp. 151, 153, 154, 225-226, 232).

34a. Premier Management provided consulting services to Momence on financial aspects – accounts receivable, accounts payable and liaison to the bank and things of that nature. (Exh. 3, Graff p. 151).

34b. Graff was an officer of Premier. (Exh. 3, Graff p. 154).

34c. Premier Management had a contract with Momence to provide certain management services. (Exh. 3, Graff p. 153).

35. Krupnick Bokor Kagda and Brooks provide accounting services to Momence and prepared their cost reports. (Exh. 3, Graff pp. 97, 271; Exh. 19, Kagda pp. 18, 92).

35a. Kagda prepared Momence's cost reports from financial data received from Appel. (Exh. 19, Kagda p. 18; Exh. 3, Graff p. 97).

37d. Glenn communicated regularly with Drs. Patel, McCuiston, Trapp, Didwania, Deguzman, and Pappa. (Exh. 8, Glenn p. 79).

37e. Nurses had access to the physicians. They were never instructed not to contact them. (Exh. 8, Glenn p. 24).

38t. Absher testified that nurses Zillmer, Archer, Isaacs and Mitchell were good or excellent nurses. (Exh. 2, Absher pp. 332-333).

45g(vi) The facility's medical people and consultants did not know what the rash was in the beginning. (Exh. 13, Henschel p. 177).

45g(vii) The doctors did not know what it was. (Exh. 13, Henschel p. 50).

45h. Residents cannot be treated for scabies without a physician's order. (Exh. 1, Mitchell p. 296; Exh. 8, Glenn pp. 248-249, 252; Exh. 10, Isaacs p. 26-27; Exh. 4, Patel pp. 265, 280).

45h(vi) Even if a resident had a negative scraping, if in Patel's medical judgment he felt they had scabies, he would treat for scabies. (Exh. 4, Patel p. 280).

45h(i) Residents could not be treated for scabies if they did not have a diagnoses of scabies from the doctor. (Exh. 10, Isaacs p. 26-27).

45k(x) Fulton was given instruction by the nurses on how to apply Kwell to a resident. Gloves were worn and discarded after each application. (Exh. 16, Fulton pp. 71-73).

45l(i) Resident MG was Dr. Patel's patient, MG had Norwegian scabies. (Exh. 4, Patel pp. 64, 95, 273).

45m(iii) Originally Dr. Patel thought her condition resulted from fungal medication he was giving her. Patel prescribed a course of treatment but not for scabies. (Exh. 8, Glenn pp. 281-283).

53a. Absher claims to have called on three occasions. (Exh. 2, Absher pp. 3031).

57. Mitchell thought the Public Health surveyors were dishonest and in cahoots with somebody. (Exh. 1, Mitchell pp. 319-320) .

58. Mitchell does not think that Public Health or others cared about the residents. (Exh. 1, Mitchell p. 399).

64. Medicaid pays a base pay per day. (Exh. 14, Schnell p. 13).

66. Momence had a records retention policy of 7 years. (Exh. 12, Sederholm pp. 22-23).

67. Henschel testified that records were usually kept in the building for a year and then moved to the garage for seven. (Exh. 13, Henschel pp. 210-211).

69. Momence records which were older than 7 years old were shredded. (Exh. 14, Schnell p. 37).

78. Glenn or the ADON would do med passes with the nurses if she felt it necessary. (Exh. 8, Glenn p. 104).

85. Absher describes incidents beginning in February 2003, i.e., flattened tires, broken windows, dead birds on her porch with nooses around their necks, gutted fish, notes and bricks thrown through her windows. (Exh. 2, Absher pp. 135136).

86. While Absher was driving on the interstate her rear car tire blew out and she attributes the blow out to Jacob Graff. (Exh. 2, Absher p. 139).

87. Absher filed a police report on 12/21/04 stating that her husband found a shop rag hanging out of the rear tail pipe of their car. (Exh. 29).

89. Absher claims to have been verbally threatened with car damage and physical abuse by nearly every CNA on all shifts. (Exh. 31).

90. Mitchell filed a police report on December 27, 2004 alleging in April 2004 both her son's and girlfriend's cars had their gas lines cut. (Exh. 28)

91. Mitchell also reported that in April 2004 she was intentionally forced off the road while driving home from work. (Exh. 28).

92. Mitchell reported that in April 2004 her son Josh was in a car accident and she could not say if it was an accident or if he was pushed into the accident. (Exh. 28).

93. Mitchell also reported that she had peeping toms and prowlers outside her residence in April 2004 (Exh. 28).

96. Mitchell testified to her belief that Police Officer Cromwell of the Momence Police Department had something to do with her daughter's accident. (Exh. 1, Mitchell p. 343).

## B. DISPUTED MATERIAL FACTS

1e. Mitchell was terminated for improper nursing care and fraudulent documentation in resident's chart. (Exh. 20).

**RESPONSE**: Plaintiffs dispute Defendants' averment that the purported fact is true or that document cited proves that Mitchell was terminated for improper nursing care and fraudulent documentation. It is a self-serving document insofar as it simply supports Defendants' assertion that this was the reason for Mitchell's termination. Mitchell alleges she was unlawfully terminated and disputes Defendants' proffered reason for her termination. (Dkt. 135, Plf's Cmpt. ¶¶ 104-110). Mitchell also disputes that she provided improper nursing care or that she falsified documentation in a resident's chart.

1g.     Mitchell acknowledged that her discharge was based on improper nursing and fraudulent documentation. (Exh. 20; Ex. 1, Mitchell pp. 152-157).

**RESPONSE**: This purported fact is not supported by the evidence cited.  Indeed, Mitchell testified that she was not the nurse on duty on the eve of the alleged improper nursing, and that Sue Cavender had directed her to falsify the deceased resident's chart.  (Exh. 2, Mitchell at pp. 149-155; Exh. 45, IDPR).

1h.     Mitchell admits that she falsified documentation in a residents record. (Exh. 1, Mitchell p. 332).

**RESPONSE**: The purported fact is not supported by the citation - there is no such page in Mitchell's deposition transcript or in Defendants' Exh. 1.  Mitchell does not dispute that she wrote a fabricated entry in resident AB's chart.  However, she did so because Sue Cavender told her to write it.  (Exh. 2, Mitchell pp. 150:25-151:5; 155:16-155:24).  Mitchell acknowledges signing an Employee Report which indicates she was being terminated for "improper nursing and fraudulent documentation," but she testified that she did so under protest and in order to receive her paycheck, which was being withheld until she signed it.  (Exh. 2, Mitchell pp. 152: 6-152:8; 152:11-152:12; 153:6-153:8, 154:11-154:13; 156:6-156:8; 156:18-156:20 ).

5b.     Premier Management provided consulting services to Momence on financial aspects – accounts receivable, accounts payable and was the liaison with the bank. (Exh. 3, Graff p. 151).

**RESPONSE**: Plaintiffs dispute this purported fact to the extent it suggests that Premier consulting services were limited strictly to accounts receivable, accounts payable, and as liaison wiht the bank.

5c.     As administrator, Willey was responsible for the day to day operations of the facility. (Exh. 5, Willey p. 240).

**RESPONSE**: Plaintiffs dispute this purported fact to the extent it suggests that Willey was the only individual responsible for the day to day operations of Momence.

    11a.    Barbara Clark worked at Momence from 1995 through 1999. (Exh. 11, Clark pp. 9-10).

**RESPONSE**: The purported fact is not supported by the cited portion of the deposition transcript. Clark was employed at Momence from 1991 or 1992 until 1999. (Ex 7, Clark at p. 4:22-4:23; Dkt. 135-11, Group Exh. D, Declaration of Barbara Clark).

    12a.    Sederholm worked at Momence for approximately 8 years, July 1998 to July 2006. (Exh. 12, Sederholm pp. 15, 49).

**RESPONSE**: Plaintiffs dispute the purported fact to the extent it suggests Sederholm was employed continuously from July 1998 to July 2006. Approximately a year and a half after she was first hired she was laid off, and was re-hired approximately eight months later. (Exh. 18, Sederholm pp. 18:12-19:15).

    12b.    Except for a six to eight month period Sederholm was the Momence employee responsible for billing. (Exh. 12, Sederholm pp. 49, 63, 152).

**RESPONSE**: Plaintiffs object to the purported fact as vague and ambiguous with respect to the term billing. Answering over this objection and without waiving same, the purported fact is not supported by the cited testimony.

    13a.    Henschel began working at Momence in 1989 as an activities coordinator. (Exh. 13, Henschel pp. 6-7).

**RESPONSE**: The purported fact is not supported by the cited portions of the deposition and misstates the testimony. Henschel was an activities assistant, not an activities coordinator. (Def's Exh.13, Henschel p. 144:14-19).

13b.    During the relevant time period Henschel was the assistant activity director. (Exh. 13, Henschel p. 144).

**RESPONSE**: The purported fact is not supported by the cited portions of the deposition, and misstates the testimony.  During the relevant time period, Henschel was the activities assistant, not the assistant activities director.  (Defs' Ex.13, Henschel p. 144:14-19).

14c.    During the period 1998 through 2006 Schnell coordinated the preparation of MDSs. (Exh. 14, Schnell pp. 10-11).

**RESPONSE**: The purported fact is not supported by the cited portions of the deposition, and misstates the testimony.  Schnell testified she did MDS and care plans.  She did not testify that she coordinated the preparation of the MDSs.  (Def's Exh. 14, Schnell p. 10:4-10:9).

16b.    Fulton was fired for putting a resident in bath water that was too hot, which resulted in the resident being burned. (Exh. 16, Fulton pp. 12-13).

**RESPONSE**: The purported fact is not supported by the cited deposition testimony and Defendants fail to include testimony related to the incident to which Fulton testified.  Fulton testified that she was suspended as a result of the resident being burned by hot water.  (Defs' Exh. 16, Fulton pp. 13:24-14:2).  Fulton also testified, "Come to find out, Ray Deddo, Paula's husband, knew that it wassomething wrong with that tub.  Him being the head of maintenance should've had a sign up there stating, 'Does not work.  Do not use.'  No sign or anything was up there saying something was wrong with it.  They –  Paula stopped talking to me.  Ray stopped talking to me because they – they're married.  They -- Paula wanted me to take the rap for Ray's mistake, so the facility wouldn't get red taped, you know, fined.  I told her no because him being a maintenance -- head of maintenance, he should've been aware, and he should -- just like if you go out on the street, and there's something there, the men working should have a sign there say, "Go around.  Make a left.

Make a right. Do not use." And nothing was there. That was not my fault." (Exh. 4, Fulton pp. 14:3-14:23). She also testified that she lost her job because she wouldn't take the blame for Deddo's husband. (Exh.4, Fulton p. 95:12-95:17).

18a.    Appel worked as the comptroller for Premier Management from 1986 to 2007. Premier Management provided bookkeeping services for Momence. (Exh. 18, Appel pp. 6, 18-20).

**RESPONSE**: In addition to bookkeeping services to Momence, Premier Management provided and was paid for rendering management services to Momence. (Exh. 3, Appel pp. 32:18-32:21; 152:13-152:24). Plaintiffs do not otherwise dispute that Appel worked as the comptroller for Premier Management.

21.     Graff was not involved in the operation of Momence. Graff was only involved in the financial aspects of Momence, not the aspects of patient care. (Exh. 3, Graff pp. 197-198, 200, 203-205; Exh. 4, Patel p. 44; Exh. 5, Willey pp. 186, 265; Exh. 6, Deddo pp. 72-73; Exh. 7, DeMeullenarer pp. 106-107; Exh. 8, Glenn pp. 131, 33; Exh. 9, Bednarowicz p. 96; Exh. 14, Schnell p. 67; Exh. 12, Sederholm p. 152).

**RESPONSE**: Disputed to the extent that it suggests the scope of Graff's role at Momence was *limited* to involvement in the financial aspects of Momence. See Def's Statement of Undisputed Fact 24, 24a-24i.

21a.    Graff was not involved in the operation of the facility, that was delegated to the administrator. Graff was only involved in the financial aspects, not the aspects of patient care. (Exh. 3, Graff p. 200).

**RESPONSE**: This purported fact is duplicative of 21. Plaintiffs object to this purported fact to the extent that it is vague and ambiguous with respect to the phrase "financial aspects." Answering over this objection and without waiving same, Disputed. See Def's Statement of Undisputed Fact 24, 24a-24i.

21k.    Graff was not involved in the day-to-day management of the facility.   (Exh. 8, Glenn p. 133).

**RESPONSE**: Plaintiffs object to this purported fact to the extent that it is vague and ambiguous with respect to the phrase "day-to-day management".  Answering over this objection and without waiving same, Disputed.  See Def's Statement of Undisputed Fact 24, 24a-24i.

21p.    Graff was not involved in the operation of the facility. (Exh. 3, Graff p. 200)

**RESPONSE**: Plaintiffs object to this purported fact to the extent that it is vague and ambiguous with respect to the term "operation."  Answering over this objection and without waiving same, Disputed.  See Def's Statement of Undisputed Fact 24, 24a-24i.

23.    Plaintiffs have no personal knowledge of Graff's role was in the operation and management of Momence. (Exh. 1, Mitchell pp. 74-75, 160; Exh. 2, Absher pp. 105-110).

**RESPONSE**: The purported facts relative to Mitchell are not supported by the cited portions of the depositions, and misstates the testimony.  Mitchell testified, "I don't recall ever seeing him [Graff]" (Def's Exh. 1, Mitchell p. 74:22-74:25), that she never saw Graff do anything at Momence Meadows (Def's Exh. 1, Mitchell p. 75:10-75:12) and, when asked whether, from her own observations, she know what he did for or at Momence, she responded, "Not with my own eyes, no." (Def's Exh. 1, Mitchell p. 75:18-75:21).

23a.    Absher knows nothing about Jacob Graff's role in running or operating Momence. (Exh. 2, Absher p. 108).

**RESPONSE**: Plaintiffs dispute that Absher knows nothing about Graff's role in running or operating Momence.  Absher testified that Graff "would call and scream ... he called daily that I was there at least five times a day screaming that there might be an empty bed of cattle." (Exh. 1, Absher pp. 185:16-186:3).  Absher also testified that she heard Graff scream on the phone close to 100 times

(Exh. 1, Absher p. 137:3-137:6) about empty beds (Exh. 1,   Absher p. 137:17-137:20).  Absher also testified that one time Paula Deddo "tried through tears to tell him that she had made oatmeal for 80 residents because there were call offs in the kitchen (Exh. 1, Absher p. 138:3-138:6) and Graff responded "I don't give a -- I don't care about your oatmeal.  I want to know why at 8:30 this morning I still have two empty beds ... get in the car, go find somebody on the street if you have to and fill the beds."  (Exh. 1, Absher p. 138:16-138:22).

> 23b.   Mitchell has no independent knowledge of what Graff did for or at Momence. (Exh. 1, Mitchell pp. 74-75, 160).

**RESPONSE**: The purported fact is not supported by the cited portions of the deposition, and misstates the testimony.  Mitchell testified, "I don't recall ever seeing him [Graff]" (Def's Exh. 1, Mitchell p. 74:22-74:25), that she never saw Graff do anything at Momence Meadows (Def's Exh. 1, Mitchell p. 75:10-75:12) and, when asked whether, from her own observations, she knows what he did for or at Momence, she responded, "Not with my own eyes, no."  (Def's Exh. 1, Mitchell p. 75:18-75:21).  In response to the statement, "But you yourself are unaware of anything Mr. Graff may have done at Momence ..." Mitchell replied, "To my actual seeing him there, no ... I only know that he is the owner of that facility and in my opinion responsible for everything that goes on there. I don't care if you're sitting seven states away, that man owns it, that man better know what's going on in it.  And if he doesn't, then he needs to sell it and let somebody else know."  (Exh. 2, Mitchell, p. 159:5-159:8; 159:17-159:22).

> 25.   Graff's role for Momence related to making sure its financial needs were taken met. (Exh. 3, Graff pp. 230, 248-249; Exh. 5, Willey pp. 26, 50; Exh. 6, Deddo pp. 267-268; Exh. 7, DeMeullenarer pp. 146-147; Exh. 8, Glenn pp. 133-135;  Exh. 9, Bednarowicz pp. 235-236; Exh. 18, Appel p. 173).

**RESPONSE**: Disputed to the extent that it suggests the scope of Graff's role at Momence

was *limited* to ensuring financial needs were met.  See Def's Statement of Undisputed Fact 24, 24a-

> 25a.   The administrator at Momence had the responsibility and the latitude to spend whatever she need to care for the residents. If however it was an extraordinary expense she would discuss it with the controller. (Exh. 3, Graff p. 230).

**RESPONSE:** Disputed. The cited testimony does not support the averment. When asked how the administrator would know how much money was available to spend, Graff said, "She knew." (Defs' Exh. 3, Graff p. 230:20-230:24).  When asked about the revenue stream, and asked "it wasn't unlimited was it?" Graff responded, "It was what it was." (Defs' Exh. 3, Graff p. 230:25-231:12).

> 25b.   Expenses that had to do with patient care were always provided even whether they could not afford it or not. That was the way the home was run. (Exh. 3, Graff p. 248).

**RESPONSE:** Disputed. The cited testimony does not support the averment.  When asked what proof there was of that, he said "My word." (Defs' Exh. 3, Graff p. 248:14-15).

> 25c.   Extraordinary expenditures of $10,000 or $20,000 would be discussed with the controller or Graff, but never an expense relating to staffing or patient care. (Exh. 3, Graff p. 249).

**RESPONSE**: Disputed. The cited testimony does not support the averment.  Graff testified if for payroll or patient care "it was delivered without any issue, period. Is that clear?"  (Defs' Exh. 3, Graff p.  249:13-18)

> 25f.   Appel never denied funds for anything the administrator said was needed to provide quality care to patients. (Exh. 18, Appel p. 173).

**RESPONSE**: Plaintiffs object to the averment to the extent it calls for a legal conclusion, expert opinion and/or impermissible lay opinion.  Appel is not a medical professional and is not qualified to determine what is or is not "quality care."

25g.    Staff was never denied anything necessary for the patient care because of money.
        (Exh. 6, Deddo pp. 267-268).

**RESPONSE**: Plaintiffs object to the averment insofar as it calls for speculation, calls for a

legal conclusion, expert opinion and/or impermissible lay opinion.  Answering over these objections

and without waiving same, Plaintiffs do not dispute the fact that Deddo gave this testimony, but

dispute that she has any basis or personal knowledge of whether resources for patient care were ever

withheld.

25h.    The expenditure of money for patient care was never refused or unavailable. (Exh.
        9, Bednarowicz pp. 235-236)

**RESPONSE**: Plaintiffs object to the averment insofar as it calls for speculation, calls for a

legal conclusion, expert opinion and/or impermissible lay opinion.  Answering over these objections

and without waiving same, Plaintiffs do not dispute the fact that Bednarowicz gave this testimony,

but dispute that she has any basis or personal knowledge as to whether the expenditure of money for

patient care was never refused or unavailable  resources for patient care were ever withheld.

25i.    They were provided the resources needed to care for the patients. (Exh. 7,
        DeMeullenarer pp. 146-147).

**RESPONSE**: Plaintiffs object to the averment insofar as it calls for speculation, calls for a

legal conclusion, expert opinion and/or impermissible lay opinion.  Answering over these objections

and without waiving same, Plaintiffs do not dispute the fact that DeMeullenarer gave this testimony,

but dispute that she has any basis or personal knowledge as to whether "they" were provided

adequate resources necessary to care for the patients as required under the law.

27.     As medical director Patel monitored the provision of medical care and was
        available for consult anytime another physician was unavailable. (Exh. 4, Patel pp.
        72, 209, 213, 298).

**RESPONSE**: The fact that Patel was or was not available for consult anytime another physician was unavailable does bear directly on any of the issues raised in Defendants' Motion or to the ultimate issues and/or resolution of this case. With respect to remainder of the statement, Defendants mischaracterize the testimony, and the pages cited do not support the purported facts. When asked what he has done to make sure that the policies of Momence reflect an awareness of the provisions for meeting the total needs of the residents, Dr. Patel responded, "Well that's what they -- we discuss in a quality assurance meeting, making sure they are being provided the appropriate care." (Def's Exh. 4, Patel p. 73:1-73:6). When asked what he does to ensure that the residents receive adequate services appropriate to their needs, Dr. Patel answered, "I think it's the part of the administrator. Nursing home administrator is the one who – administrator is the one who provides making sure it's -- care is provided. If they feel uncomfortable or something is not right, they bring it to my attention." (Def's Exh. 4, Patel p. 73:7-73:13). Further, Dr. Patel testified that, "Usually, if they cannot get hold of the attending physician for whatever reason, they call me," and between 1998 and 2006, that happened "One or two times a year. If it happens." (Def's Exh. 4, Patel p. 213:24-214:12).

       27a.    Patel supervises and evaluates the adequacy of treatment of all the Momence employees. He observes them and if something is wrong he addresses it. (Exh. 4, Patel p. 209).

**RESPONSE**: Defendants mischaracterize the testimony. When asked if he evaluates the treatment of all employees, he stated "I don't evaluate, write-up requests, anything, you know. That's if I see something unusual, then I brought it to their attention ... But I am not responsible for evaluating each and every employee." (Def's Ex. 4, Patel p. 209:11-209:18). When asked what he has done to keep quality of care under constant surveillance, Dr. Patel testified, "That's a part of the

nursing home. They provide -- they coordinate the care of -- provide the quality care and then they -- if there is something, there's a question, they ask me." He was approached with questions very occasionally. (Exh. 16, Patel 71:1-71:9).

27b.    Patel reviewed the Momence's policies to make sure they were appropriate. (Exh. 4, Patel p. 72).

**RESPONSE**: The purported fact is disputed to the extent it suggests Dr. Patel was involved in the development and review of Momence's policies. When asked what he has done to participate in the development of written policies, rules, and regulations to govern the nursing care and related medical and other healthcare services, Dr. Patel responded, "every nursing was [its] own policies already... I don't develop the policy." (Exh. 16, Patel, p. 71:14-71:20).

30a.    Nursing staff or the administrator would bring things to his attention if they felt something was not right or if they were uncomfortable about something. (Exh. 4, Patel p. 73).

**RESPONSE**: The purported fact is disputed to the extent it mischaracterizes or is an incomplete summary of the testimony. When asked what he does to ensure that the residents receive adequate services appropriate to their needs, Dr. Patel responded, " I think it's the part of the administrator. Nursing home administrator is the one who – administrator is the one who provides making sure it's  -- care is provided. If they feel uncomfortable or something is not right, [the administrator or nursing staff] bring it to my attention." (Defs' Exh. 4, Patel, p. 73:7-73:16). When asked if the administrator or nursing staff ever brought these issues to his attention, Dr. Patel responded, "Very occasionally. Very rare." (Defs' Exh. 4, Patel, 73:19-73:22).

31.    Neither Absher nor Mitchell ever complained to Patel about the care being given to the residents of Momence. (Exh. 4, Patel pp. 302-303, 306-308, 317; Exh. 27).

**RESPONSE**: This purported fact is not supported by the evidence cited. Absher and

Mitchell did in fact complain to Dr. Patel about the care being given to residents of Momence. In a letter dates April 21, 2003, Absher and Mitchell complained about, among other things, that "a certain nurse on the midnight shift was not giving medication or even looking at residents the entire night shift" and that "the G-tube patients labs were also indicating they were not getting medicines." (Def's Exh. 27, pp. 1-2). They also complained that patients with scabies were never quarantined, their belongings were not properly bagged up, and curtains were never washed. The patients with scabies roamed throughout the facility getting into other patients beds and not for one minute quarantined. (Def's Exh. 27, p. 2).

31a.    Absher never complained to Dr. Patel about the care residents at Momence were receiving. (Exh. 4, Patel p. 306-308).

**RESPONSE**: This purported fact is duplicative of No. 31 and is not supported by the evidence cited. Absher and Mitchell did in fact complain to Dr. Patel about the care being given to residents of Momence. In a letter to Dr. Patel dated April 21, 2003, Absher and Mitchell complained about, among other things, that "a certain nurse on the midnight shift was not giving medication or even looking at residents the entire night shift" and that "the G-tube patients labs were also indicating they were not getting medicines." (Def's Exh. 27, pp. 1-2). They also complained that patients with scabies were never quarantined, their belongings were not properly bagged up, and curtains were never washed. The patients with scabies roamed throughout the facility getting into other patients beds and not for one minute quarantined. (Def's Exh. 27, p. 2).

31b.    Mitchell never complained to Dr. Patel about the care given to the residents of Momence. (Exh. 4, Patel p. 317).

**RESPONSE**: This purported fact is duplicative of No. 31 and is not supported by the evidence cited. Absher and Mitchell did in fact complain to Dr. Patel about the care being given

18

to residents of Momence. In a letter to Dr. Patel dated April 21, 2003, Absher and Mitchell complained about, among other things, that "a certain nurse on the midnight shift was not giving medication or even looking at residents the entire night shift" and that "the G-tube patients labs were also indicating they were not getting medicines." (Def's Exh. 27, pp. 1-2). They also complained that patients with scabies were never quarantined, their belongings were not properly bagged up, and curtains were never washed. The patients with scabies roamed throughout the facility getting into other patients beds and not for one minute quarantined. (Def's Exh. 27, p. 2).

32.  No physician, nurse or staff member ever complained to Patel about the quality of care given to residents at Momence. (Exh. 4, Patel p. 262).

**RESPONSE**: This purported fact is not supported by the evidence cited. In a letter to Dr. Patel dated April 21, 2003, Absher , on behalf of herself and Mitchell, Lydia Isaacs, Sue Rockert, and Vickey Bushey, complained about, among other things, that "a certain nurse on the midnight shift was not giving medication or even looking at residents the entire night shift" and that "the G-tube patients labs were also indicating they were not getting medicines." (Def's Exh. 27, pp. 1-2). They also complained that patients with scabies were never quarantined, their belongings were not properly bagged up, and curtains were never washed. The patients with scabies roamed throughout the facility getting into other patients beds and not for one minute quarantined. (Def's Exh. 27, p. 2).

33.  Patel attended the quality assurance meetings at Momence. (Exh. 4, Patel pp. 43-44, 69, 74, 77-78, 221; Exh. 6, Deddo pp. 93-95; Exh. 8, Glenn pp. 58, 62; Exh. 13, Henschel pp. 19-20; Exh. 15, Burt-Lafi pp. 109-110).

**RESPONSE**: The purported fact is not supported by the cited deposition testimony; there is no such testimony in Exh. 6, Deddo, pp. 93-5; Exh. 8, Glenn p. 58; Exh. 13, Henschel pp. 19-20;

Exh. 15, Burt-Lafi, pp. 109-110). Plaintiffs do not otherwise dispute that Dr. Patel testified that he attended quality assurance meetings at Momence.

33b.    Survey findings were discussed during the quality assurance meetings. (Exh. 4, Patel pp. 77-78, 221).

**RESPONSE**: The purported fact is disputed to the extent it suggests that survey findings were both reviewed and discussed by Dr Pate. Dr. Patel testified that he does not personally review the surveys, and does not recall ever seeing one. (Defs' Exh. 4, Patel p. 77:11-77:20). Dr. Patel does not recall reviewing any survey or inspection reports between 1998 and 2006. (Defs' Exh. 4, Patel 221:8-221:10).

33c.    Complaints were discussed during quality assurance meetings. (Exh. 4, Patel p. 87).

**RESPONSE**: The purported fact is disputed to the extent it suggests that complaints were both reviewed and discussed by Dr. Patel. Dr. Patel testified that he has never seen or reviewed a complaint by either a resident or a resident's family about Momence Meadows. He also testified that he could not recall ever making any recommendations to deal with complaints. (Defs' Exh. 4, Patel p. 87:2-87:18).

33e.    Momence also had quarterly meetings to which they invited the medical director, physicians, pharmacy, lab, and the different outside agencies used on a regular bases. One of the purposes of this meeting was to bring the facility up to date on any changes and provide in-services. It was also an opportunity to address any issues. (Exh. 8, Glenn p. 62).

**RESPONSE**: These purported facts are disputed to the extent that they are hopelessly vague and not supported by and/or mischaracterize or misstate the cited deposition testimony. Glenn testified that one purpose of the quarterly meetings was for in-servicing for the pharmacy or lab representative would bring in any new reports that they had on medications or different lab tests or

-- or different disease processes that were going around.  They would tally up all the months to find

out, say, the trend for decubs and weight loss, weight gain, and they would go over that with all the

physicians and get their input.  Psychiatry would beinvolved with it so we could do psychotropics.

Also, if the physicians or medical director had problems with something that was going on at the

facility they addressed those issues at the quarterly meetings.  (Exh. 10, Glenn pp. 61:22-62:25).

> 33j.    Quality assurance meetings were held monthly.  Department heads, doctors, occupational and physical therapy were there, dietary, the psychologist and maintenance when necessary attended. (Exh. 6, Deddo pp. 93-95).

**RESPONSE**: The purported frequency of quality assurance meetings is disputed.  First,

Deddo testified "We tried to do them monthly."  (Defs' Exh. 6, Deddo pp. 94:4).  In addition, Dr.

Patel testified that the quality assurance meetings previously took place every other month or every

third month (Exh. 16, Patel pp. 39:24-40:1; 69:13-70:1).

> 33k.    When a problem arose and it was brought to the staff's attention it was responded to quickly and properly. (Exh. 15, Burt-Lafi pp. 109-110).

**RESPONSE**: The purported fact is disputed to the extent it suggests the conclusion that

whenever problems arose at Momence the staff responded quickly and properly in all cases.  The

deposition testimony cited in support of the purported fact deals with *one* situation the witness was

asked about.  The purported fact is also disputed insofar as the deposition testimony, and the

purported fact itself, have no relation to the proposition suggested in the general heading of statement

of fact number 33 ("Patel attended the quality assurance meetings at Momence").

> 34d.    Graff was paid a management fee for his management of the financial matters of Momence. (Exh. 3, Graff pp. 225-226).

**RESPONSE**: Plaintiffs dispute this purported fact to the extent it suggests Graff's

relationship to Momence was limited to management of the financial matters of Momence.

34e. Graff's relationship with the facility was to make sure if had the money it needed to operate. (Exh. 3, Graff p. 232).

**RESPONSE**: Plaintiffs dispute this purported fact to the extent it suggests Graff's relationship was limited to making sure Momence had the money necessary to operate.

35b. Graff did not play any role in the preparation of Momence's cost reports. (Exh. 19, Kagda p. 92; Exh. 3, Graff p. 271).

 **RESPONSE**: Mr. Kagda didn't know whether or not Mr. Graff played a role in preparing any of the data he received for preparing the cost report. "A. I'm not aware of that." (Exh 19. 92:12-15) Mr. Graff didn't prepare cost reports or provide information for their preparation. (Exh 3. 271:16-272:1)

36c. If they found any problems, like a call light on the floor, they would check to make sure it was not a widespread problem. They would also do in-servicing to insure the problem was corrected. (Exh. 8, Glenn pp. 99-100).

**RESPONSE**: Disputed. Numerous residents consistently complained that call lights were intentionally placed out of reach or on the floor by staff on the evening and overnight shifts. On numerous occasions between 2001 and 2003, Plaintiffs and other staff members advised Assistant Administrator Deddo and DON Cavender about the call lights being intentionally placed out of residents' reach, but they did nothing to prevent it from happening again in the future. Between 2001 and 2003, residents VY, SR, EB, ES, and LN also advised Defendants' staff that their call lights were intentionally left out of their reach by CNAs on the night shift. (Dkt. 135, Ptfs' Cmpt.. ¶¶ 87, 88).

36h. Even as Assistant Administrator Deddo would work on the floor if needed. She did rounds to made sure CNAs were doing their jobs and residents were cared for. (Exh. 6, Deddo p. 15).

**RESPONSE**: Disputed. This statement by Deddo was her answer to why she was qualified to be hired as assistant administrator.(Exh 6. 15:11-17)

36i.     Deddo made sure the residents were fed, cleaned, they got their medication as ordered, that they were treated with respect and free from abuse and neglect. (Exh. 6, Deddo p. 85-87).

**RESPONSE**: Plaintiffs object to the purported fact to the extent it calls for speculation, calls for a legal conclusion, calls for expert opinion and/or is based on impermissible lay opinion. Answering over objection and without waiving the same, Plaintiffs dispute this averment to the extent that it suggests that Deddo singlehandedly fed, cleaned, and administered medication to all Momence residents and ensured that each and every resident was treated with respect and free from abuse and neglect.

38.     Staff cared about their residents and provided quality care to their residents. (Exh. 4, Patel pp. 294-295, 297, 323; Exh. 6, Deddo pp. 90-91, 262; Exh. 7, DeMeullenarer p. 143; Exh. 8, Glenn pp. 372-373; Exh. 9, Bednarowicz p. 269; Exh. 10, Isaacs pp. 13, 19-20; Exh. 11, Clark pp. 10-11; Exh. 13, Henschel pp. 190-194; Exh. 15, Burt-Lafi pp. 96, 115; Exh. 16, Fulton pp. 52-53, 107, 113; Exh. 2, Absher pp. 332-333).

**RESPONSE**: Plaintiffs object to the purported fact to the extent it calls for a legal conclusion, calls for expert opinion and/or is based on impermissible lay opinion. Answering over objection and without waiving the same, Plaintiffs dispute this averment to the extent that it suggests that Momence residents were provided quality care as required by law. Plaintiffs do not dispute that the witnesses testified that they cared about their residents, which is irrelevant to the issues in this case.

45.     There were occasional incidents of scabies at Momence, which were all resolved. (Exh. 8, Glenn p. 280).

**RESPONSE:** Plaintiffs object to the purported fact to the extent it calls for a legal

conclusion, calls for expert opinion and/or is based upon impermissible lay opinion. Answering over objection and without waiving the same, this fact is disputed. There was a problem with scabies at Momence. (Exh. 13, Isaacs p. 16:7-16:16). Scrapings were needed because there were too many incidents of somebody having scabies, " if the patients were getting treatment, if we're doing what we're supposed to be doing, it should've reduced in numbers, not increased." (Exh. 13, Isaacs pp. 55:26-56:9). "It got to the point that everybody had scabies, so it didn't make any difference [to isolate patients] (Exh. 13, Issacs p. 60:1-60:12). Absher testified, "In my nursing judgment, I felt there were too many residents itching too much, I wanted to get to the bottom of it. I wanted them quarantined." So this is the Scabies? "Correct." (Exh. 1, Absher p. 21:2-21:13). Momence had a scabies outbreak. (Exh. 5, Bednarowicz p 86). MG had Norwegian scabies. (Exh. 5, Bednarowicz p. 177: 12-177:19). "How many prescriptions of elimite was issued? A lot." (Exh. 5, Bednarowicz pp. 197:25-198:4). Mitchell reported to DON Sue Cavender and Judy DeMeullenarer that patients had scabies in 2001. "I was told to shut my mouth." (Exh. 2, Mitchell pp. 58:11-59:1). All residents at Momence had to be bathed in Acuzine. (Exh. 2, Mitchell, p. 64:2-64:10). Every CNA in the building just about had scabies on their arms, chest and stomach (Exh. 2, Mitchell p. 65:3-65:8). All residents and CNA's got tubes to treat scabies. (Exh. 2, Mitchell p. 65:5-65:24. There was a period of time before skin conditions were recognized and diagnosed as scabies. (Exh. 2, Mitchell p. 291:22-291:25). It was unusual to have so many residents with rash or red spots and itching. (Exh. 6, Burt-Lafi pp.75:24-76:6). Momence had scabies frequently: "So, actually, if you want true diagnosis, I don't even remember how many of those we had. But yeah, we had it quite often." (Exh. 9, DeMeullenarer p. 52:2-52:4).

In 2003, several years after scabies was a problem, Momence personnel continued to fail to

establish an infection control program under which is investigates, controls and prevents infections in the facility; decides what procedures such as isolation should be applied to an individual resident, and maintains a record of incidents and corrective action related to infections. (Exh. 33, FOIA 0048-0056).

This was a time period when scabies and rashes were a problem. The prescribed treatment was Acticin or Kwell. The drugs were kept in stock for quicker access. (Exh. 10, Cavender pp. 262:12-263:24). There were a large number of people diagnosed with scabies at Momence. (Exh. 12, Henschel p. 46:15-46:20). They were doing several room changes to try and get those that had the same thing quarantined. It was taking forever to figure out who to quarantine. It was early 2000, 2002, 2003. They were moving residents around to try to prevent the spread of the scabies because they weren't sure what it was at the time. (Exh. 12, Henschel, p. 47:7-47:24). No one was giving the residents the answer, no one understood or was trying to figure it out at the beginning. Paula Deddo told Henschell not to talk about it. (Exh. 12, Henschel p. 53:3-53:12).

Somebody would break out, they wouldn't know for sure what it was, somebody else would break out. It was "constant" until they realized what was going on. At any given time there were probably six to eight people with scabies. (Exh. 19, Willey p. 136:2-136:9). The medication for the treatment of scabies was "house stock" (Exh. 19, Willey p. 140:1-140:14). Willey did not report outbreaks of scabies to the IDPH. (Exh. 19, Willey p. 139:4-139:14).

45a(viii) The spread of scabies in a facility does not mean they did anything wrong. (Exh. 4, Patel p. 256).

**RESPONSE**: Plaintiffs object to the purported fact to the extent it calls for a legal conclusion, calls for expert opinion and/or is based upon impermissible lay opinion. Answering over

objection and without waiving the same, this fact is disputed.  Defendants misrepresent testimony.

Dr. Patel testified that "if you are taking precautions, scabies can be controlled." (Exh. 16, Patel p. 254:8-254:23).

>   45b(iv)  Scabies can be spread while sitting next to a resident during a meal or an activity.  Anywhere you go it could be spread.  (Exh. 4, Patel pp. 254-255).

**RESPONSE**:  Plaintiffs object to the purported fact to the extent it calls for a legal conclusion, calls for expert opinion and/or is based upon impermissible lay opinion.  Answering over objection and without waiving the same, this fact is disputed.  Persons with typical scabies generally have fewer than 50 live mites on their skin at any given time.  Therefore, typical scabies is difficult to transmit from patient to healthcare worker unless there is prolonged, unprotected skin–to-skin contact between the infested patient and the non-infested healthcare worker.  (Exh. 53, Management of Scabies Outbreaks in California Health Care Facilities).  The scabies mite is generally transmitted from one person to another by direct contact with the skin of the infested person.  Scabies may also be acquired by wearing an infected persons clothing such as sweaters, coats or scarves.  Procedures such as bathing a patient, applying body lotions, back rubs, or any extensive hands on contact can provide an opportunity for mite transmission.  (Exh. 55 Los Angeles County Department of Public Heath Scabies Prevention and Control Guidelines Acute and Sub-Acute Care Facilities).  The issue in this case is whether Momence Meadows prevented statutorily defined outcomes, If, as Dr. Patel suggests, the parasite is so easily spread, it only further supports that staff was expected to be trained to understand federal and CDC guidelines on prevention and control to prevent scabies infection.  Dr. Patel is not familiar with CDC and federal regulations that describe and mandate proper prevention and control of scabies in long term facilities.  (Exh. 16, Patel p. 223:17-223:23).

45c.    All incidents of scabies at Momence were resolved.  (Exh. 8, Glenn p. 280; Exh. 13, Henschel p. 177).

**RESPONSE:** This purported fact is duplicative of No. 45.  Plaintiffs object to the purported fact to the extent it calls for a legal conclusion, calls for expert opinion and/or is based upon impermissible lay opinion.  Answering over objection and without waiving the same, this fact is disputed.   There was a problem with scabies at Momence.  (Exh. 13, Isaacs p. 16:7-16:16). Scraping were necessary because there were too many incidents of somebody having scabies, " if the patients were getting treatment, if we're doing what we're supposed to be doing, it should've reduced in numbers, not increased."  (Exh. 13, Isaacs pp. 55:26-56:9).  "It got to the point that everybody had scabies, so it didn't make any difference [to isolate patients] (Exh. 13, Issacs p. 60:1-60:12).  Absher testified, "In my nursing judgment, I felt there were too many residents itching too much, I wanted to get to the bottom of it.  I wanted them quarantined."  So this is the Scabies? "Correct." (Exh. 1, Absher p. 21:2-21:13).  Momence had a scabies outbreak.  (Exh. 5, Bednarowicz p 86).  MG had Norwegian scabies.  (Exh. 5, Bednarowicz p. 177:12-177:19).  "How many prescriptions of elimite was issued? A lot."  (Exh. 5, Bednarowicz pp. 197:25-198:4).  Mitchell reported to DON Sue Cavender and Judy DeMeullenarer that patients had scabies in 2001. "I was told to shut my mouth."  (Exh. 2, Mitchell pp. 58:11-59:1).  All residents at Momence had to be bathed in Acuzine. (Exh. 2, Mitchell, p. 64:2-64:10).  Every CNA in the building just about had scabies on their arms, chest and stomach (Exh. 2, Mitchell p. 65:3-65:8).  All residents and CNA's got tubes to treat scabies. (Exh. 2, Mitchell p. 65:5-65:24. There was a period of time before skin conditions were recognized and diagnosed as scabies.  (Exh. 2, Mitchell p. 291:22-291:25).  It was unusual to have so many residents with rash or red spots and itching.  (Exh. 6, Burt-Lafi pp.75:24-

76:6). Momence had scabies frequently: "So, actually, if you want true diagnosis, I don't even remember how many of those we had. But yeah, we had it quite often." (Exh. 9, DeMeullenarer p. 52:2-52:4).

In 2003, several years after scabies was a problem, Momence personnel continued to fail to establish an infection control program under which is investigates, controls and prevents infections in the facility; decides what procedures such as isolation should be applied to an individual resident, and maintains a record of incidents and corrective action related to infections. (Exh. 33, FOIA 0048-0056).

This was a time period when scabies and rashes were a problem. The prescribed treatment was Acticin or Kwell. The drugs were kept in stock for quicker access. (Exh. 10, Cavender pp. 262:12-263:24). There were a large number of people diagnosed with scabies at Momence. (Exh. 12, Henschel p. 46:15-46:20). They were doing several room changes to try and get those that had the same thing quarantined. It was taking forever to figure out who to quarantine. It was early 2000, 2002, 2003. They were moving residents around to try to prevent the spread of the scabies because they weren't sure what it was at the time. (Exh. 12, Henschel, p. 47:7-47:24). No one was giving the residents the answer, no one understood or was trying to figure it out at the beginning. Paula Deddo told Henschell not to talk about it. (Exh. 12, Henschel p. 53:3-53:12).

Somebody would break out, they wouldn't know for sure what it was, somebody else would break out. It was "constant" until they realized what was going on. At any given time there were probably six to eight people with scabies. (Exh. 19, Willey p. 136:2-136:9). The medication for the treatment of scabies was "house stock" (Exh. 19, Willey p. 140:1-140:14). Willey did not report outbreaks of scabies to the IDPH. (Exh. 19, Willey p. 139:4-139:14).

45(i)   There were occasional incidents of scabies at Momence.  But they were resolved. (Exh. 8, Glenn p. 280).

**RESPONSE:** This purported fact is duplicative of Nos. 45 and 45c.  Plaintiffs object to the purported fact to the extent it calls for a legal conclusion, calls for expert opinion and/or is based upon impermissible lay opinion.  Answering over objection and without waiving the same, this fact is disputed.   There was a problem with scabies at Momence.  (Exh. 13, Isaacs p. 16:7-16:16). Scraping were necessary because there were too many incidents of somebody having scabies, " if the patients were getting treatment, if we're doing what we're supposed to be doing, it should've reduced in numbers, not increased."  (Exh. 13, Isaacs pp. 55:26-56:9).  "It got to the point that everybody had scabies, so it didn't make any difference [to isolate patients] (Exh. 13, Issacs p. 60:1-60:12).  Absher testified, "In my nursing judgment, I felt there were too many residents itching too much, I wanted to get to the bottom of it.  I wanted them quarantined."  So this is the Scabies? "Correct." (Exh. 1, Absher p. 21:2-21:13).  Momence had a scabies outbreak.  (Exh. 5, Bednarowicz p 86).  MG had Norwegian scabies.  (Exh. 5, Bednarowicz p. 177: 12-177:19).  "How many prescriptions of elimite was issued? A lot."  (Exh. 5, Bednarowicz pp. 197:25-198:4).  Mitchell reported to DON Sue Cavender and Judy DeMeullenarer that patients had scabies in 2001. "I was told to shut my mouth."  (Exh. 2, Mitchell pp. 58:11-59:1).  All residents at Momence had to be bathed in Acuzine. (Exh. 2, Mitchell, p. 64:2-64:10).  Every CNA in the building just about had scabies on their arms, chest and stomach (Exh. 2, Mitchell p. 65:3-65:8).  All residents and CNA's got tubes to treat scabies. (Exh. 2, Mitchell p. 65:5-65:24. There was a period of time before skin conditions were recognized and diagnosed as scabies.  (Exh. 2, Mitchell p. 291:22-291:25).  It was unusual to have so many residents with rash or red spots and itching.  (Exh. 6, Burt-Lafi pp.75:24-

76:6).  Momence had scabies frequently: "So, actually, if you want  true diagnosis, I don't even remember how many of those we had.  But yeah, we had it quite often." (Exh. 9, DeMeullenarer p. 52:2-52:4).

In 2003, several years after scabies was a problem, Momence personnel continued to fail to establish an infection control program under which is investigates, controls and prevents infections in the facility; decides what procedures such as isolation should be applied to an individual resident, and maintains a record of incidents and corrective action related to infections.  (Exh. 33, FOIA 0048-0056).

This was a time period when scabies and rashes were a problem.  The prescribed treatment was Acticin or Kwell.  The drugs were kept in stock for quicker access. (Exh. 10, Cavender pp. 262:12-263:24).  There were a large number of people diagnosed with scabies at Momence.  (Exh. 12, Henschel p. 46:15-46:20).  They were doing several room changes to try and get those that had the same thing quarantined.  It was taking forever to figure out who to quarantine.  It was early 2000, 2002, 2003.  They were moving residents around to try to prevent the spread of the scabies because they weren't sure what it was at the time.  (Exh. 12, Henschel, p. 47:7-47:24).  No one was giving the residents the answer, no one understood or was trying to figure it out at the beginning.  Paula Deddo told Henschell not to talk about it. (Exh. 12, Henschel p. 53:3-53:12).

Somebody would break out, they wouldn't know for sure what it was, somebody else would break out.  It was "constant" until they realized what was going on.  At any given time there were probably six to eight people with scabies.  (Exh. 19, Willey p. 136:2-136:9).  The medication for the treatment of scabies was "house stock" (Exh. 19, Willey p. 140:1-140:14).  Willey did not report outbreaks of scabies to the IDPH.  (Exh. 19, Willey p. 139:4-139:14).

45c(ii) There came a time when there were no scabies at Momence. (Exh. 13, Henschel p. 177).

**RESPONSE**: Plaintiffs object to the purported fact to the extent it calls for a legal conclusion, calls for expert opinion and/or is based upon impermissible lay opinion. Answering over objection and without waiving the same, this fact is disputed. Ms. Henschel didn't know when the incidents of scabies ended at Momence, but estimated the time to be around 2003. (Exh. 12, Henschel p. 178:1-178:9). However, that testimony is contradicted by hospital records of Momence patient MG, reporting a skin biopsy positive for scabies in April 2003. After this MG was treated and returned to Momence. (Exh. 27, RMC 001442-001444). She then returned to RMC with a new scabies infection on her right arm in October of 2003. (Exh. 27, RMC 001162-001164). MG continued to demonstrate the red-purple spots until her death in 2004. (Exh. 27, RMC 000057).

In 2003, years after scabies was first observed, Momence personnel continued to fail to establish an infection control program under which is investigates, controls and prevents infections in the facility; decides what procedures such as isolation should be applied to an individual resident, and maintains a record of incidents and corrective action related to infections. (Exh. 33, FOIA 0048-0056).

45f. Only doctors are allowed to diagnose the condition of a resident, including scabies. (Exh. 1, Mitchell pp. 95-96, 300; Exh. 15, Burt-Lafi p. 100; Exh. 10, Isaacs p. 26; Exh. 7, DeMeullenarer pp. 56, 141-142; Exh. 4, Patel p. 263; Exh. 9, Bednarowicz pp. 246-247; Exh. 8, Glenn pp. 266-267).

**RESPONSE**: Plaintiffs dispute that this was the practice at Momence. Testimony reveals that nurses were reporting scabies to doctors verbally, doctors would prescribe based upon nurse's opinion. "So any time you observed a patient that you believed had scabies, you'd report it to the physician who then would write the order for the scabies treatment? "Correct." "And if we weren't

sure then we would have the doctor come in and take a look at the patient and give his opinion."

(Exh. 5, Bednarowicz pp. 186:9-187:2).

There were patients with rashes and they did not do scrapings on, so the nurses said they had

a rash, looked like it could be scabies. The doctor then would have given an order either for

preventative or for the treatment of and they would have been treated for, and that policy would have

been followed. (Exh. 19, Willey p. 130:14-130:20).

Despite the fact that the residents clearly had scabies, there was never an official diagnosis

of scabies. Nancy Zillmer routinely observed and charted the residents' symptoms and notified both

Judy DeMuellenare, the treatment nurse and Sue Cavender, director of nursing. After observing the

residents, Judy and Sue determined that the residents were suffering from a fungal infection, not

scabies. They then ordered the resident treated with a fungal cream. However, when the fungal

cream did not work, Judy and Sue would always order treatment with Elimite, even though they

continued to refuse to acknowledge that the residents had scabies. It is my belief that Momence

management did not acknowledge that the residents had scabies because they did not want the public

to find out, since any outbreaks had to be reported to the Department of Health. (Dkt. 135-11, Group

Exhibit D, Nancy Zillmer Decl. ¶ 11).

> 45f(i)   Only doctors can diagnose a resident's condition. (Exh. 1, Mitchell p. 300; Exh. 15,
> Burt-Lafi p. 100; Exh. 10, Isaacs p. 26).

**RESPONSE**: This statement is duplicative of No. 45f above. Plaintiffs dispute that this was

the practice at Momence. Testimony reveals that nurses were reporting scabies to doctors verbally,

doctors would prescribe based upon nurse's opinion. "So any time you observed a patient that you

believed had scabies, you'd report it to the physician who then would write the order for the scabies

treatment? "Correct." "And if we weren't sure then we would have the doctor come in and take a look at the patient and give his opinion." (Exh. 5, Bednarowicz pp. 186:9-187:2).

There were patients with rashes and they did not do scrapings on, so the nurses said they had a rash, looked like it could be scabies. The doctor then would have given an order either for preventative or for the treatment of and they would have been treated for, and that policy would have been followed. (Exh. 19, Willey p. 130:14-130:20).

Despite the fact that the residents clearly had scabies, there was never an official diagnosis of scabies. Nancy Zillmer routinely observed and charted the residents' symptoms and notified both Judy DeMuellenare, the treatment nurse and Sue Cavender, director of nursing. After observing the residents, Judy and Sue determined that the residents were suffering from a fungal infection, not scabies. They then ordered the resident treated with a fungal cream. However, when the fungal cream did not work, Judy and Sue would always order treatment with Elimite, even though they continued to refuse to acknowledge that the residents had scabies. It is my belief that Momence management did not acknowledge that the residents had scabies because they did not want the public to find out, since any outbreaks had to be reported to the Department of Health. (Dkt. 135-11, Group Exhibit D, Nancy Zillmer Decl. ¶ 11).

45f(ii)  Nurses are not allowed to diagnose. (Exh. 4, Patel p. 263; Exh. 9, Bednarowicz pp. 246-247).

**RESPONSE**: This statement is duplicative of Nos. 45f and 45f(i) above. Plaintiffs dispute that this was the practice at Momence. Testimony reveals that nurses were reporting scabies to doctors verbally, doctors would prescribe based upon nurse's opinion. "So any time you observed a patient that you believed had scabies, you'd report it to the physician who then would write the

order for the scabies treatment? "Correct." "And if we weren't sure then we would have the doctor come in and take a look at the patient and give his opinion." (Exh. 5, Bednarowicz pp. 186:9-187:2).

There were patients with rashes and they did not do scrapings on, so the nurses said they had a rash, looked like it could be scabies. The doctor then would have given an order either for preventative or for the treatment of and they would have been treated for, and that policy would have been followed. (Exh. 19, Willey p. 130:14-130:20).

Despite the fact that the residents clearly had scabies, there was never an official diagnosis of scabies. Nancy Zillmer routinely observed and charted the residents' symptoms and notified both Judy DeMuellenare, the treatment nurse and Sue Cavender, director of nursing. After observing the residents, Judy and Sue determined that the residents were suffering from a fungal infection, not scabies. They then ordered the resident treated with a fungal cream. However, when the fungal cream did not work, Judy and Sue would always order treatment with Elimite, even though they continued to refuse to acknowledge that the residents had scabies. It is my belief that Momence management did not acknowledge that the residents had scabies because they did not want the public to find out, since any outbreaks had to be reported to the Department of Health. (Dkt. 135-11, Group Exhibit D, Nancy Zillmer Decl. ¶ 11).

> 45f (iv) Only a doctor can make a diagnosis. (Exh. 8, Glenn p. 266; Exh. 7,
> DeMeullenarer p. 141).

**RESPONSE**: This statement is duplicative of Nos. 45f and 45f(i) above. Plaintiffs dispute that this was the practice at Momence. Testimony reveals that nurses were reporting scabies to doctors verbally, doctors would prescribe based upon nurse's opinion. "So any time you observed a patient that you believed had scabies, you'd report it to the physician who then would write the

order for the scabies treatment? "Correct." "And if we weren't sure then we would have the doctor come in and take a look at the patient and give his opinion." (Exh. 5, Bednarowicz pp. 186:9-187:2).

There were patients with rashes and they did not do scrapings on, so the nurses said they had a rash, looked like it could be scabies. The doctor then would have given an order either for preventative or for the treatment of and they would have been treated for, and that policy would have been followed. (Exh. 19, Willey p. 130:14-130:20).

Despite the fact that the residents clearly had scabies, there was never an official diagnosis of scabies. Nancy Zillmer routinely observed and charted the residents' symptoms and notified both Judy DeMuellenare, the treatment nurse and Sue Cavender, director of nursing. After observing the residents, Judy and Sue determined that the residents were suffering from a fungal infection, not scabies. They then ordered the resident treated with a fungal cream. However, when the fungal cream did not work, Judy and Sue would always order treatment with Elimite, even though they continued to refuse to acknowledge that the residents had scabies. It is my belief that Momence management did not acknowledge that the residents had scabies because they did not want the public to find out, since any outbreaks had to be reported to the Department of Health. (Dkt. 135-11, Group Exhibit D, Nancy Zillmer Decl. ¶ 11).

> 45f(v)  It would be inappropriate to note that a resident had scabies if there was no diagnosis.
> (Exh. 7, DeMeullenarer p. 142).

**RESPONSE**: Plaintiffs dispute this purported fact. The standard of practice at Momence tolerated nurses reporting to physicians their observations related to scabies. Doctors prescribed scabies treatment based upon a phone report from a nurse at Momence. Testimony reveals that nurses were reporting scabies to doctors verbally, doctors would prescribe based upon nurse's

opinion. "So any time you observed a patient that you believed had scabies, you'd report it to the physician who then would write the order for the scabies treatment? "Correct." "And if we weren't sure then we would have the doctor come in and take a look at the patient and give his opinion." (Exh. 5, Bednarowicz pp. 186:9-187:2).

There were patients with rashes and they did not do scrapings on, so the nurses said they had a rash, looked like it could be scabies. The doctor then would have given an order either for preventative or for the treatment of and they would have been treated for, and that policy would have been followed. (Exh. 19, Willey p. 130:14-130:20).

Despite the fact that the residents clearly had scabies, there was never an official diagnosis of scabies. Nancy Zillmer routinely observed and charted the residents' symptoms and notified both Judy DeMuellenare, the treatment nurse and Sue Cavender, director of nursing. After observing the residents, Judy and Sue determined that the residents were suffering from a fungal infection, not scabies. They then ordered the resident treated with a fungal cream. However, when the fungal cream did not work, Judy and Sue would always order treatment with Elimite, even though they continued to refuse to acknowledge that the residents had scabies. It is my belief that Momence management did not acknowledge that the residents had scabies because they did not want the public to find out, since any outbreaks had to be reported to the Department of Health. (Dkt. 135-11, Group Exhibit D, Nancy Zillmer Decl. ¶ 11).

> 45f(vi) Mitchell did not have the authority to diagnose a resident's condition. (Exh. 1, Mitchell p. 300).

**RESPONSE**: Plaintiffs dispute this purported fact. The standard of practice at Momence tolerated nurses reporting to physicians their observations related to scabies. Doctors prescribed

scabies treatment based upon a phone report from a nurse at Momence. Testimony reveals that nurses were reporting scabies to doctors verbally, doctors would prescribe based upon nurse's opinion. "So any time you observed a patient that you believed had scabies, you'd report it to the physician who then would write the order for the scabies treatment? "Correct." "And if we weren't sure then we would have the doctor come in and take a look at the patient and give his opinion." (Exh. 5, Bednarowicz pp. 186:9-187:2).

There were patients with rashes and they did not do scrapings on, so the nurses said they had a rash, looked like it could be scabies. The doctor then would have given an order either for preventative or for the treatment of and they would have been treated for, and that policy would have been followed. (Exh. 19, Willey p. 130:14-130:20).

Despite the fact that the residents clearly had scabies, there was never an official diagnosis of scabies. Nancy Zillmer routinely observed and charted the residents' symptoms and notified both Judy DeMuellenare, the treatment nurse and Sue Cavender, director of nursing. After observing the residents, Judy and Sue determined that the residents were suffering from a fungal infection, not scabies. They then ordered the resident treated with a fungal cream. However, when the fungal cream did not work, Judy and Sue would always order treatment with Elimite, even though they continued to refuse to acknowledge that the residents had scabies. It is my belief that Momence management did not acknowledge that the residents had scabies because they did not want the public to find out, since any outbreaks had to be reported to the Department of Health. (Dkt. 135-11, Group Exhibit D, Nancy Zillmer Decl. ¶ 11).

> 45f(vii) A nursing entry in a residents chart that the resident had scabies, without a physician's diagnosis of scabies, would be an improper nursing note. (Exh. 8, Glenn p. 266).

**RESPONSE**: Plaintiffs dispute this purported fact. Testimony reveals that higher level staff instructed employees to inappropriately leave patient observations out of the charts to avoid documentation of untoward events.

Medical records were altered, including chart notes, in anticipation of state inspections. The medical records were always re-written in anticipation for state inspection. (Dkt. 135-11, Group Exhibit D, Barbara Clark Decl. ¶ 4). Clark also observed nurses change entire sets of residents' chart notes in cases where a resident experienced health complications because the chart notes showed that the resident had received either substandard care or no care at all, leading to the resident's new symptoms and/or complication. (Dkt. 135-11, Group Exhibit D, Barbara Clark Decl. ¶ 5). Clark personally observed false chart notes to cover-up their failure to follow a residents care plan. (Dkt. 135-11, Group Exhibit D, Barbara Clark Decl. ¶ 5).

Lydia Isaacs was asked to forge other nurses' initials in the Medication Administration Records (MAR) which purports to represent when a patient received a medication. (Dkt. 135-11, Group Exhibit D, Lydia Isaacs Decl. ¶ 15). Glen told Isaacs there is nothing wrong with forging other nurses' initials in the MAR, Glen reports to Isaacs, she has been doing it a long time, and that she would continue to do it. (Dkt. 135-11, Group Exhibit D, Lydia Isaacs Decl. ¶ 16).

> 45f(viii) If such an entry was made, Glenn would have an in-service, to make sure nurses knew how to properly chart. (Exh. 8, Glenn p. 267).

**RESPONSE**: Plaintiffs dispute this purported fact. Testimony reveals that higher level staff instructed employees to inappropriately leave patient observations out of the charts to avoid documentation of untoward events.

Medical records were altered, including chart notes, in anticipation of state inspections. The

medical records were always re-written in anticipation for state inspection. (Dkt. 135-11, Group Exhibit D, Barbara Clark Decl. ¶ 4). Clark also observed nurses change entire sets of residents' chart notes in cases where a resident experienced health complications because the chart notes showed that the resident had received either substandard care or no care at all, leading to the resident's new symptoms and/or complication. (Dkt. 135-11, Group Exhibit D, Barbara Clark Decl. ¶ 5). Clark personally observed false chart notes to cover-up their failure to follow a residents care plan. (Dkt. 135-11, Group Exhibit D, Barbara Clark Decl. ¶ 5).

Lydia Isaacs was asked to forge other nurses' initials in the Medication Administration Records (MAR) which purports to represent when a patient received a medication. (Dkt. 135-11, Group Exhibit D, Lydia Isaacs Decl. ¶ 15). Glen told Isaacs there is nothing wrong with forging other nurses' initials in the MAR, Glen reports to Isaacs, she has been doing it a long time, and that she would continue to do it. (Dkt. 135-11, Group Exhibit D, Lydia Isaacs Decl. ¶ 16).

> 45f(ix) Mitchell was instructed by Glenn to rewrite her nursing note on SP because she had put in the chart that SP had scabies, but there was no diagnosis of scabies from the doctor. Mitchell was told she could not put down a diagnosis as none had been made by the doctor, she could only describe SP's condition. (Exh. 1, Mitchell pp. 95-96).

**RESPONSE**: Plaintiffs dispute this purported fact. The standard of practice at Momence was to report to the physician when the nurse opined that a patient had scabies. Doctors would prescribe scabicide based upon the phone report. Testimony reveals that nurses were reporting scabies to doctors verbally, doctors would prescribe based upon nurse's opinion. "So any time you observed a patient that you believed had scabies, you'd report it to the physician who then would write the order for the scabies treatment? "Correct." "And if we weren't sure then we would have the doctor come in and take a look at the patient and give his opinion." (Exh. 5, Bednarowicz pp.

186:9-187:2).

There were patients with rashes and they did not do scrapings on, so the nurses said they had a rash, looked like it could be scabies. The doctor then would have given an order either for preventative or for the treatment of and they would have been treated for, and that policy would have been followed. (Exh. 19, Willey p. 130:14-130:20).

Despite the fact that the residents clearly had scabies, there was never an official diagnosis of scabies. Nancy Zillmer routinely observed and charted the residents' symptoms and notified both Judy DeMuellenare, the treatment nurse and Sue Cavender, director of nursing. After observing the residents, Judy and Sue determined that the residents were suffering from a fungal infection, not scabies. They then ordered the resident treated with a fungal cream. However, when the fungal cream did not work, Judy and Sue would always order treatment with Elimite, even though they continued to refuse to acknowledge that the residents had scabies. It is my belief that Momence management did not acknowledge that the residents had scabies because they did not want the public to find out, since any outbreaks had to be reported to the Department of Health. (Dkt. 135-11, Group Exhibit D, Nancy Zillmer Decl. ¶ 11).

45g(viii) DeMuellenarer performed scraping between 1998 – 2006, as did Peggy Weybright and Dr. Patel. (Exh. 7, DeMeullenarer pp. 56-57).

**RESPONSE**: The purported fact is not supported by the cited deposition testimony. There has been no testimony that supports that cutting into the skin of the residents of Momence by Momence personnel can qualify as following standard professional practices by a trained personnel to perform skin biopsies sufficiently accurate to serve as a basis of a scabies diagnosis.

45g(ix) Glenn, Judy DeMeullenarer, Stacy Bednarowicz and Lydia Isaacs were trained on how to do a scraping to test for scabies. (Exh. 8, Glenn pp. 250-251).

**RESPONSE**: The purported fact is not supported by the cited deposition testimony. Skin scrapings should always be performed by a clinician [M.D.] who is trained to perform the procedure. Only nurse practitioners and physician assistants can also perform the procedure if they have been trained by a clinician. (Exh. 54, Prevention and control of scabies in California Long-Term Care Facilities, Appendix B, Proper Procedure for Skin Scraping). There is no evidence that Glenn, DeMeullenarer, Bednarowicz or Isaacs were properly trained by a physician to perform skin scrapings. There has been no testimony that supports that cutting into the skin of the residents of Momence by Momence personnel can qualify as following standard professional practices by a trained personnel to perform skin biopsies sufficiently accurate to serve as a basis of a scabies diagnosis.

Isaacs was not qualified to do a scraping and did not know what she was doing. Isaac only scratched the top of the skin, but one must go under the skin. (Exh. 2, Mitchell pp. 103-109). When Sue Cavender instructed nurse Isaac to perform a scraping, Isaac reported she does not know how to do a scraping. (Exh. 2, Mitchell p. 110).

After only doing one scraping on a patient, Bednarowicz refused to do scrapings, as she thought they were inhumane. (Exh. 5, Bednarowicz pp. 174:23-175:6).

"There was only one time that I am aware of that Dr. Patel ordered a scraping, which occurred when I called him to report a cause of scabies. . .He ordered a scraping test and told me to do it. I told him I did not know how to do a scrape test, gut he told me it was simple, that I should just follow the instructions. I am not sure I did the scrape test correctly, because the results came back negative. Although it was obvious that the patient had a rash that was scabies, we did not treat the resident because the scrape test was allegedly negative. (Dkt. 135-11, Group Exhibit D, Lydia

Isaacs Decl. ¶ 21).

> 45g(x) Scrapings were done on residents suspected of having scabies. (Exh. 13, Henschel p. 148).

**RESPONSE**:  Plaintiffs object to the purported fact to the extent it calls for speculation. Answering over objection and without waiving the same, this fact is disputed.  "There was only one time that I am aware of that Dr. Patel ordered a scraping, which occurred when I called him to report a cause of scabies. . .He ordered a scraping test and told me to do it.  I told him I did not know how to do a scrape test, gut he told me it was simple, that I should just follow the instructions.  I am not sure I did the scrape test correctly, because the results came back negative. Although it was obvious that the patient had a rash that was scabies, we did not treat the resident because the scrape test was allegedly negative.  (Dkt. 135-11, Group Exhibit D, Lydia Isaacs Decl. ¶ 21).  After only doing one scraping on a patient, Bednarowicz refused to do scrapings, as she thought they were inhumane. (Exh. 5, Bednarowicz pp. 174:23-175:6).

> 45h(ii) Nurses are not supposed to make treatment decisions on their own. The physician makes treatment decisions and the nurses follow the physician's orders. (Exh. 4, Patel p. 265).

**RESPONSE**:  Plaintiffs dispute this statement as it does not reflect the practice at Momence. "Despite the fact that the residents clearly had scabies, there was never an official diagnosis of scabies.  I routinely observed and charted the residents' symptoms and notified both Judy DeMuellenarer, the treatment nurse and Sue Cavender, director of nursing.  After observing the residents, Judy and Sue determined that the residents were suffering from a fungal infection, not scabies.  They then ordered the residents treated with a fungal cream.. However, when the fungal cream did not work, Judy and Sue would always order treatment with Elimite, even though the continued to refuse to acknowledge that the residents had scabies.  It is my belief that Momence

management did not acknowledge that the residents had scabies because they did not want to public to find out since an outbreaks had to be reported to the Department of Health." (Dkt. 135-11, Group Exhibit D, Nancy Zillmer Decl. ¶ 11).

45h(iii)  Only a physician can determine treatment.  (Exh. 8, Glenn pp. 248-249).

**RESPONSE**:  Plaintiffs dispute this statement as it does not reflect the practice at Momence. "Despite the fact that the residents clearly had scabies, there was never an official diagnosis of scabies.  I routinely observed and charted the residents' symptoms and notified both Judy DeMuellenarer, the treatment nurse and Sue Cavender, director of nursing.  After observing the residents, Judy and Sue determined that the residents were suffering from a fungal infection, not scabies.  They then ordered the residents treated with a fungal cream.. However, when the fungal cream did not work, Judy and Sue would always order treatment with Elimite, even though the continued to refuse to acknowledge that the residents had scabies.  It is my belief that Momence management did not acknowledge that the residents had scabies because they did not want to public to find out since an outbreaks had to be reported to the Department of Health." (Dkt. 135-11, Group Exhibit D, Nancy Zillmer Decl. ¶ 11).

45h(iv)  A resident could not be given Kwell without a doctor's order. (Exh. 1, Mitchell p. 296).

**RESPONSE**:  Plaintiffs dispute this statement as it does not reflect the practice at Momence. "Despite the fact that the residents clearly had scabies, there was never an official diagnosis of scabies.  I routinely observed and charted the residents' symptoms and notified both Judy DeMuellenarer, the treatment nurse and Sue Cavender, director of nursing.  After observing the residents, Judy and Sue determined that the residents were suffering from a fungal infection, not scabies.  They then ordered the residents treated with a fungal cream.. However, when the fungal

43

cream did not work, Judy and Sue would always order treatment with Elimite, even though the continued to refuse to acknowledge that the residents had scabies. It is my belief that Momence management did not acknowledge that the residents had scabies because they did not want to public to find out since an outbreaks had to be reported to the Department of Health." (Dkt. 135-11, Group Exhibit D, Nancy Zillmer Decl. ¶ 11).

45h(v)  Treatment for scabies could not be given without a physician's order. (Exh. 8, Glenn p. 252).

**RESPONSE**:  Plaintiffs dispute this statement as it does not reflect the practice at Momence. "Despite the fact that the residents clearly had scabies, there was never an official diagnosis of scabies. I routinely observed and charted the residents' symptoms and notified both Judy DeMuellenarer, the treatment nurse and Sue Cavender, director of nursing. After observing the residents, Judy and Sue determined that the residents were suffering from a fungal infection, not scabies. They then ordered the residents treated with a fungal cream.. However, when the fungal cream did not work, Judy and Sue would always order treatment with Elimite, even though the continued to refuse to acknowledge that the residents had scabies. It is my belief that Momence management did not acknowledge that the residents had scabies because they did not want to public to find out since an outbreaks had to be reported to the Department of Health." (Dkt. 147-11, Group Exhibit D, Nancy Zillmer Decl. ¶ 11).

45i.  A resident cannot be put into isolation without a physician's order and doing so can constitute resident abuse. (Exh. 9, Bednarowicz p. 238; Exh. 1, Mitchell p. 393, 402).

**RESPONSE**:  Plaintiffs object to the purported fact to the extent it calls for a legal conclusion, calls for expert opinion and/or is based on impermissible lay opinion. Answering over objection and without waiving the same, this fact is disputed. Defendants misstate witness testimony.

44

Mitchell testified that if she believes that a patient is at risk for contaminating somebody else, she can order 24-isolation until she can get an order from the doctor. (Ex. 2, Mitchell p. 395:2-395:4). She had the authority to order isolation and did in fact order isolation. (Ex. 2, Mitchell p. 395:5-395:9). Bednarowicz testified that she can initiate isolation of a resident, and that there is a small window of time before she must follow-up and get the doctor to officially order isolation. (Exh. 5, Bednarowicz p. 237:22-238:8).

45i(i)  It requires a physician's order to isolate a resident. (Exh. 1, Mitchell p. 393; Exh. 9, Bednarowicz p. 238).

**RESPONSE**: This statement is duplicative of No. 45i above. Plaintiffs object to the purported fact to the extent it calls for a legal conclusion, calls for expert opinion and/or is based on impermissible lay opinion. Answering over objection and without waiving the same, this fact is disputed. Defendants misstate witness testimony. Mitchell testified that if she believes that a patient is at risk for contaminating somebody else, she can order 24-isolation until she can get an order from the doctor. (Ex. 2, Mitchell p. 395:2-395:4). She had the authority to order isolation and did in fact order isolation. (Ex. 2, Mitchell p. 395:5-395:9). Bednarowicz testified that she can initiate isolation of a resident, and that there is a small window of time before she must follow-up and get the doctor to officially order isolation. (Exh. 5, Bednarowicz p. 237:22-238:8).

45i(ii)  A facility can be cited for abuse of a resident if the resident is isolated without a physician's order. (Exh. 1, Mitchell p. 402).

**RESPONSE**: Plaintiffs object to the purported fact to the extent it calls for a legal conclusion, calls for expert opinion and/or is based on impermissible lay opinion. Answering over objection and without waiving the same, this fact is disputed to the extent it misstates witness testimony. Mitchell testified stated that if a resident is isolated without a physician's order, the

45

facility can be cited for abuse of that resident, and may be considered a violation of the resident's rights with the exception that a nurse can initiate isolation if, in his or her judgment, it is necessary for the safety of the other patients. (Exh. 2, Mitchell pp. 401:22-402:11).

> 45i(iii) Putting a resident into isolation without a physician's order is a violation of a resident's rights. (Exh. 9, Bednarowicz p. 238).

**RESPONSE**: Plaintiffs object to the purported fact to the extent it calls for a legal conclusion, calls for expert opinion and/or is based on impermissible lay opinion. Answering over objection and without waiving the same, this fact is disputed. Defendants misstate witness testimony. Bednarowicz testified that she can initiate isolation of a resident, and that there is a small window of time before she must follow-up and get the doctor to officially order isolation. (Exh. 5, Bednarowicz p. 237:22-238:8).

> 45j(iii) There were never circumstances where the facility staff ignored residents with scabies, did not respond to them or failed to provide them treatment. (Exh. 7, DeMeullenarer p. 148).

**RESPONSE**: Plaintiffs object to the statement to the extent it calls for speculation, calls for a legal conclusion, calls for expert opinion and/or is based upon impermissible lay opinion. Answering over objection and without waiving the same, this fact is disputed. Several residents had the rash and no one was giving them an answer. No one understood or was trying to figure it out at the beginning. Deddo told Henschel not to talk about the scabies. (Exh. 12, Henschel p. 53:3-53:12). Residents cried due to the discomfort. (Exh. 12, Henschel p. 56:16-56:18). Resident MG would have tears, noticing it over a 3-4 week period. (Exh. 12, Henschel p. 57:24-58:10). Resident CA was usually in tears due to the itching. (Exh. 12, Henschel p. 56:25-57:11; 58:11-58:24). Resident RR was scratching, she has Alzheimer's and was scratching. She became very lethargic. (Exh. 12, Henschel p. 59:4-59:19). Resident MN had it on her belly, which she scratched. (Exh. 12, Henschel

p. 59:24-60:1).  Resident BH would scratch so much that there would be blood when he scratched. (Exh. 12, Henschel p. 60:2-60:17).  Resident DA had a bad case, had scratch marks all over her arms. (Exh. 12, Henschel p. 60:18-61:9).  Henschel believed staff did not take the outbreak serious enough. (Exh. 12, Henschel p. 202:6-202:24).

45k(ix)  Patel instructed staff on what treatments to give.  (Exh. 4, Patel p.170).

**RESPONSE**: Plaintiffs dispute this fact to the extent it suggests that any sort of protocol was followed at Momence.  Judy DeMeullenarer was unaware that scabies was a communicable disease reportable to the Illinois Department of Health.  (Exh. 9, DeMeullenarer p. 134:10-134:24).  When asked "What conditions [of] participation Momence neglected to provide?" Absher testified, "Proper isolation and containment and elimination of a contagious skin problem."  (Exh. 1, Absher pp.287:19-289:17).

Vesta Fulton (N/K/A Barrett) testified that she did not put tape on the closet doors of the residents rooms as according to scabies protocol.  (Exh. 4, Barrett p. 87).  Burt-Lafi testified that there was a shortage of gloves.  She remembers seeing Judy DeMeullenarer doing a lot of treatments without gloves.  (Exh. 6, Burt-Lafi p. 27:5-27:11).  Burt Lafi did not receive any general information about scabies. (Exh. 6, Burt-Lafi, p. 60:18-60:21).

Momence's  infectious control nurse had not seen, nor learned guidelines on infection and control of scabies until after the outbreak at Momence.  (Exh. 5, Bednarowicz p. 99:19-99:25).  "We got on [line] and learned , you know, low long a patient has to be in isolation for, how long you're supposed to keep the articles of clothing in bags for." (Exh. 5, Bednarowicz p. 100:2-100:5).

Cavender told staff not to talk about a resident having scabies, as "it's part of HIPAA.  They can't talk about it in the community or to other family members." (Exh. 10,  Cavender p. 265:8-

265:12). Cavender's instructions did not follow protocol, and her reasoning was a lie.

Several residents had the rash and no one was giving them an answer. No one understood or was trying to figure it out at the beginning. Deddo told Henschel not to talk about the scabies. (Exh. 12, Henschel p. 53:3-53:12). Residents cried due to the discomfort. (Exh. 12, Henschel p. 56:16-56:18). Resident MG would have tears, noticing it over a 3-4 week period. (Exh. 12, Henschel p. 57:24-58:10). Resident CA was usually in tears due to the itching. (Exh. 12, Henschel p. 56:25-57:11; 58:11-58:24). Resident RR was scratching, she has Alzheimer's and was scratching. She became very lethargic. (Exh. 12, Henschel p. 59:4-59:19). Resident MN had it on her belly, which she scratched. (Exh. 12, Henschel p. 59:24-60:1). Resident BH would scratch so much that there would be blood when he scratched. (Exh. 12, Henschel p. 60:2-60:17). Resident DA had a bad case, had scratch marks all over her arms. (Exh. 12, Henschel p. 60:18-61:9). Henschel believed staff did not take the outbreak serious enough. (Exh. 12, Henschel p. 202:6-202:24).

45k(xi)     Momence followed a protocol for treating residents with scabies. (Exh. 4, Patel p. 102; Exh. 5, Willey p. 132; Exh. 16, Fulton pp. 87-90).

**RESPONSE**: Disputed. Judy DeMeullenarer was unaware that scabies was a communicable disease reportable to the Illinois Department of Health. (Exh. 9, DeMeullenarer p. 134:10-134:24). When asked "What conditions [of] participation Momence neglected to provide?" Absher testified, "Proper isolation and containment and elimination of a contagious skin problem." (Exh. 1, Absher pp.287:19-289:17).

Vesta Fulton (N/K/A Barrett) testified that she did not put tape on the closet doors of the residents rooms as according to scabies protocol. (Exh. 4, Barrett p. 87). Burt-Lafi testified that there was a shortage of gloves. She remembers seeing Judy DeMeullenarer doing a lot of treatments without gloves. (Exh. 6, Burt-Lafi p. 27:5-27:11). Burt Lafi did not receive any general information

48

about scabies. (Exh. 6, Burt-Lafi, p. 60:18-60:21).

Momence's infectious control nurse had not seen, nor learned guidelines on infection and control of scabies until after the outbreak at Momence. (Exh. 5, Bednarowicz p. 99:19-99:25). "We got on [line] and learned , you know, low long a patient has to be in isolation for, how long you're supposed to keep the articles of clothing in bags for." (Exh. 5, Bednarowicz p. 100:2-100:5).

Cavender told staff not to talk about a resident having scabies, as "it's part of HIPAA. They can't talk about it in the community or to other family members." (Exh. 10, Cavender p. 265:8-265:12). Cavender's instructions did not follow protocol, and her reasoning was a lie.

Several residents had the rash and no one was giving them an answer. No one understood or was trying to figure it out at the beginning. Deddo told Henschel not to talk about the scabies. (Exh. 12, Henschel p. 53:3-53:12). Residents cried due to the discomfort. (Exh. 12, Henschel p. 56:16-56:18). Resident MG would have tears, noticing it over a 3-4 week period. (Exh. 12, Henschel p. 57:24-58:10). Resident CA was usually in tears due to the itching. (Exh. 12, Henschel p. 56:25-57:11; 58:11-58:24). Resident RR was scratching, she has Alzheimer's and was scratching. She became very lethargic. (Exh. 12, Henschel p. 59:4-59:19). Resident MN had it on her belly, which she scratched. (Exh. 12, Henschel p. 59:24-60:1). Resident BH would scratch so much that there would be blood when he scratched. (Exh. 12, Henschel p. 60:2-60:17). Resident DA had a bad case, had scratch marks all over her arms. (Exh. 12, Henschel p. 60:18-61:9). Henschel believed staff did not take the outbreak serious enough. (Exh. 12, Henschel p. 202:6-202:24).

45k(xii)  During the early 2000s room changes were made to try and prevent the spread of scabies – because they weren't sure what it was. (Exh. 13, Henschel p. 47).

**RESPONSE**: Plaintiffs dispute that changes were made to try and prevent the spread of scabies. Despite the fact that the residents clearly had scabies, there was never an official diagnosis

of scabies. Nancy Zillmer routinely observed and charted the residents' symptoms and notified both Judy DeMuellenarer, the treatment nurse and Sue Cavender, director of nursing. After observing the residents, Judy and Sue determined that the residents were suffering from a fungal infection, not scabies. They then ordered the resident treated with a fungal cream. However, when the fungal cream did not work, Judy and Sue would always order treatment with Elimite, even though they continued to refuse to acknowledge that the residents had scabies. It is my belief that Momence management did not acknowledge that the residents had scabies because they did not want the public to find out, since any outbreaks had to be reported to the Department of Health. (Dkt. 135-11 Group Exh. D, Nancy Zillmer Decl. ¶ 11).

The first treatments in 2002 did not take care of the problem. (Exh. 12, Henschel p. 47:1-47:5). "We were doing several room changes at the time to try and get those who had the same thing quarantined. But it was taking forever to figure out who to quarantine and who not. . . Because they weren't sure what it was." (Exh. 12, Henschel pp. 47:7-48:8).

Plaintiffs do not dispute that Momence and its Medical Director didn't know what they were dealing with.

> 45k(xiii) Henschel recalls the bagging up of clothing, pillows, curtains, and the washing of mattresses. (Exh. 13, Henschel p. 48).

**RESPONSE**: Plaintiffs object to the statement to the extent it calls for speculation, calls for a legal conclusion, calls for expert opinion and/or is based upon impermissible lay opinion. Answering over objection and without waiving the same, Plaintiffs dispute that Henschel Defendants engaging in a scabies protocol. "We were doing several room changes at the time to try and get those who had the same thing quarantined. But it was taking forever to figure out who to quarantine and who not. . . Because they weren't sure what it was." (Exh. 12, Henschel pp. 47:7-48:8).

45k(xiv) If a resident's roommate had scabies, the resident's physician would be called to see if he wanted his resident prophylactically treated or moved to another room. (Exh. 8, Glenn p. 272).

**RESPONSE**: Disputed. Dr. Patel testified he is not familiar with CDC and federal regulations that describe and mandate proper prevention and control of scabies in long term care facilities. (Exh. 16, Patel p. 223:17-223:23). Dr. Patel did not know that scabies was reportable to IDPH. (Exh. 16, Patel pp. 166:12-167:9). Upon the December 15, 2003, admission of his Momence patient MG to Riverside Medical Center, a colleague had this to say about the treatment and care Dr. Patel and Momence provided to MG: "This patient is very well-known to me from multiple previous admissions. Her wounds are tending to follow a rather predictable process in that they routinely improve while she is here at RMC. She usually returns to the hospital after about 2 weeks at the NH and her wound are routinely worse when she is readmitted to RMC. That is definitely the case this time as she did not have any open area to the coccyx on the previous admissions." (Exh. 27, RMC000578). "Past skin biopsy was negative, but since there was a scabies outbreak in the hospital, it was suspected that the patient might have an atypical scabies like Norwegian scabies. Skin biopsy was repeated and pos for scabies" (Exh. 27, RMC 001442-001444).

45k(xv) Staff was trained on how to use contact precautions. (Exh. 8, Glenn p. 272; Exh. 9, Bednarowicz p. 35).

**RESPONSE**: When asked "What conditions [of] participation Momence neglected to provide?" Absher testified, "Proper isolation and containment and elimination of a contagious skin problem." (Exh. 1, Absher pp.287:19-289:17).

Vesta Fulton (N/K/A Barrett) testified that she did not put tape on the closet doors of the residents rooms as according to scabies protocol. (Exh. 4, Barrett p. 87). Burt-Lafi testified that there was a shortage of gloves. She remembers seeing Judy DeMeullenarer doing a lot of treatments

without gloves. (Exh. 6, Burt-Lafi p. 27:5-27:11). Burt Lafi did not receive any general information about scabies. (Exh. 6, Burt-Lafi, p. 60:18-60:21).

Momence's infectious control nurse had not seen, nor learned guidelines on infection and control of scabies until after the outbreak at Momence. (Exh. 5, Bednarowicz p. 99:19-99:25). "We got on [line] and learned , you know, low long a patient has to be in isolation for, how long you're supposed to keep the articles of clothing in bags for." (Exh. 5, Bednarowicz p. 100:2-100:5).

Cavender told staff not to talk about a resident having scabies, as "it's part of HIPAA. They can't talk about it in the community or to other family members." (Exh. 10,  Cavender p. 265:8-265:12). Cavender's instructions did not follow protocol, and her reasoning was a lie.

Several residents had the rash and no one was giving them an answer. No one understood or was trying to figure it out at the beginning. Deddo told Henschel not to talk about the scabies. (Exh. 12, Henschel p. 53:3-53:12). Residents cried due to the discomfort. (Exh. 12, Henschel p. 56:16-56:18). Resident MG would have tears, noticing it over a 3-4 week period. (Exh. 12, Henschel p. 57:24-58:10). Resident CA was usually in tears due to the itching. (Exh. 12, Henschel p. 56:25-57:11; 58:11-58:24). Resident RR was scratching, she has Alzheimer's and was scratching. She became very lethargic. (Exh. 12, Henschel p. 59:4-59:19). Resident MN had it on her belly, which she scratched. (Exh. 12, Henschel p. 59:24-60:1). Resident BH would scratch so much that there would be blood when he scratched. (Exh. 12, Henschel p. 60:2-60:17). Resident DA had a bad case, had scratch marks all over her arms. (Exh. 12, Henschel p. 60:18-61:9). Henschel believed staff did not take the outbreak serious enough. (Exh. 12, Henschel p. 202:6-202:24).

45k(xvi)  Momence was responding properly to the scabies issue. They had a protocol and they followed it. (Exh. 6, Deddo p. 253).

**RESPONSE**: Judy DeMeullenarer was unaware that scabies was a communicable disease

52

reportable to the Illinois Department of Public Health. (Exh. 9, DeMuellenarer p. 134:10-134:24). When asked "What conditions [of] participation Momence neglected to provide?" Absher testified, "Proper isolation and containment and elimination of a contagious skin problem." (Exh. 1, Absher pp.287:19-289:17).

Vesta Fulton (N/K/A Barrett) testified that she did not put tape on the closet doors of the residents rooms as according to scabies protocol. (Exh. 4, Barrett p. 87). Burt-Lafi testified that there was a shortage of gloves. She remembers seeing Judy DeMeullenarer doing a lot of treatments without gloves. (Exh. 6, Burt-Lafi p. 27:5-27:11). Burt Lafi did not receive any general information about scabies. (Exh. 6, Burt-Lafi, p. 60:18-60:21).

Momence's infectious control nurse had not seen, nor learned guidelines on infection and control of scabies until after the outbreak at Momence. (Exh. 5, Bednarowicz p. 99:19-99:25). "We got on [line] and learned , you know, low long a patient has to be in isolation for, how long you're supposed to keep the articles of clothing in bags for." (Exh. 5, Bednarowicz p. 100:2-100:5).

Cavender told staff not to talk about a resident having scabies, as "it's part of HIPAA. They can't talk about it in the community or to other family members." (Exh. 10, Cavender p. 265:8-265:12). Cavender's instructions did not follow protocol, and her reasoning was a lie.

Several residents had the rash and no one was giving them an answer. No one understood or was trying to figure it out at the beginning. Deddo told Henschel not to talk about the scabies. (Exh. 12, Henschel p. 53:3-53:12). Residents cried due to the discomfort. (Exh. 12, Henschel p. 56:16-56:18). Resident MG would have tears, noticing it over a 3-4 week period. (Exh. 12, Henschel p. 57:24-58:10). Resident CA was usually in tears due to the itching. (Exh. 12, Henschel p. 56:25-57:11; 58:11-58:24). Resident RR was scratching, she has Alzheimer's and was scratching. She

became very lethargic. (Exh. 12, Henschel p. 59:4-59:19). Resident MN had it on her belly, which she scratched. (Exh. 12, Henschel p. 59:24-60:1). Resident BH would scratch so much that there would be blood when he scratched. (Exh. 12, Henschel p. 60:2-60:17). Resident DA had a bad case, had scratch marks all over her arms. (Exh. 12, Henschel p. 60:18-61:9). Henschel believed staff did not take the outbreak serious enough. (Exh. 12, Henschel p. 202:6-202:24).

> 45k(xvii)  Dr. Patel, as medical director of the facility ordered all infected residents to be bathed in Acuzine. It was facility policy. The nursing staff put together a list of all the patients they suspected had scabies and gave the list to Cavendar. Cavendar then got the needed medication to treat the residents and staff. They were all treated appropriately. (Exh. 1, Mitchell pp. 63-67).

**RESPONSE**: Plaintiffs object to the statements to the extent they call for speculation, call for a legal conclusion, call for expert opinion and/or are based upon impermissible lay opinion. Answering over objection and without waiving the same, Defendants mischaracterize witness testimony. Plaintiffs dispute that Mitchell testified that Dr. Patel's order to bathe all residents with scabies was a facility policy. Plaintiffs also dispute that residents with scabies were provided the appropriate medical treatment. Dr. Patel testified that he has no standing order for anything at Momence. (Exh. 16, Patel p. 119:12-119:19). Dr. Patel did not contribute to creating Momence scabies protocol (Exh. 16, Patel p. 106:19-106:25) and has not worked to develop the infection control protocol. (Exh. 16, Patel pp. 101:1-102:7). Dr. Patel never looked at federal statues, Illinois statutes, no seminars that discuss regulations is not aware that federal regulations govern activities at nursing home, never continuing education of Nursing home regulations. (Exh. 16, Patel pp. 80:17-82:6). He never did any research about the responsibilities to be a Medical director. (Exh. 16, Patel p. 35:4-35:16). He has never looked at 42 CFR 483. (Exh. 16, Patel p. 46:16-46:18). Dr. Patel has not seen scabies in his patients in the past five years at Momence. (Exh. 16, Patel p.

327:4-327:9).

Judy DeMeullenarer was unaware that scabies was a communicable disease reportable to the Illinois Department of Public Health. (Exh. 9, DeMuellenarer p. 134:10-134:24). When asked "What conditions [of] participation Momence neglected to provide?" Absher testified, "Proper isolation and containment and elimination of a contagious skin problem." (Exh. 1, Absher pp.287:19-289:17).

Vesta Fulton (N/K/A Barrett) testified that she did not put tape on the closet doors of the residents rooms as according to scabies protocol. (Exh. 4, Barrett p. 87). Burt-Lafi testified that there was a shortage of gloves. She remembers seeing Judy DeMeullenarer doing a lot of treatments without gloves. (Exh. 6, Burt-Lafi p. 27:5-27:11). Burt Lafi did not receive any general information about scabies. (Exh. 6, Burt-Lafi, p. 60:18-60:21).

Momence's  infectious control nurse had not seen, nor learned guidelines on infection and control of scabies until after the outbreak at Momence. (Exh. 5, Bednarowicz p. 99:19-99:25). "We got on [line] and learned , you know, low long a patient has to be in isolation for, how long you're supposed to keep the articles of clothing in bags for." (Exh. 5, Bednarowicz p. 100:2-100:5).

Cavender told staff not to talk about a resident having scabies, as "it's part of HIPAA. They can't talk about it in the community or to other family members." (Exh. 10,  Cavender p. 265:8-265:12). Cavender's instructions did not follow protocol, and her reasoning was a lie.

Several residents had the rash and no one was giving them an answer. No one understood or was trying to figure it out at the beginning. Deddo told Henschel not to talk about the scabies. (Exh. 12, Henschel p. 53:3-53:12). Residents cried due to the discomfort. (Exh. 12, Henschel p. 56:16-56:18). Resident MG would have tears, noticing it over a 3-4 week period. (Exh. 12, Henschel

p. 57:24-58:10).  Resident CA was usually in tears due to the itching.  (Exh. 12, Henschel p. 56:25-57:11; 58:11-58:24).  Resident RR was scratching, she has Alzheimer's and was scratching.  She became very lethargic.  (Exh. 12, Henschel p. 59:4-59:19).  Resident MN had it on her belly, which she scratched.  (Exh. 12, Henschel p. 59:24-60:1).  Resident BH would scratch so much that there would be blood when he scratched.  (Exh. 12, Henschel p. 60:2-60:17).  Resident DA had a bad case, had scratch marks all over her arms.  (Exh. 12, Henschel p. 60:18-61:9).  Henschel believed staff did not take the outbreak serious enough.  (Exh. 12, Henschel p. 202:6-202:24).

45l.    Resident MG was Dr. Patel's patient and had a unique condition called Norwegian scabies.  (Exh. 4, Patel pp. 64, 95, 273; Exh. 8, Glenn pp. 281-283; Exh. 7, DeMeullenarer pp. 166-167).

**RESPONSE**:  Norwegian scabies occurs when a patient's physician fails to timely diagnose and treat a scabies infestation.  "The severity of scabies infestation is directly related to the number of mites residing on the skin and the length of time between initial infestation and subsequent diagnosis and treatment.  Persons with typical scabies generally have fewer than 50 live mites on their skin at any given time.  If diagnosis and treatment are delayed, the number of live mites multiplies resulting in heavier or atypical infestations.  Norwegian scabies occurs when treatment for infestation has been delayed for many months and is characterized by thick, crusted lesions.  Imbedded within these crusts are thousand to millions of live mites."  (Exh. 54, CDPH: Prevention and Control of Scabies in California Long-Term Care Facilities).  According to the Centers for Disease Control and Prevention, because they are infested with large numbers of mites (up to 2 million), persons with crusted scabies are very contagious.  (Ex. 64, Centers for Disease Control and Prevention http://www.cdc.gov/parasites/scabies/epi.html).  Dr. Patel and the Momence staff failed to timely recognize and treat resident MG's condition.  At Riverside Medical Center, when the

diagnosis of MG was put in the hands of a physician not associated with Momence, Norwegian scabies was immediately diagnosed and treated resulting in patient improvement. (Exh.27, RMC 000567). After spending sometime at Momence, MG was sent to Riverside Medical Center and was properly diagnosed and treated for Norwegian scabies. Her physician ordered contact isolation upon her return to Momence Health Care. Eventually MG had to be readmitted to the hospital with worsening pressure ulcers, and reinfestation of scabies. Had the facility been competently "entirely cleaned from top to bottom" according to protocol, and staff was following proper isolation protocol, MG would not have been reinfected with scabies at Momence. (Exh. 27, RMC 001162-001164). Prior to admission to Momence, MG did not exhibit signs of Norwegian scabies. (Exh. 5, Bednarowicz pp 178:14-178-18). Eventually, staff at Momence began to suspect MG suffered from scabies. (Exh. 5, Bednarowicz pp 177:24-178-13).

    45l(ii)  Resident MG had a case of Norwegian scabies. Glenn believes MG was finally diagnosed with scabies while she was at the hospital. She was then treated and cured. As a result, all residents and staff were checked for scabies and the entire facility was cleaned from top to bottom. (Exh. 8, Glenn pp. 281-283).

**RESPONSE**: After spending some time at Momence, MG was sent to Riverside Medical Center and properly diagnosed and treated for Norwegian scabies. (Exh. 27, RMC 001442-001444). Her physician ordered contact isolation upon her return to Momence. Eventually MG had to be readmitted to the hospital with worsening pressure ulcers, and reinfestation of scabies. Had the Momence facility been "entirely cleaned from top to bottom" and appropriate contact precautions been followed at the facility according to Federal regulations 483.65 and CDC protocol, MG would not have been reinfected with scabies when she returned to Momence. (Exh. 27, RMC 001162-001164).

    45l(iii)  MG had Norwegian scabies which was an abnormal form of scabies. The facility

made every effort to identify her condition and provide her with appropriate care. (Exh. 7, DeMeullenarer pp. 166-167).

**RESPONSE**: Plaintiffs object to the statements generally to the extent they call for speculation, call for a legal conclusion, call for expert opinion and/or are based upon impermissible lay opinion and, in particular with respect to whether or not Norwegian scabies is an "abnormal form of scabies." Answering over objection and without waiving the same, disputed. Prior to admission to Momence, MG did not exhibit signs of Norwegian scabies. (Exh. 5, Bednarowicz pp. 178:14-178:18). Eventually, staff began to suspect MG suffered from scabies. (Exh. 5, Bednarowicz pp. 177:24-178:13). Norwegian scabies occurs when a patient's physician fails to timely diagnose and treat a scabies infestation. "The severity of scabies infestation is directly related to the number of mites residing on the skin and the length of time between initial infestation and subsequent diagnosis and treatment. Persons with typical scabies generally have fewer than 50 live mites on their skin at any given time. If diagnosis and treatment are delayed, the number of live mites multiplies resulting in heavier or atypical infestations. Norwegian scabies occurs when treatment for infestation has been delayed for many months and is characterized by thick, crusted lesions. Imbedded within these crusts are thousand to millions of live mites." (Exh. 54, CDPH: Prevention and Control of Scabies in California Long-Term Care Facilities). According to the Centers for Disease Control and Prevention, because they are infested with large numbers of mites (up to 2 million), persons with crusted scabies are very contagious. (Ex. 64, Centers for Disease Control and Prevention http://www.cdc.gov/parasites/scabies/epi.html). Dr. Patel and the Momence staff failed to timely recognize and treat MG's condition. At Riverside Medical Center, when the diagnosis of MG was put in the hands of a physician not associated with Momence, Norwegian scabies was immediately diagnosed and treated resulting in patient improvement. (Exh. 27, RMC 000567).

45m. Resident MG's skin condition did not present as scabies. Patel believed it to be a form of dermatitis. (Exh. 4, Patel pp. 95, 273-276; Exh. 8, Glenn pp. 281-283; Exh. 7, DeMeullenarer pp. 166-167).

**RESPONSE**:  Plaintiffs object to the statements generally to the extent they call for speculation, call for a legal conclusion, call for expert opinion and/or are based upon impermissible lay opinion and, in particular with respect to whether or not Norwegian scabies is an "abnormal form of scabies." Answering over objection and without waiving the same, disputed. After spending some time at Momence, MG was sent to Riverside Medical Center and properly diagnosed and treated for Norwegian scabies. (Exh. 27, RMC 001442-001444). Her physician ordered contact isolation upon her return to Momence. Eventually MG had to be readmitted to the hospital with worsening pressure ulcers, and reinfestation of scabies. Had the Momence facility been "entirely cleaned from top to bottom" and appropriate contact precautions been followed at the facility according to Federal regulations 483.65 and CDC protocol, MG would not have been reinfected with scabies when she returned to Momence. (Exh. 27, RMC 001162-001164).

Prior to admission to Momence, MG did not exhibit signs of Norwegian scabies. (Exh. 5, Bednarowicz pp. 178:14-178:18). Eventually, staff began to suspect MG suffered from scabies. (Exh. 5, Bednarowicz pp. 177:24-178:13). Norwegian scabies occurs when a patient's physician fails to timely diagnose and treat a scabies infestation. "The severity of scabies infestation is directly related to the number of mites residing on the skin and the length of time between initial infestation and subsequent diagnosis and treatment. Persons with typical scabies generally have fewer than 50 live mites on their skin at any given time. If diagnosis and treatment are delayed, the number of live mites multiplies resulting in heavier or atypical infestations. Norwegian scabies occurs when treatment for infestation has been delayed for many months and is characterized by thick, crusted

lesions.  Imbedded within these crusts are thousand to millions of live mites." (Exh. 54, CDPH: Prevention and Control of Scabies in California Long-Term Care Facilities).  According to the Centers for Disease Control and Prevention, because they are infested with large numbers of mites (up to 2 million), persons with crusted scabies are very contagious.  (Ex. 64, Centers for Disease Control and Prevention http://www.cdc.gov/parasites/scabies/epi.html).  Dr. Patel and the Momence staff failed to timely recognize and treat MG's condition.  At Riverside Medical Center, when the diagnosis of MG was put in the hands of a  physician not associated with Momence, Norwegian scabies was immediately diagnosed and treated resulting in patient improvement.  (Exh. 27, RMC 000567).

> 45m(i) Norwegian scabies is difficult to diagnose.  It's a unique presentation.  (Exh. 4, Patel p. 95).

**RESPONSE**: Plaintiffs object to the statements generally to the extent they call for speculation, call for a legal conclusion, call for expert opinion and/or are based upon impermissible lay opinion and,  in particular with respect to whether or not Norwegian scabies is an "abnormal form of scabies."  Answering over objection and without waiving the same, disputed.   Prior to admission to Momence, MG did not exhibit signs of Norwegian scabies. (Exh. 5, Bednarowicz pp. 178:14-178:18).  Eventually, staff began to suspect MG suffered from scabies. (Exh. 5, Bednarowicz pp. 177:24-178:13).  Norwegian scabies occurs when a patient's physician fails to timely diagnose and treat a scabies infestation.  "The severity of scabies infestation is directly related to the number of mites residing on the skin and the length of time between initial infestation and subsequent diagnosis and treatment.  Persons with typical scabies generally have fewer than 50 live mites on their skin at any given time.  If diagnosis and treatment are delayed, the number of live mites multiplies resulting in heavier or atypical infestations.  Norwegian scabies occurs when treatment

for infestation has been delayed for many months and is characterized by thick, crusted lesions. Imbedded within these crusts are thousand to millions of live mites." (Exh. 54, CDPH: Prevention and Control of Scabies in California Long-Term Care Facilities). According to the Centers for Disease Control and Prevention, because they are infested with large numbers of mites (up to 2 million), persons with crusted scabies are very contagious. (Ex. 64, Centers for Disease Control and Prevention http://www.cdc.gov/parasites/scabies/epi.html). Dr. Patel and the Momence staff failed to timely recognize and treat MG's condition. At Riverside Medical Center, when the diagnosis of MG was put in the hands of a physician not associated with Momence, Norwegian scabies was immediately diagnosed and treated resulting in patient improvement. (Exh. 27, RMC 000567).

> 45m (ii) When her skin condition originally presented it did not appear to be scabies. Patel believed it to be a form of dermatitis. Norwegian scabies looks more like dermatitis. (Exh. 4, Patel pp. 273-276).

**RESPONSE**: Plaintiffs object to the statements generally to the extent they call for speculation, call for a legal conclusion, call for expert opinion and/or are based upon impermissible lay opinion and, in particular with respect to whether or not Norwegian scabies is an "abnormal form of scabies." Answering over objection and without waiving the same, disputed. Staff at Momence suspected MG had scabies due to her reddened skin and "she has the bumps." (Exh. 5, Bednarowicz pp. 177:24-178:13).

> 45m(iv) It did not present as regular scabies. (Exh. 7, DeMeullenarer pp. 166-167).

**RESPONSE**: Plaintiffs object to the statement generally to the extent it calls for speculation, calls for a legal conclusion, calls for expert opinion and/or is abased upon impermissible lay opinion. Plaintiffs also object on grounds the term "It" is vague and ambiguous. Answering over objection and without waiving the same, disputed. Norwegian scabies occurs when a patient's physician fails

to timely diagnose and treat a scabies infestation. "The severity of scabies infestation is directly related to the number of mites residing on the skin and the length of time between initial infestation and subsequent diagnosis and treatment. Persons with typical scabies generally have fewer than 50 live mites on their skin at any given time. If diagnosis and treatment are delayed, the number of live mites multiplies resulting in heavier or atypical infestations. Norwegian scabies occurs when treatment for infestation has been delayed for many months and is characterized by thick, crusted lesions. Imbedded within these crusts are thousand to millions of live mites." (Exh. 54, CDPH: Prevention and Control of Scabies in California Long-Term Care Facilities). According to the Centers for Disease Control and Prevention, because they are infested with large numbers of mites (up to 2 million), persons with crusted scabies are very contagious. (Ex. 64, Centers for Disease Control and Prevention http://www.cdc.gov/parasites/scabies/epi.html).

45n.    Two infectious disease specialists thought MG had an atopic dermatitis. (Exh. 4, Patel p. 274).

**RESPONSE**: Plaintiffs object to the statement insofar as it calls for speculation. Answering over objection and without waiving the same, disputed. The averment is not supported by the cited deposition testimony. Defendants and Dr. Patel provide no evidence that "Infectious Disease Specialists" examined resident MG. Additionally, no evidence exists in MG's medical records that her conditioned was examined by any other physician other that those whom treated and diagnosed MG at Riverside Medical Center.

45o.    MG was being treated for her symptoms and when she did not improve Patel sought out the opinions of specialists. (Exh. 4, Patel pp. 273-277).

**RESPONSE**: Dr. Patel performed a punch biopsy in a weak attempt to diagnose scabies, even though the staff at Momence suspected scabies due to her reddened skin and "she has the

bumps".  (Exh. 5, Bednarowicz pp. 177:24-178:13).  Nonetheless, Dr.  Patel reported to the Ombudsman that MG's condition was not scabies.  Dr.  Patel was apparently unfamiliar with crusted scabies and did not listen.  A second biopsy performed by another physician at Riverside Medical Center confirmed scabies, and a diagnosis of  Norwegian scabies was finally given for MG.  (Exh. 27, RMC 00001442-001444).

> 45p.   It took a while for MG to be diagnosed with Norwegian scabies.  During this period her physician was involved and different treatments were administered.  (Exh. 6, Deddo p. 277).

**<u>RESPONSE</u>**: Dr. Patel performed a punch biopsy in a weak attempt to diagnose scabies, even though the staff at Momence suspected scabies due to her reddened skin and "she has the bumps".  (Exh. 5, Bednarowicz pp. 177:24-178:13).  Nonetheless, Dr. Patel reported to the Ombudsman that MG's condition was not scabies.  Dr.  Patel was apparently unfamiliar with crusted scabies and did not listen.  A second biopsy performed by another physician at Riverside Medical Center confirmed scabies, and a diagnosis of  Norwegian scabies was finally given for MG.  (Exh. 27, RMC 00001442-001444).

> 45q.   Once it was determined to be Norwegian scabies, MG was treated and the condition cleared.  (Exh. 8, Glenn p. 283).

**<u>RESPONSE</u>**:  Plaintiffs object to the statement to the extent it calls for speculation, calls for a legal conclusion, calls for  expert opinion and/or is abased upon impermissible lay opinion.  Plaintiffs also object on grounds the term "It" is vague and ambiguous.   Answering over objection and without waiving the same, disputed.  When MG returned to Momence Meadows, she was again exposed to an uncontained scabies outbreak at the facility, and returned to the hospital in more serious condition and again reinfected with scabies.  (Exh. 27,  RMC 001162-RMC001164).  She died a short time later.

45r.    Absher claims to have called the IDPH hotline to report that she believed residents at Momence had scabies.  IDPH surveyors investigated the claims and concluded there was no wrongdoing.  (Exh. 2, Absher pp. 23-24, 29-30).

**RESPONSE**:  Plaintiffs object to the averment to the extent it calls for speculation. Answering over objection and without waiving the same, disputed.  The averment is not supported by the cited evidence.  "Based on observation, record review and interview, the facility failed to investigate, monitor and prevent the spread of skin rashes to 6 residents in a sample of 10." (Exh. 33, FOIA0048-56).   Momence residents were eventually treated with Elimite. (Exh. 56, MM236183).

45s.    When a resident was diagnosed with scabies the DON reported it to Public Health. (Exh. 5, Willey pp. 139; Exh. 6, Deddo pp. 50-51, 162-163).

**RESPONSE**:  Plaintiffs object to the statement to the extent it calls for speculation. Answering over objection and without waiving the same, disputed.  Defendants have put forth no evidence to support the statement. Dr. Patel was not aware that scabies was a reportable disease in Illinois.  (Exh. 16, Patel pp. 166:12-167:9).

46a.    Public Health investigated all complaints. (Exh. 8, Glenn pp. 119-120).

**RESPONSE**: Plaintiffs object to the statement as calling for speculation.  Answering over and without waiving said objection, Glenn cannot possibly know whether or not Public Health investigated all complaints.  Defendants have put forth no evidence to support such a claim. Nevertheless, even if the statement is true, the mere fact that Public Health investigated all complaints has no bearing on the issues raised in Defendants' Motion or to the ultimate issues and/or outcome of this case.

55.    Absher did not report any suspicion of neglect to state or federal agencies. (Exh. 2, Absher p. 256).

**RESPONSE**: Disputed. Absher called the IDPH hotline several times. (Defs' Exh. 2, Absher p. 30-31).

    51d.    DeMeullenarer was never discouraged from talking to a surveyor and never told to hide documentation from surveyors. Surveyors were not told they couldn't talk to residents. (Exh. 7, DeMeullenarer pp. 159-160).

**RESPONSE**: The statement that "Surveyors were not told they couldn't talk to residents" is objectionable in that it calls for speculation and is not supported by the cited deposition testimony. DeMeullenarer testified, in response to whether the surveyors were ever told they couldn't see certain residents, "Not to my knowledge." Plaintiffs do not dispute the other statement.

    52.    Momence responded to and corrected any problem identified by the government. (Exh. 6, Deddo p. 267).

**RESPONSE**: Disputed. There was a scabies outbreak at Momence that had waned during the winter of 2002-03, but by March 2003 it had blossomed again leading to an investigation by IDPH of a scabies outbreak. (Exh. 33). The investigation includes an admission by a top-level employee at Momence that they failed to track the situation or to figure out what was causing the problem. (Id.). The investigation also verifies that the top-level employee's assurance to the inspector that appropriate protocols were being followed was utterly false, as shown by the inspector's observation of employee practices. (Id.).

There was a problem with scabies at Momence. (Exh. 13, Isaacs p. 16:7-16:16). Scrapings were needed because there were too many incidents of somebody having scabies, " if the patients were getting treatment, if we're doing what we're supposed to be doing, it should've reduced in numbers, not increased." (Exh. 13, Isaacs pp. 55:26-56:9). "It got to the point that everybody had scabies, so it didn't make any difference [to isolate patients] (Exh. 13, Issacs p. 60:1-60:12). Absher

testified, "In my nursing judgment, I felt there were too many residents itching too much, I wanted to get to the bottom of it. I wanted them quarantined." So this is the Scabies? "Correct." (Exh. 1, Absher p. 21:2-21:13). Momence had a scabies outbreak. (Exh. 5, Bednarowicz p 86). MG had Norwegian scabies. (Exh. 5, Bednarowicz p. 177: 12-177:19). "How many prescriptions of elimite was issued? A lot." (Exh. 5, Bednarowicz pp. 197:25-198:4). Mitchell reported to DON Sue Cavender and Judy DeMeullenarer that patients had scabies in 2001. "I was told to shut my mouth." (Exh. 2, Mitchell pp. 58:11-59:1). All residents at Momence had to be bathed in Acuzine. (Exh. 2, Mitchell, p. 64:2-64:10). Every CNA in the building just about had scabies on their arms, chest and stomach (Exh. 2, Mitchell p. 65:3-65:8). All residents and CNA's got tubes to treat scabies. (Exh. 2, Mitchell p. 65:5-65:24. There was a period of time before skin conditions were recognized and diagnosed as scabies. (Exh. 2, Mitchell p. 291:22-291:25). It was unusual to have so many residents with rash or red spots and itching. (Exh. 6, Burt-Lafi pp.75:24-76:6). Momence had scabies frequently: "So, actually, if you want true diagnosis, I don't even remember how many of those we had. But yeah, we had it quite often." (Exh. 9, DeMeullenarer p. 52:2-52:4).

In 2003, several years after scabies was a problem, Momence personnel continued to fail to establish an infection control program under which is investigates, controls and prevents infections in the facility; decides what procedures such as isolation should be applied to an individual resident, and maintains a record of incidents and corrective action related to infections. (Exh. 33, FOIA 0048-0056).

This was a time period when scabies and rashes were a problem. The prescribed treatment was Acticin or Kwell. The drugs were kept in stock for quicker access. (Exh. 10, Cavender pp. 262:12-263:24). There were a large number of people diagnosed with scabies at Momence. (Exh.

12, Henschel p. 46:15-46:20). They were doing several room changes to try and get those that had the same thing quarantined. It was taking forever to figure out who to quarantine. It was early 2000, 2002, 2003. They were moving residents around to try to prevent the spread of the scabies because they weren't sure what it was at the time. (Exh. 12, Henschel, p. 47:7-47:24). No one was giving the residents the answer, no one understood or was trying to figure it out at the beginning. Paula Deddo told Henschell not to talk about it. (Exh. 12, Henschel p. 53:3-53:12).

Somebody would break out, they wouldn't know for sure what it was, somebody else would break out. It was "constant" until they realized what was going on. At any given time there were probably six to eight people with scabies. (Exh. 19, Willey p. 136:2-136:9). The medication for the treatment of scabies was "house stock" (Exh. 19, Willey p. 140:1-140:14). Willey did not report outbreaks of scabies to the IDPH. (Exh. 19, Willey p. 139:4-139:14).

60.     Absher has no personal knowledge of anything that occurred at Momence prior to or after her employment at Momence. (Exh. 2, Absher p. 255).

**RESPONSE**: Disputed insofar as it misstates Absher's testimony. Absher testified that she didn't see any of what happened at Momence before or after her term of employment with her own eyes Defs' Exh. 2, Absher p. 255:4-255:7). However, after resident RR died by suffocating on the guardrail of her bed, three people called Absher to tell her about RR's death after they'd been to a meeting regarding the death and told her that Momence management had ordered them not to speakd to anybody about it. (Defs' Exh. 2, Absher pp. 254:14-255:7).

61.     Absher has no personal knowledge of Momence miscaring for any resident after her resignation. (Exh. 2, Absher p. 42-43).

**RESPONSE**: Plaintiffs object to the statement as vague and ambiguous with regard to the tgerm "miscaring." Answering over objection and without waiving same, disputed. Absher testified

67

that she didn't see any of what happened at Momence before or after her term of employment with her own eyes Defs' Exh. 2, Absher p. 255:4-255:7).   However, after resident RR died by suffocating on the guardrail of her bed, three people called Absher to tell her about RR's death after they'd been to a meeting regarding the death and told her that Momence management had ordered them not to speak to anybody about it. (Defs' Exh. 2, Absher pp. 254:14-255:7).

62.     Absher did not personally observe or overhear many of the allegations made in the Sixth Amended Complaint. (Exh. 2, Absher p. 256).

**RESPONSE**: Disputed.  The allegations in Plaintiffs' Complaint is based in large part on Absher's personal knowledge. "To qualify as an original source, a relator does not have to have personal knowledge of all elements of a cause of action." *United States ex rel. Minn. Assn. of Nurse Anesthetists v. Allina Health Sys. Corp*., 276 F.3d 1032, 1050 (8th Cir. 2002).

63.     Plaintiffs have no direct, independent or first-hand knowledge of any allegedly false or fraudulent claim submitted by defendants to the state or federal government for payment or approval. (Exh. 2, Absher pp. 278-279; Exh. 1, Mitchell pp. 272-273, 348-349, 350-351).

**RESPONSE**: Disputed.  Plaintiffs testified that every piece of paper in a resident's medical file constituted a bill or claim for payment.  Mitchell testified that everything in the chart was used for billing and constituted the bill.  (Exh. 2, Mitchell p. 274:9-274:11).   Absher testified that my understanding is that every chart of every patient is billing.  The chart is an invoice.  (Exh. 1, Absher p. 35:13-35:21).

63a.     Absher has never seen a claim for reimbursement submitted by Momence to any payor, including Medicare and Medicaid. (Exh. 2, Absher pp. 278279).

**RESPONSE**: Disputed.  Plaintiffs testified that every piece of paper in a resident's medical file constituted a bill or claim for payment.  Mitchell testified that everything in the chart was used for billing and constituted the bill.  (Exh. 2, Mitchell p. 274:9-274:11).   Absher testified that my

understanding is that every chart of every patient is billing. The chart is an invoice. (Exh. 1, Absher p. 35:13-35:21).

> 63b.  Mitchell has never actually seen a bill issued by Momence. (Exh. 1, Mitchell pp. 272-273, 348-349).

**RESPONSE**: Disputed. Plaintiffs testified that every piece of paper in a resident's medical file constituted a bill or claim for payment. Mitchell testified that everything in the chart was used for billing and constituted the bill. (Exh. 2, Mitchell p. 274:9-274:11). Absher testified that my understanding is that every chart of every patient is billing. The chart is an invoice. (Exh. 1, Absher p. 35:13-35:21).

> 63d.  Mitchell can't say a bill was false because she has never seen one. (Exh. 1, Mitchell pp. 350-351).

**RESPONSE**: Disputed. Plaintiffs testified that every piece of paper in a resident's medical file constituted a bill or claim for payment. Mitchell testified that everything in the chart was used for billing and constituted the bill. (Exh. 2, Mitchell p. 274:9-274:11). Absher testified that my understanding is that every chart of every patient is billing. The chart is an invoice. (Exh. 1, Absher p. 35:13-35:21).

> 81.  No one at Momence could have known Absher was a perspective qui tam plaintiff in March 2003. (Exh. 2, Absher p. 131).

**RESPONSE**: Absher's testimony is taken out of context. On the page Defendants cite, Absher testified that the "folks at Momence who sent the fax to Provena" could not have known that she was a prospective qui tam plaintiff in March 2003. (Defs' Exh. 2, Absher pp. 131:11-131:15). Additionally, Absher's previous testimony demonstrates that at least one person at Momence Meadows Nursing Center believed Absher was a prospective qui tam plaintiff because in February 2003, Director of Nursing Sue Cavender said to her, "so you're a whistleblower now?" (Exh. 1,

Absher pp. 96:14-97:1).

83. No one associated with Momence ever harassed or discriminated against Absher prior to March 2003. (Exh. 2, Absher p. 126).

**RESPONSE**: Plaintiffs object to this fact as vague and ambiguous. Answering over objection and without waiving the same, Absher testified that someone at Momence Meadows sent the fax of her resignation in either February or March of 2003. (Exh. 2, Absher p. 131:1-5). Also, Absher testified that in February 2003, Director of Nursing Sue Cavender said to her, "so you're a whistleblower now?" (Exh. 1, Absher pp. 96:14-97:1).

88. Absher admits she has no facts that link the events she describes as harassment to Momence or Jacob Graff. (Exh. 2, Absher p. 146).

**RESPONSE**: Absher's testimony is taken out of context. On the page Defendants cite, Plaintiff Absher testified that she believes all the acts of violence against her and her property are related to Momence Meadows. (Absher Dep. 146:5-13, 8/10/10). Additionally, Absher previously testified that she had a conversation with Mike Sederholm, Assistant Administrator Paula Deddo's son and Momence Meadows employee, regarding her dropping the lawsuit against Momence and Graff, and she took Sederholm's statement, "You know how the old man is," to be attributed to Graff. (Defs' Exh. 2, Absher pp. 140:1-142:25, 146:5-147:1).

94. Mitchell alleges additional bad acts against her and her family in September, 2004, November 2004 and December 2004 including. (Exh. 28).

**RESPONSE**: Defendants misstate witness testimony. In the Exhibit Defendants cite, Mitchell reported additional bad acts against her and her family in September 2004, November 2004, and December 2004, including being run off the road, her daughter's brake line being cut, and her granddaughter hearing a threatening voice over the telephone. (Defs' Exhibit 28).

95. Mitchell is unaware of any fact that Momence or Jacob Graff were involved in any of the bad acts (including peeping tom and traffic accidents) against her or her family. She never claimed Graff was involved. (Exh. 1, Mitchell pp. 197, 202203, 205, 208, 217, 338).

**RESPONSE**: Defendants' misstate the testimony. Mitchell testified that she has suspicions of who was behind the bad acts, but does not know whether Momence Meadows or Graff were involved. (Defs' Exh. 1, Mitchell pp. 197:11-198:1, 205:3-5, 208:23-25; Exh. 2, Mitchell pp. 338:10-339:11). She also testified that Mike Sederholm, Assistant Administrator Paula Deddo's son and Momence Meadows employee, was involved in one of the peeping tom incidents and issued a verbal threat to her. (Defs' Exh. 1, Mitchell pp. 203:7-203:17, 217:1-217:4).

97. Mitchell acknowledges there is no known connection between Officer Cromwell and Jacob Graff. (Exh. 1, Mitchell p. 345).

**RESPONSE**: Mitchell testified that she did not know if there was a connection between Officer Cromwell and Graff, but that there was a connection between Officer Cromwell and Assistant Administrator Paula Deddo and Director of Nursing Sue Cavender. (Exh. 2, Mitchell pp. 344:24-345:2).

## C. DISPUTED IMMATERIAL FACTS

33f. Insuring patients received appropriate care was discussed at the quality assurance meetings. (Exh. 4, Patel p. 69).

**RESPONSE**: The purported fact is disputed to the extent it misstates the cited deposition testimony. Dr. Patel testified that what was discussed at quality assurance meetings was making sure Momence *provides* the appropriate care to its residents. (Defs' Exh. 4, Patel p. 69:16-69:18).

33i. The purpose was to identify any issues the facility was having and to get them corrected before they became large problems. (Exh. 8, Glenn p. 58).

**RESPONSE**: This purported fact is disputed to the extent it does not accurately the cited deposition testimony. In response to the question "What would you do if you identified [during a quality assurance meeting] that the facility wasn't doing what you thought it should be doing?" Glenn testified, "Then we would have another meeting and try to put in a plan so that we could fix the problem because you always try to get it when it's a small problem so it doesn't become a big problem. And then we would identify who would be overseeing this and how they would do it and how they would report back to whoever they needed to report to." (Defs' Exh. 8, Glenn pp. 58:14-58:24).

      38a.     Patel who was routinely at Momence is of the opinion that Momence provided very good care to its residents. (Exh. 4, Patel p. 323).

**RESPONSE**: This purported fact is disputed to the extent it does not accurately the cited deposition testimony. Dr. Patel testified he is at the Momence 2-3 times a month. He never testifies he is at the facility "routinely." (Ex. 16, Patel p. 322).

      38b.     Staff was dedicated to providing quality care to the residents and did provide quality care to residents. (Exh. 8, Glenn pp. 372-373; Exh. 7, DeMeullenarer p. 164).

**RESPONSE**: Plaintiffs object to the purported fact to the extent it calls for a legal conclusion, calls for expert opinion and/or is based on impermissible lay opinion. Answering over objection and without waiving the same, Plaintiffs dispute this averment to the extent that it suggests that Momence residents were provided quality care as required by law. Plaintiffs do not dispute that the witnesses testified that they cared about their residents, which is irrelevant to the issues in this case.

38d. Nurses were dedicated to providing quality care to the residents. (Exh. 15, Burt-Lafi p. 115).

**RESPONSE**: Plaintiffs object to the purported fact to the extent it calls for a legal conclusion, calls for expert opinion and/or is based on impermissible lay opinion. Answering over objection and without waiving the same, Plaintiffs dispute this averment to the extent that it suggests that Momence residents were provided quality care as required by law. Plaintiffs do not dispute that the witnesses testified that they cared about their residents, which is irrelevant to the issues in this case. Burt-Lafi's opinion as to whether nurses were dedicated to providing quality care to the residents has no bearing on the issues raised in Defendants' Motion or the ultimate issues and/or outcome of this case.

38e. Overall the nurses and CNAs at Momence provided good care to their residents. (Exh. 10, Isaacs pp. 13, 19).

**RESPONSE**: Plaintiffs object to the purported fact to the extent it calls for a legal conclusion, calls for expert opinion and/or is based on impermissible lay opinion. Answering over objection and without waiving the same, Plaintiffs dispute this averment to the extent that it suggests that Momence residents were provided quality care as required by law. Moreover, Isaacs has stated there were serious problems with Defendants. (Dkt. 135-11, Group Exhibit D - Lydia Isaacs Decl.). (Dkt. 135-11, Group Exhibit D - Lydia Isaacs Decl.). Nevertheless, Isaacs' personal opinion that "overall" the nurses and CNAs provided good care to their residents has no bearing on the issues raised in Defendants' Motion or the ultimate issues and/or outcome of this case.

38f. Overall Momence did a terrific job as a nursing home. (Exh. 10, Isaacs p. 20).

**RESPONSE**:  Plaintiffs object to the purported fact to the extent it calls for a legal conclusion, calls for expert opinion and/or is based on impermissible lay opinion.  Answering over objection and without waiving the same, Plaintiffs dispute this averment to the extent that it suggests that Momence provided the requisite care to its residents as required by law.   Moreover, Isaacs has stated there were serious problems with Defendants.  (Dkt. 135-11, Group Exhibit D - Lydia Isaacs Decl.).  Neverthelss, Isaacs' personal opinion about the "job" Momence did has no bearing on the issues raised in Defendants' Motion or the ultimate issues and/or outcome of this case.

38g.    Momence's nurses and CNAs provided quality care to their residents. (Exh. 9, Bednarowicz p. 269).

**RESPONSE**:  Plaintiffs object to the purported fact to the extent it calls for a legal conclusion, calls for expert opinion and/or is based on impermissible lay opinion.  Answering over objection and without waiving the same, Plaintiffs dispute this averment to the extent that it suggests that Momence provided the requisite care to its residents as required by law.  The personal opinion of Bednarowicz as to whether Momence residents received quality care  has no bearing on the issues raised in Defendants' Motion or the ultimate issues and/or outcome of this case.

38h.    Deddo provided quality care to the Momence residents as did the other CNAs. (Exh. 6, Deddo p. 262).

**RESPONSE**:  Plaintiffs object to the purported fact to the extent it calls for a legal conclusion, calls for expert opinion and/or is based on impermissible lay opinion.  Answering over objection and without waiving the same, Plaintiffs dispute this averment to the extent that it suggests that Momence provided the requisite care to its residents as required by law.  Deddo's personal opinion about the fact that she provided quality care to the residents is purely self-serving,

especially in light of the many allegations about her in Plaintiffs' Complaint. Her opinion of herself and the other CNAs has no bearing on the issues raised in Defendants' Motion or the ultimate issues and/or outcome of this case.

> 38i. From Deddo's observations, the nurses were providing quality care to the Momence residents. (Exh. 6, Deddo p. 262).

**RESPONSE**: Plaintiffs object to the purported fact to the extent it calls for a legal conclusion, calls for expert opinion and/or is based on impermissible lay opinion. Answering over objection and without waiving the same, Plaintiffs dispute this averment to the extent that it suggests that Momence provided the requisite care to its residents as required by law. Deddo is not qualified to render expert opinion or make a legal conclusion and, more importantly, her personal opinion as to whether the nurses provided quality care has no bearing on the issues raised in Defendants' Motion or the ultimate issues and/or outcome of this case.

> 38o. DeMeullenarer was an advocate for her patients. (Exh. 7, DeMeullenarer p. 143).

**RESPONSE**: Plaintiffs object to the purported fact as vague and ambiguous with respect to the term "advocate." Answering over objection and without waiving the same, DeMeullenarer's personal opinion that she is an advocate, whatever that may mean, is immaterial to any of the issues raised in Defendants' Motion or the ultimate issues and/or resolution of this case.

> 45a. Scabies is a very common disease in hospitals, nursing homes and schools.(Exh. 4, Patel pp. 97-98, 252-253, 256, 265-266; Exh. 8, Glenn p. 246; Exh. 9, Bednarowicz pp. 86-87; Exh. 7. DeMeullenarer pp. 50-51).

**RESPONSE**: Plaintiffs object to the purported fact to the extent it calls for a legal conclusion, calls for expert opinion and/or is based upon impermissible lay opinion. None of the

witnesses cited by Defendants are experts in epidemiology or prevention and control of scabies, nor have they cited references for such an assertion. Answering over objection and without waiving the same, this fact is disputed but is immaterial and does not entitle Defendants to summary judgment. This action alleges that the government failed to receive the benefit of its bargain for nursing home services that delivered statutorily defined outcomes. Momence Meadows received Medicare and Medicaid dollars on the condition that it complied with federal mandates to establish and maintain an infection control program preventing certain outcomes of harm. 42 CFR 483 establishes regulations for Long Term Care Facilities and conditions Medicare and Medicaid payments to the facility on the facility's compliance with the regulation. In particular, Subpart B includes a provision for the establishment and maintenance of an infection control program that, among other things, investigates, controls, and prevents infections in the facility. (Exh. 62, 63, 42 CFR 483.1, 483.65).

In addition, evidence supports there were several outbreaks at the facility over a very long course of time at Momence, including at least one patient with a diagnosis of Norwegian Scabies-a condition that only arises when clinician and staff fail to properly recognize and treat a scabies infestation in a patient. See, response to Statement No. 45 herein.

45a(i). Scabies is common in nursing homes, hospitals and schools. (Exh. 4, Patel p. 98).

**RESPONSE**: This statement is duplicative of No. 45a. Plaintiffs object to the purported fact to the extent it calls for a legal conclusion, calls for expert opinion and/or is based upon impermissible lay opinion. None of the witnesses cited by Defendants are experts in epidemiology or prevention and control of scabies, nor have they cited references for such an assertion. Answering over objection and without waiving the same, this fact is disputed but is immaterial insofar as this action alleges that the government failed to receive the benefit of its

bargain for nursing home services that delivered statutorily-defined outcomes. Momence Meadows received Medicare and Medicaid dollars on the condition that it complied with federal mandates to establish and maintain an infection control program preventing certain outcomes of harm. In addition, evidence supports there were several outbreaks at the facility over a very long course of time at Momence, including at least one patient with a diagnosis of Norwegian Scabies-a condition that only arises when clinician and staff fail to properly recognize and treat a scabies infestation in a patient.

45a(ii) Scabies have been found in other nursing homes and hospitals. (Exh. 8, Glenn P. 246).

**RESPONSE**: Plaintiffs object to the purported fact to the extent it calls for a legal conclusion, calls for expert opinion and/or is based upon impermissible lay opinion. Answering over objection and without waiving the same, this fact is disputed but is immaterial and does not entitle Defendants to summary judgment. None of the witnesses cited by Defendants are experts in epidemiology or prevention and control of scabies, nor have they cited references for such an assertion. This action alleges that the government failed to receive the benefit of its bargain for nursing home services that delivered statutorily-defined outcomes. Momence Meadows received Medicare and Medicaid dollars on the condition that it complied with federal mandates to establish and maintain an infection control program preventing certain outcomes of harm.

42 CFR 483 establishes regulations for Long Term Care Facilities and conditions Medicare and Medicaid payments to the facility on the facility's compliance with the regulation. In particular, Subpart B includes a provision for the establishment and maintenance of an infection control

program that, among other things, investigates, controls, and prevents infections in the facility. (Exh. 62, 63, 42 CFR 483.1, 483.65).

Evidence supports there were several outbreaks at the facility over a very long course of time at Momence, including at least one patient with a diagnosis of Norwegian Scabies-a condition that only arises when clinician and staff fail to properly recognize and treat a scabies infestation in a patient. See, response to Statement No. 45 herein.

45a(iii) Scabies is very prevalent in long term care facilities. (Exh. 9, Bednarowicz pp. 86-87).

**RESPONSE**: Plaintiffs object to the purported fact to the extent it calls for a legal conclusion, calls for expert opinion and/or is based upon impermissible lay opinion. Answering over objection and without waiving the same, this fact is disputed but is immaterial and does not entitle Defendants to summary judgment. Defendants misrepresent testimony. None of the witnesses cited by Defendants are experts in epidemiology or prevention and control of scabies, nor have they cited references for such an assertion. This action alleges that the government failed to receive the benefit of its bargain for nursing home services that delivered statutorily-defined outcomes. Momence Meadows received Medicare and Medicaid dollars on the condition that it complied with federal mandates to establish and maintain an infection control program preventing certain outcomes of harm.

42 CFR 483 establishes regulations for Long Term Care Facilities and conditions Medicare and Medicaid payments to the facility on the facility's compliance with the regulation. In particular, Subpart B includes a provision for the establishment and maintenance of an infection control

program that, among other things, investigates, controls, and prevents infections in the facility. (Exh. 62, 63, 42 CFR 483.1, 483.65). Dr. Patel testified that "if you are taking precautions, scabies can be controlled." (Exh. 16, Patel p. 254:8-254:23).

Evidence supports there were several outbreaks at the Momence facility, including at least one patient with a diagnosis of Norwegian Scabies-a condition that only arises when clinician and staff fail to properly recognize and treat a scabies infestation in a patient. *See* response to Statement No. 45 herein. "If diagnosis and treatment are delayed, the number of live mites multiplies resulting in heavier or atypical infestations. Norwegian scabies occurs when treatment for infestation has been delayed for many months and is characterized by thick, crusted lesions. Imbedded within these crusts are thousand to millions of live mites." (Exh. 54, CDPH: Pevention and Control of Scabies in California Long-term Care facilities p. 4).

45a(vii)   The new Momence had an outbreak of scabies about a year ago. (Exh. 7, DeMeullenarer pp. 50-51).

**RESPONSE**:   Plaintiffs object to the purported facts to the extent they call for a legal conclusion, call for expert opinion and/or are based upon impermissible lay opinion. Answering over objection and without waiving the same, this purported fact is disputed. Dr. Patel, Momence Meadows' Medical Director, testified that "if you are taking precautions, scabies can be controlled." (Exh. 16, Patel p. 254:8-254:23).

45b.   Scabies has an incubation period of five to seven days during which there are no signs or symptoms, so it is easily spread without anyone knowing about it. (Exh. 4, Patel pp. 252-255; Exh. 9, Bednarowicz p. 240; Exh. 7, DeMeullenarer pp. 149-150).

**RESPONSE**:  Plaintiffs object to the purported facts to the extent they call for a legal conclusion, call for expert opinion and/or are based upon impermissible lay opinion.  Answering over objection and without waiving the same, this purported fact is disputed but is immaterial and does not entitle Defendants to summary judgment.   According to the Centers for Disease Control & Prevention, in previously infested persons, symptoms appear much sooner, as soon as 24 hours following re-infestation. (Exh. 64 - www.cdc.gov/parasites/scabies/disease.html).  Nonetheless, the issue in this case is whether Momence Meadows prevented statutorily-defined outcomes, not the incubation period of a scabies infestation.

45b(i)  Scabies has in incubation period of five to seven days during which there are no signs or symptoms.  (Exh. 4, Patel pp. 252-253).

**RESPONSE**: This purported fact is duplicative of Fact No. 45b above.  Plaintiffs object to the purported fact to the extent it calls for a legal conclusion, calls for expert opinion and/or is based upon impermissible lay opinion.  Answering over objection and without waiving the same, this purported fact is disputed but immaterial and has no bearing on the issues raised in Defendants' Motion or to the ultimate issues and/or outcome of this case.  According to the Centers for Disease Control & Prevention, in previously infested persons, symptoms appear much sooner, as soon as 24 hours following re-infestation.  (Exh. 64    www.cdc.gov/parasites/scabies/disease.html). Nonetheless, the issue in this case is whether Momence Meadows prevented statutorily-defined outcomes, not the incubation period of a scabies infestation.

45b(ii)          Scabies is not immediately identifiable.  (Exh. 9, Bednarowicz p. 240).

**RESPONSE**: This purported fact is duplicative of Fact No. 45b above.  Plaintiffs object

to the purported fact as vague and ambiguous with respect to the term "identifiable." Plaintiffs also object to the purported fact to the extent it calls for a legal conclusion, calls for expert opinion and/or is based upon impermissible lay opinion. Answering over objection and without waiving the same, this purported fact is disputed but immaterial in that it has no bearing on the issues raised in Defendants' Motion or to the ultimate issues and/or outcome of this case. According to the Centers for Disease Control & Prevention, in previously infested persons, symptoms appear much sooner, as soon as 24 hours following re-infestation. (Exh. 64 - www.cdc.gov/parasites/scabies/disease.html). Nonetheless, the issue in this case is whether Momence Meadows prevented statutorily-defined outcomes, not the incubation period of a scabies infestation.

      45b(iii)  There is an incubation period during which scabies can spread. (Exh. 9, Bednarowicz p. 240).

**RESPONSE**: This purported fact is duplicative of Fact No. 45b above. Plaintiffs also object to the purported fact to the extent it calls for a legal conclusion, calls for expert opinion and/or is based upon impermissible lay opinion. Bednarowicz is not a medical doctor, nor is she an infectious control expert and therefore is not qualified to make this statement. Answering over objection and without waiving the same, this purported fact is disputed but immaterial in that it has no bearing on the issues raised in Defendants' Motion or to the ultimate issues and/or outcome of this case. According to the Centers for Disease Control & Prevention, in previously infested persons, symptoms appear much sooner, as soon as 24 hours following re-infestation. (Exh. 64 - www.cdc.gov/parasites/scabies/disease.html). Nonetheless, the issue in this case is whether

Momence Meadows prevented statutorily-defined outcomes, not the incubation period of a scabies infestation.

> 45b(v) Scabies has an incubation period. Scabies does not immediately show up with red burrows or bumps. A person who has scabies can be re-infected even after treatment. (Exh. 7, DeMeullenarer p. 149-150).

**RESPONSE**: This purported fact is duplicative of Fact No. 45b above. Plaintiffs also object to the purported fact to the extent it calls for a legal conclusion, calls for expert opinion and/or is based upon impermissible lay opinion. DeMeullenarer is not a medical doctor, nor is she an infectious control expert and therefore is not qualified to make this statement. Answering over objection and without waiving the same, this purported fact is disputed but immaterial in that it has no bearing on the issues raised in Defendants' Motion or to the ultimate issues and/or outcome of this case. According to the Centers for Disease Control & Prevention, in previously infested persons, symptoms appear much sooner, as soon as 24 hours following re-infestation. (Exh. 64 - www.cdc.gov/parasites/scabies/disease.html.). Nonetheless, the issue in this case is whether Momence Meadows prevented statutorily-defined outcomes. Resolution will not turn on nor by the incubation period of a scabies infestation.

> 45d. Scabies can be brought into a facility by a number of people (residents, staff, visitors, UPS driver, ombudsman, public health surveyor) anyone could have brought it into Momence. (Exh. 9, Bednarowicz pp. 238-239; Exh. 4, Patel pp. 253-254; Exh. 7, DeMeullenarer pp. 90-91, 150-152; Exh. 17, Jaffe p. 83).

**RESPONSE**: Plaintiffs object to the purported fact to the extent it calls for a legal conclusion, calls for expert opinion and/or is based upon impermissible lay opinion. Answering over objection and without waiving the same, this purported fact is disputed but immaterial in that it has no bearing on the issues raised in Defendants' Motion or to the ultimate issues and/or outcome of

this case.  The issue in this case is whether Momence Meadows prevented statutorily- defined outcomes, not the mode of transmission of which a scabies mite was brought into the facility. Additionally, no one has testified, nor is there any evidence that a scabies mite came into the facility via one of these vectors, therefore this testimony will not be admissible at trial.

45d(i)  Scabies can be brought into the facility by a resident, a staff member or a visitor to the facility.  (Exh. 4, Patel pp. 253-254).

**RESPONSE**: This statement is duplicative of No. 45d.  Plaintiffs object to the purported fact to the extent it calls for a legal conclusion, calls for expert opinion and/or is based upon impermissible lay opinion.  Answering over objection and without waiving the same, this purported fact is disputed but immaterial in that it has no bearing on the issues raised in Defendants' Motion or to the ultimate issues and/or outcome of this case.  The issue in this case is whether Momence Meadows prevented statutorily- defined outcomes, not the mode of transmission of which a scabies mite was brought into the facility.  Additionally, no one has testified, nor is there any evidence that a scabies mite came into the facility via one of these vectors, therefore this testimony will not be admissible at trial.

45d(ii) Scabies has to have come from an outside source.  They were brought into the facility – could have been by an employee, visitor or a resident that had gone out to a doctor's appointment or hospital.  There is no prevention that can be done to prevent this as a person is contagious before they show any signs of having scabies. (Exh. 7, DeMeullenarer pp. 90-91, 150-152).

**RESPONSE**: This statement is duplicative of No. 45d.  Plaintiffs object to the purported fact to the extent it calls for a legal conclusion, calls for expert opinion and/or is based upon impermissible lay opinion.  Answering over objection and without waiving the same, this purported fact is disputed but immaterial in that it has no bearing on the issues raised in Defendants' Motion

or to the ultimate issues and/or outcome of this case. The issue in this case is whether Momence Meadows prevented statutorily defined outcomes, not the mode of transmission of which a scabies mite was brought into the facility. Additionally, no one has testified, nor is there any evidence that a scabies mite came into the facility via one of these vectors, therefore this testimony will not be admissible at trial. Evidence does show that residents and Momence employees were infected with scabies, and the employees at the facility were improperly trained to recognize, prevent, treat and report to proper health authorities, the many scabies outbreaks at the facility.

45d(iii)   Scabies is a mite and has to live on a host that carries it in to the facility. (Exh. 7, DeMeullenarer pp. 150-151).

**RESPONSE**: This statement is duplicative of No. 45d(ii). Plaintiffs object to the purported fact to the extent it calls for a legal conclusion, calls for expert opinion and/or is based upon impermissible lay opinion. Answering over objection and without waiving the same, this purported fact is disputed but immaterial in that it has no bearing on the issues raised in Defendants' Motion or to the ultimate issues and/or outcome of this case. The issue in this case is whether Momence Meadows prevented statutorily defined outcomes, not the mode of transmission of which a scabies mite was brought into the facility.

45d(iv)   Staff visitors, surveyors, UPS drivers, the ombudsmen, and any other visitor to the facility could have scabies. (Exh. 9, Bednarowicz pp. 238-239).

**RESPONSE**: Plaintiffs object to the purported fact to the extent it calls for speculation, a legal conclusion, calls for expert opinion and/or is based upon impermissible lay opinion. Answering over objection and without waiving the same, this purported fact is disputed but

immaterial in that it has no bearing on the issues raised in Defendants' Motion or to the ultimate issues and/or outcome of this case. The issue in this case is whether Momence Meadows prevented statutorily-defined outcomes, not the mode of transmission of which a scabies mite was brought into the facility. Defendants have not produced evidence that any of these sources were in fact vectors that carried the scabies mite into the facility. Testimony of the possibility of something occurring is speculation, and not admissible at trial.

45d(v)  Scabies can be brought in by a visiting child.  (Exh. 17, Jaffe p. 83).

**RESPONSE**:  Plaintiffs object to the purported fact to the extent it calls for speculation, a legal conclusion, calls for expert opinion and/or is based upon impermissible lay opinion. Answering over objection and without waiving the same, this purported fact is disputed but immaterial in that it has no bearing on the issues raised in Defendants' Motion or to the ultimate issues and/or outcome of this case. The issue in this case is whether Momence Meadows prevented statutorily-defined outcomes, not the mode of transmission of which a scabies mite was brought into the facility. Defendants have not produced evidence that any of these sources were in fact vectors that carried the scabies mite into the facility. Testimony of the possibility of something occurring is speculation, and not admissible at trial.

45e.    Patel is familiar with how to treat scabies.  He has been treating scabies since he completed his fellowship in dermatology in 1978.  (Exh. 4, Patel p. 26).

**RESPONSE**: This purported fact is disputed but immaterial in that it has no bearing on the issues raised in Defendants' Motion or to the ultimate issues and/or outcome of this case.  Norwegian scabies occurs when treatment for infestation has been delayed for many months and is characterized by thick, crusted lesions.  Imbedded within these crusts are thousand to millions of live mites."

(Exh. 54, *prevention and Control of Scabies in California Long-Term Care Facilities).* Dr. Patel was not able to timely and accurately diagnose his patient MG, with Norwegian scabies. (Exh. 27, RMC 001442-001444), even though staff at Momence suspected MG had scabies (Exh. 5, Bednarowicz, pp.177:24-178:18). Dr. Patel testified he is not familiar with CDC and federal regulations that describe and mandate proper prevention and control of scabies in long term care facilities. (Exh. 16, Patel p. 223:17-223:23). Dr. Patel did not know that scabies was reportable to IDPH. (Exh. 16, Patel pp. 166:12-167:9). Upon the December 15, 2003, admission of his Momence patient MG to Riverside Medical Center, a colleague had this to say about the treatment and care Dr. Patel and Momence provided to MG: "This patient is very well-known to me from multiple previous admissions. Her wounds are tending to follow a rather predictable process in that they routinely improve while she is here at RMC. She usually returns to the hospital after about 2 weeks at the NH and her wound are routinely worse when she is readmitted to RMC. That is definitely the case this time as she did not have any open area to the coccyx on the previous admissions." (Exh. 27, RMC000578). "Past skin biopsy was negative, but since there was a scabies outbreak in the hospital, it was suspected that the patient might have an atypical scabies like Norwegian scabies. Skin biopsy was repeated and pos for scabies" (Exh. 27, RMC 001442-001444).

45e(i)  Patel treated patients with scabies while he worked as a dermatologist in India from 1978 to 1980. Scabies was very common and treatment was the same in India as in the U.S. (Exh. 4, Patel p. 26).

**RESPONSE**: Plaintiffs have insufficient knowledge to determine the truth or falsity of these statements, therefore Plaintiffs cannot reply to this assertion of fact.

45g.  Scabies can be difficult to diagnose. (Exh. 4, Patel pp. 163, 267-268; Exh. 7, DeMeullenarer pp. 56-57, 64; Exh. 15, Burt-Lafi p. 99; Exh. 13, Henschel pp. 50, 148, 177; Exh. 8, Glenn pp. 250-251).

**RESPONSE**:  Plaintiffs object to the purported fact to the extent it calls for a legal conclusion, calls for expert opinion and/or is based upon impermissible lay opinion.  Answering over objection and without waiving the same, this purported fact is disputed but immaterial in that  it has no bearing on the issues raised in Defendants' Motion or to the ultimate issues and/or outcome of this case.  Testimony reveals that nurses were reporting scabies to doctors verbally, doctors would prescribe based upon nurse's opinion.  "So any time you observed a patient that you believed had scabies, you'd report it to the physician who then would write the order for the scabies treatment?  "Correct." "And if we weren't sure then we would have the doctor come in and take a look at the patient and give his opinion." (Exh. 5, Bednarowicz pp. 186:9-187:2).

There were patients with rashes and they did not do scrapings on, so the nurses said they had a rash, looked like it could be scabies.  The doctor then would have given an order either for preventative or for the treatment of and they would have been treated for, and that policy would have been followed.  (Exh. 19, Willey p. 130:14-130:20).

Despite the fact that the residents clearly had scabies, there was never an official diagnosis of scabies.  Nancy Zillmer routinely observed and charted the residents' symptoms and notified both Judy DeMuellenare, the treatment nurse and Sue Cavender, director of nursing.  After observing the residents, Judy and Sue determined that the residents were suffering from a fungal infection, not scabies.  They then ordered the resident treated with a fungal cream. However, when the fungal cream did not work, Judy and Sue would always order treatment with Elimite, even though they

continued to refuse to acknowledge that the residents had scabies. It is my belief that Momence management did not acknowledge that the residents had scabies because they did not want the public to find out, since any outbreaks had to be reported to the Department of Health. (Dkt. 135-11, Group Exhibit D, Nancy Zillmer Decl. ¶ 11).

45g(i) Diagnosing scabies versus another skin condition is a medical judgment that is made by a dermatologist or skin specialist. (Exh. B4, Patel p. 163).

**RESPONSE**: Plaintiffs object to the purported fact to the extent it calls for a legal conclusion, calls for expert opinion and/or is based upon impermissible lay opinion. Answering over objection and without waiving the same, this purported fact is disputed but immaterial insofar as this was not the practice at Momence and it has no bearing on the issues raised in Defendants' Motion or to the ultimate issues and/or outcome of this case. Testimony reveals that nurses were reporting scabies to doctors verbally, doctors would prescribe based upon nurse's opinion. "So any time you observed a patient that you believed had scabies, you'd report it to the physician who then would write the order for the scabies treatment? "Correct." "And if we weren't sure then we would have the doctor come in and take a look at the patient and give his opinion." (Exh. 5, Bednarowicz pp. 186:9-187:2).

There were patients with rashes and they did not do scrapings on, so the nurses said they had a rash, looked like it could be scabies. The doctor then would have given an order either for preventative or for the treatment of and they would have been treated for, and that policy would have been followed. (Exh. 19, Willey p. 130:14-130:20).

45g(v) DeMeullenarer has been a treatment nurse for twenty years and still cannot diagnose scabies from the appearance of the rash. (Exh. 7, DeMeullenarer p. 56).

**RESPONSE**: Plaintiffs dispute the purported fact to the extent Defendants' inclusion of the statement is intended to imply that scabies cannot be diagnosed from the appearance of a rash. Scabies are not hard to detect, skin checks are done by nurses and CNAs in the shower. (Exh. 10, Cavender pp. 246:12-247:7). Otherwise, whether or not DeMeullenarer is able to diagnose scabies from the appearance of a rash is immaterial insofar as it has no bearing on the issues raised in Defendants' Motion or to the ultimate issues and/or outcome of this case.

> 45j(ii)  The facility's medical people and consultants did not know what the rash was in the beginning.  Once they figured it out, they tried different treatment options until they found one that worked for each resident.  (Exh. 13, Henschel p. 177).

**RESPONSE**: Plaintiffs object to the purported facts to the extent it is vague and ambiguous with respect to the phrase "medical people and consultants" and also to the extent they call for speculation, call for a legal conclusion, call for expert opinion and/or are based upon impermissible lay opinion.  Answering over objection and without waiving the same, Plaintiffs do not dispute the fact that Momence's "medical people and consultants" did not know what the "rash" was.  Plaintiffs dispute the statement that "they figured it out."  Henschel  has no personal knowledge of the truth of the statement. Moreover, Henschel is not a medical doctor, nor is she an infectious control expert and there is not qualified to make this statement.  However, these purported facts, even if true, are immaterial to issues raised in Defendants' Motion or to the ultimate issues and/or resolution of this case.

> 45k.    Momence had a protocol for treating scabies and it was followed.  (Exh. 4, Patel pp. 102, 169-170, 172; Exh. 8, Glenn pp. 272, 278-279; Exh. 6, Deddo p. 253; Exh. 16, Fulton pp. 71-73, 87-90; Exh. 1, Mitchell pp. 63-67, 403; Exh. 7, DeMeullenarer pp. 86-89, 153-154; Exh. 13, Henschel pp. 47-48).

**RESPONSE**: Judy DeMeullenarer was unaware that scabies was a communicable disease reportable to the Illinois Department of Health. (Exh. 9, DeMeullenarer p. 134:10-134:24). When asked "What conditions [of] participation Momence neglected to provide?" Absher testified, "Proper isolation and containment and elimination of a contagious skin problem." (Exh. 1, Absher pp.287:19-289:17).

Vesta Fulton (N/K/A Barrett) testified that she did not put tape on the closet doors of the residents rooms as according to scabies protocol. (Exh. 4, Barrett p. 87). Burt-Lafi testified that there was a shortage of gloves. She remembers seeing Judy DeMeullenarer doing a lot of treatments without gloves. (Exh. 6, Burt-Lafi p. 27:5-27:11). Burt Lafi did not receive any general information about scabies. (Exh. 6, Burt-Lafi, p. 60:18-60:21).

Momence's infectious control nurse had not seen, nor learned guidelines on infection and control of scabies until after the outbreak at Momence. (Exh. 5, Bednarowicz p. 99:19-99:25). "We got on [line] and learned , you know, low long a patient has to be in isolation for, how long you're supposed to keep the articles of clothing in bags for." (Exh. 5, Bednarowicz p. 100:2-100:5).

Cavender told staff not to talk about a resident having scabies, as "it's part of HIPAA. They can't talk about it in the community or to other family members." (Exh. 10, Cavender p. 265:8-265:12). Cavender's instructions did not follow protocol, and her reasoning was a lie.

Several residents had the rash and no one was giving them an answer. No one understood or was trying to figure it out at the beginning. Deddo told Henschel not to talk about the scabies. (Exh. 12, Henschel p. 53:3-53:12). Residents cried due to the discomfort. (Exh. 12, Henschel p. 56:16-56:18). Resident MG would have tears, noticing it over a 3-4 week period. (Exh. 12, Henschel

p. 57:24-58:10). Resident CA was usually in tears due to the itching. (Exh. 12, Henschel p. 56:25-57:11; 58:11-58:24). Resident RR was scratching, she has Alzheimer's and was scratching. She became very lethargic. (Exh. 12, Henschel p. 59:4-59:19). Resident MN had it on her belly, which she scratched. (Exh. 12, Henschel p. 59:24-60:1). Resident BH would scratch so much that there would be blood when he scratched. (Exh. 12, Henschel p. 60:2-60:17). Resident DA had a bad case, had scratch marks all over her arms. (Exh. 12, Henschel p. 60:18-61:9). Henschel believed staff did not take the outbreak serious enough. (Exh. 12, Henschel p. 202:6-202:24).

45k(i)  The protocol for scabies was to put them in contact isolation, contact their families, give them a shower, put Elimite on (which the doctor must order), bag all their bedding and belongings. If there was another resident in the room, their physician was contacted to see how they wanted their patient taken care of. Then the next day the Elimite would be washed off and repeated in seven days. (Exh. 8, Glenn pp. 278-279).

**RESPONSE**: Without agreeing or disagreeing whether the identified protocol complied with the guidelines under 42 CFR 483.65 or the Centers for Disease Control with respect to the prevention, isolation and control of infections, Plaintiffs do not dispute that Glenn identified a protocol at Momence. However, Plaintiffs dispute Momence followed those protocols. In 2003, years after scabies was first observed, Momence personnel continued to fail to establish an infection control program under which is investigates, controls and prevents infections in the facility; decides what procedures such as isolation should be applied to an individual resident, and maintains a record of incidents and corrective action related to infections. The Quality Assurance/Infection Control Nurse reported that Momence had not done any tracking of the development of rashes, and had not monitored the spread of the rashes and had not investigation why the residents are developing these

rashes.  Further it was established that *no clothes were washed for residents per scabies protocol and no room cleaning was done per scabies protocol*.  (Exh. 33, FOIA 0048-0056).

>   45k(ii) The protocol for treatment of scabies between 1998 – 2006 included preventative measures for residents that were in a room with someone that was believed to have scabies.  They were Elimited and isolated in their room for 24 hours, re-showered and then Elimited again a week later.  (Exh. 7, DeMeullenarer pp. 86-87).

**RESPONSE**: Without agreeing or disagreeing whether the identified protocol complied with the guidelines under 42 CFR 483.65 or the Centers for Disease Control with respect to the prevention, isolation and control of infections, Plaintiffs do not dispute that a protocol existed for the treatment of scabies at Momence.  However, Plaintiffs dispute the fact that any kind of protocol was followed at Momence.  In 2003, years after scabies was first observed, Momence personnel continued to fail to establish an infection control program under which is investigates, controls and prevents infections in the facility; decides what procedures such as isolation should be applied to an individual resident, and maintains a record of incidents and corrective action related to infections. The Quality Assurance/Infection Control Nurse reported that Momence had not done any tracking of the development of rashes, and had not monitored the spread of the rashes and had not investigation why the residents are developing these rashes.  Further it was established that *no clothes were washed for residents per scabies protocol and no room cleaning was done per scabies protocol*.  (Exh. 33, FOIA 0048-0056).

>   45k(iii) People entering their room had to wear gloves and gowns.  A sign was also posted on their door alerting people to the fact they were in isolation.  (Exh. 7, DeMeullenarer pp. 87-88).

**RESPONSE**: Plaintiffs dispute that any sort of protocol was followed at Momence. In 2003, years after scabies was first observed, Momence personnel continued to fail to establish an infection control program under which is investigates, controls and prevents infections in the facility; decides what procedures such as isolation should be applied to an individual resident, and maintains a record of incidents and corrective action related to infections. The Quality Assurance/Infection Control Nurse reported that Momence had not done any tracking of the development of rashes, and had not monitored the spread of the rashes and had not investigation why the residents are developing these rashes. Further it was established that *no clothes were washed for residents per scabies protocol and no room cleaning was done per scabies protocol*. (Exh. 33, FOIA 0048-0056).

45k(iv) The residents' clothing and belongings were bagged for a certain amount of time. (Exh. 7, DeMeullenarer pp. 88-89, 153-154).

**RESPONSE**: Plaintiffs dispute that any sort of protocol was followed at Momence. In 2003, years after scabies was first observed, Momence personnel continued to fail to establish an infection control program under which is investigates, controls and prevents infections in the facility; decides what procedures such as isolation should be applied to an individual resident, and maintains a record of incidents and corrective action related to infections. The Quality Assurance/Infection Control Nurse reported that Momence had not done any tracking of the development of rashes, and had not monitored the spread of the rashes and had not investigation why the residents are developing these rashes. Further it was established that *no clothes were washed for residents per scabies protocol and no room cleaning was done per scabies protocol*. (Exh. 33, FOIA 0048-0056).

45k(v) Patel would instruct the nurses to put scabies patients in contact isolation. (Exh. 4, Patel p. 172).

**RESPONSE**: Plaintiffs dispute the fact that any sort of protocol was followed at Momence. In 2003, years after scabies was first observed, Momence personnel continued to fail to establish an infection control program under which is investigates, controls and prevents infections in the facility; decides what procedures such as isolation should be applied to an individual resident, and maintains a record of incidents and corrective action related to infections. The Quality Assurance/Infection Control Nurse reported that Momence had not done any tracking of the development of rashes, and had not monitored the spread of the rashes and had not investigation why the residents are developing these rashes. Further it was established that *no clothes were washed for residents per scabies protocol and no room cleaning was done per scabies protocol*. (Exh. 33, FOIA 0048-0056).

> 45k(vi) DeMeullenarer does not recall any time that this protocol was not followed for an individual who was either being treated with scabies or was diagnosed with scabies. (Exh. 7, DeMeullenarer p.89).

**RESPONSE**: Plaintiffs dispute that any sort of protocol was followed at Momence. Judy DeMeullenarer was unaware that scabies was a communicable disease reportable to the Illinois Department of Health. (Exh. 9, DeMeullenarer p. 134:10-134:24). When asked "What conditions [of] participation Momence neglected to provide?" Absher testified, "Proper isolation and containment and elimination of a contagious skin problem." (Exh. 1, Absher pp.287:19-289:17).

Vesta Fulton (N/K/A Barrett) testified that she did not put tape on the closet doors of the residents rooms as according to scabies protocol. (Exh. 4, Barrett p. 87). Burt-Lafi testified that there was a shortage of gloves. She remembers seeing Judy DeMeullenarer doing a lot of treatments without gloves. (Exh. 6, Burt-Lafi p. 27:5-27:11). Burt Lafi did not receive any general information about scabies. (Exh. 6, Burt-Lafi, p. 60:18-60:21).

Momence's infectious control nurse had not seen, nor learned guidelines on infection and control of scabies until after the outbreak at Momence. (Exh. 5, Bednarowicz p. 99:19-99:25). "We got on [line] and learned , you know, low long a patient has to be in isolation for, how long you're supposed to keep the articles of clothing in bags for." (Exh. 5, Bednarowicz p. 100:2-100:5).

Cavender told staff not to talk about a resident having scabies, as "it's part of HIPAA. They can't talk about it in the community or to other family members." (Exh. 10, Cavender p. 265:8-265:12). Cavender's instructions did not follow protocol, and her reasoning was a lie.

Several residents had the rash and no one was giving them an answer. No one understood or was trying to figure it out at the beginning. Deddo told Henschel not to talk about the scabies. (Exh. 12, Henschel p. 53:3-53:12). Residents cried due to the discomfort. (Exh. 12, Henschel p. 56:16-56:18). Resident MG would have tears, noticing it over a 3-4 week period. (Exh. 12, Henschel p. 57:24-58:10). Resident CA was usually in tears due to the itching. (Exh. 12, Henschel p. 56:25-57:11; 58:11-58:24). Resident RR was scratching, she has Alzheimer's and was scratching. She became very lethargic. (Exh. 12, Henschel p. 59:4-59:19). Resident MN had it on her belly, which she scratched. (Exh. 12, Henschel p. 59:24-60:1). Resident BH would scratch so much that there would be blood when he scratched. (Exh. 12, Henschel p. 60:2-60:17). Resident DA had a bad case, had scratch marks all over her arms. (Exh. 12, Henschel p. 60:18-61:9). Henschel believed staff did not take the outbreak serious enough. (Exh. 12, Henschel p. 202:6-202:24).

45k(vii) Mitchell recalls that the entire D hall was cleaned, isolated, bagged up, boxed up, stripped down and cleaned to deal with the scabies issue. (Exh. 1, Mitchell p. 403).

**RESPONSE**: Defendants misstate witness testimony. Mitchell testified that only eventually after several outbreaks occurred and upon her insistence did administration engage in some activity

that involves cleaning D hall. Momence would not have engaged in this activity on its own, as legally compliant protocol was not followed at Momence. (Defs' Exh. 1, Mitchell p. 403:7-403:13). Other than under this particular circumstance, Plaintiffs dispute the fact that any sort of protocol was followed by Momence for the treatment, monitoring and prevention of scabies. In 2003, years after scabies was first observed, Momence personnel continued to fail to establish an infection control program under which is investigates, controls and prevents infections in the facility; decides what procedures such as isolation should be applied to an individual resident, and maintains a record of incidents and corrective action related to infections. The Quality Assurance/Infection Control Nurse reported that Momence had not done any tracking of the development of rashes, and had not monitored the spread of the rashes and had not investigation why the residents are developing these rashes. Further it was established that *no clothes were washed for residents per scabies protocol and no room cleaning was done per scabies protocol*. (Exh. 33, FOIA 0048-0056).

45k(viii) Patel addressed the scabies issue with nurses and staff. (Exh. 4, Patel pp. 169-170).

**RESPONSE**: Plaintiffs dispute that any sort of protocol was followed at Momence. Judy DeMeullenarer was unaware that scabies was a communicable disease reportable to the Illinois Department of Health. (Exh. 9, DeMeullenarer p. 134:10-134:24). When asked "What conditions [of] participation Momence neglected to provide?" Absher testified, "Proper isolation and containment and elimination of a contagious skin problem." (Exh. 1, Absher pp.287:19-289:17).

Vesta Fulton (N/K/A Barrett) testified that she did not put tape on the closet doors of the residents rooms as according to scabies protocol. (Exh. 4, Barrett p. 87). Burt-Lafi testified that there was a shortage of gloves. She remembers seeing Judy DeMeullenarer doing a lot of treatments

without gloves. (Exh. 6, Burt-Lafi p. 27:5-27:11). Burt Lafi did not receive any general information about scabies. (Exh. 6, Burt-Lafi, p. 60:18-60:21).

Momence's infectious control nurse had not seen, nor learned guidelines on infection and control of scabies until after the outbreak at Momence. (Exh. 5, Bednarowicz p. 99:19-99:25). "We got on [line] and learned , you know, low long a patient has to be in isolation for, how long you're supposed to keep the articles of clothing in bags for." (Exh. 5, Bednarowicz p. 100:2-100:5).

Cavender told staff not to talk about a resident having scabies, as "it's part of HIPAA. They can't talk about it in the community or to other family members." (Exh. 10, Cavender p. 265:8-265:12). Cavender's instructions did not follow protocol, and her reasoning was a lie.

Several residents had the rash and no one was giving them an answer. No one understood or was trying to figure it out at the beginning. Deddo told Henschel not to talk about the scabies. (Exh. 12, Henschel p. 53:3-53:12). Residents cried due to the discomfort. (Exh. 12, Henschel p. 56:16-56:18). Resident MG would have tears, noticing it over a 3-4 week period. (Exh. 12, Henschel p. 57:24-58:10). Resident CA was usually in tears due to the itching. (Exh. 12, Henschel p. 56:25-57:11; 58:11-58:24). Resident RR was scratching, she has Alzheimer's and was scratching. She became very lethargic. (Exh. 12, Henschel p. 59:4-59:19). Resident MN had it on her belly, which she scratched. (Exh. 12, Henschel p. 59:24-60:1). Resident BH would scratch so much that there would be blood when he scratched. (Exh. 12, Henschel p. 60:2-60:17). Resident DA had a bad case, had scratch marks all over her arms. (Exh. 12, Henschel p. 60:18-61:9). Henschel believed staff did not take the outbreak serious enough. (Exh. 12, Henschel p. 202:6-202:24).

Dr. Patel testified he is not familiar with CDC and federal regulations that describe and mandate proper prevention and control of scabies in long term care facilities. (Exh. 16, Patel p. 223:17-223:23). Dr. Patel did not know that scabies was reportable to IDPH. (Exh. 16, Patel pp. 166:12-167:9). Upon the December 15, 2003, admission of his Momence patient MG to Riverside Medical Center, a colleague had this to say about the treatment and care Dr. Patel and Momence provided to MG: "This patient is very well-known to me from multiple previous admissions. Her wounds are tending to follow a rather predictable process in that they routinely improve while she is here at RMC. She usually returns to the hospital after about 2 weeks at the NH and her wound are routinely worse when she is readmitted to RMC. That is definitely the case this time as she did not have any open area to the coccyx on the previous admissions." (Exh. 27, RMC000578). "Past skin biopsy was negative, but since there was a scabies outbreak in the hospital, it was suspected that the patient might have an atypical scabies like Norwegian scabies. Skin biopsy was repeated and pos for scabies" (Exh. 27, RMC 001442-001444).

48.     During a complaint investigation Public Health did not only look at what had been the issue of the original complaint. (Exh. 8, Glenn p. 122).

**RESPONSE**: Plaintiffs object to the statement as calling for speculation. Answering over and without waiving said objection, Plaintiffs dispute the statement to and to the extent it suggests that Public Health always looked at issues not raised in complaint. Defendants misstate witness testimony. Glenn answered yes when asked, "In your experience if they identified another problem or concern, would they look into it?" (Defs' Exh. 8 p. 122:25-123:2). Nevertheless, the mere fact that Public Health may have looked into other issues besides those in the original complaint has no bearing on the issues raised in Defendants' Motion or to the ultimate issues and/or outcome of this

case and does not certify, implicitly or explicitly, that Defendants had met their obligations under the law with respect to the care they are required to provide to the residents of Momence pursuant to 42 C.F.R. 483 and other rules and regulations governing Medicare and Medicaid.

49.  Any time the government performed a survey, publicly available documentation was created which outlined the basis for the investigation, the subject matter of the investigation, and the results of the investigation. (Exh. 31).

**RESPONSE**: Plaintiffs object to the statement as calling for speculation. Answering over and without waiving said objection, the cited document does not support the averment. However, even if it did, however, the mere fact that the government made public its survey results has no bearing on the issues raised in Defendants' Motion or to the ultimate issues and/or outcome of this case.

50.  The survey results were available at all times at the nursing home for review by the public and available via a FOIA request. (Exh. 32).

**RESPONSE**: Plaintiffs object to the statement as calling for speculation. Answering over and without waiving said objection, the exhibit cited does not support the averment that survey results were available at all times for review by the public. Nevertheless, even if true, the availability of survey results has no bearing on the issues raised in Defendants' Motion or to the ultimate issues and/or outcome of this case.

51g.  Public Health never left the facility without copies of the documents they wanted. (Exh. 8 Glenn p. 123-124).

**RESPONSE**: Plaintiffs object to the statement insofar as it calls for speculation. Answering over objection and without waiving same, Plaintiffs dispute the statement to the extent that Glenn is unable to testify that Public Health *never* left the facility without copies of documents they wanted. This action alleges that the government failed to receive the benefit of its bargain for nursing home

services that delivered statutorily defined outcomes. Momence Meadows received Medicare and Medicaid dollars on the condition that it complied with federal mandates to establish and maintain an infection control program preventing certain outcomes of harm. Even if the purported fact is true, it is immaterial and has no bearing on the issues raised in Defendants' Motion or to the ultimate issues and/or outcome of this case and does not certify, implicitly or explicitly, that Defendants were in compliance with any surveys that were conducted or that they met their obligations under the law with respect to the care they are required to provide to the residents of Momence pursuant to 42 C.F.R. 483 and other rules and regulations governing Medicare and Medicaid.

> 51h.    IDPH surveyors were always given whatever documents that asked for. And they were always given copies of materials they requested be copied. (Exh. 6, Deddo pp. 257-258).

**RESPONSE**: Plaintiffs object to the statement insofar as it calls for speculation. Answering over objection and without waiving same, Plaintiffs dispute the statement to the extent that Deddo is unable to testify that Public Health were *always* given whatever documents they asked for. This action alleges that the government failed to receive the benefit of its bargain for nursing home services that delivered statutorily defined outcomes. Momence Meadows received Medicare and Medicaid dollars on the condition that it complied with federal mandates to establish and maintain an infection control program preventing certain outcomes of harm. Even if the purported fact is true, it has no bearing on the issues raised in Defendants' Motion or to the ultimate issues and/or outcome of this case and does not certify, implicitly or explicitly, that Defendants were in compliance with any surveys that were conducted or that they met their obligations under the law with respect to the care they are required to provide to the residents of Momence pursuant to 42 C.F.R. 483 and other rules and regulations governing Medicare and Medicaid.

70. Willey did not order Schnell and Sederholm to stay late and shred documents. (Exh. 5, Willey p. 129, 195-196; Exh. 12, Sederholm p. 173).

**RESPONSE**: Undisputed. However, disputed to the extent the averment suggests that no documents were shred. According to Henschel, in approximately the summer of 2005, Defendants' attorney met with the staff of Momence to discuss a "federal" investigation. (Ex. 12, Henschel pp. 63:5-25, 64:1-25, 65:1-7). Sometime after the meeting with Defendants' attorney, a shredding truck came to Momence and shredded boxes of documents that were taken from a storage garage containing deceased or discharge resident files, charts and billing records. (*Id*. at 63:5-73:8 *inclusive*) Further, Ms. Henschel recalls a discussion with a fellow employee of Momence, Kathy Schnell. In that conversation, Ms. Schnell told her that she was instructed to get rid of patient records and medical bills, and that she feared going to jail for destroying the documents. (*Id*. at 101:25-110:14 *inclusive*).

71. Schnell testified she was not asked to gather up documents for shredding. (Exh. 14, Schnell pp. 36-37).

**RESPONSE**: Undisputed. However, disputed to the extent the averment suggests that no documents were shred. According to Henschel, in approximately the summer of 2005, Defendants' attorney met with the staff of Momence to discuss a "federal" investigation. (Ex. 12, Henschel pp. 63:5-25, 64:1-25, 65:1-7). Sometime after the meeting with Defendants' attorney, a shredding truck came to Momence and shredded boxes of documents that were taken from a storage garage containing deceased or discharge resident files, charts and billing records. (*Id*. at 63:5-73:8 *inclusive*) Further, Ms. Henschel recalls a discussion with a fellow employee of Momence, Kathy Schnell. In that conversation, Ms. Schnell told her that she was instructed to get rid of patient records and medical bills, and that she feared going to jail for destroying the documents. (*Id*. at

101:25-110:14 *inclusive*).

80. Absher did not consider filing suit against Momence or Graff until a year and a half after resigning from Momence. (Exh. 2, Absher p. 125).

**RESPONSE**: On the page Defendants cite, Absher's testimony is that she thought of herself as a prospective qui tam plaintiff for the first time a year and a half after she left Momence Meadows Nursing Center. (Defs' Exh. 2, Absher p. 125:16-125:24). However, this fact is immaterial as case law does not require plaintiffs to even know what a qui tam is at the time of their protected activity. *See Fanslow v. Chicago Manufacturing Center, Inc.*, 384 F.3d 469, 479-480, 481 (7th Cir. 2004); *U.S. ex rel. Yesudian v. Howard Univ.*, 153 F.3d 731, 739-741 (D.C. Cir. 1998).

82. Absher and Mitchell first retained counsel to represent them in an action before the licensing board regarding their licenses. (Exh. 1, Mitchell p. 164-165).

RESPONSE: On the page Defendants cite, Mitchell testified that Plaintiffs originally were looking for an attorney to defend them against the licensure board. (Defs' Exh. 1, Mitchell pp. 164:21-165:3). However, this fact is irrelevant and does not entitle Defendants to summary judgment.

98. Absher testified that she and Mitchell first met with the government in December 2004, three months after filing their complaint. (Exh. 2, Absher p. 152; Dkt. 1).

**RESPONSE**: On the page Defendants cite, Absher did not testify that Plaintiffs first met with the government in December 2004, only that Plaintiffs had met with the government at that time. (Defs' Exh. 2, Absher p. 152:12-15). This fact is immaterial and does not entitle Defendants to summary judgment. *See Fanslow v. Chicago Manufacturing Center, Inc.*, 384 F.3d 469, 479-480, 481 (7th Cir. 2004); *U.S. ex rel. Yesudian v. Howard Univ.*, 153 F.3d 731, 739-741 (D.C. Cir. 1998).

## D. UNDISPUTED IMMATERIAL FACTS

1. Plaintiff Lynda Mitchell ("Mitchell") was deposed on May 27, 2010 and August 24, 2010.

**RESPONSE**: The mere fact that Mitchell was deposed is immaterial in that it has no bearing on the legal issues raised in Defendants' Motion. What is potentially material is her actual testimony.

      2.      Plaintiff Vanessa Absher ("Absher") was deposed on August 10, 2010 and August 24, 2010.

**RESPONSE**: The mere fact that Absher was deposed is immaterial in that it has no bearing on the legal issues raised in Defendants' Motion. What is potentially material is her actual testimony.

      2c.     On May 31, 2001, Absher tendered a resignation letter in which she cites personal reasons for her resignation. She did not complain in her letter about the quality of care at Momence, violations of state or federal regulations or neglect. Absher withdrew her resignation the same day. (Exh. 22; Exh. 2, Absher pp. 311-312; Exh. 8,; Glenn pp. 200-201).

**RESPONSE:** It is immaterial to any of the issues raised in Defendants' Motion that Absher resigned from Momence in 2001 for personal reasons. Absher alleges in the Complaint that she suffered a constructive termination in 2003: "the death of AB and Defendants' response to it constituted a constructive discharge as these actions created a work environment so intolerable Plaintiff Absher had no other reasonable choice but to resign from her employment." (Dkt. # __, Pls' Cmplt at ¶ 128).

      2h.     Absher understood from Willey, Cavendar and Deddo that she was welcome to return to work at Momence when she was ready. (Exh. 2, Absher pp. 51-52).

**RESPONSE:** It is immaterial to any of the issues raised in Defendants' Motion whether Absher understood that she could return to work when she was ready. As she alleged in the Complaint, "the death of AB and Defendants' response to it constituted a constructive discharge as these actions created a work environment so intolerable Plaintiff Absher had no other reasonable choice but to resign from her employment." (Pls' Cmplt, at ¶ 128). The work environment was so

intolerable that an offer to return to it was meaningless.

      3.      Defendant Jacob Graff ("Graff") was deposed on March 1, 2011 and September 20, 2011.

**RESPONSE**: The mere fact that Graff was deposed is immaterial in that it has no bearing on the legal issues raised in Defendants' Motion. What is potentially material is his actual testimony.

      3a.     Graff was at all relevant times a resident of California. (Dkt. 207, Answer ¶12).

**RESPONSE**: Where Graff resides or resided is immaterial to the issues raised in Defendants' Motion and to the ultimate issues of liability and Graff's actions and/or inactions as alleged in Complaint.

      4.      Dr. Vallabhbhai Patel was deposed on June 9, 2011 and September 22, 2011.

**RESPONSE**: The mere fact that Dr. Patel was deposed is immaterial in that it has no bearing on the legal issues raised in Defendants' Motion. What is potentially material is his actual testimony.

      4b.    After completing medical school and his internship, Dr. Patel did a two year fellowship in dermatology. He then worked in a hospital in India as a dermatologist until 1980. (Exh. 4, Patel pp. 24-26).

**RESPONSE**: Whether or not Dr. Patel did a fellowship in dermatology and then worked as a dermatologist in India has no relevance whatsoever to the issues raised in Defendants' Motion or to the allegations and/or ultimate resolution of this case.

      4c.    Patel has a background in dermatology. (Exh. 8, Glenn p. 353).

**RESPONSE**: Whether or not Dr. Patel has a background in dermatology  no relevance whatsoever to the issues raised in Defendants' Motion or to the allegations and/or ultimate resolution of this case. Further, Dr. Patel is not a party to this lawsuit, is not responsible for the manner in which Defendants' operated Momence, and there are no allegations of any wrongdoing

against him.

5.  Joan Willey ("Willey") was deposed on May 25, 2010 and February 21, 2011. (Exh. 5).

**RESPONSE**: The mere fact that Willey was deposed is immaterial in that it has no bearing on the legal issues raised in Defendants' Motion. What is potentially material is her actual testimony.

6.  Paula Deddo ("Deddo") was deposed on September 16, 2011. (Exh. 6).

**RESPONSE**: The mere fact that Deddo was deposed is immaterial in that it has no bearing on the legal issues raised in Defendants' Motion. What is potentially material is her actual testimony.

6b.  Deddo held a number or positions at Momence beginning in 1992. (Exh. 6, Deddo p. 9).

**RESPONSE**: The fact that Deddo held a number of positions at Momence is immaterial. It has no bearing on the issues raised in Defendants' Motion or the ultimate issues in or outcome of this case.

6c.  Deddo became a CNA in 1993. (Exh. 6, Deddo p. 9).

**RESPONSE**: The fact that Deddo became a CNA at any point in time is immaterial to any of the issues raised in Defendants' Motion or the ultimate issues in this case.

6d.  In 1994 Deddo became the CNA Supervisor. (Exh. 6, Deddo p. 13).

**RESPONSE**: The fact that Deddo became a CNA supervisor is not material to any the issues raised in Defendants' Motion or to the ultimate issues in or outcome of this case.

6e.  Deddo then went into Social Services for a year and a half and then became Assistant Administrator in 2001 or 2002 through 2006. (Exh. 6, Deddo p. 14).

**RESPONSE**: The fact that Deddo worked in Social Services and went on to become an Assistant Administrator has no bearing on the issues raised in Defendants' Motion or the ultimate issues in or outcome of this case.

7. Judith DeMeullenarer Piekarczyk ("Piekarczyk") was deposed on June 16, 2011. (Exh. 7).

**RESPONSE**: The mere fact that Piekarczyk was deposed is immaterial in that it has no bearing on the legal issues raised in Defendants' Motion. What is potentially material is her actual testimony.

7b. DeMuellenarer received specialized training in wound care during the period from 1998 – 2006. (Exh. 7, DeMuellenarer pp. 22-23).

**RESPONSE**: This fact is immaterial to the issues raised in Defendants' Motion and to the issues in and outcome of this case. DeMuellenarer is not named as a defendant in this lawsuit, and no allegations have been raised against her in the Complaint.

7c. DeMeullenarer worked as a floor nurse and wound care nurse. (Exh. 7, DeMeullenarer pp. 37-38).

**RESPONSE**: The positions held by DeMeullenarer are immaterial to any of the issues raised in Defendants' Motion or the ultimate issues in or outcome of this case.

8. Sue Cavender Glenn ("Glenn") was deposed on March 3, 2011. (Exh. 8).

**RESPONSE**: The mere fact that Glenn was deposed is immaterial in that it has no bearing on the legal issues raised in Defendants' Motion. What is potentially material is her actual testimony.

8f. Glenn's position as the quality assurance nurse was eliminated in 2005 when the facility downsized upper management positions. (Exh. 8, Glenn pp. 381-384).

**RESPONSE**: The fact that Glenn's position was eliminated has no bearing on any of the issues raised in Defendants' Motion or to the ultimate issues in or outcome of this case.

9. Stacy Bednarowicz ("Bednarowicz") was deposed on June 14, 2011. (Exh. 9).

**RESPONSE:** The mere fact that Bednarowicz was deposed is immaterial in that it has no bearing on the legal issues raised in Defendants' Motion. What is potentially material is her actual testimony.

9a. Bednarowicz was hired in May 2001 as Momence's quality assurance nurse. (Exh. 9, Bednarowicz p. 91).

**RESPONSE**: The fact of Bednarowicz's hiring is immaterial to any of the issues raised

in Defendants' Motion or the ultimate issues in this case.

9b. As the quality assurance nurse Bednarowicz reviewed incident reports and physician's telephone orders. (Exh. 9, Bednarowicz p. 15, 92).

**RESPONSE**: The fact that Bednarowicz reviewed incident reports and telephone orders has no bearing on the issues raised in Defendants' Motion or the ultimate outcome of this case.

10. Lydia Beth Isaacs ("Isaacs") was deposed on August 30, 2010. (Exh. 10).

**RESPONSE:** The mere fact that Isaacs was deposed is immaterial in that it has no bearing on the legal issues raised in Defendants' Motion. What is potentially material is her actual testimony.

11. Barb Clark ("Clark") was deposed on September 7, 2010. (Exh. 11).

**RESPONSE:** The mere fact that Clark was deposed is immaterial in that it has no bearing on the legal issues raised in Defendants' Motion. What is potentially material is her actual testimony.

11b. Clark was a receptionist and then a medical records clerk. (Exh. 11, Clark pp. 9-10).

**RESPONSE**: That Clark was a receptionist and medical records clerk has absolutely no relevance to the issues raised by Defendants' Motion.

11c. Clark interacted with residents daily. (Exh. 11, Clark pp. 9-10).

**RESPONSE**: The fact that Clark interacted with residents daily is immaterial to any of the issues raised by Defendants' Motion or to the ultimate resolution of this case.

12. Melissa Sederholm ("Sederholm") was deposed on August 30, 2010. (Exh. 12).

**RESPONSE**: The mere fact that Sederholm was deposed is immaterial in that it has no bearing on the legal issues raised in Defendants' Motion. What is potentially material is her actual testimony.

13. Cheryl Lee Henschel ("Henschel") was deposed on May 24, 2010. (Exh. 13).

**RESPONSE**: The mere fact that Henschel was deposed is immaterial in that it has no bearing on the legal issues raised in Defendants' Motion. What is potentially material is her actual testimony.

    13b.    During the relevant time period Henschel was the assistant activity director. (Exh. 13, Henschel p. 144).

**RESPONSE**: That Henschel was the activity director has absolutely no bearing on any issue raised by Defendants' Motion or to the ultimate outcome of this case.

    13c.    Henschel is still employed at the new Momence. (Exh. 13, Henschel p. 136).

**RESPONSE**: The fact that Henschel is still employed at Momence is immaterial to any of the issues raised in Defendants' Motion.

    14.    Kathleen Schnell ("Schnell") was deposed on August 30, 2010. (Exh. 14).

**RESPONSE**: The mere fact that Schnell was deposed is immaterial in that it has no bearing on the legal issues raised in Defendants' Motion. What is potentially material is her actual testimony.

    14b.    Schnell began as a CNA, then transferred to social services, then to restorative department and is now currently in charge of medical records and central supply. (Exh. 14, Schnell pp. 10-11).

**RESPONSE**: The fact that Schnell held a number of positions at Momence is immaterial. It has no bearing on the issues raised in Defendants' Motion or the ultimate issues in and/or outcome of this case.

    14c.    During the period 1998 through 2006 Schnell coordinated the preparation of MDSs. (Exh. 14, Schnell pp. 10-11).

**RESPONSE**: That Schnell coordinated preparation of MDS forms is wholly immaterial to the issues raised in Defendants' Motion or to the ultimate resolution of this case.

    15.    Carol Burt-Lafi ("Burt-Lafi") was deposed on June 17, 2011. (Exh. 15).

**RESPONSE:** The mere fact that Burt-Lafi was deposed is immaterial in that it has no

bearing on the legal issues raised in Defendants' Motion. What is potentially material is her actual testimony.

16. Vesta Fulton, n/k/a Vesta Barrett ("Fulton") was deposed on June 17, 2011. (Exh. 16).

**RESPONSE**: The mere fact that Fulton was deposed is immaterial in that it has no bearing on the legal issues raised in Defendants' Motion. What is potentially material is her actual testimony.

17. Fred Jaffe ("Jaffe") was deposed on February 28, 2011. (Exh. 17).

**RESPONSE**: The mere fact that Jaffe was deposed is immaterial in that it has no bearing on the legal issues raised in Defendants' Motion. What is potentially material is his actual testimony.

18. Mark Appel ("Appel") was deposed on June 13, 2011. (Exh. 18).

**RESPONSE**: The mere fact that Appel was deposed is immaterial in that it has no bearing on the legal issues raised in Defendants' Motion. What is potentially material is his actual testimony.

19. Bob Kagda ("Kagda") was deposed on March 7, 2011. (Exh. 19).

**RESPONSE**: The mere fact that Kagda was deposed is immaterial in that it has no bearing on the legal issues raised in Defendants' Motion. What is potentially material is his actual testimony.

19a. Kagda, of the accounting firm of Krupnick Bokor Kagda and Brooks prepared the cost reports for Momence (Exh. 19, Kagda pp. 8, 12, 15).

**RESPONSE**: The fact that Kagda merely plugged numbers which Defendants provided to him into preprinted cost reports is immaterial in that it has no bearing on the legal issues raised in Defendants' Motion. Kagda did not verify the accuracy of the figures and made no certifications or representations that he did so.

20a.    Momence was sold to new ownership on July 1, 2006. (Dkt. 207, Answer ¶12).

**RESPONSE**: The sale of Momence in 2006 is immaterial to the issues raised in Defendants' Motion, especially in light of the fact that Plaintiffs' Complaint states acknowledges that the sale took place. (Dkt. 135, Pltf's Cmpt. ¶ 12).

21j.    Glenn met Jacob Graff in person on one or two occasions. They spoke for two to five minutes. Joan Willey, Paula Deddo were also present. The conversation consisted of general pleasantries. (Exh. 8, Glenn p. 131).

**RESPONSE**: Brief conversations between Glenn and Graff, which Willey and Deddo witnessed, are immaterial to any of the issues raised in Defendants' Motion or to the ultimate issues and/or resolution of this case.

21l.    DeMeullenarer met Graff two times while passing in the hall. They said hello. She has never had any conversation with him. (Exh. 7, DeMeullenarer pp. 106-107).

**RESPONSE**: The fact that DeMeullenarer briefly met Graff in passing has absolutely no bearing on the issues raised in Defendants' Motion or this case in general.

21m.    Graff did not come to Momence very often. Bednarowicz believes she saw him twice the entire time she worked at Momence. (Exh. 9, Bednarowicz p. 96).

**RESPONSE**: The fact that Bednarowicz saw Graff at Momence approximately two times while she was employed at Momence has no bearing or relevance to any of the issues raised in Defendants' Motion.

21n.    Deddo did not see any policies or procedures ever being faxed to the facility by Graff. (Exh. 6, Deddo pp. 72-73).

**RESPONSE**: Whether or not Deddo ever saw faxes from Graff related to policies or procedures  is immaterial to the issues raised in Defendants' Motion, and has no bearing on the allegations or ultimate of this case.

21o.    Graff never gave Sederholm instructions on how to bill. (Exh. 12, Sederholm p. 152).

**RESPONSE**: The fact that Graff never gave Sederholm instructions on how to bill is

immaterial to the issues raised in Defendants' Motion, and has no bearing on the outcome of this case.

22d.    Mitchell never spoke to Graff.  He never gave her instruction on how to chart. (Exh. 1, Mitchell pp. 403-404).

**RESPONSE**: The fact that Mitchell never spoke to Graff or received instructions from him relative to how to chart is immaterial to the issues raised in Defendants' Motion, and neither of these has any bearing on the ultimate issues and/or outcome of this case.

23c.    Mitchell does not recall ever seeing Graff, she has no idea what he looks like. (Exh. 1, Mitchell pp. 74-75).

**RESPONSE**: Whether Mitchell ever saw Graff or knows what he looks like has no relevance to the issues raised in Defendants' Motion and the ultimate issues and/or outcome of this case.  There is no requirement that in order to allege fraud that one must personally see or know what a defendant looks like.

23d.    During the approximately 4 years Absher worked at Momence, she only saw Jacob Graff at Momence on three occasions, all of which she believes may have been in 2002. (Exh. 2, Absher pp. 109-110).

**RESPONSE**: The number of times Absher saw Graff is immaterial to the issues raised in Defendants' Motion and the ultimate issues and/or outcome of this case.  There is no requirement that in order to allege fraud that one must personally see or know what a defendant looks like.

23e.    Absher never had a substantive conversations with Jacob Graff. (Exh. 2, Absher pp. 105-106).

**RESPONSE**: Whether Absher ever had a conversation with Graff, substantive or otherwise, is irrelevant to any issue raised in Defendants' Motion and the ultimate issues and/or outcome of this case.    There is no requirement that in order to allege fraud that one must personally see or know what a defendant looks like.

23f.    Absher knows nothing about Jacob Graff's personal or professional life, other

111

than she believes he owned Momence. (Exh. 2, Absher pp. 107-108).

**RESPONSE**: Knowledge about, or lack of, a Graff's personal or professional life is immaterial to the issues raised by Defendants in their Motion, and is not a prerequisite for bringing a qui tam lawsuit alleging violations of the federal False Claims Act and other claims as Plaintiffs have done in the instant case.

24i.    Graff would follow up to make sure deficiencies were corrected. (Exh. 5, Willey p. 187)

**RESPONSE**: The fact that Graff followed up in the event of any deficiencies is immaterial to the issues raised in Defendants' Motion, and is immaterial to the fact that deficiencies and/or a plan of correction were noted in the first place.

26.     Dr. Patel the medical director of Momence was highly regarded as a physician and was recently named physician of the year. (Exh. 8, Glenn p. 63; Exh. 9, Bednarowicz p. 28; Exh. 6, Deddo p. 93; Exh. 27; Exh. 4, Patel pp. 235-236, 244249, 303-304; Exh. 27).

**RESPONSE**: The fact that Dr. Patel was named physician of the year and/or that he was highly regarded by some of the staff at Momence is immaterial to the issues raised in Defendants' Motion, and has no relation whatsoever to the allegations in Plaintiffs' Complaint.

26c.    Dr. Patel was the medical director during the time Deddo worked at Momence. (Exh. 6, Deddo p. 93).

**RESPONSE**: This fact is undisputed to the extent it reflects the fact that Deddo testified that Dr. Patel was the medical director at Momence while she was employed there.  This fact is otherwise immaterial to any of the issues raised in Defendants' Motion or the ultimate issues and/or outcome of this case insofar as Dr. Patel is not a party to this lawsuit and there are no allegations of any wrongdoing against him.

26d.    Nurses, including Absher, Mitchell, Lydia Isaacs, Sue Rockert, and Vickey Bushey considered Patel an excellent doctor. (Exh. 27).

**RESPONSE**: Plaintiffs object to this purported fact to the extent it calls for impermissible

112

lay opinion. The fact that several nurses had an opinion about Dr. Patel's abilities as a doctor is of no import to the issues raised by Defendants' Motion or the ultimate issues and/or outcome of this case insofar as Dr. Patel is not a party to this lawsuit and there are no allegations of any wrongdoing against him.

      26e.    He was a great doctor. (Exh. 9, Bednarowicz p. 28).

      **RESPONSE**: Plaintiffs object to this purported fact to the extent it calls for impermissible lay opinion. The fact that Bednarowicz testified that Dr. Patel was a great doctor is immaterial to the issues raised by Defendants' Motion or the ultimate issues and/or outcome of this case insofar as Dr. Patel is not a party to this lawsuit and there are no allegations of any wrongdoing against him.

      26f.    Absher and her family are patients of Dr. Patel. Absher has always praised him on being a good doctor. (Exh. 4, Patel pp. 303-304; Exh. 27).

      **RESPONSE**: The fact that Absher was a patient of Dr. Patel and praised him is immaterial to the issues raised in Defendants' Motion or the ultimate issues and/or outcome of this case insofar as Dr. Patel is not a party to this lawsuit and there are no allegations of any wrongdoing against him.

      26g.    Patel is not concerned with being paid for his services, he is concerned about the welfare of his patients. He did not become a doctor for the money. He would not bill a patient for services he did not provide. (Exh. 4, Patel pp. 244-247).

      **RESPONSE**: None of Dr. Patel's assertions is relevant to the issues raised in Defendants' Motion or the ultimate issues and/or outcome of this case and, further, Dr. Patel is not a party to this lawsuit and there are no allegations of any wrongdoing against him.

      26h.    Patel was told by patients, families, staff and the Administrators at Momence that he was doing a good job at Momence. (Exh. 4, Patel pp. 235, 248).

**RESPONSE**: Whether or not Dr. Patel was told he was doing a good job has no bearing on the issues raised in Defendants' Motion and is not the subject of any of the allegations in Plaintiffs' Complaint.

26i.   He was never told by any DON that he was not doing a good job. (Exh. 4, Patel p. 236).

**RESPONSE**: The fact that no DON told Dr. Patel he was not doing a good job is irrelevant to the issues raised in Defendants' Motion and this case. Dr. Patel is not a party to this lawsuit and there are no allegations of any wrongdoing against him.

26j.   Patel was recently named physician of the year. (Exh. 4, Patel p. 249).

**RESPONSE**: This "Material Fact" is, in part, duplicative of No. 26. The fact that Dr. Patel was named physician of the year is immaterial to the issues raised in Defendants' Motion, and has no relation whatsoever to the allegations in Plaintiffs' Complaint.

27c.   Patel is unaware of any injuries to a resident as a result of an employee failing to follow a policy or procedure. (Exh. 4, Patel p. 213).

**RESPONSE**: The fact that Dr. Patel is unaware of any injuries to a resident is immaterial insofar as it has no bearing on any of the issues raised in Defendants' Motion, and has no relation whatsoever to the ultimate issues and/or outcome in this case.

27d.   Patel never had a problem with staff not following his orders. (Exh. 4, Patel p. 298).

**RESPONSE**: Whether or not staff followed Dr. Patel's orders is immaterial because it does not bear directly on any of the legal issues raised in Defendants' Motion, and Plaintiffs have made no such allegations.

28.   At any given time, Patel was the treating physician for 60-70% of the patients at Momence. (Exh. 4, Patel p. 260).

**RESPONSE**: The percentage of patients at Momence for whom Dr. Pate was the treating physician has no bearing on any of the issues raised in Defendants' Motion, nor to the ultimate issues and/or outcome of this case.

      29.     Patel was at the facility at least once a week. (Exh. 8, Glenn pp. 63-64; Exh. 9, Bednarowicz p. 28; Exh. 13, Henschel p. 150).

**RESPONSE**: The frequency of Dr. Patel's presence at Momence is immaterial in that it has no bearing on any of the issues raised in Defendants' Motion. Further, Dr. Patel is not a party to this lawsuit, is not responsible for the manner in which Defendants' operated Momence, and there are no allegations of any wrongdoing against him.

      29a.    Patel was generally at the facility at least once a week. (Exh. 8, Glenn pp. 63-64).

**RESPONSE**: This fact is duplicative of No. 29. The frequency of Dr. Patel's presence at Momence is immaterial in that it has no bearing on any of the issues raised in Defendants' Motion. Further, Dr. Patel is not a party to this lawsuit, is not responsible for the manner in which Defendants' operated Momence, and there are no allegations of any wrongdoing against him.

      29b.    Patel was at the facility at least once a week. (Exh. 13, Henschel p. 150; Exh. 9, Bednarowicz p. 28).

**RESPONSE**: This fact is duplicative of No. 29. The frequency of Dr. Patel's presence at Momence is immaterial in that it has no bearing on any of the issues raised in Defendants' Motion. Further, Dr. Patel is not a party to this lawsuit, is not responsible for the manner in which Defendants' operated Momence, and there are no allegations of any wrongdoing against him.

      30.     Nurses and administrators had regular contact with Patel. (Exh. 4, Patel pp. 73, 215-217, 258, 263-264; Exh. 8, Glenn pp. 63-64; Exh. 6, Deddo p. 272).

**RESPONSE**: Whether or not nurses and administrator had regular contact with Dr. Patel has no bearing on the issues raised by Defendants in their Motion. Dr. Patel is not a party to this

lawsuit and there are no allegations of any wrongdoing against him.

  30b. Dr. Patel was involved in patient care and was available if people had questions or needed him. (Exh. 6, Deddo p. 272).

**<u>RESPONSE</u>**: The fact that Dr. Patel was involved in patient care is to be expected, given the fact that Dr. Patel was the treating physician for 60-70% of the patients at Momence. However, neither that, nor the fact that he was available if people had questions or needed him are in any way relevant to the issues raised in Defendants' Motion or to the ultimate issues and/or resolution of this case. Moreover, Dr. Patel is not a party to this lawsuit and there are no allegations of any wrongdoing against him.

  30c. Glenn had regular contact with Patel. (Exh. 8, Glenn pp. 63-64).
**<u>RESPONSE</u>**: This fact s duplicative of No. 30. Whether or not Glenn had regular contact with Dr. Patel has no bearing on the issues raised by Defendants in their Motion. Dr. Patel is not a party to this lawsuit and there are no allegations of any wrongdoing against him.

  30d. Patel has never received a complaint that he was not responsive to a call from someone at Momence. In fact he has been told he is the only physician that responds right away. (Exh. 4, Patel p. 258).
**<u>RESPONSE</u>**: Whether or not Dr. Patel is responsive to calls from Momence or the fact that he was told he was the only physician who responds right away is immaterial to any of the issues raised in Defendants' Motion, and has no bearing on the ultimate issues and/or outcome of this case because Dr. Patel is not a party to this lawsuit and there are no allegations of any wrongdoing against him.

  30e. Patel is called when other physician are unreachable. (Exh. 4, Patel p. 258).

**RESPONSE**: The purported fact is immaterial to the issues raised by Defendants in their Motion. Moreover, Dr. Patel is not a party to this lawsuit and there are no allegations of any wrongdoing against him.

30f. The DONs called the Medical Director if and when they had questions or concerns. (Exh. 4, Patel pp. 215-217).

**RESPONSE**: The fact that the DONs may have called Dr. Patel if they had questions or concerns has no bearing whatsoever on any of the issues raised in Defendants' Motion. Further, Dr. Patel is not a party to this lawsuit and there are no allegations of any wrongdoing against him.

30g. Nurses and the administrator would call Patel if they had questions or concerns. (Exh. 4, Patel pp. 263-264).

**RESPONSE**: The fact that the nurses and the administrator may have called Dr. Patel if they had questions or concerns has no bearing whatsoever on any of the issues raised in Defendants' Motion. Further, Dr. Patel is not a party to this lawsuit and there are no allegations of any wrongdoing against him.

31c. Patel has never seen Exhibit 29, Absher's letter of April 2003. (Exh. 4, Patel pp. 302-303; Exh. 27).

**RESPONSE**: Whether or not Dr. Patel ever saw a copy of the letter Absher sent on behalf or herself and other nurses is immaterial to the issues raised in Defendants' Motion or to the ultimate issues and/or outcome of this case. Dr. Patel is not a party to this lawsuit, is not responsible for the manner in which Defendants' operated Momence, and there are no allegations of any wrongdoing against him.

36. Administration and staff monitored the care given to ensure the residents were receiving quality care and problems corrected. (Exh. 6, Deddo pp. 15, 24, 35, 63, 85-87; Exh. 8, Glenn pp. 98-100).

**RESPONSE**: Plaintiffs object to the purported fact to the extent it calls for a legal conclusion, calls for expert opinion and/or is based on impermissible lay opinion. Answering over objection and without waiving the same, this fact is disputed.

    36a.    Glenn, Deddo and the CNA supervisor would do random rounds in the middle of the night to make sure residents were receiving the required care. (Exh. 8, Glenn pp. 98-100).

**RESPONSE**: Plaintiffs object to the purported fact to the extent it calls for a legal conclusion, calls for expert opinion and/or is based on impermissible lay opinion. Answering over objection and without waiving the same, this fact is disputed.

    36b.    Glenn lived two houses away so it was easy for her to make these unannounced visits. (Exh. 8, Glenn pp. 98-99).

**RESPONSE**: The fact that Glenn lived two houses away is immaterial to any of the issues raised in Defendants' Motion, and has no bearing on the ultimate issues and/or outcome of this case.

    36d.    Deddo would do spot checks of the nursing home at different times of the day checking to make sure staff was on their assigned halls, they were taking their breaks as they should be, residents were repositioned, dry and had call lights in place and residents had fresh water. (Exh. 6, Deddo p. 24).

**RESPONSE**: The fact that Glenn did spot checks has no bearing on the ultimate issues and/or outcome of this case.

    36e.    Deddo worked about 60 plus hours a week. She would come back to the facility to do spot checks at the end of the second shift and the middle of the third shift. (Exh. 6, Deddo p. 35).

**RESPONSE**: The number of hours Glenn worked is immaterial to any of the issues raised in Defendants' Motion, and has no bearing on the ultimate issues and/or outcome of this case.

    36f.    Deddo was in charge one weekend a month and then came in almost every other weekend to do rounds. (Exh. 6, Deddo p. 35).

**RESPONSE**: The fact that Glenn was in charge one weekend a month is immaterial to any of the issues raised in Defendants' Motion, and has no bearing on the ultimate issues and/or outcome of this case.

36g.    Joan Willey was at the facility all the time, sometimes 7 days a week. (Exh. 6, Deddo p. 63).

**RESPONSE**: The number of hours worked by Willey is immaterial to any of the issues raised in Defendants' Motion, and has no bearing on the ultimate issues and/or outcome of this case.

37.    The attending physicians for residents at Momence were providing quality care to their residents. (Exh. 1, Mitchell pp. 277-278; Exh. 2, Absher p. 118; Exh. 7, DeMeullenarer p. 145; Exh. 8, Glenn pp. 24, 79; Exh. 4, Patel p. 300).

**RESPONSE**: This fact is immaterial to any issue raised in Defendants' Motion insofar as Plaintiffs allege it was the Defendants, not the doctors, who are at fault here.

37a.    Doctors were caring for their patients. (Exh. 1, Mitchell pp. 277-278).

**RESPONSE**: This fact is immaterial to the issues raised in Defendants' Motion and insofar as the Plaintiffs allege that it was the Defendants, not the doctors, who are at fault here.

37b.    Doctors normally saw their patients/residents at Momence on a monthly basis, unless staff called with a change in a residents condition which they felt required the doctors to see them. (Exh. 2, Absher p. 118).

**RESPONSE**: This fact is immaterial to the issues raised in Defendants' Motion and insofar as the Plaintiffs allege that it was the Defendants, not the doctors, who are at fault here.

37c.    DeMeullenarer had no complaints with the medical care the physicians were providing, the level of communication she had with the physicians or the attention the physicians were paying to the residents. (Exh. 7, DeMeullenarer p. 145).

**RESPONSE**: This fact is immaterial to the issues raised in Defendants' Motion and insofar as the Plaintiffs allege that it was the Defendants, not the doctors, who are at fault here.

37f.    Nursing home residents are a highly vulnerable population and even when quality care is provided there is no guarantee of a positive outcome. (Exh. 4, Patel p. 300).

**RESPONSE**: This fact is objectionable insofar as it calls for expert opinion. Moreover, the purported fact has no bearing on the issues raised in Defendants' Motion or to the ultimate

issues and/or outcome of this case in that it does not excuse Defendants from their legal obligations with respect to the care they are required to provide to the residents of Momence pursuant to 42 C.F.R. 483.25 and other rules and regulations governing Medicare and Medicaid providers. More importantly, this fact does not entitle Defendants to summary judgment.

38a(i). Patel has moved patients from other nursing homes when they were not receiving proper care. (Exh. 4, Patel pp. 294-295).

**RESPONSE**: This fact immaterial to any of the issues raised in Defendants' Motion, has no relation whatsoever to Defendant Momence Meadows, and has no bearing whatsoever on the ultimate issues and/or outcome of this case.

38a(ii). Patel would have resigned as Medical Director if he felt Momence was not providing quality care to its residents. (Exh. 4, Patel p. 297).

**RESPONSE**: This fact immaterial to any of the issues raised in Defendants' Motion, has no relation whatsoever to Defendant Momence Meadows, and has no bearing whatsoever on the ultimate issues and/or outcome of this case.

38c. Carol Burt-Lafi provided the best care she could to the residents of Momence. (Exh. 15, Burt-Lafi p. 96).

**RESPONSE**: The fact that Burt-Lafi provided the best care she could to the residents of Momence is immaterial to any of the issues raised in Defendants' Motion. Ms. Burt-Lafi is not a party to this lawsuit, and the level of care she provided has not been raised by Plaintiffs in this case.

38j. Deddo saw first-hand what went on Momence with the staff and residents. She was on the floor the majority of her day and monitored what the staff was doing and how the residents were. (Exh. 6, Deddo pp. 90-91).

**RESPONSE**: Plaintiffs object to the extent the statement is vague and ambiguous generally and in particular with respect to the phrases "what went on," and "how the residents were." Answering over this objection and without waiving same, the statements are meaningless and

therefore have no bearing on the issues raised in Defendants' Motion or to the ultimate issues and/or resolution of this case.

38k. Deddo was there for the residents. She did her job to the best of her ability. (Exh. 6, Deddo pp. 90-91).

**RESPONSE**: Plaintiffs object to the extent the statement is vague and ambiguous generally and in particular with respect to the phrase "there for the residents." Answering over this objection and without waiving same, the fact that Deddo did her job to the best of her ability immaterial to any of the issues raised in Defendants' Motion.

38l. Part of Fulton's responsibilities were to make sure her residents were fed, dry and properly turned. (Exh. 16, Fulton pp. 52-53).

**RESPONSE**: The fact that Burt-Lafi provided the best care she could to the residents of Momence is immaterial to any of the issues raised in Defendants' Motion. Ms. Burt-Lafi is not a party to this lawsuit, and the level of care she provided has not been raised by Plaintiffs in this case.

38m. Fulton took her job seriously, cared about her residents and provided the best care she could. (Exh. 16, Fulton p. 113).

**RESPONSE**: The fact that Ms. Fulton provided the best care she could is immaterial to any of the issues raised in Defendants' Motion. Ms. Fulton is not a party to this lawsuit, and the level of care she provided has not been raised by Plaintiffs in this case.

38n. Deddo cared about the residents. (Exh. 16, Fulton p. 107).

**RESPONSE**: Fulton's personal opinion as to whether Deddo cared about the residents has no bearing on the issues raised in Defendants' Motion or to the ultimate issues and/or resolution of this case.

38p. Clark saw the residents' living conditions and did not have concerns about the level of care residents were receiving. She was never concerned that the residents were being abused or neglected. (Exh. 11, Clark pp. 10-11).

**RESPONSE**: Plaintiffs object to the extent the averment calls for speculation, a legal conclusion, expert opinion, and/or impermissible lay opinion. Answering over the objection without waiving same, Clark's personal opinion about the living conditions and level of care at Momence has no bearing on the issues raised in Defendants' Motion or to the ultimate issues and/or resolution of this case.

38q. Henschel was on the floor interacting with residents about 6 hours a day, 5 days a week and considered the nursing staff by and large caring. (Exh. 13, Henschel p. 190).

**RESPONSE**: Plaintiffs object to the averment as vague and ambiguous with respect to the phrase "by and large caring." Answering over the objection and without waiving same, Henschel's personal opinion as to whether the nursing staff was by large caring, whatever that may mean, has no bearing on the issues raised in Defendants' Motion or to the ultimate issues and/or resolution of this case.

38r. Momence made an earnest attempt to provide activities for the residents. (Exh. 13, Henschel pp. 191-192).

**RESPONSE**: Henschel's personal opinion about the provision of activities at Momence has has no bearing on the issues raised in Defendants' Motion or to the ultimate issues and/or resolution of this case.

38s. During the relevant time there were resident outings about twice a week which the residents enjoyed. (Exh. 13 Henschel pp. 193-194).

**RESPONSE**: The frequency of resident outings has no bearing whatsoever on any of the issues raised in Defendants' Motion or to the ultimate issues and/or resolution of this case.

39. The CNAs at Momence worked as a team and helped one another care for the residents. (Exh. 15, Burt-Lafi pp. 19, 111-112; Exh. 9, Bednarowicz p. 137; Exh. 16, Fulton pp. 107-108).

**RESPONSE**: Plaintiffs object to the statement as vague and ambiguous with respect to the phrase "worked as a team." Answering over and without waiving said objection, the personal opinions of Burt-Lafi and Bednarowicz with respect to CNAs working as a team whatever that may mean or entail, has no bearing on the issues raised in Defendants' Motion and is immaterial to the ultimate issues and/or outcome of this case.

39a.    CNAs worked as a team. (Exh. 15, Burt-Lafi pp. 19, 111-112).

**RESPONSE**: This statement is duplicative of No. 39 above. Plaintiffs object to the statement as vague and ambiguous with respect to the phrase "worked as a team." Answering over and without waiving said objection, the personal opinion of Burt-Lafi with respect to CNAs working as a team, whatever that may mean or entail, has no bearing on the issues raised in Defendants' Motion and is immaterial to the ultimate issues and/or outcome of this case.

39b.    The staff all worked as a team. (Exh. 9, Bednarowicz p. 137)

**RESPONSE**: This statement is duplicative of No. 39 above. Plaintiffs object to the statement as vague and ambiguous with respect to the phrase "worked as a team." Answering over and without waiving said objection, the personal opinions of Bednarowicz with respect to the staff working as a team, whatever that may mean or entail, has no bearing on the issues raised in Defendants' Motion and is immaterial to the ultimate issues and/or outcome of this case.

39c.    Deddo would help out when they were short a CNA or attempt to find a replacement for someone who called off. Deddo took her job seriously. (Exh. 16, Fulton, p. 107-108).

**RESPONSE**: Plaintiffs object to the statement as vague and ambiguous with respect to the phrase "took her job seriously." Answering over and without waiving said objection, the personal opinions of Fulton about Deddo have no bearing on the issues raised in Defendants' Motion and is immaterial to the ultimate issues and/or outcome of this case.

40. The nurses at Momence worked as a team and helped one another as needed. (Exh. 10, Isaacs p. 30; Exh. 9, Bednarowicz p. 137)

**RESPONSE**: This statement is duplicative of Nos. 39 above. Plaintiffs object to the statement as vague and ambiguous with respect to the phrase "worked as a team." Answering over and without waiving said objection, the personal opinion of Bednarowicz with respect to nurses working as a team whatever that may mean or entail, has no bearing on the issues raised in Defendants'

41. Momence's interdisciplinary team met each morning to review the events of the night and address any issues that needed to be resolved. (Exh. 8, Glenn pp. 4243; Exh. 13, Henschel pp. 18, 176).

**RESPONSE**: This purported fact is immaterial and has no bearing on the issues raised in Defendants' Motion or to the ultimate issues and/or outcome of this case. Morning staff meetings do not excuse Defendants from their legal obligations with respect to the care they are required to provide to the residents of Momence pursuant to 42 C.F.R. 483 and other rules and regulations governing Medicare and Medicaid providers.

41a. Momence had regular morning meetings during which all the interdisciplinary team (administrator, DON or ADON, dietary, housekeeping, maintenance, Medicare, MDS coordinators and therapy) attended and went over the 24-hour log and anything else that needed to be discussed. (Exh. 8, Glenn pp. 42-43).

**RESPONSE**: This purported fact is immaterial and has no bearing on the issues raised in Defendants' Motion or to the ultimate issues and/or outcome of this case. Morning staff meetings do not excuse Defendants from their legal obligations with respect to the care they are required to provide to the residents of Momence pursuant to 42 C.F.R. 483 and other rules and regulations governing Medicare and Medicaid providers nor suggest compliance with said laws.

41b. The daily morning meetings of all department supervisors were directed at providing the best practical care for the residents. (Exh. 13, Henschel p. 176).

**RESPONSE**: This purported fact is immaterial and has no bearing on the issues raised in Defendants' Motion or to the ultimate issues and/or outcome of this case.  Morning staff meetings do not excuse Defendants from their legal obligations with respect to the care they are required to provide to the residents of Momence pursuant to 42 C.F.R. 483 and other rules and regulations governing Medicare and Medicaid providers nor suggest compliance with said laws.

      41c.    There were morning meetings to discuss what may have happened in the evening or something the doctor ordered to follow up on. The administrator or assistant administrator, the DON and supervisors of all departments would attend. (Exh. 13, Henschel p. 18).

**RESPONSE**: This purported fact is immaterial and has no bearing on the issues raised in Defendants' Motion or to the ultimate issues and/or outcome of this case.  Morning staff meetings do not excuse Defendants from their legal obligations with respect to the care they are required to provide to the residents of Momence pursuant to 42 C.F.R. 483 and other rules and regulations governing Medicare and Medicaid providers nor suggest compliance with said laws.

      42.    In addition to the morning meetings and quality assurance meetings, there were Medicare meetings and care plan meetings. (Exh. 8, Glenn pp. 55-57).

**RESPONSE**: This purported fact is immaterial and has no bearing on the issues raised in Defendants' Motion or to the ultimate issues and/or outcome of this case.  Morning quality assurance meetings do not excuse Defendants from their legal obligations with respect to the care they are required to provide to the residents of Momence pursuant to 42 C.F.R. 483 and other rules and regulations governing Medicare and Medicaid providers nor suggest compliance with said laws.

      42a.    Momence held Medicare meetings which usually involved the administrator, the DON, ADON, therapy and the whole interdisciplinary team and a consultant on Medicare rules and regs. (Exh. 8, Glenn p. 55).

**RESPONSE**: This purported fact is immaterial and has no bearing on the issues raised in Defendants' Motion or to the ultimate issues and/or outcome of this case.  Morning Medicare

meetings do not excuse Defendants from their legal obligations with respect to the care they are required to provide to the residents of Momence pursuant to 42 C.F.R. 483 and other rules and regulations governing Medicare and Medicaid providers nor suggest compliance with said laws.

42b.    During the Medicare meetings they discussed the care provided, the reason for the care and the progress they were making. (Exh. 8, Glenn p. 56).

**RESPONSE**: This purported fact is immaterial and has no bearing on the issues raised in Defendants' Motion or to the ultimate issues and/or outcome of this case. Morning Medicare meetings do not excuse Defendants from their legal obligations with respect to the care they are required to provide to the residents of Momence pursuant to 42 C.F.R. 483 and other rules and regulations governing Medicare and Medicaid providers nor suggest compliance with said laws.

42c.    Momence held care plan meetings which usually involved staff, family, the resident or the resident's representative to make sure the plan in place met the needs of the resident. (Exh. 8, Glenn p. 57).

**RESPONSE**: This purported fact is immaterial and has no bearing on the issues raised in Defendants' Motion or to the ultimate issues and/or outcome of this case. Morning Medicare meetings do not excuse Defendants from their legal obligations with respect to the care they are required to provide to the residents of Momence pursuant to 42 C.F.R. 483 and other rules and regulations governing Medicare and Medicaid providers nor suggest compliance with said laws.

43.    Momence was staffed, equipped and managed in a way that met the needs of its residents. (Exh. 6, Deddo p. 279; Exh. 7, DeMeullenarer pp. 146-147).

**RESPONSE**: Plaintiffs object to the extent the statement calls for speculation, a legal conclusion, expert opinion and/or impermissible lay opinion. Answering over and without waiving said objection, this purported fact is disputed to the extent that Deddo and DeMeullenarer are not qualified to render such an opinion. Moreover, Plaintiffs dispute the statement to the extent it suggests that the needs of every resident were met at all times. Nevertheless, the statement is

immaterial and has no bearing on the issues raised in Defendants' Motion or to the ultimate issues and/or outcome of this case. The personal opinions of Deddo and DeMeullenarer, whether credible or not, do not excuse Defendants from their legal obligations with respect to the care they are required to provide to the residents of Momence pursuant to 42 C.F.R. 483 and other rules and regulations governing Medicare and Medicaid providers nor suggest compliance with said laws.

44. Several members of Momence's staff had their loved ones living at Momence. (Exh. 2, Absher pp. 7, 14, 95-96; Exh. 8, Glenn p. 201; Exh. 15, Burt-Lafi pp. 40, 94; Exh. 12, Sederholm pp. 43, 122, 181-182; Exh. 16, Fulton pp. 26-28, 30).

**RESPONSE**: The issue in this case is whether the government received the benefit of its bargain for nursing home services that delivered statutorily defined outcomes. Therefore, the fact several members of Momence's staff had relatives living at Momence at some point in time has no bearing on the issues raised in Defendants' Motion and is immaterial to the ultimate issues and/or outcome of this case.

44a. Absher's mother was a resident of Momence from 1995 through June 2002. (Exh. 2, Absher pp. 7, 14; Exh. 8, Glenn p. 201).

**RESPONSE**: The issue in this case is whether the government received the benefit of its bargain for nursing home services that delivered statutorily defined outcomes. Therefore, the fact Absher's mother was a resident at Momence has no bearing on the issues raised in Defendants' Motion and is immaterial to the ultimate issues and/or outcome of this case.

44b. Absher's mother was well cared for while a resident at Momence. (Exh. 2, Absher pp. 95-96).

**RESPONSE**: The issue in this case is whether the government received the benefit of its bargain for nursing home services that delivered statutorily defined outcomes. Therefore, the fact Absher is of the opinion that her mother was well cared for has no bearing on the issues raised in Defendants' Motion and is immaterial to the ultimate issues and/or outcome of this case.

44c.   Carol Burt-Lafi's mother and father-in-law were residents at Momence. (Exh. 15, Burt-Lafi pp. 40, 94).

**RESPONSE**: The issue in this case is whether the government received the benefit of its bargain for nursing home services that delivered statutorily defined outcomes. Therefore, the fact Burt-Lafi's mother and father-in-law were residents at Momence has no bearing on the issues raised in Defendants' Motion and is immaterial to the ultimate issues and/or outcome of this case.

44d.   Sederholm's grandmother was a resident at Momence for about 5 years. Sederholm was satisfied with the care her grandmother received at Momence (Exh. 12, Sederholm pp. 43, 122, 181-182).

**RESPONSE**: The issue in this case is whether the government received the benefit of its bargain for nursing home services that delivered statutorily defined outcomes. Therefore, the fact Bsederholm's grandmother was a resident at Momence and she was satisfied with her care has no bearing on the issues raised in Defendants' Motion and is immaterial to the ultimate issues and/or outcome of this case.

44e.   Fulton's father was a resident at Momence for therapy while Fulton was still employed there. He liked his stay there. (Exh. 16, Fulton pp. 26-28, 30)

**RESPONSE**: The issue in this case is whether the government received the benefit of its bargain for nursing home services that delivered statutorily defined outcomes. Therefore, the fact Fulton's father was a resident at Momence and that he purportedly liked his stay there has no bearing on the issues raised in Defendants' Motion and is immaterial to the ultimate issues and/or outcome of this case.

45a(iv)   Bednarowicz sees cases of scabies today in the facilities she visits. (Exh. 9, Bednarowicz p. 87).

**RESPONSE**: Plaintiffs object to the purported fact to the extent it calls for a legal conclusion, calls for expert opinion and/or is based upon impermissible lay opinion. T he witness cited by Defendants is not an expert in epidemiology or prevention and control of scabies, nor have

they cited references for such an assertion. Answering over objection and without waiving the same, this purported fact is immaterial and has no bearing on the issues raised in Defendants' Motion or to the ultimate issues and/or outcome of this case. It is of no consequence what occurs in other nursing homes and it does not excuse Defendants from their legal obligations with respect to the care they are required to provide to the residents of Momence pursuant to 42 C.F.R. 483 and other rules and regulations governing Medicare and Medicaid providers.

> 45a(v) Patel has patients at other nursing homes in the area and many of them have had scabies in their facilities. Several area nursing homes all had incidents of scabies at the same time. (Exh. 4, Patel pp. 265-266).

**RESPONSE**: Plaintiffs object to the purported facts to the extent they call for a legal conclusion, call for expert opinion and/or are based upon impermissible lay opinion. Answering over objection and without waiving the same, this purported fact is immaterial and has no bearing on the issues raised in Defendants' Motion or to the ultimate issues and/or outcome of this case. It is of no consequence what occurs in other nursing homes and it does not excuse Defendants from their legal obligations with respect to the care they are required to provide to the residents of Momence pursuant to 42 C.F.R. 483 and other rules and regulations governing Medicare and Medicaid providers.

> 45a(vi) Momence is not the only nursing home that had incidents of scabies. (Exh. 4, Patel p. 97).

**RESPONSE**: Plaintiffs object to the purported facts to the extent they call for a legal conclusion, call for expert opinion and/or are based upon impermissible lay opinion. Answering over objection and without waiving the same, this purported fact is immaterial and has no bearing on the issues raised in Defendants' Motion or to the ultimate issues and/or outcome of this case. The fact that Dr. Patel has seen or is aware of incidents of scabies at facilities other than Momence does

not excuse Defendants from their legal obligations with respect to the care they are required to provide to the residents of Momence pursuant to 42 C.F.R. 483 and other rules and regulations governing Medicare and Medicaid providers.

45f(iii) A physician can make the diagnosis of scabies. (Exh. 7, DeMeullenarer p. 56).

**RESPONSE**: This purported fact is undisputed and immaterial as it has no bearing on the issues raised in Defendants' Motion or to the ultimate issues and/or outcome of this case.

45g(ii) Not all rashes are scabies. There are hundreds of conditions that can cause a rash. (Exh. 4, Patel pp. 267-268).

**RESPONSE**: Plaintiffs object to the purported facts to the extent they call for a legal conclusion, call for expert opinion and/or are based upon impermissible lay opinion. Answering over objection and without waiving the same, the issue in this case is whether Momence Meadows failed to prevented statutorily defined outcomes. Momence Meadows received Medicare and Medicaid dollars on the condition that it complied with federal mandates to establish and maintain an infection control program to achieve certain outcomes. The purported facts are immaterial and have no bearing on the issues raised in Defendants' Motion or to the ultimate issues and/or outcome of this case.

45g(iii) There are a lot of different rashes, red papillas, heat rash, eczema, psoriasis and others. (Exh. 7, DeMeullenarer p. 64).

**RESPONSE**: Plaintiffs object to the purported fact to the extent it calls for a legal conclusion, calls for expert opinion and/or is based upon impermissible lay opinion. Answering over objection and without waiving the same, this action alleges that the government failed to receive the benefit of its bargain for nursing home services that delivered statutorily defined outcomes. Momence Meadows received Medicare and Medicaid dollars on the condition that it complied with federal mandates to establish and maintain an infection control program preventing certain outcomes

of harm.  The purported fact is immaterial and has no bearing on the issues raised in Defendants' Motion or to the ultimate issues and/or outcome of this case.

> 45g(iv)  Burt-Lafi who prepared a substantial number of the shower sheets acknowledged that there are different forms of rashes and reasons a resident could have bumps or red marks besides scabies.  (Exh. 15, Burt-Lafi p. 99).

**RESPONSE**: Plaintiffs object to the purported fact to the extent it calls for a legal conclusion, calls for expert opinion and/or is based upon impermissible lay opinion.  Answering over objection and without waiving the same, this action alleges that the government failed to receive the benefit of its bargain for nursing home services that delivered statutorily defined outcomes. Momence Meadows received Medicare and Medicaid dollars on the condition that it complied with federal mandates to establish and maintain an infection control program preventing certain outcomes of harm.  The purported fact therefore is immaterial and has no bearing on the issues raised in Defendants' Motion or to the ultimate issues and/or outcome of this case.

> 45j.  Once scabies was diagnosed, residents received the needed treatment. (Exh. 1, Mitchell pp. 303-304; Exh. 13, Henschel p. 177; Exh. 7, DeMeullenarer pp. 148-149).

**RESPONSE**: Plaintiffs object to the purported fact to the extent it calls for a legal conclusion, calls for expert opinion and/or is based upon impermissible lay opinion.  Answering over objection and without waiving the same, this action alleges that the government failed to receive the benefit of its bargain for nursing home services that delivered statutorily defined outcomes. Momence Meadows received Medicare and Medicaid dollars on the condition that it complied with federal mandates to establish and maintain an infection control program preventing certain outcomes of harm.  Thus, the fact that residents officially diagnosed with scabies were treated is immaterial and has no bearing on the issues raised in Defendants' Motion or to the ultimate issues and/or outcome of this case.

45j(i)   Once the doctors diagnosed the scabies residents received medication to treat the condition. (Exh. 1, Mitchell pp. 303-304).

**RESPONSE**: This statement is duplicative of No. 45j above. Plaintiffs object to the purported fact to the extent it calls for a legal conclusion, calls for expert opinion and/or is based upon impermissible lay opinion. Answering over objection and without waiving the same, this action alleges that the government failed to receive the benefit of its bargain for nursing home services that delivered statutorily defined outcomes. Momence Meadows received Medicare and Medicaid dollars on the condition that it complied with federal mandates to establish and maintain an infection control program preventing certain outcomes of harm. Thus, the fact that residents officially diagnosed with scabies were treated is immaterial and has no bearing on the issues raised in Defendants' Motion or to the ultimate issues and/or outcome of this case.

45j(iv) DeMeullenarer was informed about all skin integrity issues and was involved in the provision of care for residents at Momence. (Exh. 7, DeMeullenarer p. 149).

**RESPONSE**: Plaintiffs object to the purported fact to the extent it calls for a legal conclusion, calls for expert opinion and/or is based upon impermissible lay opinion. T he witness cited by Defendants is not an expert in epidemiology or prevention and control of scabies, nor have they cited references for such an assertion. Answering over objection and without waiving the same, this purported fact is immaterial and has no bearing on the issues raised in Defendants' Motion or to the ultimate issues and/or outcome of this case. It is of no consequence that DeMeullenarer was informed about skin integrity issues and involved in the provision of care, insofar as it does not excuse Defendants from their legal obligations with respect to the care they are required to provide to the residents of Momence pursuant to 42 C.F.R. 483 and other rules and regulations governing Medicare and Medicaid providers.

45t.     Mitchell claims to have called Public Health's 800 number twice during August and September '01 regarding scabies at Momence and testified IDPH never came out to investigate. (Exh. 1, Mitchell pp. 52-55).

**RESPONSE**: The  issue in this case is whether Momence Meadows prevented statutorily-defined outcomes, not whether IDPH responded to complaints.  Therefore, this statement has no bearing on the issues raised in Defendants' Motion and to the ultimate issues and/or outcome in this case.

45t(i)   Mitchell testified she made no other complaints to Public Health's 800 number. (Exh. 1, Mitchell pp. 52- 55).

**RESPONSE**:  The issue in this case is whether Momence Meadows prevented statutorily defined outcomes, not whether Mitchell made additional complaints to the IDPH.  Therefore statement of fact 45 (t)(i) has no bearing on the issues raised in Defendants' Motion or to the ultimate issues and/or resolution of this case.

46.      Public Health preformed annual surveys of Momence to ensure Momence was in compliance with state and federal regulations. They also came in to do complaint investigations. (Exh. 8, Glenn p. 118-120; Exh. 2, Absher pp. 18-19; Exh. 36).

**RESPONSE**: Plaintiffs object to the extent the statement calls for speculation, a legal conclusion, expert opinion and/or impermissible lay opinion.  Plaintiffs also object to the statement to the extent it suggests that Momence was in compliance with state and federal regulations by virtue of the fact that public health performed surveys.  Answering over and without waiving said objection, the mere fact that Public Health performed annual surveys, regardless of their findings, is immaterial and has no bearing on the issues raised in Defendants' Motion or to the ultimate issues and/or outcome of this case and does not certify, implicitly or explicitly, that Defendants had met their  obligations under the law with respect to the care they are required to provide to the residents of Momence pursuant to 42 C.F.R. 483 and other rules and regulations governing Medicare and Medicaid.

46b.    They also came in to do complaint investigations. (Exh. 8, Glenn p. 118; Exh. 2, Absher pp. 18-19).

**RESPONSE**: This statement is duplicative of No. 46 and 46a above. Plaintiffs object to the statement as vague and ambiguous with respect to the term "they." Answering over and without waiving said objection, the mere fact that complaint investigations were conducted, regardless of their findings, is immaterial and has no bearing on the issues raised in Defendants' Motion or to the ultimate issues and/or outcome of this case and does not certify, implicitly or explicitly, that Defendants had met their obligations under the law with respect to the care they are required to provide to the residents of Momence pursuant to 42 C.F.R. 483 and other rules and regulations governing Medicare and Medicaid.

47.    Public Health preformed follow-up surveys to determine if a problem was corrected and the facility was in substantial compliance. (Exh. 8, Glenn pp. 121-122).

**RESPONSE**: Plaintiffs object to the statement as calling for speculation. Answering over and without waiving said objection, the mere fact that Public Health performed follow-up surveys has no bearing on the issues raised in Defendants' Motion or to the ultimate issues and/or outcome of this case and does not certify, implicitly or explicitly, that Defendants had met their obligations under the law with respect to the care they are required to provide to the residents of Momence pursuant to 42 C.F.R. 483 and other rules and regulations governing Medicare and Medicaid.

51.    Public Health surveyors had access to the entire facility including residents, staff and documents. (Exh. 13, Henschel pp. 154-155, 159-160; Exh. 8, Glenn p. 123127; Exh. 6, Deddo pp. 257-258; Exh. 7, DeMeullenarer pp. 159-160, 171-172; Exh. 2, Absher pp. 192-193, 198-199; Exh. 5, Willey p. 147).

**RESPONSE**: This action alleges that the government failed to receive the benefit of its bargain for nursing home services that delivered statutorily defined outcomes. Momence Meadows received Medicare and Medicaid dollars on the condition that it complied with federal mandates to

establish and maintain an infection control program preventing certain outcomes of harm.  Plaintiffs

dispute the purported fact insofar as Momence management steered Public Health officials towards

the D-Wing because it was newer and would give a better impression.  (Defs' Exh. 13, Henschel p.

159:13-159:20).  The fact that Public Heath surveyors otherwise had access to the entire facility is

immaterial and has no bearing on the issues raised in Defendants' Motion or to the ultimate issues

and/or outcome of this case and does not certify, implicitly or explicitly, that Defendants were in

compliance with any surveys that were conducted or that they met their obligations under the law

with respect to the care they are required to provide to the residents of Momence pursuant to 42

C.F.R. 483 and other rules and regulations governing Medicare and Medicaid.

> 51a.    Public Health surveyors can go anywhere they want. They had run of the place
> when they were there. (Exh. 13, Henschel pp. 159-160).

**RESPONSE**: This is duplicative of No. 51 above.  This action alleges that the government

failed to receive the benefit of its bargain for nursing home services that delivered statutorily defined

outcomes.  Momence Meadows received Medicare and Medicaid dollars on the condition that it

complied with federal mandates to establish and maintain an infection control program preventing

certain outcomes of harm.  Plaintiffs dispute the purported fact insofar as Momence management

steered Public Health officials towards the D-Wing because it was newer and would give a better

impression.  (Defs' Exh. 13, Henschel p. 159:13-159:20).  The fact that Public Heath surveyors

otherwise had access to the entire facility is immaterial and has no bearing on the issues raised in

Defendants' Motion or to the ultimate issues and/or outcome of this case and does not certify,

implicitly or explicitly, that Defendants were in compliance with any surveys that were conducted

or that they met their obligations under the law with respect to the care they are required to provide

to the residents of Momence pursuant to 42 C.F.R. 483 and other rules and regulations governing Medicare and Medicaid.

> 51b. Public Health surveyors had access to the entire facility. Glenn communicated openly with the public health surveyors. (Exh. 8, Glenn p. 126).

**RESPONSE**: This is duplicative of Nos. 51 and 51a above. This action alleges that the government failed to receive the benefit of its bargain for nursing home services that delivered statutorily defined outcomes. Momence Meadows received Medicare and Medicaid dollars on the condition that it complied with federal mandates to establish and maintain an infection control program preventing certain outcomes of harm. Plaintiffs dispute the purported fact insofar as Momence management steered Public Health officials towards the D-Wing because it was newer and would give a better impression. (Defs' Exh. 13, Henschel p. 159:13-159:20). The fact that Public Heath surveyors otherwise had access to the entire facility is immaterial and has no bearing on the issues raised in Defendants' Motion or to the ultimate issues and/or outcome of this case and does not certify, implicitly or explicitly, that Defendants were in compliance with any surveys that were conducted or that they met their obligations under the law with respect to the care they are required to provide to the residents of Momence pursuant to 42 C.F.R. 483 and other rules and regulations governing Medicare and Medicaid.

> 51c. Surveyors were always allowed to talk to any resident or staff member. (Exh. 6, Deddo p. 258).

**RESPONSE**: This action alleges that the government failed to receive the benefit of its bargain for nursing home services that delivered statutorily defined outcomes. Momence Meadows received Medicare and Medicaid dollars on the condition that it complied with federal mandates to establish and maintain an infection control program preventing certain outcomes of harm. The fact

that Public Heath surveyors were "allowed" to talk to any resident or staff member is immaterial and has no bearing on the issues raised in Defendants' Motion or to the ultimate issues and/or outcome of this case and does not certify, implicitly or explicitly, that Defendants were in compliance with any surveys that were conducted or that they met their obligations under the law with respect to the care they are required to provide to the residents of Momence pursuant to 42 C.F.R. 483 and other rules and regulations governing Medicare and Medicaid.

      51e.    Surveyors would speak with DeMeullenarer when they were interested in wound care. She provided surveyors with the requested documentation and they would observe her technique in treating wounds. (Exh. 7, DeMeullenarer pp. 171-172).

**RESPONSE**: This action alleges that the government failed to receive the benefit of its bargain for nursing home services that delivered statutorily defined outcomes. Momence Meadows received Medicare and Medicaid dollars on the condition that it complied with federal mandates to establish and maintain an infection control program preventing certain outcomes of harm. The fact that Public Heath surveyors spoke with DeMeullenarer is immaterial and has no bearing on the issues raised in Defendants' Motion or to the ultimate issues and/or outcome of this case and does not certify, implicitly or explicitly, that Defendants were in compliance with any surveys that were conducted or that they met their obligations under the law with respect to the care they are required to provide to the residents of Momence pursuant to 42 C.F.R. 483 and other rules and regulations governing Medicare and Medicaid.

      51f.    Surveyors had access to the physicians. (Exh. 8, Glenn p. 127).

**RESPONSE**: This action alleges that the government failed to receive the benefit of its bargain for nursing home services that delivered statutorily defined outcomes. Momence Meadows received Medicare and Medicaid dollars on the condition that it complied with federal mandates to

establish and maintain an infection control program preventing certain outcomes of harm. The fact that Public Heath surveyors to physicians is immaterial and has no bearing on the issues raised in Defendants' Motion or to the ultimate issues and/or outcome of this case and does not certify, implicitly or explicitly, that Defendants were in compliance with any surveys that were conducted or that they met their obligations under the law with respect to the care they are required to provide to the residents of Momence pursuant to 42 C.F.R. 483 and other rules and regulations governing Medicare and Medicaid.

      51i.    Absher is unaware of whether or not surveyors failed to get copies of needed records due to the "out of order" sign on the copy machine. In fact there were at least four copy machines in the building and there were not "out of order" signs on all of them. Absher never saw surveyors denied access to other copying machines. (Exh. 2, Absher pp. 192-193, 198-199).

**RESPONSE**: This action alleges that the government failed to receive the benefit of its bargain for nursing home services that delivered statutorily defined outcomes. Momence Meadows received Medicare and Medicaid dollars on the condition that it complied with federal mandates to establish and maintain an infection control program preventing certain outcomes of harm. The fact that Absher does not know whether or not Public Health failed to get copies of documents is undisputed and immaterial and has no bearing on the issues raised in Defendants' Motion or to the ultimate issues and/or outcome of this case.

      51j.    If a staff member was not on duty and a Public Health surveyor wanted to speak to them, they were provided information so they could be contacted. (Exh. 8, Glenn p. 125).

**RESPONSE**: This action alleges that the government failed to receive the benefit of its bargain for nursing home services that delivered statutorily defined outcomes. Momence Meadows received Medicare and Medicaid dollars on the condition that it complied with federal mandates to

establish and maintain an infection control program preventing certain outcomes of harm. The fact that Public Health surveyors may have been given contact information for Momence staff is undisputed and immaterial and has no bearing on the issues raised in Defendants' Motion or to the ultimate issues and/or outcome of this case and does not certify, implicitly or explicitly, that Defendants were in compliance with any surveys that were conducted or that they met their obligations under the law with respect to the care they are required to provide to the residents of Momence pursuant to 42 C.F.R. 483 and other rules and regulations governing Medicare and Medicaid.

  51k. Henschel interacted with Public Health surveyors when they were in the facility. She always told them the truth and was never asked to deceive a surveyor. (Exh. 13, Henschel pp. 154-155).

**<u>RESPONSE</u>**:  This action alleges that the government failed to receive the benefit of its bargain for nursing home services that delivered statutorily defined outcomes. Momence Meadows received Medicare and Medicaid dollars on the condition that it complied with federal mandates to establish and maintain an infection control program preventing certain outcomes of harm. The fact that Henschel interacted with Public Health surveyors is undisputed and immaterial and has no bearing on the issues raised in Defendants' Motion or to the ultimate issues and/or outcome of this case and does not certify, implicitly or explicitly, that Defendants were in compliance with any surveys that were conducted or that they met their obligations under the law with respect to the care they are required to provide to the residents of Momence pursuant to 42 C.F.R. 483 and other rules and regulations governing Medicare and Medicaid.

  51l. Willey was interviewed each time Public Health came in for a survey. (Exh. 5, Willey p.147).

**RESPONSE**:  This action alleges that the government failed to receive the benefit of its bargain for nursing home services that delivered statutorily defined outcomes.  Momence Meadows received Medicare and Medicaid dollars on the condition that it complied with federal mandates to establish and maintain an infection control program preventing certain outcomes of harm.  The fact that Willey was interviewed each time  Public Health came in for a survey is undisputed and immaterial and has no bearing on the issues raised in Defendants' Motion or to the ultimate issues and/or outcome of this case and does not certify, implicitly or explicitly, that Defendants were in compliance with any surveys that were conducted or that they met their obligations under the law with respect to the care they are required to provide to the residents of Momence pursuant to 42 C.F.R. 483 and other rules and regulations governing Medicare and Medicaid.

51m.   Surveyors would talk to whoever they wanted to talk to. (Exh. 5, Willey p. 147)

**RESPONSE**:  This action alleges that the government failed to receive the benefit of its bargain for nursing home services that delivered statutorily defined outcomes.  Momence Meadows received Medicare and Medicaid dollars on the condition that it complied with federal mandates to establish and maintain an infection control program preventing certain outcomes of harm.  The fact that surveyors could talk to whoever they wanted to is undisputed and immaterial and has no bearing on the issues raised in Defendants' Motion or to the ultimate issues and/or outcome of this case and does not certify, implicitly or explicitly, that Defendants were in compliance with any surveys that were conducted or that they met their obligations under the law with respect to the care they are required to provide to the residents of Momence pursuant to 42 C.F.R. 483 and other rules and regulations governing Medicare and Medicaid.

53. To ensure that residents, families and staff, including Plaintiffs were aware how to make a complaint, the Public Health 800 number was posted at Momence. (Exh. 13, Henschel p.155).

**RESPONSE**: This action alleges that the government failed to receive the benefit of its bargain for nursing home services that delivered statutorily defined outcomes. Momence Meadows received Medicare and Medicaid dollars on the condition that it complied with federal mandates to establish and maintain an infection control program preventing certain outcomes of harm. The fact that the Public Health 800 number was posted is undisputed and immaterial and has no bearing on the issues raised in Defendants' Motion or to the ultimate issues and/or outcome of this case.

54. Henschel testified that she believed all staff was obligated to call the 800 number to report abuse or negligent. Henschel never called. (Exh. 13, Henschel p. 156).

**RESPONSE**: This action alleges that the government failed to receive the benefit of its bargain for nursing home services that delivered statutorily defined outcomes. Momence Meadows received Medicare and Medicaid dollars on the condition that it complied with federal mandates to establish and maintain an infection control program preventing certain outcomes of harm. Henschel's belief that staff was obligated to call the Public Health 800 number to report abuse or neglect is undisputed and immaterial and has no bearing on the issues raised in Defendants' Motion or to the ultimate issues and/or outcome of this case. Further, the fact that Henschel testified that she never called does not certify, implicitly or explicitly, that Defendants had met their obligations under the law with respect to the care they are required to provide to the residents of Momence pursuant to 42 C.F.R. 483 and other rules and regulations governing Medicare and Medicaid.

55a. Mitchell never took a public health surveyor a side to tell them anything she thought was awry at Momence. (Exh. 1, Mitchell pp. 52,74)

**RESPONSE**:  This action alleges that the government failed to receive the benefit of its bargain for nursing home services that delivered statutorily defined outcomes.  Momence Meadows received Medicare and Medicaid dollars on the condition that it complied with federal mandates to establish and maintain an infection control program preventing certain outcomes of harm.  Whether or not Mitchell spoke to a public health surveyor at Momence is undisputed and immaterial and has no bearing on the issues raised in Defendants' Motion or to the ultimate issues and/or outcome of this case.  Further, the fact that Mitchell never spoke to a surveyor does not certify, implicitly or explicitly, that Defendants had met their obligations under the law with respect to the care they are required to provide to the residents of Momence pursuant to 42 C.F.R. 483 and other rules and regulations governing Medicare and Medicaid.

56.     Henschel had plenty of opportunities to tell surveyors about a problem if she felt the necessity. They were in the building all the time and she believed they were doing their job. (Exh. 13, Henschel p. 159)

**RESPONSE**:  This action alleges that the government failed to receive the benefit of its bargain for nursing home services that delivered statutorily defined outcomes.  Momence Meadows received Medicare and Medicaid dollars on the condition that it complied with federal mandates to establish and maintain an infection control program preventing certain outcomes of harm.  The fact that Henschel had the opportunity to speak with surveyors if she chose to do so is undisputed and immaterial and has no bearing on the issues raised in Defendants' Motion or to the ultimate issues and/or outcome of this case.

59.     Plaintiff were only employed by Momence 54 of the 210 months for which they make claims in the Sixth Amended Complaint. (Dkt. 207, Answer).

**RESPONSE**: This fact is immaterial and does not entitle Defendants to summary judgment.

63c.    Mitchell has never seen a payment received by Momence. (Exh. 1, Mitchell p. 273, 348-349).

**RESPONSE**: This fact is immaterial and does not entitle Defendants to summary judgment.

64.    Medicaid pays a base pay per day. (Exh. 14, Schnell p. 13).

**RESPONSE**: Plaintiff's object as calling for speculation by the witness. Answering over objection and without waiving same, this fact is undisputed, but is immaterial and does not entitle Defendants to summary judgment. The method or rate of reimbursement is immaterial and has no bearing on the issues raised in Defendants' Motion or to the ultimate issues and/or outcome of this case.

65.    Medicare payments vary. They are based on a resident's RUG classification. (Exh. 14, Schnell p. 13).

**RESPONSE**: Plaintiff's object as calling for speculation by the witness. Answering over objection and without waiving same, this fact is undisputed, but is immaterial and does not entitle Defendants to summary judgment. The fact that Medicare payments are based on a resident's RUG classification is immaterial and has no bearing on the issues raised in Defendants' Motion or to the ultimate issues and/or outcome of this case.

66.    Momence had a records retention policy of 7 years. (Exh. 12, Sederholm pp. 22-23).

**RESPONSE**: Plaintiff's object as calling for speculation by the witness. Answering over objection and without waiving same, this fact is undisputed, but is immaterial and does not entitle Defendants to summary judgment. Momence's record retention policy is immaterial and has no

bearing on the issues raised in Defendants' Motion or to the ultimate issues and/or outcome of this case.

67.    Henschel testified that records were usually kept in the building for a year and then moved to the garage for seven. (Exh. 13, Henschel pp. 210-211).

**RESPONSE**: Plaintiff's object as calling for speculation by the witness. Answering over objection and without waiving same, this fact is undisputed, but is immaterial and does not entitle Defendants to summary judgment. Where Defendants' records were stored is immaterial and has no bearing on the issues raised in Defendants' Motion or to the ultimate issues and/or outcome of this case.

68.    Schnell testified that Melissa Sederholm kept a record of the files sent to the garage for storage on her computer. That computer was left at the facility when ownership changed hands. (Exh. 14, Schnell pp. 6-8).

**RESPONSE**: Plaintiff's object as calling for speculation by the witness. Answering over objection and without waiving same, this fact is undisputed, but is immaterial and does not entitle Defendants to summary judgment. The fact that Sederholm kept a record of Defendants' files in a computer is immaterial and has no bearing on the issues raised in Defendants' Motion or to the ultimate issues and/or outcome of this case.

69.    Momence records which were older than 7 years old were shredded. (Exh. 14, Schnell p. 37).

**RESPONSE**: Plaintiff's object as calling for speculation by the witness. Answering over objection and without waiving same, this fact is undisputed, but is immaterial and does not entitle Defendants to summary judgment. Momence's record retention policy is immaterial and has no bearing on the issues raised in Defendants' Motion or to the ultimate issues and/or outcome of this case.

72.     Mitchell has never seen any documents being shredded or destroyed at Momence. (Exh. 1, Mitchell pp. 261-262).

**RESPONSE**: This fact is undisputed, but is immaterial and does not entitle Defendants to summary judgment. The fact that Mitchell did not personally witness documents being shredded at Momence has no bearing on the issues raised in Defendants' Motion or to the ultimate issues and/or outcome of this case.

73.     Absher testified that she never saw anyone shredding documents. (Exh. 2, Absher p. 227).

**RESPONSE**: This fact is undisputed, but is immaterial and does not entitle Defendants to summary judgment. The fact that Absher did not personally witness documents being shredded at Momence has no bearing on the issues raised in Defendants' Motion or to the ultimate issues and/or outcome of this case.

74.     Residents have the right to refuse their meals. (Exh. 1, Mitchell p. 272; Exh. 10, Isaacs p. 31; Exh. 8, Glenn pp. 95-96).

**RESPONSE**: This action alleges that the government failed to receive the benefit of its bargain for nursing home services that delivered statutorily defined outcomes. Momence Meadows received Medicare and Medicaid dollars on the condition that it complied with federal mandates to establish and maintain an infection control program preventing certain outcomes of harm. The fact that residents have the right to refuse a meal is undisputed and immaterial and has no bearing on the issues raised in Defendants' Motion or to the ultimate issues and/or outcome of this case.

75.     A resident's family sometimes would bring in food for their loved ones resulting in a meal going uneaten. (Exh. 8, Glenn pp. 95-96).

**RESPONSE**: This action alleges that the government failed to receive the benefit of its bargain for nursing home services that delivered statutorily defined outcomes. Momence Meadows

received Medicare and Medicaid dollars on the condition that it complied with federal mandates to establish and maintain an infection control program preventing certain outcomes of harm. The fact that a resident's family sometimes brought in food is undisputed and immaterial and has no bearing on the issues raised in Defendants' Motion or to the ultimate issues and/or outcome of this case.

76.     Residents have the right to refuse their medications. (Exh. 1, Mitchell p. 271; Exh. 8, Glenn pp. 104-105).

**RESPONSE**:  This action alleges that the government failed to receive the benefit of its bargain for nursing home services that delivered statutorily defined outcomes. Momence Meadows received Medicare and Medicaid dollars on the condition that it complied with federal mandates to establish and maintain an infection control program preventing certain outcomes of harm. The fact that residents have the right to refuse medication is undisputed and immaterial and has no bearing on the issues raised in Defendants' Motion or to the ultimate issues and/or outcome of this case.

77.     If there was a complaint that medications were not given, Glenn would investigate and depending on what she learned the nurse would be given a verbal warning, a write up or be terminated. (Exh. 8, Glenn p. 103).

**RESPONSE**:  This action alleges that the government failed to receive the benefit of its bargain for nursing home services that delivered statutorily defined outcomes. Momence Meadows received Medicare and Medicaid dollars on the condition that it complied with federal mandates to establish and maintain an infection control program preventing certain outcomes of harm. Whether or not Glenn investigated complaints of medications not being given is undisputed and immaterial and has no bearing on the issues raised in Defendants' Motion or to the ultimate issues and/or outcome of this case.

78.     Glenn or the ADON would do med passes with the nurses if she felt it necessary. (Exh. 8, Glenn p. 104).

**RESPONSE**:  This action alleges that the government failed to receive the benefit of its bargain for nursing home services that delivered statutorily defined outcomes.  Momence Meadows received Medicare and Medicaid dollars on the condition that it complied with federal mandates to establish and maintain an infection control program preventing certain outcomes of harm.  The fact that Glenn or the ADON might have done med passes with nurses is undisputed and immaterial and has no bearing on the issues raised in Defendants' Motion or to the ultimate issues and/or outcome of this case.

> 79.     Neither Mitchell nor Absher considered filing a qui tam action against Momence or Graff while they were employed at Momence. (Exh. 1, Mitchell p. 40; Exh. 2, Absher p. 125).

**RESPONSE**: This fact is immaterial and does not entitle Defendants to summary judgment because courts have determined that plaintiffs do not have to know what a qui tam is to be protected by Section 3730(h). See Fanslow, 384 F.3d at 479-80, 481; Yesudian, 153 F.3d at 739-41.

> 84.     No one associated with Momence harassed Absher between March 2003 and August 2004. (Exh. 2, Absher p. 126-127).

**RESPONSE**: Plaintiffs object to this fact as vague and ambiguous, in particular with respect to the term "harassed."  Answering over objection and without waiving the same, this fact is undisputed, but is immaterial and does not entitle Defendants to summary judgment.

## E.  STATEMENT OF ADDITIONAL MATERIAL FACTS
## A.    Background

1.     As part of becoming a certified Medicare/Medicaid facility, Momence submitted an application form wherein it certified that it would comply with all statutes, regulations and rules governing the operation of that type of facility. (6th Am. Compl. Doc #145-2 Ex. B).

2.	After passing inspection, Momence executed a Provider Agreement in which it made the same certifications. (Ex. 28).

3.	According to the declaration of James Wasser, he saw the walls and hallway streaked in urine and feces.  (6th Am. Compl. Doc # 145-7, Ex. D Decl. of James Wasser. ¶ 7).

## B.	Systematic Problems at Momence

4.	When Momence needed more staff to deal with the problem, it made significant staff cuts in order to achieve a predetermined dollar amount in savings. (Ex. 8, Deddo Dep. 132:5-11, 14-25, and Ex. 36).

5.	Ms. Absher testified that every week she would notice pages ripped out of the nurses' log.  (Ex. 1, Absher Dep.  p. 237).

6.	Ms. Absher testified that she would see falls and incident reports one time "and the next time they're gone."  "Whole – two or three days worth of charts from nurses were gone at a time."  (Ex. 1, Absher Dep.  p. 240).

7.	It is clear that the Director of Nursing ("DON") Sue Cavender asked Lydia Isaacs (staff nurse/Assistant Director of Nursing ("ADON"), at Momence June 2002-March 2003) to forge other nurses' initial in the Medication Administration Records ("MAR"). (Doc # 145-7, Ex. D Decl. of Decl of Lydia Isaacs, ¶ 15).

8.	When Ms. Isaacs refused, Ms. Cavender said there was nothing wrong with forging initials on the MAR, that she had been doing it a long time, and that she could continue to do it.  (Doc#145-7, Ex. D Decl of Lydia Isaacs, ¶ 15).

9.	Barb Clark, a medical records clerk at Momence between approx 1991/92-1999,

observed Kim Bacon (Administrator at Momence) and Paula Deddo (Assistant Administrator at Momence) order Peggy Weybright, the Director of Nursing (DON) to have the nursing staff alter residents' medical records. The medical records were always re-written in preparation for state inspections. Ms. Clark observed nurses change entire sets of residents' chart notes in cases where a resident experienced health complications because the charts notes showed the resident had received either sub-standard care or nor care at all leading to the residents; new symptoms and/or complications. (Doc#145-7, Ex. D Decl of Barb Clark, ¶ 3,4,5).

10.     While Nancy Zillmer (a registered nurse at Momence between November 2001-July 2003) worked at Momence, Sue Cavendar (DON) asked her to change and/or re-copy residents' medical records. Specifically, Ms. Cavender told Ms. Zillmer that "We need to have this [record] recharted because someone charted something they shouldn't have." (Doc#145-7, Ex. D Decl of Nancy Zillmer, ¶ 18, Doc#145-7).

11.     While Robin Archer (a LPN at Momence between October 2002-February 2004) worked at Momence she noticed that at the end of the month there were many blank spaces in the Medication Administration Records ("MAR") and if there was a blank space in a MAR, It was assumed that the medication was not administered. At the end of each month Cavender or sometimes Judy DeMeullenarer, the treatment nurse, would ask the nurses to fill in the blanks. Ms. Archer personally observed DeMeullenarer filling in a lot of blanks in the MARs. (Doc#145-7, Ex. D Decl of Robin Archer, ¶ 9).

12.     The Assistant Administrator who oversaw staff scheduling admitted that Momence only ensured compliance with the State of Illinois regulation requiring a simple ratio for life safety purposes. (Ex. 8, Deddo Dep. pp. 86:25-87, 157:1-158:14).

13.     She admitted to occasionally adding one person to a wing, she admitted that Momence did not closely assess its acuity mix and schedule accordingly. (Ex. 8, Deddo Dep. p. 47:22-48:10).

14.     Dr. Patel was hired as the medical director at Momence in approximately 1991, and served throughout Graff's ownership of the facility for a $500/mo fee. (Ex. 16, Patel Dep. 30:11-15, 56:16-18).

15.     He had no experience in that position, took no courses relevant to the duties of a medical director, and did not do any research about the responsibilities of a medical director. (Ex. 16, Patel Dep 34-35).

16.     Between 1998 and 2006, Dr. Patel would fulfill his Medical Director duties by attending monthly quality assurance meetings at Momence. (Ex. 16, Patel Dep 41:13-21).

17.     Dr. Patel has never looked at 42 C.F.R. Chapter 483 regulating LTC facilities, did not know the regulations set forth duties for the medical director, and never saw the Long Term Care Survey book (used by the inspectors) describing the medical director role in more detail.  (Ex. 16, Patel Dep 45:9-12, 53:16-19, 8025-82).

18.     Between 1998 and 2006, Dr. Patel did not assist Momence in the development and implementation of written resident care policies and procedures, and never developed or participated in any in-service training programs. (Ex. 16, Patel Dep 75:11-76:6, 243:20-244:4).

19.     Although surveys were discussed at the QA meetings, Dr. Patel did not recall seeing an actual survey or inspection report of the facility.  (Ex. 16, Patel Dep 77:6-17).

20.     Dr. Patel does not know what an OSCAR report is, which compares the facilities

demographics and deficiencies with surrounding facilities on a local and national level as a measure of the quality of the care provided. (Ex. 16, Patel Dep 78:11-14). Momence did not provide them to Dr. Patel, even though he testified he would have liked to have seen them. (Ex. 16, Patel Dep 232:25-233:8).

21.     He also never saw a written complaint by either a resident or resident's family although they were discussed at the QA meetings. (Ex. 16, Patel Dep 87:2-12).

22.     Dr. Patel also testified that he was never aware that Momence was threatened with denial of payment by Medicare and that Momence was cited for failure to take care of pressure sores appropriately. (Ex. 16, Patel Dep 92:14-16, 125:10-126:23).

23.     Dr. Patel has never heard of a plan of correction used in the regulatory context wherein a plan is submitted to a regulatory agency to correct a deficiency. (Ex. 16, Patel Dep 86:18-23).

24.     Dr. Patel diagnosed and treated large number of patients for scabies. (Ex. 16, Patel Dep 142-166 and Ex. 39 (Bates PCMI-VP00436-, VP00542, VP00563, VP00608, VP00609, VP00620, VP00635)).

25.     He never reported an outbreak of scabies at Momence to any State or federal authority and in fact Dr. Patel does not know if scabies is a reportable communicable disease or not. (Ex. 16, Patel Dep 112-113).

## C.     IDPH Investigations

26.     IDPH inspection did not find that Momence was in 'Substantial Compliance' with

regulatory requirements as found in Title 42, Code of Federal Regulations for federal certification requirements for nursing homes participating in the Medicare/Medicaid programs. (Exh. __, Bates IDPH 29-30)

27.     IDPH conducted a revisit of Momence on December 21, 2001 as follow up and to conduct an annual survey. (Exh. __, Bates IDPH 29-30)

28.     As a result of the December 21, 2001 IDPH revisit, IDPH identified additional deficiencies with which Momence was not in compliance. (Exh. __, Bates IDPH 29-30)

29.     IDPH provided Momence with notice by certified letter that CMS would deny payment for all new admissions, effective 01-19-2002 (Exh. __, Bates IDPH 29-30)

30.     Additionally in that certified letter, IDPH informed Momence that CMS recommended termination from participation in the Medicare/Medicaid programs if the facility was not in substantial compliance. (Exh. __, Bates IDPH 29-31)

31.     Another Illinois Department of Public Health Survey dated 08/21/2003 revealed that a Resident has a leaking gastronomy tube and that a Nurse admitted that "the site leaks when she drinks liquids.  She likes coffee and the dressing smells like coffee."  IDPH Survey of 08/21/2003 at Bates MM207734 thru MM207736.  The area of the Resident's Stomach was described as "red and beefy."  Id.  The investigation revealed that there was no notification to the physician regarding the leaking coffee or other liquids.  In addition, Momence was cited in this incident for the g-tube not being set in the main mode of nutrition.  Id.  Finally, it the incident revealed improper cleaning of the g-tube.

## D.     Outcomes Insufficient

### *(i).     Pressure Sores*

32.    Decubitus Ulcer Reports tracked ulcers at Momence.  Attached are reports dated 1/3/2002, 3/15/2002 and 5/8/2002.  (Ex. 46, MM222563-64, MM222547- 49, MM222529-31).

33.    Another report was Summary of Decubs.  Attached are Summaries dated 1/3/02-1/24/02 illustrates that Momence was treating between 7 and 15 in house acquired decubitus ulcers.  (Ex. 47, MM222555).

34.    Resident MG:  The hospital records for MG identify decubitus ulcers to both her hips, coccyx and gluteal area and describe at least 3 of the ulcers are stage 3 out of 4.  The medical records go on to state that "The patient is very well-known to me from multiple previous admissions.  Her wounds are tending to follow a rather predictable process in that they routinely improve while she is here at RMC.  She usually returns to the hospital after about 2 weeks at the NH and her wounds are routinely worse when she is readmitted to RMC."  (Ex. 27, RMC-000050-51, RMC-000578).

35.    According to her medical records, resident MG was affected by multiple stage III and stage IV pressure ulcers and the ulcer in the coccyx area was "affected by what appears to be a fungal infection."  (Ex. 27, RMC-000083).

36.    A March 30, 2001 survey indicated that Momence was found to have violated this regulation because "14 residents had developed at least 31 pressure ulcers since the last survey, February 28, 2001.  Ex. 33.

37.     Robin Archer was employed at Momence between October 2002 and February 2004 as a Licensed Practical Nurse (LPN).  When she made her rounds at Momence she observed many bedsores and ulcers on the residents throughout Momence, but especially on the Medicare wing (A-wing). Ms. Archer believed the large number of pressure sores was due to the fact

that there was not enough staff at Momence, and many of the staff didn't care. The CNAs would not clean and change the residents' undergarments, and they would not turn the residents as required. (Doc # 145-7, Ex. D Decl. of Robin Archer,¶ 2,16,17).

38.    Resident AD developed pressure sores on several areas of her body,

including her coccyx, while in Momence care. In approximately 2000, AD developed a pressure sore on her coccyx that became as wide and as deep as a large, hollowed-out cantaloupe.  AD was then transferred to Riverside Hospital and then to a wound care center in Hinsdale, IL. After several months the wound care center was able to get the sore under control.  AD was transferred back to Momence and the sore flared up after a month or two. She was again transferred to Hinsdale, Il wound care center for treatment.  (Ex. 38, Decl. of Brenda Bobo, ¶ 6, 11, 12).

39.    According to Nancy Zillmer, who was a registered nurse employed at Momence

between November 2001 and July 2003, most of the pressure sores at Momence were acquired while residing at Momence and arose because the residents were not turned as often as they should have been and the staff failed to change the residents' Depends often enough. (Doc # 145-7, Ex. D Decl. of Nancy Zillmer, ¶ 2, 16).

40.    According to Lydia Isaacs, who was employed at Momence as a nurse

from June through September 2002, and then as Assistant Director of Nursing until her departure in March 2003, there was a high number of pressure sores because the facility was understaffed and thus residents could not be turned every two hours as set forth in Momence's policy or protocol for pressure sore prevention. (Ex. 13, Isaacs Dep. 62:10 – 24, 63:1-8).

41.    Momence employees, including Judy DeMeullenarer ("Judy D."), failed to

use proper protocols and precautions when treating patients' wounds. Judy D was a "wound nurse" for part of the time she worked at Momence. (Ex. 9. Demeullenarer Dep. pp. 3-4, 36-37). As a wound nurse, Judy D.'s responsibilities included "assessing the wound, starting the treatment, starting the prevention, monitoring their labs, making sure they had correct medication to enhance healing, educating the families, educating the nurses, CNAs. Monitoring the prevention being done. Calling families, calling doctors." (Ex. 9. Demeullenarer Dep. p. 37).

42. According to Carol Burt-Lafi, a certified nursing assistant (CNA) at Momence, Judy D. performed a lot of treatments without gloves. (Ex. 6 Burt-Lafi Dep. p. 11).

### (ii) Accidents

43. D.O. was a mentally disabled young female resident at Momence who was confined to her bed. Lynda Mitchell testified that she discovered D.O. with her head stuck between the bed rails and was basically suffocating to death. Mitchell immediately moved to hold the bed rail up but needed immediate assistance. Mitchell testified that "she screamed out a window for CNA's to help and was told that's not their floor." (Ex.2, Mitchell Dep p. 34).

44. Other CNA's were in the Courtyard at the time smoking pot and apparently did not want to be bothered. (Ex.2, Mitchell Dep p. 34). The bar of the bed was over the little girl's throat and that it was an old bed. (Ex.2, Mitchell Dep pp. 34-35).

45. Sue Cavender instructed Mitchell not to tell the father about the incident for a fear of a lawsuit. She was also told to only report the bare minimum of symptoms to the Doctor and not the incident details. Mitchell was instructed by Cavender on exactly what would be acceptable to chart regarding the incident and Mitchell's detailed account of the choking incident was removed from the chart by Cavender. (Ex.2, Mitchell Dep pp. 35-39).

46. Mitchell was told by Cavender that if she did not follow her instructions on charting, she would be fired. (Ex.2, Mitchell Dep p. 37).

47. The D.O. incident never was reported to the public health authorities. (Ex.2, Mitchell Dep p. 39).

48. An Illinois Department of Public Health Survey dated 07/16/2003 revealed an incident on 06/30/2003 in which a Resident (R1) sustained 1st degree burns after being left in scalding hot water in a whirlpool. The investigation revealed that: "The resident just removed from the Whirlpool, her eyes rolling up, lethargic, skin redden, vital signs: temperature 105.2F., Respiration 28." (Ex. 59, MM207079-MM207085).

49. This Resident was sent to the hospital where a Dr. commented that "when R1 arrived at the hospital her skin looked like she had horrible sun burn, had some scald spots on the skin and her skin was red." (Ex. 59, MM207079-MM207085).

50. A follow-up to this incident revealed that a hot water mixing valve malfunctioned, that staff had failed to properly monitor the temperature of the water, and that the Whirlpool Tub did not have a required safety device to alert the staff if the water in the tub is too hot. If Momence had implemented only one of these three practices this incident would have been avoided. The failure of not one, but three critical safety practices, is a *reckless* failure to do what was necessary to prevent harm. (Ex 59, MM 207085).

51. There were too many falls at Momence and Paula [Deddo] and Sue [Cavendar] did not want public health to know. (Ex. 1, Absher Dep. pp. 239:21-24, 240:17-241:5).

52. 03/13/2000 Fall: This was a fall of a Resident in either the bathroom or the next to her bed. X-rays of Resident's lumbar revealed "mild compression of uncertain age". (See

Ex. 61, MM223410-MM223419).

53.    03/14/2000 Fall:  This Resident, AS, was found on the floor by a CNA.  It is
not apparent from the report how the time of the fall (listed as 8:30 A.M.) was determined or how
long the Resident may have been lying on the floor prior to the CNA finding her. (See Ex. 61,
MM223410-MM223419).

54.    03/17/2000 Fall:  This Resident, GW, fell to the floor causing a very serious
laceration to the left side of her forehead requiring 13 sutures.  The internal investigation blamed the
resident for trying to help her roommate pick up a "call light."   (See Ex. 61, MM223410-
MM223419).

### (iii)    *Deaths*

55.    Upon arriving to work for the 7:00 am shift at Momence, Ms. Mitchell was
alerted by a CAN and a housekeeper that AB was choking.  (Ex.2, Mitchell Dep p. 121).

56.    Ms. Mitchell and Ms. Absher arrived in AB's room to find him choking on
his dried feces because his G tube came out during the night.  (Ex.2, Mitchell Dep pp. 123-126).
It was apparent that AB had not been checked on by the night nurse and had been neglected
throughout the night because the feces had dried on his face.  (Ex.2, Mitchell Dep p. 121).

57.    Ms Mitchell was unable to save AB and he died.  (Ex.2, Mitchell Dep pp.
128-129).

### (iv)    *Scabies*

58.    Ms. Burt-Lafi indicated that housekeeping bagged residents' clothing because
of an "outbreak," and observed that even the "housekeeper supervisor" would bag up the affected
clothing without wearing a protective gown. (Ex. 6 Burt-Lafi Dep. pp. 76, 78).

59.     The presented evidence shows that in 2001 there was an outbreak involving at least 6 residents. In 2002, at least 8 residents were diagnosed with scabies, and another 49 had symptoms and were treated despite lack of a diagnosis of scabies. (Ex. 34).

60.     Bednarowicz' testified that she would just get doctor approval to treat based on her assessment. (Exhibit 5, Bednarowicz Dep. 186:9-187:2).

61.     When resident MG was admitted in January 2002 she did not have scabies, but the facility still had a problem with it. (Exhibit 5, Bednarowicz Dep. 177:24-25, 178:1-18).

62.     In March 2003 IDPH investigated the scabies outbreak. The investigation includes an admission by a top-level employee at Momence that they failed to track the situation or to figure out what was causing the problem. (Ex. 33).

63.     According to Jess-Yanni Barrett (f/k/a Vesta Fulton), a CNA-shower girl-(see Fulton Tr. at 12) at Momence, she was given cream to apply to herself for scabies on two occasions. (Ex. 4 Vesta Barrett [Fulton] Dep. pp. 12, 92).

64.     Ms. Barrett also testified that "Gwen" her other "shower partner" was also given the cream. (Ex. 4 Vesta Barrett [Fulton] Dep. pp. 93).

65.     The Momence nurses handed out the medication to Gwen and Ms. Barrett. (Ex. 4, Vesta Barrett [Fulton] Dep. pp.93).

66.     An investigation report prepared by the Department of Health and Human Services Centers for Medicare & Medicaid Services confirmed in an interview with an employee (designated as E4) that Momence "had not done any tracking of the development of these rashes, had not monitored the spread of the rashes and had not investigated why the residents are developing these skin rashes. E4 did state that the residents who had received Elimite treatment had the protocol

158

for scabies followed."  The report also noted interviews with employees designated as E10 and E11 on 3/7/03.  According to the employees, in contravention of the Momence protocol, "no clothes were washed for residents per scabies protocol and no room cleaning was done per scabies protocol for any of the identified residents with rashes."  (Ex. 33, FOIA 0048-0056).

67.     When MG (resident) was sent to a local hospital without Momence informing them of her condition, her presence caused an outbreak of scabies at the hospital. (Exhibit 27, RMC-001442-44).

68.     MG was initially diagnosed and treated for scabies at Riverside Hospital.  (Ex. 27, RMC 001312).  A few months later, she was readmitted to the hospital and was found again to be infested with scabies, the source of the re-infestation was according to her records, Momence. (Exhibit 27 RMC 001162-1164).

69.     The pharmacist testified that he had never seen a facility need so much scabicide, and that a facility is generally not permitted to have "house stock" of a drug such as scabicide that requires a personalized prescription. (Ex. 14, Jaffe Dep. 71:15-18, 74:17-25, 101:16-102:2, 103:14-25, 129:6-21).

70.     The pharmacist testified that the facility insisted on paying for the medication itself, rather than allowing him to bill Medicaid directly as he normally did. (Ex. 14, Jaffe Dep. 79:21-24).

71.     He concluded, "in that situation, the home is trying - I assume, hide … that they had a scabies outbreak and took it upon themselves to pay for it."  (Ex. 14, Jaffe Dep. 80:4-13).

72.     The prescriptions he received were all in the names of employees. (Ex. 58, JUP00001-6).

73. Momence created a "house stock" of scabicide. (Ex. 10, Glenn (Cavender) Dep. 262:25-263:20; Ex. 19, Willey Dep. 140:3-141:-2).

### (a) Residents with Signs of Scabies

74. [3] DA: Clear signs of scabies including rashes and itching from April through August 2002 when, while using socks on hands to prevent him from hurting himself, was found morning of 8/31/02 in a "wet bloody sheet stuck to body" from severe scratching. No evidence of treatment. MM217695, MM218792, MM219423.

75. [6] RA: Signs of scabies including chapped skin on pelvis and groin areas in June 2002, treated (Elimite) without diagnosis in August 2002. Red bumps appear on body in October, 2002. MM219072, MM220360, MM219433.

76. [14] JB: Clear signs of scabies including bumps and red spots on upper body and chest in April 2002; treatment ordered in May 2002 and again in August 2002 (Elimite). Symptoms apparent on hands/fingernails in late August following treatment. MM218842, MM218668, MM220364, MM220053.

77. [117] AN1: Diagnosis and treatment of scabies in July 2001 ('Kwell'); symptoms including rash and red bumps appear on back, neck, right breast, arm, and left thigh between August and November of 2001. No evidence of further treatment for scabies following initial diagnosis. PCMI00542, MM192586, MM192555, MM192543, MM192665.

78. [12] BD1: Redness found on breast and underneath breast in May and July of 2002, buttocks in June of 2002, and treatment ("Quill") applied to a "spot" on resident's body in September, 2002. MM218634, MM218131, MM220154, MM219961.

79. [16] EB: Purple spots appear on hands throughout June, 2002, and

treatment ("Quailed," "Elimite") given twice in August, 2002, though no apparent diagnosis was made at that time. Clear signs including rashes, swollen skin, and "edema" noted on legs and ear/forehead areas in September and December, 2002, and continuing from January until March, at which point resident was diagnosed with scabies. MM218985, MM218985, MM220311, MM219969, MM219334, MM219334, MM219334, PCMI00652.

80.     [17] BB2: Diagnosis of scabies given on 9/22/00. PCMI00436.

81.     [18] LB: Resident treated ("Elimite") in June, 2001, and diagnosed with scabies in July, 2001. PCMI00542.

82.     [22] EC1: Signs of scabies including open blisters on right thigh and purple spots on hands noted in September, 2001, and June, 2002; treatment ("Elimite") given in August, 2002. MM192563, MM218107, MM220017.

83.     [25] JC: Signs of scabies including a red spot on lower back, scab on right leg, "red marks" on right shoulder and sores on buttocks noted in May and June, 2002. Treatment ("Quelled") provided on 6/14/02. MM217538, MM218645, MM217429, MM218242.

84.     [29] GC1: Scabs and purple coloration found on legs March through June of 2002; rash found on abdomen and purple spots and scabs noted on legs in August, 2002, at which point resident was treated ("Elimited") twice. At the end of August and beginning of September, 2002, purple coloration and scabs noted again as well as black color to resident's heel. MM219982, MM217249, MM220378, MM219030, MM218693, MM217767, MM217946.

85.     [30] EC2: Rash noted on chest and arms in May through July of 2002. Spots and purple coloration noted on chest and right hand in June, 2002, and resident was treated ("Elimited," "Quelled"). Symptoms appeared again in November, 2002, including a rash on the chest

area, and treatment ("Elimited") was given again in January, 2003. MM220239, MM217421, MM218243, MM218417, MM219345.

86.     [31] GC2: Patient treated ("Quill") in June, 2002. No evidence of any diagnosis. MM218035.

87.     [33] MD1: Rash found on upper right shoulder, legs, and back, and red spots noted on buttocks in July, 2002. Resident was treated ("Quailed") four times August, 2002, after scratches and red bumps were discovered. Red spots appeared again on shoulder and chest in September, 2002. MM219834, MM219834. [no # for treatment]

88.     [36] SD: Red and purple spots found on arms during June 2002; during August 2002, purple spots and scabs from rash on arms are discovered along with a "crusty" gastronomy tube site. Treatment ('Kwellel') given in August 2002. MM218977, MM220313, MM217222.

89.     [54] MF3: Clear signs of scabies including blistering, rash, red spot, and red patches noted on buttocks, inner thigh, legs, and chest in May and June, 2002. Resident was treated ("Elimited") twice in August, 2002. MM217250, MM219055, MM219003, MM218694.

90.     [61] MG: Dry skin, redness, rash, bumps, and other signs of scabies found on resident's body between April and October of 2002 and January, March, and April or 2004, culminating in an extensive rash with crusting on hands. Scabies diagnoses made in May, June, and July of 2003. PCMI00645, MM219657, MM217325, MM217471, MM220219, PCMI00665, PCMI00669.

91.     [81] AK: Clear signs of scabies including rash over entire body and "dry, scaly" skin between January and May, 2002. Treatment given in June, 2002 ("Quill,"

"Elimite"), though scabs appeared on the scalp and red bumps appeared on resident's chest in August and September of 2002. MM217472, MM219954, MM218244, MM219957.

92. [85] HK2: Red spots, scabs, rash, and other signs of scabies found on feet, genitals, and back in August of 2002, and resident was given treatment ("Elimite"). A red rash returned on back, chest, and upper thighs in September, 2002.

93. [88] DL: Resident noted to have an abdominal rash and diagnosed with scabies and treated ("Elimite") in September, 2002. PCMI00620, MM219941.

94. [90] LL1: Signs of scabies including chapping and scabs around chest tube noted in June, 2002. Redness reported under breast in August, 2002, and resident was treated ("Elimited"). Rash appeared around neck and back in October, 2002. MM217285, MM220018, MM218222, MM219521.

95. [93] EL1: Rash reported on resident's arms and feet in April and June, 2002. Resident was treated ("Elimite") in August, 2002. No evidence of diagnosis of scabies. MM217482, MM219045, MM217277, MM217291.

96. [94] BL: Red bumps, rash, and other signs of scabies noted in July and October, 2002. Resident was treated ("Elimited") in August, 2002. MM220413, MM220363, MM219727.

97. [95] EL2: Scabs and rash noted in August, 2002, and resident was treated ("Elimited"). Red bumps appeared between legs in October, 2002. MM220308, MM220308, MM220361.

98. [98] LL3L: Red spots found on left arm, back, feet, shoulder, and chest between June and July, 2002. Treatment started in August, 2002. MM218435, MM218007,

MM220348.

99.    [109] MM2: Clear signs of scabies including "crust" on feet and red bumps under breasts and stomach noted in April and July and resident was treated ("Elimited") in August, 2002. In September, 2002, resident had scabs on stomach, redness on legs, and yellow scab on leg. MM219919, MM217248, MM218363, MM218295.

100.    [110] AM2: Signs of scabies including spots, sores, rash, and scratches found all over body between April and August, 2002. Resident was treated ("Quelled") in June, 2002. MM218277, MM218526, MM218241, MM218389, MM220398.

101.    [111] DM: Resident diagnosed with scabies and treated ("Kewll") in October, 2001, and June, 2002. Resident presented with itchiness and self-inflicted scratch wounds in June, October, and December of 2002. PCMI00609, PCMI00563.

102.    [114] JM: Resident was treated ("Elimited") in August, 2002, without any evidence of diagnosis. PCMI00563.

103.    [116] HN: Signs of scabies including rash and scabs found in August, 2002; treatment ("Elimited") was given twice the same month. MM220304, MM217218, MM220358, MM220352.

104.    [128] MP1: Resident showed signs of scabies in May and August, 2002, including small red spots on thighs and redness on her feet. Treated ("Kwelled") given in June, 2002. MM217543, MM218237, MM217303.

105.    [130] IP: Resident diagnosed with scabies in June, 2002; signs of scabies including "breaking out" between legs, red bumps, and blistering appeared in May, July, and August of 2002. MM218500, PCMI00608, MM220147, MM217306.

106.    [133] EP: Resident diagnosed with scabies in July, 2001. PCMI00542

107.    [145] MR: Scabies diagnosis and treatment ("Kwell") made in July, 2001, and signs of scabies including rash and skin dryness found in August, 2001. PCMI00542, MM192609, MM192616.

108.    [146] RR: Resident diagnosed with scabies in July, 2001, and redness, scabs, red spots, and rash found on shoulder, feet, knees, and chest in March through June of 2002. Treatment ("Quill") given in June, 2002. MM217906, MM217737, MM217558, PCMI00542, MM218089.

109.    [146] RR: Diagnosis of scabies given in July, 2001. Rashes and redness noted on buttocks, inner thighs between March and June of 2002. Red bumps were found in June, 2002, and resident was treated ("Quill"). PCMI00542, MM217906, MM217737, MM217558, MM218089.

110.    [147] ER: Rashes over resident's body noted in October and November, 2002, and February, 2003. Diagnosis of scabies made in May, 2003. PCMI00663, MM219482, MM219341, MM219341.

111.    [150] LCS: Resident had raised scabs and bumps on upper thighs, was diagnosed with scabies and treated in August, 2002. MM152539, MM217279, MM217289.

112.    [153] CS: Clear signs of scabies including scratches and red marks on feet and neck in March through June, 2002, and was treated ("Kwell") in August, 2002, after red bumps were discovered "all over." Red bumps returned in October, 2002. MM219517, MM220442, MM218149, MM218860, MM218484, MM217876.

113.    [155] MS2: Rash on back and front of torso noted in October, 2002,

and treatment ("Kwell") given at that time. No evidence of diagnosis of scabies. MM220068.

114. [159] LS: Red rash and bumps on abdomen, buttocks, and thighs described as "highly visible speckled rash" in June and July, 2001; resident was treated ("Quelled") in July. Symptoms noted in May and June of 2002, including rashes and red bumps; resident diagnosed and treated ("Quell," "Elimite") for scabies in June, 2002. Resident diagnosed and treated ("Elimited") for scabies again in August, 2002. Symptoms of scabies returned in September, 2002, including red spots on back and scratches. MM154718, MM154718, MM154718, MM154987, MM218088, MM154927, MM154928, MM219890.

115. [162] ES1: Rash and scabs treated ("Elimited") in August, 2002; scabs did not abate in September, 2002, and in October, 2002, resident was found with stomach red and bleeding. MM219530, MM220056, MM220352.

116. [166] OS2: Clear signs of scabies noted between April and August, 2002, including rash, red spots, and bumps on legs, genitalia, and torso. Resident found with red spots on back in October, 2002, and treated for scabies. MM218831, MM217594, MM218436, MM218408, MM217287, MM219525.

117. [171] ST: Resident treated ("Elimited") for scabies in August, 2002. MM220359.

118. [179] VY: Rash noted on resident's body in June, 2002, and treatment given for scabies in July, 2002. MM218008, MM218392.

119. [7] LA: Resident showed signs of scabies including red spots and redness on genitalia, breasts, and stomach areas in July, August, and October of 2002. MM218390, MM217319, MM219514.

120.    [10] HB: Scratches and other signs of scabies including red spots, dry and cracking skin, and rashes on torso, head and hands observed in April, May, June, and August of 2002. No evidence of diagnosis or treatment. MM217499, MM218856, MM217392, MM217264.

121.    [123] DO: Resident developed a sore on hand from "chewing" and red marks on chest in April, 2002; later, in June and July of 2002, gastronomy tube site appeared red and "infected" in appearance and rashes/spots developed on scalp and hands. MM218011, MM220212, MM219069, MM218495, MM218839. MM218839.

122.    [173] JW: Resident displayed clear signs of scabies, including redness, scabs, blisters, scratches, and bumps on various parts of body--arms, stomach, genitals, legs, feet, chest between April and November, 2002. During October, 2002, resident had "red bloody bumps" all over body, bloody sores, and self-inflicted scratches. No evidence of treatment for scabies. MM219731, MM219516, MM219942, MM217172, MM220169, MM217610, MM218828.

123.    HG: Dr. Patel Diagnosed scabies on 9/22/2000, Exhibit 11 to Depo of Patel, PCMI-VP00436

124.    SP:  Dr. Patel diagnosed scabies on 12/19/2002. Exhibit 11 to Depo of Patel, PCMI-VP00635

125.    EP:  Dr. Patel diagnosed scabies on December 7/2/2001. Exhibit 11 to Depo of Patel, PCMI-VP00542

## E.    Incompetent and Insufficient Staffing

### *(i)    Billing*

126.    Melissa Sederolm was trained in billing for Medicare by Gail Moldovan. Moldovan was the medical records assistant supervisor (Depo Sederholm 8/30/10 p. _).

### *(ii)* *Nursing*

127.    MMNC failed to maintain the minimum levels of nurse and certified nurse assistant staffing required by Medicare and Medicaid and necessary to meet the basic needs of the residents; (Declaration of Robin Archer,  3.)

128.    During the entire time Robin Archer worked at Momence, until shortly before she left, Archer witnessed that MMNC was seriously understaffed. On the night shifts she worked and in some cases, days, there was only one nurse for the A/B wings and one nurse for C/D wings. As a result, each nurse had 60 residents to take care of during his or her shift. (Declaration of Robin Archer,  4.)

129.    Archer complained about the understaffing to Joan Willey and Sue Cavender and they responded there was not enough money to hire any more nurses. (Declaration of Robin Archer,  5.)

130.    Most of the certified nurse assistants refused to do their jobs, specifically, the CNAs did not keep the residents clean and dry and did not turn them in order to prevent pressure sores. (Declaration of Robin Archer,  5.)

### *(iii)* *Administrators*

131.    Gail Moldovan was the medical records assistant supervisor, but eventually became the MMNC administrator. (Depo Sederholm 8/30/10 p. 16).

132.    Jacob Graff gave Joan Willey, his appointed administrator of MMNC, latitude to hire, fire, raise, demote, or spend money wherever she felt benefitted the residents. Besides hiring Willey, he did not personally do anything to ensure compliance with laws and regulations. Graff believes MMNC was in substantial compliance with laws and regulations between

1998 and June 2006, and bases this on his relationship with Willey and their discussions regarding the surveys. (Depo Jacob Graff 3/1/11 p. 89).

133.    Sederholm found out about positions with MMNC from mother in law, Paula Deddo and Kim Bacon. When Bacon was administrator, Sederholm talked to Bacon and gave her the job.

134.    Prior to her employment with MMNC, Sederholm only had employment experience as a babysitter and private insurance billing for a dentist and his wife.

## H.    Retaliation Against Plaintiffs/Relators

135.    Mitchell and Absher understood their charting to be part of each Momence Meadows Nursing Center resident's billing. (Mitchell Dep. 16:10, 26:5, 5/27/10; Mitchell Dep. 264:21, 266:7, 274:5, 360:12-361:11 8/24/10; Absher Dep. 34:16, 35:1, 380:24-381:4, 412:6-13, 429:19)

136.    Mitchell would report missing or false chart information to Momence Meadows administrative staff. (Mitchell Dep. 32:19-36:16, 138:8, 140:2-148:7, 233:9-246:17 5/27/10)

137.    Mitchell would be told by Momence Meadows administrative staff to rechart or falsify information on a resident's chart if she did not chart the way they had instructed. (Mitchell Dep. 32:19-36:16, 95:4-118:20, 118:17-137:6 5/27/10; Mitchell Dep. 373:2 8/24/10). She was also told that if she did not chart the way she was instructed, then she would be fired (Mitchell Dep. 37, 5/27/10).

138.    Mitchell was told on several occasions that unless she wanted to lose her job, she was not to mention scabies or other bad facts and events to anyone. (Mitchell Dep. 58:11-64:25,

95:4-118:20 5/27/10; Mitchell Dep. 291:22-295:22, 361:24-363:18 8/24/10).

139.     Mitchell called the IDPH Nursing Home Hotline on two separate occasions in 2001 regarding scabies at Momence Meadows Nursing Center. (Mitchell Dep. 52:17-56:3, 58:11-64:25 5/27/10; Mitchell Dep. 306:2-18, 8/24/10).

140.     Absher called the IDPH Nursing Home Hotline on several occasions between 2000 and 2002 regarding scabies and staff shortages at Momence Meadows Nursing Center. (Absher Dep. 16:16, 20:20, 121:16, 8/10/10).

141.     Absher reported Momence Meadows Nursing Center resident AB's death to the Office of the State Guardian. (Absher Dep. 119:22-120:12 8/10/10).

142.     Absher would inform IDPH surveyors of items or equipment that was set up just for the IDPH survey. (Absher Dep. 368:19, 369:19, 8/24/10).

143.     Absher would report to Momence Meadows Nursing Center administrative staff about resident neglect, staffing shortages, and false information on patient records as well as false information being provided to IDPH. (Absher Dep. 204:22-221:8, 364:14; Bednarowicz Dep. 248:18-249:1; Cavender Dep. 180:19-184:18, 184:19-186:7, 195:3-21).

144.     Quality Assurance Nurse Stacy Bednarowicz testified that neglect is fraud, and that if a nursing home neglects patients and submits Medicare/Medicaid claims, then it is fraud. (Bednarowciz Dep. 106:7-18, 172:7-12).

145.     In February 2003, Director of Nursing Sue Cavender said to Absher, "So you're a whistleblower now?" (Absher Dep. 96:14-97:1, 8/10/10).

146.     After the death of Momence Meadows Nursing Center resident AB, Mitchell was instructed by Director of Nursing Sue Cavender not to speak with the state or the Office of the

State Guardian or anyone else until Cavender spoke with them first. (Mitchell Dep. 119:9-12,

130:9-15, Mitchell's Statement to IDPR, Bates No. IDPR 000000115-116, 6/13/03).

Furthermore, Mitchell was instructed by Cavender to falsely chart that she had spoken with Dr.

Patel when she had not done so. (Mitchell Dep. 120:14-23, 131:20-133:12, Mitchell's Statement

to IDPR, Bates No. IDPR 000000115, 6/13/03).

147.    At first, Mitchell objected to Cavender's instruction, and told Cavender that she

would not rechart that she had spoken with Dr. Patel. (Mitchell Dep. 133:14-135:3). Only after

Cavender threatened her with her job, then Mitchell charted that she had spoken with Dr. Patel

when she had not. (Mitchell Dep. 135:3-137:6).

148.    On February 14, 2003, six days after resident AB's death, Mitchell was terminated

from her employment at Momence Meadows Nursing Center for neglect of a patient and

falsifying documentation. (Mitchell Dep. 150:6-8, MMNC Investigation Report of AB's death,

Bates No. IDPR 000000078). Mitchell asked Cavender about her instruction to falsely chart that

she had spoken with Dr. Patel, but Cavender denied it in front of the Administrator, Assistant

Administrator, and Quality Assurance Nurse. (Mitchell Dep. 149:5-151:12).

149.    Mitchell was told to sign her termination document by Cavender and Bednarowicz

in order to receive her final paycheck from Momence Meadows Nursing Center. (Mitchell Dep.

152:6-153:5). After refusing to sign the termination document for approximately six weeks,

Mitchell signed the document because she needed her check and she was falsely told that Absher

signed a similar document. (Mitchell Dep. 154:9-157:2).

150.    Resident AB died after he aspirated on his own bile and feces. (Mitchell Dep.

123:4-124:20, 128:14-129:2). Licensed Practical Nurse Donna Morrow worked the night shift in

the hours preceding AB's death, and neglected to check on AB throughout the night. (Mitchell Dep. 125:4, 125:6-126:10, 131:13-18). Mitchell was just beginning her shift when she was notified of AB choking. (Mitchell Dep. 121:9-122:3, 124:21-125:2)

151.    Absher resigned from Momence Meadows Nursing Center in part due to resident AB's death, Mitchell's termination, and PA announcements instructing Momence Meadows employees not to speak to her or else they would be fired. (Absher Dep. 53:12-15, 60:15-61:24, 62:16-63:8, 341:16).

152.    Absher testified that her February 1, 2003 letter was requesting a leave of absence, and her March 7, 2003 letter was a letter of resignation. (Absher Dep. 53:12-58:22, 59:3-15).

153.    On February 8, 2003, Absher told Sue Cavender and Paula Deddo that she would call OSG, CMS, IDPH, ombudsman, or any other agency, and tell them about how sick Momence Meadows' residents are and how short staffed the facility was. (Absher Dep. 97:4-21).

## I.    Jacob Graff's Involvement at Momence Meadows

154.    Graff admitted he called the facility to inquire about the census (i.e. revenue stream). (Ex. 11, Graff Dep. 79:7-25, 80:1-16).

155.    Other witnesses clarified that Graff called several times daily to check on the census, and one recounted Graff yelling that he did not care whether the residents were fed breakfast, all he was concerned about was why two beds were full. (Ex. 1, Absher Dep. 136:11-138:22).

156.    Graff denied setting budgets (Ex. 11, Graff Dep. 69:19-25, 70:1-18),

157.    Graff had to approve all major purchases. (Exhibit 19, Willey Dep. 31:13-16).

158.    Larry Hovey arrived at Momence and described himself as "Graff's right-hand

172

man." (Ex 8, Deddo Dep. 64:1-2).

159.     Hovey worked on-site at Momence as Graff's agent for several months. (Ex 8,

Deddo, Dep. 64:3-22, 66:23-68:13).

160.     Graff oversaw the Administrator either personally or through his agent Larry Hovey.

(Ex. 11, Graff Dep. 193:11-17, 195:21-23), (Ex. 19, Willey Dep. 19:9-19) and (Ex. 8 Deddo Dep.

28:18-30:24).

161.     Graff asserted other employees were involved in evaluating potential administrators.

(Ex. 11, Graff Dep. P. 201:14-202:24).

162.     Graff testified that he did nothing to monitor whether the policies were effective to

properly manage and operate the facility. (Ex. 11, Graff Dep. 200:7-12).

163.     He also testified that he did nothing to monitor the effectiveness of the administrator

in discharging their duties, despite having been an administrator himself for many years. (Ex. 11,

Graff Dep. 26:11-21).

164.     Graff sat back and waited to see whether the state inspectors caught them doing

anything wrong, and then simply reviewed the reports and told the administrator to fix what his

attorneys didn't negotiate down. (Ex. 11, Graff Dep, p. 28:6-11).